FILED
AUG 28 2008
U.S. COURT OF FEDERAL CLAIMS

ORIGINAL

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

****************************

THE REDLAND COMPANY, INC., for itself and for the use and benefit of Homestead Paving Co. and APAC, Inc.,

Plaintiff,

v.

UNITED STATES OF AMERICA

Defendant.

No.: 08-606 C

****************************

## COMPLAINT

## JURISDICTION

Jurisdiction of this Court is founded upon the Contract Disputes Act of 1978, 41 U.S.C. 601 et seq.

## STATEMENT OF FACTS

1. On July 29, 2000, the United States of America, through Operational Contract Office, 482nd LSS/LGC, Homestead ARB/AFR, Homestead, Florida ("Government") awarded Contract No. FA6648-01-C0001 (the "Contract") to The Redland Company, Inc. ("Redland"), 23799 S.W. 167th Avenue, Homestead, Florida 33031, for Mill/Overlay Asphalt Ramp FANG, Project No. KYJM 99-9037, Homestead ARB, Homestead, Florida ("Project").

2. The Contract awarded to Redland was based on Redland's price contractually agreed to by the parties. A true and correct copy of the Contract is attached hereto as Exhibit "1" and is incorporated herein by reference.

3. The Contract contained standard clauses governing Prompt Payment for Construction Contracts (52.232-27) (June 1997); Government Delay of Work (52.242-17) (Apr. 1984); Pricing Adjustments (252.215-7000) (Dec. 1991); Pricing of Contract Modifications (252.243-7001) (Dec. 1991); Differing Site Conditions (52.236-2) (Apr. 1984), Changes (52.243-4) (Aug. 1987), Requests for Equitable Adjustment (252.243-7002) (Mar. 1998) and (252.243-7002)(March 1998) , and Disputes (52-233-1) (Dec. 1998).

4. Redland subcontracted certain Contract work to Homestead Paving Company and APAC, Inc.

5. During the course of the Project work, Redland and its subcontractors incurred additional time and costs in performing the work due to delays, changes in the work, defective specifications, and unforeseen conditions, including without limitation standby delays due to the late Notice to Proceed, delays in security clearance, additional asphalt milling and grading costs for asphalt thicker than the Contract requirements, additional costs for repair of unforeseen electrical conduits and removal of concrete footing, additional costs of finish grade elevations for paving and drainage, concrete lane replacement for wrongfully rejected concrete, concrete spall crack rework and additional indirect overhead. These issues impacted Redland's costs and time of performance on the critical path of the Project, as well as those of Redland's subcontractors. Pursuant to the terms of the Subcontracts, Redland is obligated to provide its subcontractors with subcontract time and price adjustments for the impact of these issues, and Redland is also entitled to Contract time and price adjustments.

6. Certain Redland claims were settled in whole or in part by the Government. The claims that were completely settled include the claims submitted under Request for Change Order ("RFCO") No. 2 for costs of re-starting the Project after stand-by, and costs relating to

removing debris from an existing duct bank under RFCO No. 4. Accordingly, these claims are not included here.

7. The original Notice to Proceed was issued on December 1, 2000. However, the Government suspended the work the same day. Redland was then on indefinite stand-by until the Notice to Proceed was re-issued on October 18, 2004. The government-caused delay suspended all contract work, the delay was substantial, of indefinite duration, and during the delay Redland was required to be ready to resume work on the contract at full speed, as well as immediately. Redland submitted RFCO No. 1 for the additional costs incurred due to the delayed Notice to Proceed in the amount of $429,478.53, and Redland remains unpaid for this amount.

8. On October 18, 2004, Redland was delayed due to the unreasonable denial of security clearance to Redland and its subcontractors. After submitting all required paperwork for clearance to enter the designated work site, Redland and its subcontractors were denied access, causing unforeseen delay through no fault of Redland and its subcontractors. RFCO No. 3 requested $1,803.63 for this delay, and Redland remains unpaid for this amount.

9. During the performance of the work, Redland and its subcontractor, APAC, Inc., incurred unforeseen additional costs in milling and removing asphalt that was thicker than shown by the contract specifications. RFCO No. 5 requested $30,749.00 for this additional unforeseen work, and Redland remains unpaid for this amount.

10. During the performance of the work, Redland encountered unforeseen concrete footing and rebar/beams with duct banks contained therein while removing the existing asphalt base to the required thickness along the northeast portion of the project. Redland incurred unforeseen additional costs as a result. RFCO No. 6 requested $7,999.00 for additional work due

to unforeseen electrical conduits encountered and removal of concrete footings, including cutting, dumping and excavator costs, but RFCO No. 6 remains unpaid. RFCO No. 7 requested $8,000.28 for the unforeseen additional work of repair to the above referenced electrical conduits and chipping of concrete footings. . The Government approved cost liability for RFCO No. 7 but disputed the amount. The amount of RFCO No. 7 that remains unpaid is $5,175.00.

11. The Government requested that Redland provide finish grade elevations for paving and drainage, which was not included in the Contract price. As a result, Redland incurred additional costs. RFCO No. 8 requested $3,525.00 for this unforeseen additional work. The Government approved liability but disputed the amount, and $525.00 remains unpaid on this claim.

12. Redland subcontracted certain Project concrete work to Homestead Paving Co. ("Homestead Paving"). The Government required repair of certain cracking even though the cracking was allowable under the specifications. RFCO No. 10 requested $6,257.00 for this work performed by Homestead Paving under Redland's supervision. The Government approved the claim as to liability but disputed the amount, and $2,257.00 remains unpaid on this claim.

13. Redland and Homestead Paving also incurred additional costs due to concrete lane replacement. The first lane of concrete was poured on about November 4, 2004. During and after the performance of this concrete work, the Government and its Engineer raised certain concerns and applied certain specifications wrongfully or unreasonably, even though the work was performed in conformance to contract and industry standards. The Government required removal and replacement of certain concrete work as a result. Redland is obligated to pay its subcontractor, Homestead Paving for additional costs incurred relating to removal and replacement of concrete placed and rejected, and Redland is also entitled to its costs and all

required mark-ups. RFCO No. 9/Claim No. 3 requested $103,637.50 for these costs, and Redland remains unpaid for this amount.

14. The delayed Notice to Proceed upon which the work was performed was issued October 18, 2004, for the work to commence on October 20, 2004. The original specified performance period was sixty (60) days. However, due to Government caused delays, including but not limited to the items listed in Paragraphs 7 through 13 above, Redland was on the Project for an additional three hundred eighty seven days. Pursuant to FAR Section 52.242-17 requiring additional payment for delay costs, Redland calculated its additional overhead pursuant to its audited overhead rate of six percent (6%) using the original contract period of sixty (60) days. This resulted in calculation of additional home office overhead costs of $117,295.83. This amount was submitted as Claim No. 5, and Redland remains unpaid for this amount.

15. During the course of the Project work, Redland initially submitted its claims as Requests for Change Order (RFCO) numbered 1 through 11. RFCO No. 11 was submitted simultaneously with the certified claim as Claim No. 5, and RFCO No. 9 was submitted as Claim No. 3.

16. When the requested change orders were not granted or were only granted in part, Redland submitted the remaining disputed claims as a certified claim on September 8, 2006 claim in five claim sections in the total amount of $ 707,777.81, representing the total cost of the changed work, additional work and delays that remained unpaid, in accordance with Contract Clause 52-233-1 Disputes (Dec. 1998). A true and correct copy of the certified claim is attached hereto as Exhibit "2" and is incorporated herein by reference. The Government has paid certain Contract Modifications. However, as of this date, the Government has not paid the full amount of the claim. The amount of the total claim that remains unpaid is $698,939.16.

17. The Contracting Officer issued a final decision on the Redland claim with regard to Claim No. 1 on September 4, 2007, that denied Claim No. 1. Despite repeated requests for a final decision, the Contracting Officer has not issued final decisions on the other claims submitted. FAR 52-233.1 requires that for claims under $100,000 a decision shall be made within sixty (60) days and for larger claims the Contracting Officer shall indicate within sixty (60) days when such a decision will be made. Since the Contracting Officer neither issued a decision within sixty days not indicated when such a decision should be made with regard to the remaining claims, and since over one year has elapsed since the claims were submitted, Redland has notified the Government that Redland deems the remaining disputed claims to be decided and denied.

WHEREFORE, Redland is entitled to an equitable adjustment to the Contract for the additional Project costs incurred by Redland in the amount of $698,939.16, together with interest required by law pursuant to 41 U.S.C. § 611 measured from the date when the certified claim was received by the Government, interest required by law pursuant to 31 U.S.C. § 3901 et seq. from the date payment on the claim was due through the date the Government received the certified claim, attorneys' fees pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412 *et seq.*, and such other and further relief as the Court may deem just and proper.

Dated this 27 day of August, 2008.

Respectfully submitted,

Joseph W. Lawrence, II
Florida Bar No. 211303
E-mail: JLawrence@vlplaw.com
Vezina, Lawrence & Piscitelli, P.A.
The Museum Building
300 SW First Avenue, Suite 150
Fort Lauderdale, FL 33301
Telephone: (954) 728-1270
Facsimile: (954) 728-1271

Attorneys for The Redland Company, Inc., for itself and for the use and benefit of Homestead Paving Co. and APAC, Inc.

EXHIBIT 1

# SOLICITATION, OFFER, AND AWARD
*(Construction, Alteration, or Repair)*

| 1. SOLICITATION NO. | 2. TYPE OF SOLICITATION | 3. DATE ISSUED | PAGE OF PAGES |
|---|---|---|---|
| FA6648-00-R0015 | ☐ SEALED BID (IFB) ☒ NEGOTIATED (RFP) | 28 JUL 2000 | 1 OF 41 |

IMPORTANT — The "offer" section on the reverse must be fully completed by offeror.

| 4. CONTRACT NO. | 5. REQUISITION/PURCHASE REQUEST NO. | 6. PROJECT NO. |
|---|---|---|
| FA6648-01-C0001 | | KYJM 99-9037 |

7. ISSUED BY CODE MA27B

OPERATIONAL CONTRACT OFFICE
482nd LSS/LGC, ATTN: HENRY BURGAINS
29050 CORAL SEA BLVD., BOX 50
HOMESTEAD ADS, FLORIDA 33039-1299

8. ADDRESS OFFER TO

OPERATIONAL CONTRACT OFFICE
482nd LSS/LGC, ATTN: HENRY BURGAINS
29050 CORAL SEA BLVD., BOX 50
HOMESTEAD ARS, FLORIDA 33039-1299

**IF PROPOSALS ARE HAND-CARRIED, BRING THEM TO BUILDING 360, ROOM 116.

| 9. FOR INFORMATION CALL: | A. NAME | B. TELEPHONE NO. *(Include area code)* *(NO COLLECT CALLS)* |
|---|---|---|
| | HENRY BURGAINS | (305) 224-7406 |

## SOLICITATION

NOTE: In sealed bid solicitations "offer" and "offeror" mean "bid" and "bidder".

10. THE GOVERNMENT REQUIRES PERFORMANCE OF THE WORK DESCRIBED IN THESE DOCUMENTS *(Title, identifying no., date):*

PROJECT TITLED: MILL/OVERLAY ASPHALT RAMP, FANG KYJM: 99-9037

LOCATION OF PERFORMANCE: HOMESTEAD ADS, FL MIAMI-DADE COUNTY, HOMESTEAD, FLORIDA
SITE VISIT: THERE WILL BE ONLY ONE FORMAL SITE VISIT, SEE PAGE (o) FOR DETAILS.

NOTE: BONDS COST MUST BE SHOWN AS A SEPARATE LINE ITEM ON THE BID SCHEDULE. BEFORE AWARD CAN BE ACCOMPLISHED, CONTRACTOR MUST BE REGISTERED WITH CENTRAL CONTRACTOR REGISTRATION AGENCY. SEE PAGES 20 & 21 FOR DETAILS.

NOTE: FUNDS ARE NOT PRESENTLY AVAILABLE FOR THIS PROJECT. NO AWARD WILL BE MADE UNTIL FUNDS ARE AVAILABLE TO MAKE PAYMENTS UNDER A CONTRACT. THE GOVERNMENT RESERVES THE RIGHT TO CANCEL THIS SOLICITATION, EITHER BEFORE OR AFTER BID OPENING, WITH NO OBLIGATION TO THE OFFEROR BY THE GOVERNMENT.

THIS AWARD IS ISSUED PURSUANT TO SMALL BUSINESS COMPETITIVENESS DEMONSTRATION PROGRAM.

NOTE: ALL OFFERORS MUST PROVIDE DOCUMENTATION TO SUPPORT FIVE YEARS EXPERIENCE ALONG WITH HIS OR HER OFFER. IF DOCUMENTATION IS NOT PROVIDED, THE OFFEROR SHALL BE DETERMINED NON-RESPONSIVE. SEE PAGE 38 OF STATEMENT OF WORK AND PAGE 010156-2, PARAGRAPH 1.4, OF SPECIFICATION FOR SPECIFIC.

11. The Contractor shall begin performance within 14 calendar days and complete it within 60 (SIXTY) calendar days after receiving ☐ award, ☒ notice to proceed. This performance period is ☒ mandatory, ☐ negotiable. *(See __________ .)*

| 12A. THE CONTRACTOR MUST FURNISH ANY REQUIRED PERFORMANCE AND PAYMENT BONDS? *(If "YES," indicate within how many calendar days after award in Item 12B.)* | 12B. CALENDAR DAYS |
|---|---|
| ☒ YES ☐ NO | 10 TEN |

13. ADDITIONAL SOLICITATION REQUIREMENTS:

A. Sealed offers in original and ZERO copies to perform the work required are due at the place specified in Item 8 by ______ *(hour)* local time ______ *(date)* If this is a sealed bid solicitation, offers will be publicly opened at that time. Sealed envelopes containing offers shall be marked to show the offeror's name and address, the solicitation number, and the date and time offers are due

B. An offer guarantee ☒ is, ☐ is not required. **FAILURE TO PROVIDE ADEQUATE BID GAUARANTEE MAY BE CAUSE FOR REJECTION OF PROPOSAL.**

C. All offers are subject to the (1) work requirements, and (2) other provisions and clauses incorporated in the solicitation in full text or by reference.

D. Offers providing less than 120 calendar days for Government acceptance after the date offers are due will not be considered and will be rejected.

OFFER *(Must be fully completed by offeror)*

14. NAME AND ADDRESS OF OFFEROR *(Incl... P Code)*

The Redland Company, Inc.
23799 S.W. 167th Avenue
Homestead, Fla. 33031

DUNS# 005834106 CAGE CODE# OER58

CODE MA27B FACILITY CODE

15. TELEPHONE NO. *(Inc... area code)* (305) 247-3226

16. REMITTANCE ADDRESS *(Include only if different than Item 14)*

17. The offeror agrees to perform the work required at the prices specified below in strict accordance with the terms of this solicitation, if this offer is accepted by the Government in writing within ________ calendar days after the date offers are due *(Insert any number equal to or greater than the minimum requirement stated in Item 13D. Failure to insert any number means the offeror accepts the minimum in Item 13D.*

AMOUNTS ▶ SEE BID SCHEDULE

18. The offeror agrees to furnish any required performance and payment bonds

19 ACKNOWLEDGMENT OF AMENDMENTS
*(The offeror acknowledges receipt of amendments to the solicitation — give number and date of each)*

| AMENDMENT NO. | 1 | 2 | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| DATE | 8/10/00 | 8/16/00 | | | | | | | | |

20A. NAME AND TITLE OF PERSON AUTHORIZED TO SIGN OFFER *(Type or print)*
F. BRADLEY NOWELL, SR.

20B. SIGNATURE
[signature]

20C. OFFER DATE
8/31/00

AWARD *(To be completed by Government)*

21. ITEMS ACCEPTED:

Line item 0001 is accepted.

22. AMOUNT
$303,085.00

23. ACCOUNTING AND APPROPRIATION DATA
5713400 301 7874 764497 010000 52100 27578F 667100 FB4800

24. SUBMIT INVOICES TO ADDRESS SHOWN IN *(4 copies unless otherwise specified)* ▶ ITEM #8

25. OTHER THAN FULL AND OPEN COMPETITION PURSUANT TO
☐ 10 U.S.C. 2304(c) ( ) ☐ 41 U.S.C. 253(c) ( )

26. ADMINISTERED BY CODE MA27B

OPERATIONAL CONTRACTING OFFICE
482 LSS/LGCC
29050 CORAL SEA BLVD, ROOM 116
HOMESTEAD ARS, FLORIDA 33039-1299

27. PAYMENT WILL BE MADE BY

DFAS-OR/FPV/AIR FORCE
BOX 934500, 2500 LEARY AVENUE
ORLANDO, FLORIDA 22893-4500

CONTRACTING OFFICER WILL COMPLETE ITEM 28 OR 29 AS APPLICABLE

☐ 28 NEGOTIATED AGREEMENT *Contractor is required to sign this document and return ________ copies to issuing office.)* Contractor agrees to furnish and deliver all items or perform all work requirements identified in this form and any continuation sheets for the consideration stated in this contract. The rights and obligations of the parties to this contract shall be governed by (a) this contract award, (b) the solicitation, and (c) the clauses, representations, certifications, and specifications incorporated by reference or attached to this contract

☐ 29. AWARD *(Contractor is not required to sign this document.)* Your offer on this solicitation is hereby accepted as to the items listed. This award consummates the contract, which consists of (a) the Government solicitation and your offer, and (b) this contract award. No further contractual document is necessary.

30A. NAME AND TITLE OF CONTRACTOR OR PERSON AUTHORIZED TO SIGN *(Type or print)*

30B. SIGNATURE

30C. DATE

31A. NAME OF CONTRACTING OFFICER *(Type or print)*
HENRY BURGAINS
Henry.Burgains@Homestead.af.mil.

31B. UNITED STATES OF AMERICA
BY [signature]

31C. AWARD DATE
20001030

GPO : 1985 O - 469-796

STANDARD FORM 1442 BACK (REV 4-85)

SOLICITATION NUMBER: FA6648-00-R0
CONTRACT NUMBER: FA6648-01-C0001

## BID SCHEDULE

**BONDS:** BOND COSTS, INCLUDING THE COSTS OF BID, PERFORMANCE, AND PAYMENT BONDS, SHALL BE SEPARATE FROM CONSTRUCTION COSTS. A LINE FOR BONDS, FOLLOWS EACH OF THE CONSTRUCTION COSTS, THEN A LINE FOR ADDING THE TWO TOGETHER.

**0001 BASE BID** 1 JB $ 300,085.00
**REMOVE PAVEMENT**
IAW SPECIFICATIONS, PROJECT NUMBER: KYJM 99-9037, DATED: JUNE 2000

**BONDS** $ 3,000.00

**TOTAL OF LINE ITEM 0001** $ 303,085.00

**0002 ADDITIVE BID #1** 1 JB $ 59,215.00
**REMOVE EXISTING 4.5" ACC AS INDICATED.**
IAW SPECIFICATIONS, PROJECT NUMBER: KYJM 99-9037, DATED: JUNE 2000

**BONDS** $ 750.00

**TOTAL OF LINE ITEM 0002** $ 59,965.00

**0003 ADDITIVE BID #2** 1 JB $ 113,723.00
**MILL EXISTING 4.5 ACC WHERE INDICATED.**
IAW SPECIFICATIONS, PROJECT NUMBER: KYJM 99-9037, DATED: JUNE 2000

**BONDS** $ 1,500.00

**TOTAL OF LINE ITEM 0003** $________

**TOTAL OF LINE ITEM 0003** $ 115,223.00

**GRAND TOTAL** $ 478,273.00

**(X)*NOTE #1:** CONTRACT LINE ITEM NUMBER (CLIN) **001** COVERS PROJECT **KYJM 95-0235** WHICH IS SUBJECT TO A STATUTORY COST LIMITATION OF **$1.5 MILLION .** BASE ON THE GOVERNMENT ESTIMATE, THIS PROJECT REPRESENTS **100%** OF THE TOTAL BID/PROPOSAL PRICE. **THE GOVERNMENT RESERVES THE RIGHT TO WAIVE THE STATUTORY LIMITATION.**

**( )*NOTE #2 - AWARD:** ONLY ONE AWARD WILL BE MADE AS RESULT OF THIS SOLICITATION AND SUCH AWARD WILL BE MADE IN THE AGGREGATE TO THE LOWEST RESPONSIBLE AND RESPONSIVE OFFEROR. OFFEROR MUST BID ON ALL ITEMS. FAILURE TO DO SO SHALL BE CAUSE FOR REJECTION OF THE OFFER.

**(X)*NOTE #3:** ALTHOUGH NOT SPECIFICALLY IDENTIFIED IN ITEM(S) 0001 ABOVE, ALL ITEMS SPECIFIED IN TECHNICAL PROVISIONS AND SHOWN ON THE CONTRACT DRAWINGS ARE INCORPORATED IN THIS SCHEDULE.

**SOLICITATION NUMBER: FA6648-00-R0015**
**CONTRACT NUMBER:** F[illegible]-01 C0001

## FIXED-PRICE CONSTRUCTION GENERAL CONTRACT CLAUSES

I. FEDERAL ACQUISITION REGULATION (48 CFR CHAPTER 1) CLAUSES

CLAUSES INCORPORATED BY REFERENCE (FEB 1998) (FAR 52.252-2; 52.107(b))

This contract incorporates one or more clauses by reference, with the same force and effect as if they were given in full text. Upon request, the Contracting Officer will make their full text available. Also, the full text of a clause may be accessed electronically at this/these address(es): **http://farsite.hill.af.mil/ OR http://www.safaq.hq.af.mil.contracting/ OR http://www.arnet.gov/far**

(End of Clause)

| REF NO. | FAR REF | TITLE | DATE |
|---|---|---|---|
| 1. | 52.202-1 | Definitions (Alternate I (APR 1984)) | OCT 1995 |
| 2. | 52.203-3 | Gratuities | APR 1984 |
| 3. | 52.203-5 | Covenant Against Contingent Fees | APR 1984 |
| 3a. | 52.203-6 | Restrictions on Subcontractor Sales to the Government | JUL 1995 |
| 4. | 52.203-7 | Anti-Kickback Procedures | JUL 1995 |
| 5. *(X) | 52.203-10 | Price or Fee Adjustment for Illegal or Improper Activity | JAN 1997 |
| 6. *(X) | 52.203-12 | Limitation on Payments to Influence Certain Federal Transactions | JUN 1997 |
| 7. | 52.204-4 | Printing/Copying Double-Sided on Recycled Paper | JUN 1996 |
| 8. | 52.209-6 | Protecting the Governments' Interest When Subcontracting with Contractors Debarred, Suspended or Proposed for Debarment | JUL 1995 |
| 9. | 52.211-6 | Brand Name or Equal | AUG 1999 |
| 10. *( ) | 52.211-13 | Time Extensions | APR 1984 |
| 11. | 52.211-15 | Defense Priority and Allocation Requirements | SEP 1990 |
| 12. *(X) | 52.215-2 | Audit and Records - Negotiation | JUN 1999 |
| 13. *( ) | 52.215-8 | Order of Precedence | OCT 1997 |
| 14. *( ) | 52.215-10 | Price Reduction for Defective Cost or Pricing Data | OCT 1997 |
| 15. *( ) | 52.215-11 | Price Reduction for Defective Cost or Pricing Data - Modifications | OCT 1997 |
| 16. *( ) | 52.215-12 | Subcontractor Cost or Pricing Data | OCT 1997 |
| 17. *( ) | 52.215-13 | Subcontractor Cost or Pricing Data - Modifications | OCT 1997 |
| 18. *( ) | 52.215-15 | Pension - Adjustment and Asset Revisions | DEC 1998 |

*( ) Applicable only if X'd

**SOLICITATION NUMBER: FA6648-00-R0015**
**CONTRACT NUMBER:** FA6648 -01-C0001

## GENERAL CONTRACT CLAUSES (Continued)

| | | | |
|---|---|---|---|
| 19. *( ) | 52.215-18 | Reversion or Adjustment of Plans for Post retirement (PRB) Other Than Pensions | OCT 1997 |
| 20. *( ) | 52.215-19 | Notification of Ownership Changes | OCT 1997 |
| 21. *( ) | 52.215-21 | Requirements for Cost for Cost or Pricing Data or Information Other Than Cost or Pricing Data - Modification | OCT 1997 |
| 21a. | 52.216-18 | Ordering | OCT 1995 |
| 22.*( ) | 52.216-19 | Ordering Limitations | OCT 1995 |
| 23.*( ) | 52.216-22 | Indefinite Quantity | OCT 1995 |
| 24.*( ) | 52.217-5 | Evaluation of Options | JUL 1990 |
| 25.*( ) | 52.217-9 | Option to Extend the Term of the Contract | MAR 1989 |
| 26.*( ) | 52.219-5 | Very Small Business Set-Aside (Applicable if less than $50K) | MAR 1999 |
| 27.*( ) | 52.219-5 | (Alternate I) | MAR 1999 |
| 28.*( ) | 52.219-5 | (Alternate II) | MAR 1999 |
| 29.*( ) | 52.219-8 | Utilization of Small Business Concerns | OCT 1999 |
| 30.*( ) | 52.219-9 | Small Business Subcontracting Plan | JAN 1999 |
| 31.*( ) | 52.219-9 | (Alternate I ) | JAN 1999 |
| 32.*( ) | 52.219-9 | (Alternate II ) | JAN 1999 |
| 33.*( ) | 52.219-10 | Incentive Subcontracting Program | JAN 1999 |
| 34.*( ) | 52.219-16 | Liquidated Damages--Subcontracting Plan | FEB 2000 |
| 34a. | 52.219-24 | Small Disadvantaged Business Participation Programs--Targets | JAN 1999 |
| 35. | 52.219-25 | Small Disadvantage Business Participation Programs –Disadvantaged Status And Reporting | JAN 1999 |
| 36. | 52.219-26 | Small Disadvantaged Business Participation Programs – Incentive Subcontracting | FEB 2000 |
| | 52.222-1 | Notice to the Government of Labor Disputes | FEB 1997 |
| 37. | 52.222-3 | Convict Labor | AUG 1996 |
| 38. | 52.222-4 | Contract Work Hours and Safety Standards Act - Overtime Compensation | JUL 1995 |
| 39. | 52.222-6 | Davis-Bacon Act | FEB 1995 |
| 40. | 52.222-7 | Withholding of Funds | FEB 1988 |
| 41. | 52.222-8 | Payrolls and Basic Records | FEB 1988 |
| 42. | 52.222-9 | Apprentices and Trainees | FEB 1988 |
| 43. | 52.222-10 | Compliance with Copeland Act Requirements | FEB 1988 |
| 44. | 52.222-11 | Subcontracts (Labor Standards) | FEB 1988 |
| 45. | 52.222-12 | Contract Termination - Debarment | FEB 1988 |
| 46. | 52.222-13 | Compliance with Davis-Bacon and Related Act Regulations | FEB 1988 |
| 47. | 52.222-14 | Disputes Concerning Labor Standards | FEB 1988 |

*( ) Applicable only if X'd

**SOLICITATION NUMBER: FA6648-00-R0015**
**CONTRACT NUMBER:**

## GENERAL CONTRACT CLAUSES (Continued)

| | | | |
|---|---|---|---|
| 48. | 52.222-15 | Certification of Eligibility | FEB 1988 |
| 48a. | 52.222-21 | Prohibition on Segregated Facilities | FEB 1999 |
| 49. | 52.222-26 | Equal Opportunity | FEB 1999 |
| 50.*(X) | 52.222-27 | Affirmative Action Compliance Requirements for Construction | FEB 1999 |
| 51. | 52.222-35 | Affirmative Action for Special Disabled and Vietnam Era Veterans | APR 1998 |
| 52. | 52.222-36 | Affirmative Action for Workers With Disabilities | JUN 1998 |
| 53. | 52.222-37 | Employment Reports on Disabled Veterans and Veterans of the Vietnam Era | JAN 1999 |
| 54.*( ) | 52.223-3 | Hazardous Material Identification and Material Safety Data (applicable if hazardous material is contemplated) | JAN 1997 |
| 55.*(X) | 52.223-5 | Pollution Prevention and Right-to-Know Information | APR 1998 |
| 56. | 52.223-6 | Drug-Free Workplace | JAN 1997 |
| 57. | 52.223-12 | Refrigeration Equipment and Air Conditioners | MAY 1995 |
| 58.*(X) | 52.223-14 | Toxic Chemical Release Reporting | OCT 1996 |
| 59. | 52.225-5 | Trade Agreements | APR 2000 |
| 60. | 52.225-11 | Buy America Act-Balance of Payments Program-Construction Materials Under Trade Agreements | FEB 2000 |
| 61.*( ) | 52.225-15 | Sanctioned European Union Country End Products | FEB 2000 |
| 62.*( ) | 52-225-15 | Buy American Act - Construction Material Under Trade Agreements Act and North American Free Trade Agreement (Alternate I) (May 1997) | JUN 1997 |
| 63.*( ) | 52.226-1 | Utilization of Indian Organizations and Indian-Owned Economic Enterprises | FEB 2000 |
| 64. | 52.227-1 | Authorization and Consent | JUL 1995 |
| 65. | 52.227-2 | Notice and Assistance Regarding Patent and Copyright Infringement | AUG 1996 |
| 66. | 52.227-4 | Patent Indemnity - Construction Contracts | APR 1984 |
| 67.*( ) | 52.228-1 | Bid Guarantee | SEP 1996 |
| 68.*(X) | 52.228-2 | Additional Bond Security | OCT 1997 |
| . | 52.228-5 | Insurance - Work on a Government Installation | JAN 1997 |
| 69. | 52.228-11 | Pledges of Assets | FEB 1992 |
| 70. | 52.228-12 | Prospective Subcontractors Requests for Bonds | OCT 1995 |
| 71.*(X) | 52.228-13 | Alternative Payment Protection Payment bond or Letter of Irrevocable Credit | OCT 1997 |
| 72. | 52.228-14 | Irrevocable Letter of Credit | DEC 1999 |
| 73.*(X) | 52.228-15 | Performance and Payment Bonds - Construction | SEP 1996 |

*( ) Applicable only if X'd.

**SOLICITATION NUMBER: FA6648-00-R0015**
**CONTRACT NUMBER:** FA664- -01-C0001

## GENERAL CONTRACT CLAUSES (Continued)

| | | | |
|---|---|---|---|
| 74. | 52.229-3 | Federal, State, and Local Taxes | JAN 1991 |
| 75.*(X) | 52.229-4 | Federal, State and Local Taxes - (Noncompetitive Contract) | JAN 1991 |
| 76. | 52.229-5 | Taxes--Contracts Performed in U.S. Possessions or Puerto Rico | APR 1984 |
| 77. | 52.232-5 | Payments Under Fixed Price Construction Contracts | MAY 1997 |
| 78. | 52.232-17 | Interest | JUN 1996 |
| 79. | 52.232-23 | Assignment of Claim (Alternate I [APR 1984]) | JAN 1986 |
| 80. | 52.232-27 | Prompt Payment for Construction Contracts | JUN 1997 |
| 81. | 52.232-33 | Payment by Electronic Funds Transfer Central Contractor Registration | MAY 1999 |
| 82. | 52.232-34 | Payment by Electronic funds Transfer Other Than Central Contractor Registration | MAY 1999 |
| 83. | 52.233-1 | Disputes | DEC 1998 |
| 84. | 52.233-3 | Protest After Award | AUG 1996 |
| 85.*( ) | 52.236-1 | Performance of Work by the Contractor | APR 1984 |
| 86. | 52.236-2 | Differing Site Conditions | APR 1984 |
| 87. | 52.236-3 | Site Investigation and Conditions Affecting the Work | APR 1984 |
| 88. | 52.236-5 | Material and Workmanship | APR 1984 |
| 89. | 52.236-6 | Superintendence by the Contractor | APR 1984 |
| 90. | 52.236-7 | Permits and Responsibilities | NOV 1991 |
| 91. | 52.236-8 | Other Contracts | APR 1984 |
| 92. | 52.236-9 | Protection of Existing Vegetation, Structures, Equipment, Utilities, and Improvements | APR 1984 |
| 93. | 52.236-10 | Operations and Storage Areas | APR 1984 |
| 94. | 52.236-11 | Use and Possession Prior to Completion | APR 1984 |
| 95. | 52.236-12 | Cleaning Up | APR 1984 |
| 96. | 52.236-13 | Accident Prevention | NOV 1991 |
| 96a. | 52.236-14 | Availability and use of Utility Service | APR 1984 |
| 97. | 52.236-15 | Schedules for Construction Contracts | APR 1984 |
| 98. | 52.236-21 | Specifications and Drawings for Construction | FEB 1997 |
| 99.*(X) | 52.236-21 | Specifications and Drawings for Construction (Alternate I) | APR 1984 |
| 100.*(X) | 52.236-21 | Specifications and Drawings for Construction (Alternate II) | APR 1984 |
| 101. | 52.236-26 | Pre-construction Conference | FEB 1995 |
| 102. | 52.242-13 | Bankruptcy | JUL 1995 |
| 103. | 52.242-14 | Suspension of Work | APR 1984 |
| 104.*( ) | 52.242-17 | Government Delay of Work | APR 1984 |
| 105. | 52.243-4 | Changes | AUG 1987 |
| 106.*(.) | 52.245-2 | Government Property (Fixed Price contracts) | DEC 1989 |
| 107.*( ) | 52.245-4 | Government Furnished Property (Short Form) | APR 1984 |

*( ) Applicable only if X'd

**SOLICITATION NUMBER: FA6648-00-R0015**
**CONTRACT NUMBER:** [illegible]

## GENERAL CONTRACT CLAUSES (Continued)

| | | | |
|---|---|---|---|
| 108. | 52.246-12 | Inspection of Construction | AUG 1996 |
| 109. | 52.246-21 | Warranty of Construction | MAR 1994 |
| 110. | 52.248-3 | Value Engineering--Construction | FEB 2000 |
| 111.*( ) | 52.249-1 | Termination for Convenience of the Government (Fixed Price) (Short Form) | APR 1984 |
| 112.*(X) | 52.249-2 | Termination for Convenience of the Government (Fixed-Price) -- Alternate I | SEP 1996 |
| 113. | 52.249-10 | Default (Fixed-Price Construction) | APR 1984 |
| 114. | 52.253-1 | Computer Generated Forms | JAN 1991 |

*( ) Applicable if X'd

**SOLICITATION NUMBER: FA6648-00-R0015**
**CONTRACT NUMBER:** FA[illegible]-01-C-0001

## GENERAL CONTRACT CLAUSES (Continued)

II. DOD FEDERAL ACQUISITION REGULATION SUPPLEMENT (48 CFR CHAPTER 2) CLAUSES

The following clauses are incorporated herein from the Defense FAR Supplement by with the same force and effect as if they were given in full text. Upon request, the Contracting Officer will make their full text available.

| REF NO. | DFARS REF | TITLE | DATE |
|---|---|---|---|
| 1. | 52.203-7001 | Prohibition on Persons Convicted of Fraud or Other Defense-Contract Related Felonies | MAR 1999 |
| 2. | 252.204-7003 | Control of Government Personnel Work Product | APR 1992 |
| 3. | 252.204-7004 | Required Central Contractor Registration | MAR 2000 |
| *(X) 4. | 252.205-7000 | Provision of Information to Cooperative Agreement Holders | DEC 1991 |
| 5. | 252.209-7000 | Acquisition from Subcontractors Subject to On-Site Inspection Under the Intermediate Range Nuclear Forces (INF) Treaty | NOV 1995 |
| *(X) 6. | 252.209-7004 | Sub-contracting With Firms That Are owned Or Controlled By The Government Of A Terrorist Country | MAR 1998 |
| *(X) 7. | 252.211-7005 | Substitutions for Military or Federal Specifications and Standards | MAR 1999 |
| *(X) 8. | 252.215-7000 | Pricing Adjustments | DEC 1991 |
| *() 9. | 252.219-7003 | Small, Small Disadvantaged and Women-Owned Small Business Subcontracting Plan | APR 1996 |
| *() 10. | 252.223-7001 | Hazard Warning Labels | DEC 1991 |
| 11. | 252.223-7004 | Drug-Free Work Force | SEP 1988 |
| 12. | 252.223-7006 | Prohibition on Storage and Disposal of Toxic and Hazardous Materials | APR 1993 |
| 13. | 252.225-7012 | Preference for Certain Domestic Commodities | JAN 1999 |
| *() 14. | 252.225-7016 | Restriction on Acquisition of Ball and Roller Bearings | AUG 1998 |
| 15. | 252.225-7017 | Prohibition on Award to Companies Owned by the People's Republic of China | FEB 1999 |
| *() 16. | 252.225-7025 | Restriction on Acquisition of Forgings | JUN 1997 |
| *() 17. | 252.225-7030 | Restriction on Acquisition of Carbon, Alloy, and Armor Steel Plates | OCT 1992 |
| 18. | 252.225-7031 | Secondary Arab Boycott of Israel | JUN 1992 |
| 19. | 252.227-7023 | Drawings and Other Data to Become Property of Government | MAR 1979 |
| 20. | 252.227-7033 | Rights in Shop Drawings | APR 1966 |
| 21. | 252.231-7000 | Supplemental Cost Principles | DEC 1991 |
| 22. | 252.236-7000 | Modification Proposals - Price Breakdown | DEC 1991 |
| 23. | 252.236-7005 | Airfield Safety Precautions | DEC 1991 |
| 24. | 252.242-7000 | Post-award Conference | DEC 1991 |
| 25. | 252.243-7001 | Pricing of Contract Modifications | DEC 1991 |

*( ) Applicable if X'd

**SOLICITATION NUMBER: FA6648-00-R0015**
**CONTRACT NUMBER:** -01-0009

**FIXED-PRICE CONSTRUCTION**

**ADDITIONAL CONTRACT CLAUSES**

(X)*1. CANCELLATION, RESCISSION, AND RECOVERY OF FUNDS FOR ILLEGAL OR IMPROPER ACTIVITY (JAN 1997) (FAR 52.203-8; 3.104-9(a))

(a) If the Government receives information that a contractor or a person has engaged in conduct constituting a violation of subsection (a), (b), (c), or (d) of Section 27 of the Office of Federal Procurement Policy Act (41 U.S.C. 423) (the Act), as amended by section 4304 of the 1996 National Defense Authorization Act for Fiscal Year 1996 (Pub. L. 104-106), the Government may -

(1) Cancel the solicitation, if the contract has not yet been awarded or issued; or

(2) Rescind the contract with respect to which--

(i) The Contractor or someone acting for the Contractor has been convicted for an offense where the conduct constitutes a violation of subsection 27 (a) or (b) of the Act for the purpose of either--

(A) Exchanging the information covered by such subsections for anything of value; or

(B) Obtaining or giving anyone a competitive advantage in the award of a Federal agency procurement contract; or

(ii) The head of the contracting activity has determined, based upon a preponderance of the evidence, that the Contractor or someone acting for the Contractor has engaged in conduct constituting an offense punishable under subsections 27(e)(1) of the Act.

(b) If the Government rescinds the contract under paragraph (a) of this clause, the Government is entitled to recover, in addition to any penalty prescribed by law, the amount expended under the contract.

(c) The rights and remedies of the Government specified herein are not exclusive, and are in addition to any other rights and remedies provided by law, regulation, or under this contract.

(End of Clause)

2. COMMENCEMENT, PROSECUTION, AND COMPLETION OF WORK (APR 1984) (FAR 52.211-10; 11.404(b))

The Contractor shall be required to (a) commence work under this contract within 14(FOURTEEN) calendar days after the date the Contractor receives the notice to proceed, (b) prosecute the work diligently, and (c) complete the entire work ready for use not later than 60 (SIXTY) calendar days. The time stated for completion shall include final cleanup of the premises.

(End of Clause)

*( ) Applicable only if X'd

SOLICITATION NUMBER: FA6648-00-R0015
CONTRACT NUMBER: FA6648-01-C0002

## ADDITIONAL CONTRACT CLAUSES (Continued)

(X)*3. LIQUIDATED DAMAGES-CONSTRUCTION (APR 1984) (FAR 52.211-12; 11.504(b))

(a) If the Contractor fails to complete the work within the time specified in the contract, or any extension, the Contractor shall pay to the Government as liquidated damages, the sum of $338.42 for each calendar day of delay.

(b) If the Government terminates the Contractor's right to proceed, the resulting damage will consist of liquidated damages until such reasonable time as may be required for final completion of the work together with any increased costs occasioned to the Government in completing the work.

(c) If the Government does not terminate the Contractor's right to proceed, the resulting damage will consist of liquidated damages until the work is completed or accepted.

( ) **Alternate I** (APR 1984). If the completion date is expressed as a specific calendar date, computed on the basis of the contractor receiving the notice to proceed by a certain day, add the following paragraph to the basic clause:

The completion date is based on the assumption that the successful offeror will receive the notice to proceed by ________________ [Contracting Officer insert date]. The completion date will be extended by the number of calendar days after the above date that the Contractor receives the notice to proceed, except to the extent that the delay in issuance of the notice to proceed results from the failure of the Contractor to execute the contract and give the required performance and payment bonds within the time specified in the offer.

(End of Clause)

( )*4. OPTION TO EXTEND THE TERM OF THE CONTRACT (NOV 1999) (FAR 52.217-9; 17.208(g))

(a). The Government may extend the term of this contract by written notice to the Contractor within ____________ [insert the period of time within which the Contracting Officer may exercise the option]; provided that the Government gives the Contractor a preliminary written notice of its intent to extend at least __________ days [60 days unless a different number of days is inserted] before the contract expires. The preliminary notice does not commit the Government to an extension.

(b) If the Government exercises this option, the extended contract shall be considered to include this option provision.

(c) The total duration of this contract, including the exercise of any options under this clause, shall not exceed _________________ (months)(years).

(End of clause)

*( ) Applicable only if X'd

**SOLICITATION NUMBER: FA6648-00-R0015**
**CONTRACT NUMBER:** F6... -01 00001

## ADDITIONAL CONTRACT CLAUSES (Continued)

( )*5. SPECIAL 8(a) CONTRACT CONDITIONS (FEB 1990) (FAR 52.219-11; 19.811-3(a))

The Small Business Administration (SBA) agrees to the following:

(a) To furnish the supplies or services set forth in this contract according to the

specifications and the terms and conditions hereof by subcontracting with an eligible concern pursuant to the provisions of section 8(a) of the Small Business Act, as amended (15 U.S.C. 637(a)).

(b) That in the event SBA does not award a subcontract for all or apart of the work hereunder, this contract may be terminated either in whole or in part without cost to either party.

(c) Except for novation agreements and advance payments, delegate to the **482 LSS/LGS, Operational Contracting Office at Homestead ARS, FL** the responsibility for administering the subcontract to be awarded hereunder with complete authority to take any action on behalf of the Government under the terms and conditions of the subcontract; provided, however, that the **482 LSS/LGC, Operational Contracting Office at Homestead ARS, FL** shall give advance notice to the SBA before it issues a final notice terminating the right of a subcontractor to proceed with further performance, either in whole or in part, under the subcontract for default or for the convenience of the Government.

(d) That payments to be made under any subcontract awarded under this contract will be made directly to the subcontractor by the **482 LSS/LGC, Operational Contracting Office, Homestead ARS, FL**.

(e) That the subcontractor awarded a subcontract hereunder shall have the right of appeal from decisions of the Contracting Officer cognizable under the "Disputes" clause of said subcontract.

(f) To notify the **482 LSS/LGC, Operational Contracting Office, Homestead ARS, FL** Contracting Officer immediately upon notification by the subcontractor that the owner or owners upon whom 8(a) eligibility was based plan to relinquish ownership or control of the concern.

(End of Clause)

( )*6. SPECIAL 8(a) SUBCONTRACT CONDITIONS (FEB 1990) (FAR 52.219-12; 19.811(3)(b))

(a). The Small Business Administration (SBA) has entered into Contract No. ________________[insert number of contract] with the **482 LSS/LGC, Operational Contracting Office at Homestead ARS, FL** to furnish the supplies or services as described therein. A copy of the contract is attached hereto and made a part hereof.

(b) The ______________ [insert name of subcontractor], hereafter referred to as the subcontractor, agrees and acknowledges as follows:

(1) That it will, for and on behalf of the SBA, fulfill and perform all of the requirements of

*( ) Applicable only if X'd

**ADDITIONAL CONTRACT CLAUSES (Continued)**

Contract No. ______________ [insert number of contract] for the consideration stated therein and that it has read and is familiar with each and every part of the contract.

(2) That the SBA has delegated responsibility, except for novation agreements and advance payments, for the administration of this subcontract to the **482 LSS/LGC, Operational Contracting Office at Homestead ARS, FL** with complete authority to take any action on behalf of the Government under the terms and conditions of this subcontract.

(3) That it will not subcontract the performance of any of the requirements of this subcontract to any lower tier subcontractor without the prior written approval of the SBA and the designated Contracting Officer of the **482 LSS/LGC, Operational Contracting Office at Homestead ARS, FL**.

(4) That it will notify **482 LSS/LGC, Operational Contracting Office at Homestead ARS, FL** Contracting Officer in writing immediately upon entering an agreement (either oral or written) to transfer all or part of its stock or other ownership interest to any other party.

(c) Payments, including any progress payments under this subcontract, will be made directly
to the subcontractor by the **482 LSS/LGC, Operational Contracting Office at Homestead ARS, FL**.

(End of Clause)

( )*7. LIMITATIONS ON SUBCONTRACTING (DEC 1996) (FAR 52.219-14; 19.508(e))

(a) This clause does not apply to the unrestricted portion of a partial set-aside.

(b) By submission of an offer and execution of a contract, the Offeror/Contractor agrees that in performance of the contract in the case of a contract for -

(1) *Services (except Construction).* At least 50 percent of the cost of contract performance incurred for personnel shall be expended for employees of the concern.

(2) *Supplies (other than procurement from anon-manufacturer of such supplies).* The concern shall perform work for at least 50 percent of the cost of manufacturing the supplies, not including the cost of materials.

(3) *General construction.* The concern will perform at least 15 percent of the cost of the contract, not including the cost of materials, with its own employees.

(4) *Construction by special trade contractors.* The concern will perform at least 25 percent of the cost of the contract, not including the cost of materials, with its own employees.

(End of Clause)

*( ) Applicable if X'd

**SOLICITATION NUMBER: FA6648-00-R0015**
**CONTRACT NUMBER: FA6648-01-C0001**

**ADDITIONAL CONTRACT CLAUSES (Continued)**

( )*8. SECTION 8(a) AWARD (DEC 1996) (FAR 52.219-17; 19.811-3(c))

(a) By execution of a contract, the Small Business Administration (SBA) agrees to the following:

(1) To furnish supplies or services set forth in the contract according to the specifications and the terms and conditions by subcontracting with the Offeror who has been determined an eligible concern pursuant to the provisions of section 8(a) of the Small Business Act, as amended (15 U.S.C. 637(a)).

(2) Except for novation agreements and advance payments, delegates to the **482 LSS/LGC, Operational Contracting Office at Homestead ARS, FL** the responsibility for administering the contract with complete authority to take any action on behalf of the Government under the terms and conditions of the contract; provided, however that the contracting agency shall give advance notice to the SBA before it issues a final notice terminating the right of the subcontractor to proceed with further performance, either in whole or in part, under the contract.

(3) That payments to be made under the contract will be made directly to the subcontractor by the contracting activity.

(4) To notify the **482 LSS/LGC, Operational Contracting Office at Homestead ARS, FL** Contracting Officer immediately upon notification by the subcontractor that the owner or owners upon whom 8(a) eligibility was based plan to relinquish ownership or control of the concern.

(5) That the subcontractor awarded a subcontract hereunder shall have the right of appeal from decisions of the cognizant Contracting Officer under the "Disputes" clause of the subcontract.

(b) The offeror/subcontractor agrees and acknowledges that it will, for and on behalf of the SBA, fulfill and perform all of the requirements of the contract.

(c) The offeror/subcontractor agrees that it will not subcontract the performance of any of the requirements of this subcontract to any lower tier subcontractor without the prior written approval of the SBA and the cognizant Contracting Officer of the **482 LSS/LGC, Operational Contracting Office at Homestead ARS, FL**.

(End of Clause)

( )*9. Notification of Competition Limited to Eligible 8(a) Concerns (Jun 1999) (52.219-18; 19.811-3(d))

(a) Offers are solicited only from small business concerns expressly certified by the Small Business Administration (SBA) for participation in the SBA's 8(a) Program and which meet the following criteria at the time of submission of offer --

(1) The Offeror is in conformance with the 8(a) support limitation set forth in its approved business plan; and

*( ) Applicable if X'd

**SOLICITATION NUMBER: FA6648-00-R0015**
**CONTRACT NUMBER:** FA6648-01-C0001

**ADDITIONAL CONTRACT CLAUSES (Continued)**

(2) The Offeror is in conformance with the Business Activity Targets set forth in its approved business plan or any remedial action directed by the SBA.

(b) By submission of its offer, the Offeror represents that it meets all of the criteria set forth in paragraph (a) of this clause.

(c) Any award resulting from this solicitation will be made to the Small Business Administration, which will subcontract performance to the successful 8(a) offeror selected through the evaluation criteria set forth in this solicitation.

(d) (1) *Agreement.* A small business concern submitting an offer in its own name agrees to furnish, in performing the contract, only end items manufactured or produced by small business concerns in the United States. The term "United States" includes its territories and possessions, the Commonwealth of Puerto Rico, the trust territory of the Pacific Islands, and the District of Columbia. If this procurement is processed under simplified acquisition procedures and the total amount of this contract does not exceed $25,000, a small business concern may furnish the product of any domestic firm. This subparagraph does not apply in connection with construction or service contracts.

(2) The ______________________________ *[insert name of SBA's contractor]* will notify the **482 LSS/LGC, OPERATIONAL CONTRACTING OFFICE, HOMESTEAD ARS, FL.** Contracting Officer in writing immediately upon entering an agreement (either oral or written) to transfer all or part of its stock or other ownership interest to any other party.

(End of Clause)

__________ ***SIC code assigned to the acquisition by the contracting activity***

( )***Alternate I** (Nov 1989). If the competition is to be limited to 8(a) concerns within one or more specific SBA regions or districts, add the following subparagraph (a)(4) to paragraph (a) of the clause:

(4) The offeror's approved business plan is on the file and serviced by **U.S. SMALL BUSINESS ADMINISTRATION, 100 SOUTH BISCAYNE BLVD, 7TH FLOOR, MIAMI, FL**

( )* **Alternate II** (Dec 1996). When the acquisition is for a product in a class for which the Small Business Administration has determined that there are no small business manufacturers or processors in the Federal market in accordance with 19.502-2(c), delete subparagraph (d)(1).

( )*10. CERTIFICATION AND ESTIMATE OF PERCENTAGE OF RECOVERED MATERIAL CONTENT FOR EPA DESIGNATED ITEMS (OCT 1997) (FAR 52.223-9, 23.405(b))

(a) As required by the Resource Conservation and Recovery Act of 1976 (42 U.S.C. 6962(j)(2)(C)), the Contractor shall execute the follow certification:

*( ) Applicable if X'd

**SOLICITATION NUMBER: FA6648-00-R0015**
**CONTRACT NUMBER:** FA6648-01-C0001

**ADDITIONAL CONTRACT CLAUSES (Continued)**

**CERTIFICATION**

I, ______________________(name of certifier), am an officer or employee responsible for the performance of this contract and hereby certify that the percentage of recovered material content for EPA Designated Items was at least the amount required by the applicable contract specification.

______________________________________
(Signature of the Officer or Employee)

______________________________________
(Typed Name of the Officer or Employee

______________________________________
(Title)

______________________________________
(Name of Company, Firm, or Organization)

______________________________________
(Date)

(End of certification)

(b) The Contractor also shall estimate the percentage of recovered materials actually used in the performance of this contract. The estimate is in addition to their certification in paragraph (a) of this clause.

Estimate

| EPA Designated Item | Total Dollar Value of EPA Designated Item | Percentage Of Recovered Material Content |
|---|---|---|
| ________ | ________ | ________ |
| ________ | ________ | ________ |
| ________ | ________ | ________ |

*Where applicable, also include the percentage of post-consumer material content.

(c) The Contractor shall submit this certification and estimate upon completion of the contract to ***Operational Contracting Office, 482d LSS/LGC, Homestead ARS, Fl, 33030-1299**.
*To be completed in accordance with agency procedures.

(End of Clause)

( ) 11. Buy American Act - Balance of Payments Program Construction Materials (FEB 2000) (52.225-9; 25.1102(a))

(a) *Definitions*. As used in this clause--

"Component" means any article, material, or supply incorporated directly into construction materials.

*( ) Applicable if X'd

**SOLICITATION NUMBER: FA6648-00-R0015**
**CONTRACT NUMBER:** FA6648-01-C000_

**ADDITIONAL CONTRACT CLAUSES (Continued)**

"Construction material" means an article, material, or supply brought to the construction site by the Contractor or a subcontractor for incorporation into the building or work. The term also includes an item brought to the site pre-assembled from articles, materials, or supplies. However, emergency life safety systems, such as emergency lighting, fire alarm, and audio evacuation systems, that are discrete systems incorporated into a public building or work and that are produced as complete systems, are evaluated as a single and distinct construction material regardless of when or how the individual parts or components of those systems are delivered to the construction site. Materials purchased directly by the Government are supplies, not construction material.

"Cost of components" means--

(1) For components purchased by the Contractor, the acquisition cost, including transportation costs to the place of incorporation into the end product (whether or not such costs are paid to a domestic firm), and any applicable duty (whether or not a duty-free entry certificate is issued); or

(2) For components manufactured by the Contractor, all costs associated with the manufacture of the component, including transportation costs as described in paragraph (1) of this definition, plus allocable overhead costs, but excluding profit. Cost of components does not include any costs associated with the manufacture of the end product.

"Domestic construction material" means--

(1) An unmanufactured construction material mined or produced in the United States; or

(2) A construction material manufactured in the United States, if the cost of its components mined, produced, or manufactured in the United States exceeds 50 percent of the cost of all its components. Components of foreign origin of the same class or kind for which non-availability determinations have been made are treated as domestic.

"Foreign construction material" means a construction material other than a domestic construction material.

"United States" means the 50 States and the District of Columbia, U.S. territories and possessions, Puerto Rico, the Northern Mariana Islands, and any other place subject to U.S. jurisdiction, but does not include leased bases.

(b) *Domestic preference.*

(1) This clause implements the Buy American Act (41 U.S.C. 10a-10d) and the Balance of Payments Program by providing a preference for domestic construction material. The Contractor shall use only domestic construction material in performing this contract, except as provided in paragraphs (b)(2) and (b)(3) of this clause.

**SOLICITATION NUMBER: FA6648-00-R0015**
**CONTRACT NUMBER:** FA6648-01-C0041

**ADDITIONAL CONTRACT CLAUSES (Continued)**

(2) This requirement does not apply to the construction material or components listed by the Government as follows: ______ [*Contracting Officer to list applicable excepted materials or indicate ``none''*]

(3) The Contracting Officer may add other foreign construction material to the list in paragraph (b)(2) of this clause if the Government determines that

(i) The cost of domestic construction material would be unreasonable. The cost of a particular domestic construction material subject to the requirements of the Buy American Act is unreasonable when the cost of such material exceeds the cost of foreign material by more than 6 percent. For determination of unreasonable cost under the Balance of Payments Program, the Contracting Officer will use a factor of 50 percent;

(ii) The application of the restriction of the Buy American Act or Balance of Payments Program to a particular construction material would be impracticable or inconsistent with the public interest; or

(iii) The construction material is not mined, produced, or manufactured in the United States in sufficient and reasonably available commercial quantities of a satisfactory quality.

*(c) Request for determination of inapplicability of the Buy American Act or Balance of Payments Program.*

(1) (i) Any Contractor request to use foreign construction material in accordance with paragraph (b)(3) of this clause shall include adequate information for Government evaluation of the request, including--

(A) A description of the foreign and domestic construction materials;

(B) Unit of measure;

(C) Quantity;

(D) Price;

(E) Time of delivery or availability;

(F) Location of the construction project;

(G) Name and address of the proposed supplier; and

(H) A detailed justification of the reason for use of foreign construction materials cited in accordance with paragraph (b)(3) of this clause.

(ii) A request based on unreasonable cost shall include a reasonable survey of the market and a completed price comparison table in the format in paragraph (d) of this clause.

(iii) The price of construction material shall include all delivery costs to the construction site and any applicable duty (whether or not a duty-free certificate may be issued).

(iv) Any Contractor request for a determination submitted after contract award shall explain why the Contractor could not reasonably foresee the need for such determination and could not have

**SOLICITATION NUMBER: FA6648-00-R0015**
**CONTRACT NUMBER:** FA6648-01-C0001

**ADDITIONAL CONTRACT CLAUSES (Continued)**

requested the determination before contract award. If the Contractor does not submit a satisfactory explanation, the contracting officer need not make a determination.

(4) If the Government determines after contract award that an exception to the Buy American Act or Balance of Payments Program applies and the Contracting Officer and the Contractor negotiate adequate consideration, the Contracting Officer will modify the contract to allow use of the foreign construction material. However, when the basis for the exception is the unreasonable price of a domestic construction material, adequate consideration is not less than the differential established in paragraph (b)(3)(i) of this clause.

5) Unless the Government determines that an exception to the Buy American Act or Balance of Payments Program applies, use of foreign construction material is non-compliant with the Buy American Act or Balance of Payments Program.

(d) *Data.* To permit evaluation of requests under paragraph (c) of this clause based on unreasonable cost, the Contractor shall include the following information and any applicable supporting data based on the survey of suppliers:

Foreign and Domestic Construction Materials Price Comparison

| **Construction material description** | **Unit of measure** | **Quantity** | **Price (dollars) *** |
|---|---|---|---|
| Item 1 | | | |
| **Foreign construction material** | | | |
| **Domestic construction material** | | | |
| Item 2 | | | |
| **Foreign construction material** | | | |
| Domestic construction material | | | |

*[List name, address, telephone number, and contact for suppliers surveyed. Attach copy of response; if oral, attach summary.]*
*[Include other applicable supporting information.]*
*[*Include all delivery costs to the construction site and any applicable duty (whether or not a duty-free entry certificate is issued).]*

(End of Clause)

11. Preconstruction Conference (Feb 1995) (FAR 52.236-26; 36.522)

If the Contracting Officer decides to conduct a preconstruction conference, the successful offeror will be notified and will be required to attend. The Contracting Officer's notification will include specific details regarding the date, time, and location of the conference, any need for attendance by subcontractors, and information regarding the items to be discussed.

(End of Clause)

12. ALTERATIONS IN CONTRACT (APR 1984) (FAR 52.252-4; 52.107(d))

Portions of this contract are altered as follows: NONE.

(End of Clause)

**SOLICITATION NUMBER: FA6648-00-R0015**
**CONTRACT NUMBER:** [illegible]

**ADDITIONAL CONTRACT CLAUSES (Continued)**

13. AUTHORIZED DEVIATIONS IN CLAUSES (APR 1984) (FAR 52.252-6; 52.107)(f))

a. The use in this solicitation or contract of any Federal Acquisition Regulation (48 CFR Chapter 1) clause with an authorized deviation is indicated by the addition of "(DEVIATION)" after the date of the clause.

(b) The use in this solicitation or contract of any DEFENSE FEDERAL ACQUISITION REGULATION SUPPLEMENT (DFARS) (48 CFR Chapter 2 ) clause with an authorized deviation is indicated by the addition of "(DEVIATION)" after the name of the regulation.

(End of Clause)

14. REQUIRED CENTRAL CONTRACTOR REGISTRATION (MAR 2000) (DFARS 252.204-7004; 204.7304)

(a) Definitions.

As used in this clause --

(1) Central Contractor Registration (CCR database means the primary DoD repository for contractor information required for the conduct of business with DoD.

(2) Data Universal Numbering System (DUNS) number means the 9-digit number assigned by Dun and Bradsteet Information Services to identify unique business entities.

(3) Data Universal Numbering System +4 (DUNS+4) number means the DUNS number assigned by Dun and Bradsteet plus a 4-digit suffix that may be assigned by a parent (controlling) business concern. This 4--digit suffix may be assigned at the discretion of the parent business concern for such purposes as identifying sub-units or affiliates of the parent business concern.

(4) Registered in the CCR database means that all mandatory information, including the DUNS number or the DUNS+4 number, if applicable, and the corresponding Commercial and Government Entity (CAGE) code, is in the CCR database; the DUNS number and the CAGE code have been validated; and all edits have been successfully completed.

(b) (1) By submission of an offer, the offeror acknowledges the requirement that a prospective awardee must be registered in the CCR database to award, during performance, and through final payment of any contract resulting from this solicitation, except for awards to foreign vendors for work to be performed outside the United States.

(2) The offeror shall provide its DUNS or, if applicable, its DUNS+4 number with its offer, which will be used by the Contracting Officer to verify that the offeror is registered in the CCR database.

(3) Lack of registration in the CCR database will make an offeror ineligible for award.

(4) DoD has established a goal of registering an applicant in the CCR database within 48 hours after receipt of a complete and accurate application via the Internet. However, registration of an applicant submitting an application through a method other than the Internet may take up to 30 days.

## ADDITIONAL CONTRACT CLAUSES (Continued)

( )*18. REQUESTS FOR EQUITABLE ADJUSTMENTS (MAR 1998) (DFARS 252.243-7002; 243.205-72)

(a) The amount of any request for equitable adjustment to contract terms shall accurately reflect the contract adjustment for which the Contractor believes the Government is liable. The request shall include only cost for performing the change, and shall not include any costs that already have been reimbursed or that have been separately claimed. All indirect costs included in the request shall be properly allocable to the change in accordance with applicable acquisition regulations.

(b) In accordance with 10 U.S.C. 2410(a), any request for equitable adjustment to contract terms that exceeds the simplified acquisition threshold shall bear, at the time of submission, the following certificate executed by an individual authorized to certify the request on behalf of the Contractor:

______________________________
(Official's Name)

______________________________
(Title)

(c) The certification in paragraph (b) of this clause requires full disclosure of all relevant facts including--

(1) Cost or pricing data if required in accordance with subsection 15.403-4 of the Federal Acquisition Regulation (FAR); and

(2) Information other than cost or pricing data, in accordance with subsection 15.40303 of the FAR, including actual cost data and data to support any estimated costs, even if cost or pricing data are not required.

(d) The certification requirement in paragraph (b) of this clause doe not apply to ----

(1) Requests for routine contract payments; for example, requests for payment for accepted supplies and services, routine vouchers under a cost-reimbursement type contract, or progress payment invoices; or

(2) Final adjustment under an incentive provision of the contract.

(End of Clause)

19. ELIMINATION OF USE OF CLASS I OZONE DEPLETING SUBSTANCES (ODS) (MAY1996) (AFFARS 5352.223-9000; 5323.890-7)

(a) It is the Air Force policy to preserve mission readiness while minimizing dependency on Class I Ozone Depleting Substances (ODS), and their release into the environment, to help protect the Earth's stratospheric ozone layer.

*( ) Applicable if X'd

**SOLICITATION NUMBER: FA6648-00-R0015**
**CONTRACT NUMBER:** [illegible]-01-C0001

## ADDITIONAL CONTRACT CLAUSES (Continued)

(b) Unless a specific waiver has been approved, Air Force procurements:

(1) May not include any specification, standard, drawing or other document that requires the use of a Class I ODS in the design, manufacture, test, operation, or maintenance of any system, subsystem, item, component or process; and

(2) May not include any specification, standard, drawing or other document that establishes a requirement that can only be met by use of a Class I ODS;

(c) For the purposes of Air Force policy, the following are Class I ODS:

(1) Halons: 1011, 1202, 1211, 1301, and 2402;

(2) Chlorofluorocarbons (CFC): CFC-11, CFC-12, CFC-13, CFI-111, CFC-112, CFC-113, CFC-114, CFC-115, CFC-211, CFC-212, CFC-213, CFC-214, CFC-215, CFC-216, and CFC-217, and the blends R-500, R-501, R-502, and R-503; and

(3) Other controlled substances: Carbon Tetrachloride, Methyl Chloroform, and Methyl Bromide.

(d) The Air Force has reviewed the requirements specified in this contract to reflect this policy. Where considered essential, specific approval has been obtained to require use of the following substances:

| Class I Ozone Depleting Substance | Application/Use | Qty (lbs) |
|---|---|---|
| NONE | | |

(e) To assist the Air Force in implementing this policy, the offeror/contractor is encouraged, but not required, to notify the Contracting Officer if any

(f) Class I ODS not specifically listed above, is required in the performance of this contract.

(End of Clause)

20. <u>REMITTANCE ADDRESS (MAY 1996) (AFFARS 5352.232-9000; 5332.908)</u>

If the remittance address is different from the mailing address, enter the remittance address below. Failure to provide this information may impact payment.

________________________________________
________________________________________
________________________________________

(End of Clause)

**ADDITIONAL CONTRACT CLAUSES (Continued)**

Therefore, offerors that are not registered should considered applying for registration immediately upon receipt of this solicitation.

(c) The Contractor is responsible for the accuracy and completeness of the data within the CCR, and for any liability resulting from the Government's reliance on inaccurate or incomplete data. To remain registered in the CCR database after the initial registration, the Contractor is required to confirm on an annual basis that its information in the CCR database is accurate and complete.

(d) Offerors and contractors may obtain information on registration and annual confirmation requirements by calling **1-888-227-2423**, or via the Internet at **http://www.ccr2000.com**.

(End of Clause)

( )*15. SECTION 8(A) DIRECT AWARD (JUN 1998) (DFARS 252.219-7009; 219.811-3(1))

(a) This contract is issued as a direct award between the contracting office and the 8(a) Contractor pursuant to the Memorandum of Understanding dated May 6, 1998, between the Small Business Administration (SBA) and the Department of Defense. Accordingly, the SBA is not a party to this contract. SBA does retain responsibility for 8(a) certification, for 8(a) eligibility determinations and related issues, and for providing counseling and assistance to the 8(a) Contractor under the 8(a) Program. The cognizant SBA district office is:

**U.S. SMALL BUSINESS ADMINISTRATION**
**SOUTH FLORIDA DISTRICT OFFICE**
**100 SOUTH BISCAYNE BOULEVARD, 7TH FLOOR**
**MIAMI, FL 33131**
[To be completed by the Contracting Officer at the time of award]

(b) The contracting office is responsible for administering the contract and for taking any action on behalf of the Government under the terms and conditions of the contract; provided that the contracting office shall give advance notice to the SBA before it issues a final notice terminating performance, either in whole or in part, under the contract. The contracting office also shall coordinate with the SBA prior to processing any novation agreement. The contracting office may assign contract administration functions to a contract administration office.

(c) The Contractor agrees that--

(1) It will notify the Contracting Officer, simultaneous with its notification to the SBA (as required by SBA's 8(a) regulations at 13 CFR 124.308), when the owner or owners upon whom 8(a) eligibility is based plan to relinquish ownership or control of the concern. Consistent with Section 407 of Pub. L. 100-656, transfer of ownership or control shall result in termination of the contract for convenience, unless the SBA waives the requirement for termination prior to the actual relinquishing of ownership and control; and

(2) It will not subcontract the performance of any of the requirements of this contract without the prior written approval of the SBA and the Contracting Officer.

(End of Clause)

*( ) Applicable if X'd

**ADDITIONAL CONTRACT CLAUSES (Continued)**

21. CONTRACTOR ACCESS TO AIR FORCE INSTALLATIONS (MAY 1996) (AFFARS 5352.242-9000; 5342.490-1)

(a) The contractor shall obtain base identification vehicle passes for all contractor personnel who make frequent visits to or perform work on the Air Force installation(s) cited in the contract. Contractor personnel are required to wear or prominently display installation identification badges or contractor-furnished, contractor identification badges while visiting or performing work on the installation.

(b) The contractor shall submit a written request on company letterhead to the contracting officer listing the following: contract number, location of work site, start and stop dates, and names of employees and subcontractor employees needing access to the base. The letter will also specify the individual(s) authorized to sign for a request for base identification credentials or vehicle passes. The contracting officer will endorse the request and forward it to the issuing base pass and registration office or security police for processing. When reporting to the registration office, the authorized contractor individual(s) should provide a valid driver's license, current vehicle registration, valid vehicle insurance certificate, and social security numbers to obtain a vehicle pass.

(c) During performance of the contract, the contractor shall be responsible for obtaining required identification for newly assigned personnel and for prompt return of credentials and vehicle passes for any employee who no longer requires access to the work site.

(d) When work under this contract requires unescorted entry to controlled or restricted areas, the contractor shall comply with AFI 31-209, the Air Force Resource Protection Program, and AFI 31-501, Personnel Security Program Management, as applicable.

(e) Upon completion or termination of the contract or expiration of the identification passes, the prime contractor shall ensure that all base identification passes issued to employees and subcontractor employees are returned to the issuing office.

(f) Prior to submitting an invoice for final payment, the prime contractor shall obtain a clearance certification from the issuing office which states all base identification passes have been turned in, accounted for, or transferred to a follow-on contract. This certification shall be submitted to the contracting officer prior to submission of the final invoice for payment.

(g) Failure to comply with these requirements may result in withholding of final payment.

(End of Clause)

22. VEHICLE OPERATION AND REGISTRATION (DEC 1994) (AFRCFARS 5352.204-9100; 5304.103)

Security Forces, Pass and Registration Section, requires that all personnel entering the base by motor vehicle register their vehicles at Pass and Registration, Building 353.

(End of Clause)

**ADDITIONAL CONTRACT CLAUSES (Continued)**

( )* ALTERNATE A (JUN 1998) (DFARS 252.219-7010; 219.811-3(2)

(c) Any award resulting from this solicitation will be made directly by the Contracting Officer to the successful 8(a) offeror selected through the evaluation criteria set forth in this solicitation.

( )*16. NOTIFICATION TO DELAY PERFORMANCE (JUN 1998) (DFARS 252.219-7011; 219.811-3(3))

The Contractor shall not begin performance under this purchase order until 2 working days have passed from the date of its receipt. Unless the Contractor receives notification from the Small Business Administration that it is ineligible for this 8(a) award, or otherwise receives instructions from the Contracting Officer, performance under this purchase order may begin on the third working day following receipt of the purchase order. If a determination of ineligibility is issued within the 2-day period, the purchase order shall be considered canceled.

(End of clause)

17. CONTRACT DRAWINGS, MAPS AND SPECIFICATIONS (DEC 1991) (DFARS 252.236-7001; 236.570(a))

(a) The Government -

(1) Will provide the Contractor, without charge, 5 sets (five unless otherwise specified) of large-scale contract drawings and specifications except publications incorporated into the technical provisions by reference;

(2) Will furnished additional sets on request, for the cost of reproduction; and

(3) May, at its option, furnish the Contractor one set of reproducible, or half-size drawings, in lieu of the drawings in paragraph (a)(l) of this clause.

(b) The Contractor shall -

(1) Check all drawings furnished immediately upon receipt;

(2) Compare all drawings and verify the figures before laying out the work;

(3) Promptly notify the Contracting Officer of any discrepancies; and

(4) Be responsible for any errors which might have been avoided by complying with this paragraph

(c) Large scale drawings shall, in general, govern small scale drawings. Figures marked on drawings shall, in general, be followed in preference to scale measurements.

*( ) Applicable if X'd

**SOLICITATION NUMBER: FA6648-00-R0015**
**CONTRACT NUMBER:** [illegible]-01-00001

**ADDITIONAL CONTRACT CLAUSES (Continued)**

(d) Omissions from the drawings or specifications or the misdescription of details of work which are manifestly necessary to carry out the intent of the drawings and specifications, or which are customarily performed, shall not relieve the Contractor from performing such omitted or misdescribed details of the work, but shall be performed as if fully and correctly set forth and described in the drawings and specifications.

(e) The work shall conform to the specifications and the contract drawings identified on the following index of drawings:

| TITLE | FILE | DRAWING NO. |
|---|---|---|
| COVER SHEET AND INDEX OF DRAWING | N/A | X-001 |
| LOCATION AND VICINITY MAP | N/A | C-101 |
| DEMOLITION PLAN | N/A | C-102 |
| GEOMETRY PLAN | N/A | C-103 |
| GRADING PLAN | N/A | C-104 |
| MARKING PLAN | N/A | C-105 |
| JOINT LAYOUT AND JOINT SPACING PLAN | N/A | C-506 |
| JOINT DETAILS | N/A | C-507 |
| SECTION AND DETAILS | N/A | C-508 |

(End of Clause)

**SOLICITATION NUMBER: FA6648-00-R0015**
**CONTRACT NUMBER:** FA6648-01-C0001

**ADDITIONAL CONTRACT CLAUSES (Continued)**

23. TELEPHONE COMMUNICATIONS SECURITY (COMSEC) MONITORING (DEC 1994) (AFRCFARS 5352.204-9101; 5304.103)

All communications with DOD organizations are subject to COMSEC review. Contractor personnel will be aware that telecommunication networks are continually subject to intercept by unfriendly intelligence organizations. The DOD has authorized the military departments to conduct COMSEC monitoring and recording of telephone calls originating from, or terminating at, DOD organizations. Therefore, civilian contractor personnel are advised that any time they place a call to or receive a call from an Air Force organization, they are subject to COMSEC procedures. The Contractor will assume the responsibility for ensuring wide and frequent dissemination of the above information to all employees dealing with official DOD information.

(End of Clause)

(X)*24. CLAUSES AND PROVISIONS (JAN 1998) (AFRCFARS 5352.204-9102; 5304.103)

(a) Clauses and provisions in this document will be numbered in sequence, but will not necessarily appear in consecutive order.

(b) By signature on this contractual document, the Contractor certifies that the Representations and Certifications previously submitted or returned herewith are current and applicable and are hereby incorporated by reference.

(End of Clause)

25. NOTICE TO PROCEED (NOV 1997) (AFRCFARS 5352.211-9100; 5311.404(b))

Only the paragraph marked with an "X" applies.

(a) (X) NOTICE TO PROCEED: Notice to Proceed will be issued not later than thirty (30) calendar days after award of contract.

(b) ( ) DELAYED NOTICE TO PROCEED: The Government contemplates issuance of a Notice to Proceed for this requirement on or about ________________________.

(End of Clause)

(X)*26. APPLICABLE WAGE RATES (NOV 1997) (AFRCFARS 5352.222-9100; 5322.407(a)(12)(S-90))

Department of labor Wage Determination Number/General Decision Number **FL000032**, Dated **04/07/2000**, is attached hereto and made a part hereof.

(End of Clause)

*( ) Applicable if X'd

**SOLICITATION NUMBER: FA6648-00-R0015**
**CONTRACT NUMBER:**

**ADDITIONAL CONTRACT CLAUSES (Continued)**

27. CERTIFICATION OF COMPLIANCE WITH CONTRACT INSURANCE REQUIREMENTS (JAN 1998) (AFRCFARS 5352.228-9100; 5328.310(a))

The contractor shall complete and submit the following certification acknowledging compliance with contract insurance requirements prior to issuance of the notice to proceed (construction) or beginning performance (all other).

(End of Clause)

Acknowledge and Certification of Compliance with Contract
Insurance Requirements Certificate
Contract No ____________________

The undersigned Contractor hereby acknowledges that he has read and understands the insurance requirements specified in this contract and hereby certifies (1) that such insurance shall be maintained in at least the amounts and types as stated in FAR 28.307-2 and during any modification and/or time extensions granted thereto; (2) that the required insurance policies shall contain an endorsement to the effect that any cancellation of material changes adversely affecting the Government's interest shall not be effective for such period as the laws of the State in which this contract is to be performed prescribe, or until thirty (30) days after the insurer or contractor gives written notice to the Contracting Officer, whichever period is longer; (3) that ______________ (state) Worker's Compensation Insurance, or letter of reciprocal agreement with another state, shall be maintained I on this contract for and during the entire performance period and for any modifications and/or time extensions granted thereto; and (4) that a copy of all subcontractors' proofs of required insurance shall be maintained and shall be made available to the Contracting Officer upon request. This agreement shall be a part of subject contract and shall be legally binding and enforceable at law.

INSURANCE COMPANY(S):

NAME: ____________________
ADDRESS: ____________________
POLICY #: ____________________
TELEPHONE #: ____________________

CONTRACTOR:

____________________ ____________________

____________________

____________________
(Address)

____________________ ____________________
(Date)

____________________
(Typed Name and Title)

____________________
(Authorized Signature)

(End of Clause)

**ADDITIONAL CONTRACT CLAUSES (Continued)**

28. REQUIRED INSURANCE (NOV 97) (AFRC 5352.228-9102) (AFRCFARS 5328.310(b)

Reference FAR clause entitle "Insurance..." the Contractor shall, at its own expense, procure and thereafter maintain the following kinds of insurance with respect to performance under the contract.

(a) Workers' Compensation and Employers Liability Insurance as required by law except that if this contract is to be performed in a State which does not require or permit private insurance, then compliance with the statutory or administrative requirements in any such State will be satisfactory. The required Workers' Compensation insurance shall extend to cover employer's liability for accidental bodily injury or death and for occupational disease with a minimum liability limit of $100,000.

(b) General liability Insurance. Bodily injury liability insurance, in the minimum limits of $500,000 per occurrence, shall be required on the comprehensive form of policy.

(c) Automobile Liability Insurance. This insurance shall be required on the comprehensive form of policy and shall provide bodily injury liability and property damage liability covering the operation of all automobiles used in connection with the performance of the contract. At least the minimum limits of $200,000 per person and $500,000 per occurrence for bodily injury and $20,000 per occurrence for property damage shall be required.

(End of Clause)

( )*29. PAYMENT FOR MATERIALS STORED ON SITE (DEC 1994) (AFRCFARS 5352.232-9100; 5332.111)

(a) This clause supplements FAR 52.232-5, Payments Under Fixed Price Construction Contracts, with regard to material payments.

(b) Consideration for payment under this contract for materials stored on site is subject to the following conditions:

(1) The contractor shall furnish the contracting officer a list of the major high-cost items to be incorporated into the contract and for which payment, prior to installation, will be requested. Those items approved by the contracting officer shall be entered on the AF Form 3064, **Contract Progress Schedule,** as a percentage factor, or factors if items are listed individually.

(2) Payment is limited to major high-cost items. A major high-cost item is defined as a single item of material with a unit price of $_______________. Such costs as sales tax, freight, handling, pallets, etc., are excluded.

(3) Payment request shall be consistent with approved materials submittals and shall be supported by the following documents:

*( ) Applicable only if X'd

SOLICITATION NUMBER: FA6648-00-R0015
CONTRACT NUMBER: FA6648-01-C0001

ADDITIONAL CONTRACT CLAUSES (Continued)

(I) Certified paid vendor invoices.

(ii) Inventory checklists, jointly validated by the contractor, and contracting officer representative.

(iii) Accepted delivery tickets, if applicable.

(4) All material for which payment is requested shall be delivered to an approved location on-site, and certified that none will be removed without written permission the of the contracting officer. Materials may also be stored in a bonded warehouse.

(5) Payments are made monthly, or at more frequent intervals as determined by the contracting officer.

(End of Clause)

( )*30. EXCLUSION OF PAYMENT FOR MATERIAL STORED ON SITE (DEC 1994) (AFRCFARS 5352.232-9101; 5332.11)

Payment in advance of installation for materials stored on site will not be considered under this contract.

(End of Clause)

31. HOURS OF WORK (DEC 1994) (AFRCFARS 5352.236-9100; 5336.570)

The normal hours of work for the performance of this contract will be from 7:30 A.M. to 4:30 P.M., except as otherwise expressly provided in this contract. The workdays will be Monday through Friday excluding Federal holidays. Work may be performed at other times and days only with the written permission of the Contracting Officer. The Contractor must submit a written request with adequate justification at least two work days or as approved by the contracting officer in advance of the date the Contractor desires to deviate from the normal hours and days. The contractor may be required to defray additional costs to the Government including, but not limited to, inspection computed according to existing Government Regulations. if permission is granted, written authority will be furnished.

(End of Clause)

32. AVAILABILITY OF UTILITY SERVICES (DEC 1994) (AFRCFARS 5352.236-9101; 5336.514)

Notwithstanding the provisions of Contract Clause FAR 52.236-14, Availability and Use of Utility Services, all reasonable required amounts of water, gas, electricity, etc., essential to contract performance will be made available at no cost to the Contractor from existing systems, outlets, and

*( ) Applicable only if X'd

supplies. The Government may not be held responsible for interruption of utility service and will not be liable for contractor delays, damages, or increased cost occasioned by an such interruption of service.

(End of Clause)

33. PREPARATION OF MATERIAL APPROVAL SUBMITTALS (DEC 1994) (AFRCFARS 5352.236-9102; 5336.570(b)(1))

The material approval submittals contemplated by FAR 52.236-5, Material and Workmanship, shall be accomplished on and according to instructions pertaining to AF Form 3000, Material Approval Submittal.

(End of Clause)

(X)*34. PREPARATION OF PROGRESS SCHEDULES AND REPORTS (DEC 1994) (AFRCFARS5352.236-9103; 5336.570(b)(2))

The reports contemplated by FAR 52.236-15, Schedules for Construction Contracts, shall be accomplished on and in accordance with instructions pertaining to AF Form 3064, Contract Progress Schedule, and AF Form 3065, Contract Progress Report.

(End of Clause)

*( ) Applicable if X'd

**SOLICITATION NUMBER: FA6648-00-R0015**
**CONTRACT NUMBER:** FA6648-01-C0001

## ADDITIONAL CONTRACT CLAUSES (Continued)

( )*35. IDENTIFICATION OF GOVERNMENT FURNISHED PROPERTY (JAN 1998) (AFRCFARS 5352.245-9101; 5345.106)

Pursuant to the "Government Property" clause herein, the Government will furnish the item(s) of property listed below as Government Furnished Property to the Contractor, F.O.B. ______________________, for use in performance of this contract.

| ITEM NR | DESC | QTY |
|---|---|---|
| ______ | _____ | ____ |
| ______ | _____ | ____ |
| ______ | _____ | ____ |
| ______ | _____ | ____ |
| ______ | _____ | ____ |
| ______ | _____ | ____ |

(End of Clause)

( )*36. GOVERNMENT FURNISHED FACILITIES (JAN 1998) (AFRCFARS 5352.245-9102; 5345.106)

Facility: The Government will provide, without cost to the Contractor, ______________________**(Insert facility/building number)**, located at **Homestead ARS, FL**. The facility is approximately __________**(Insert square feet)** of office and storage space. The Contractor will provide, at its own expense, all necessary repair and maintenance to the building as required for the duration of this contract. Compliance with the OSHA and other applicable laws and regulations for the protection of the Contractor's employees is exclusively the obligation of the Contractor. The Government will assume no liability for the Contractor's compliance or noncompliance with such requirements. Any modification/remodeling to the facility shall be approved in writing by the Contracting Officer before any changes are initiated. Such modifications shall be at the Contractor's expense. The Contractor shall return the facility to the Government at the completion of the contract, in the same condition as received, fair wear and tear, and approved modifications excepted. This facility shall be used in performance of this contract only.

(End of Clause)

( ) Applicable only if X'd

**SOLICITATION NUMBER: FA6648-00-R0015**
**CONTRACT NUMBER:** FA66[illegible]-01-C000[illegible]

**ADDITIONAL CONTRACT CLAUSES (Continued)**

( )*37. DESIGNATION OF GOVERNMENT FURNISHED PROPERTY ADMINISTRATOR (JAN 1998) ((AFRCFARS 5352.245-9103; 5345.106)

The Base Civil Engineer or the authorized representative, is designated as property administrator for Government property to be furnished to the Contractor for performance under this contract.

(End of Clause)

38. COMMERCIAL WARRANTY (DEC 1994) (AFRCFARS 5352.246-9100; 5346.710(a)(2))

The Contractor agrees that the supplies or services furnished under this contract shall be covered by the most favorable commercial warranty the Contractor gives to any customer for such supplies or services and that the rights and remedies provided herein are in addition to and do not limit any rights afforded to the Government by any other clause of this contract. The Contractor shall mark all shipping documents and containers so that warranty items are readily identifiable on delivery. A copy of the warranty card will accompany all material under warranty. The effective date of warranty will be upon final inspection and acceptance by the contracting officer.

(End of Clause)

39. FINAL INSPECTION (DEC 1994) (AFRCFARS 5352.246-9101; 5346.312)

The contractor shall, not later than 10 calendar days prior to the expiration of the performance period specified herein, submit a written request for final inspection to the Contracting Officer. Subject request shall specify the date and time of the requested inspection. The contractor may request a pre-final inspection of the project at any time that the entire project is determined to be substantially complete by the Contracting Officer.

(End of Clause)

*( ) Applicable only if X'd

SOLICITATION NUMBER: FA6648-00-R0015
CONTRACT NUMBER: FA6648-01-C001

## General Decision Number FL000032

General Decision Number FL000032
Superseded General Decision No. FL990032

State: Florida

Construction Type:
HEAVY

County(ies):

| | | |
|---|---|---|
| BROWARD | LEE | ST LUCIE |
| COLLIER | MARTIN | |
| DADE | PALM BEACH | |

HEAVY CONSTRUCTION PROJECTS (Excluding Sewer & Water Lines)

| Modification Number | Publication Date |
|---|---|
| 0 | 02/11/2000 |
| 1 | 02/25/2000 |
| 2 | 04/07/2000 |

COUNTY(ies):

| | | |
|---|---|---|
| BROWARD | LEE | ST LUCIE |
| COLLIER | MARTIN | |
| DADE | PALM BEACH | |

CARP1026D 02/01/1998

| | Rates | Fringes |
|---|---|---|
| PILEDRIVERMEN | 17.75 | 3.85 |

---

ELEC0323C 09/05/1993

| | Rates | Fringes |
|---|---|---|
| MARTIN, PALM BEACH, AND ST LUCIE COUNTIES | | |
| ELECTRICIANS | 15.88 | 21.5% |

---

ELEC0349B 09/01/1999

| | Rates | Fringes |
|---|---|---|
| DADE COUNTY | | |
| ELECTRICIANS: | | |
| Electrical contracts including materials that are less than $2,000,000 | 19.30 | 3.10+8% |

SOLICITATION NUMBER: FA6648-00-R0015
CONTRACT NUMBER:

| | Rates | Fringes |
|---|---|---|
| Electrical contracts including materials that are $2,000,000 and over | 21.32 | 3.10+8% |

---

ELEC0728A 09/01/1998

| BROWARD AND COLLIER COUNTIES | Rates | Fringes |
|---|---|---|
| ELECTRICIANS | 21.96 | 3%+5.19 |

---

ELEC0915B 12/01/1999

| LEE COUNTY | Rates | Fringes |
|---|---|---|
| ELECTRICIANS | 19.50 | 27%+.25 |

---

* ENGI0487B 04/01/2000

| DADE COUNTY | Rates | Fringes |
|---|---|---|
| POWER EQUIPMENT OPERATORS: | | |
| Backhoes, Bulldozers | 17.35 | 3.40 |
| Cranes | 20.78 | 3.40 |
| Oilers | 15.45 | 3.40 |

---

ENGI0675B 04/01/1995

| BROWARD, COLLIER, LEE, MARTIN, PALM BEACH, AND ST LUCIE COUNTIES | Rates | Fringes |
|---|---|---|
| POWER EQUIPMENT OPERATRORS: | | |
| All Tower Cranes and all Cranes with boom length 150 ft and over | 18.64 | 6.20 |
| Cranes with boom length less than 150 ft, Backhoes, and Bulldozers | 17.92 | 6.20 |
| Oilers | 16.29 | 6.20 |

---

PLUM0630A 01/01/2000

| LEE, MARTIN, PALM BEACH, AND ST LUCIE COUNTIES | Rates | Fringes |
|---|---|---|

SOLICITATION NUMBER: FA6648-00-R0015
CONTRACT NUMBER: [illegible]-01-[illegible]

| | | |
|---|---|---|
| PIPEFITTERS | 24.81 | 4.70 |

---

PLUM0725B 01/16/2000

| BROWARD AND DADE COUNTIES | Rates | Fringes |
|---|---|---|
| PIPEFITTERS | 22.10 | 5.90 |

---

SUFL2016A 01/26/1990

| | Rates | Fringes |
|---|---|---|
| CARPENTERS | 12.71 | 2.71 |
| CEMENT MASONS | 10.50 | |
| LABORERS | 5.72 | |
| POWER EQUIPMENT OPERATORS: | | |
| Loaders | 11.25 | 2.55 |

---

WELDERS - Receive rate prescribed for craft performing operation to which welding is incidental.

---

Unlisted classifications needed for work not included within the scope of the classifications listed may be added after award only as provided in the labor standards contract clauses (29 CFR 5.5(a)(1)(v)).

---

In the listing above, the "SU" designation means that rates listed under that identifier do not reflect collectively bargained wage and fringe benefit rates. Other designations indicate unions whose rates have been determined to be prevailing.

WAGE DETERMINATION APPEALS PROCESS

1.) Has there been an initial decision in the matter? This can be:

* an existing published wage determination a survey underlying a wage determination a Wage and Hour Division letter setting forth a position on a wage determination matter a conformance (additional classification and rate) ruling

On survey related matters, initial contact, including requests for summaries of surveys, should be with the Wage and Hour Regional Office for the area in which the survey was conducted because those Regional Offices have responsibility for the Davis-Bacon survey program.

SOLICITATION NUMBER: FA6648-00-R0015
CONTRACT NUMBER:

If the response from this initial contact is not satisfactory, then the process described in 2.) and 3.) should be followed. With regard to any other matter not yet ripe for the formal process described here, initial contact should be with the Branch of Construction Wage Determinations. Write to:

Branch of Construction Wage Determinations
Wage and Hour Division
U. S. Department of Labor
200 Constitution Avenue, N. W.
Washington, D. C. 20210

2.) If the answer to the question in 1.) is yes, then an interested party (those affected by the action) can request review and reconsideration from the Wage and Hour Administrator (See 29 CFR Part 1.8 and 29 CFR Part 7). Write to:

Wage and Hour Administrator
U.S. Department of Labor
200 Constitution Avenue, N. W.
Washington, D. C. 20210

The request should be accompanied by a full statement of the interested party's position and by any information (wage payment data, project description, area practice material, etc.) that the requestor considers relevant to the issue.

3.) If the decision of the Administrator is not favorable, an interested party may appeal directly to the Administrative Review Board (formerly the Wage Appeals Board). Write to:

Administrative Review Board
U. S. Department of Labor
200 Constitution Avenue, N. W.
Washington, D. C. 20210

4.) All decisions by the Administrative Review Board are final.

END OF GENERAL DECISION

SOLICITATION NUMBER: FA6648-00-RO(
CONTRACT NUMBER:

2 JUN 2000

# STATEMENT OF WORK

WORK ORDER 50894

KYJM 99-9037

1. **GENERAL:** The work covered by this delivery order consists of, but is not limited to the furnishing of all plant, labor, services, tools, materials, equipment, transportation, supervision and all miscellaneous requirements to perform all operations in conjunction with the effort to accomplish the work identified below. All work shall be done in conformance with applicable drawings and the latest National Electrical Code, and OSHA requirements. All disturbed areas shall be restored to their original conditions. A continuous ground wire shall be used throughout the circuits. Contractor shall demonstrate to the CE inspector that the work functions properly. Panels shall be properly labeled. Contractor shall verify all measurements.

2. **DESCRIPTION OF WORK:**
Contractor is to mobilize, remove pavement section as indicated, build underlayers of material to required height and place Portland and Asphaltic Cement in area as indicated. Contractor shall then provide painting of area as indicated and perform final cleanup of area.

3. **LOCATION:** Contract to be performed at HARS FL at

4. **CONTINUED USE OF FACILITES:** Surrounding buildings and utilities will continue in use during this contract. Work and work areas shall be scheduled at least 24 hours in advance of anticipated time of accomplishments. Work shall be performed in a manner to create minimum disturbance and inconvenience to personnel. Contractor's personnel will be limited to work areas.

5. **DRAWINGS:** There are a total of 9 sheets of drawings to this project.

6. **AS BUILT DRAWINGS:** Shall be required at the end of this contract

7. **PERFORMANCE PERIOD:** The performance period for this contract shall be 60 calender days

SOLICITATION NUMBER: FA6648-01-R0015
CONTRACT NUMBER: FA6648-01-C00[illegible]

# SCHEDULE OF MATERIAL SUBMITTALS

| PROJECT NUMBER | PROJECT TITLE | SOLICITATION/CONTRACT NO. |
|---|---|---|
| KYJM 99-8037 | MILL/OVERLAY ASPHALT RAMP, FANG | |

| LINE NUMBER | SECTION | PARAGRAPH | ITEM OR DESCRIPTION OF ITEM, CONTRACT REFERENCE, TYPE OF SUBMITTAL | CERTIFICATE OF COMPLIANCE | SHOP DRAWINGS | SAMPLES | COLOR SELECTION | MANUFACTURER'S RECOMMENDATIONS | MANUFACTURER'S WARRANTY | CATALOG DATA | OPERATING INSTRUCTIONS | OTHERS | TEST REPORT | REQUIRED SUBMISSION DATE | DATE RECEIVED IN CONTRACTING | DATE TO CIVIL ENGINEERING | RETURN SUSPENSE DATE | FOLLOW-UP | DATE CONTRACTOR NOTIFIED: APPROVED | DATE CONTRACTOR NOTIFIED: DISAPPROVED | CONTRACTOR RESUBMITTAL | FINAL APPROVAL | REMARKS |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | TO BE COMPLETED BY PROJECT ENGINEER (NO. OF COPIES REQUIRED) | | | | | | | | | | | | TO BE COMPLETED BY CONTRACT ADMINISTRATOR | | | | | | | | |
| 1 | 2220 | 1.3 | Work Plan | | | | | | | | | 3 | | | | | | | | | | | |
| 2 | 2300 | 1.4 | Calibration Test | 3 | | | | | | | | | | | | | | | | | | | |
| 3 | 2300 | 1.4 | Qualification of Lab | 3 | | | | | | | | | | | | | | | | | | | |
| 4 | 2390 | 1.2 | As-Builts Drawings | | 3 | | | | | | | | | | | | | | | | | | |
| 5 | 2390 | 1.2 | Mooring Devices | 3 | | | | | | | | | | | | | | | | | | | |
| 6 | 2390 | 1.2 | Grounding Rods | 3 | | | | | | | | | | | | | | | | | | | |
| 7 | 2390 | 1.2 | Grounding Connectors | 3 | | | | | | | | | | | | | | | | | | | |
| 8 | 2390 | 1.2 | Coupper Conductors | 3 | | | | | | | | | | | | | | | | | | | |
| 9 | 2390 | 1.2 | Reinforcing Steel | 3 | | | | | | | | | | | | | | | | | | | |
| 10 | 2709 | 1.2 | Plant Equipment | | | | | | | | | 3 | | | | | | | | | | | |
| 11 | 2709 | 1.2 | Calibration Test | 3 | | | | | | | | | | | | | | | | | | | |
| 12 | 2748 | 1.3 | Bituminous Material Reports | | | 3 | | | | | | | | | | | | | | | | | |
| 13 | 2749 | 1.3 | Aggregate Gradation Test Results | | | | | | | | | | 3 | | | | | | | | | | |

AF Form 66, SEP 86

SOLICITATION NUMBER: FA6648-00-R0006
CONTRACT NUMBER: FA6648-01-C0001

# SCHEDULE OF MATERIAL SUBMITTALS

| PROJECT NUMBER | PROJECT TITLE | SOLICITATION/CONTRACT NO |
|---|---|---|
| KYJM 99-0037 | MILL/OVERLAY ASPHALT RAMP, FANG | |

TO BE COMPLETED BY PROJECT ENGINEER / TO BE COMPLETED BY CONTRACT ADMINISTRATOR

NO. OF COPIES REQUIRED

| LINE NUMBER | Section | Paragraph | ITEM OR DESCRIPTION OF ITEM, CONTRACT REFERENCE, TYPE OF SUBMITTAL | CERTIFICATE OF COMPLIANCE | SHOP DRAWINGS | SAMPLES | COLOR SELECTION | MANUFACTURER'S RECOMMENDATIONS | MANUFACTURER'S WARRANTY | CATALOG DATA | OPERATING INSTRUCTIONS | OTHERS | TEST REPORT | REQUIRED SUBMISSION DATE | DATE RECEIVED IN CONTRACTING | DATE TO CIVIL ENGINEERING | RETURN SUSPENSE DATE | FOLLOW-UP | DATE CONTRACTOR NOTIFIED: APPROVED | DATE CONTRACTOR NOTIFIED: DISAPPROVED | CONTRACTOR RESUBMITTAL | FINAL APPROVAL | REMARKS |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 14 | 2749 | 1.3 | QC Test results | | | | | | | | | | 3 | | | | | | | | | | |
| 15 | 2749 | 1.3 | Asphalt Cement Binder | | | | | | 3 | | | 3 | | | | | | | | | | | |
| 16 | 2749 | 1.3 | Testing Laboratory | 3 | | | | | | | | | | | | | | | | | | | |
| 17 | 2749 | 1.3 | Asphalt Cement Binder | | | | | 3 | | | | | | | | | | | | | | | |
| 18 | 2749 | 1.3 | Aggregate | | | | | | | | | 3 | | | | | | | | | | | |
| 19 | 2749 | 1.3 | Mix Design | | | | | | | | | 3 | | | | | | | | | | | |
| 20 | 2749 | 1.3 | Quality control Plan | | | | | | | | | 3 | | | | | | | | | | | |
| 21 | 2754 | 1.6 | Concrete Plant Equipment | | | | | | | | | 3 | | | | | | | | | | | |
| 22 | 2754 | 1.6 | Paving Schedule | | | | | | | | | 3 | | | | | | | | | | | |
| 23 | 2754 | 1.6 | Mixture Proportions | | | | | | | | | 3 | | | | | | | | | | | |
| 24 | 2760 | 1.3 | Manufacturer recommendations | | | | | 3 | | | | | | | | | | | | | | | |
| 25 | 2760 | 1.3 | Construction Equipment List | | | | | | | | | 3 | | | | | | | | | | | |
| 26 | 2760 | 1.3 | Samples | | | 3 | | | | | | | | | | | | | | | | | |
| 27 | 2763 | 1.3 | Equipment List | | | | | | | | | 3 | | | | | | | | | | | |
| 28 | 2763 | 1.3 | Mixing, Thinning and Application | | | | | 3 | | | | | | | | | | | | | | | |
| 29 | 2763 | 1.3 | Qualifications | | | | | | | | | 3 | | | | | | | | | | | |

AF Form 66, SEP 86

SOLICITATION NUMBER: FA6648-00-R0016

CONTRACT NUMBER: [illegible]-01-C0001

# SCHEDULE OF MATERIAL SUBMITTALS

| PROJECT NUMBER | PROJECT TITLE | SOLICITATION/CONTRACT NO |
|---|---|---|
| KYJM 90-R037 | MILL/OVERLAY ASPHALT RAMP, FANG | |

TO BE COMPLETED BY PROJECT ENGINEER (columns Line Number through Test Report; Certificate of Compliance through Test Report = NO. OF COPIES REQUIRED) — TO BE COMPLETED BY CONTRACT ADMINISTRATOR (columns Required Submission Date through Remarks)

| LINE NUMBER | SECTION | PARAGRAPH | ITEM OR DESCRIPTION OF ITEM, CONTRACT REFERENCE, TYPE OF SUBMITTAL | CERTIFICATE OF COMPLIANCE | SHOP DRAWINGS | SAMPLES | COLOR SELECTION | MANUFACTURER'S RECOMMENDATIONS | MANUFACTURER'S WARRANTY | CATALOG DATA | OPERATING INSTRUCTIONS | OTHERS | TEST REPORT | REQUIRED SUBMISSION DATE | DATE RECEIVED IN CONTRACTING | DATE TO CIVIL ENGINEERING | RETURN SUSPENSE DATE | FOLLOW-UP | DATE CONTRACTOR NOTIFIED: APPROVED | DATE CONTRACTOR NOTIFIED: DISAPPROVED | CONTRACTOR RESUBMITTAL | FINAL APPROVAL | REMARKS |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 30 | 2763 | 1.3 | Material Test | | | | | | | | | | 3 | | | | | | | | | | |
| 31 | 2763 | 1.3 | VOC Certificates | 3 | | | | | | | | | | | | | | | | | | | |
| 32 | [illegible] | | | | | | | | | | | | | | | | | | | | | | |

SOLICITATION NUMBER: FA6648-00-R0015
CONTRACT NUMBER: FA6648-01-C0001

# SPECIFICATIONS

ATTACHMENT 5
119 PAGES

# SPECIFICATIONS

# MILL/OVERLAY ASPHALT RAMP, FANG

# KYJM 99-9037



## 482 SUPPORT GROUP CIVIL ENGINEERING
## HOMESTEAD,FL

**PREPARED BY:**

MR SULLIVAN

JUN 2000

CONTRACTING APPROVAL ____________________

# TABLE OF CONTENTS


SECTION 1 GENERAL PROVISIONS

| | | |
|---|---|---|
| 01015 | General Provisions (Airfield) | 01015-1 - 01015-8 |
| 01090 | Sources for Reference Publications | 01090-1 – 01090-32 |
| 01330 | Submittal Procedures | 01330-1 – 01330-5 |

SECTION 2 SITEWORK

| | | |
|---|---|---|
| 02220 | Demolition | 02220-1 – 02220-4 |
| 02300 | Earthwork | 02300-1 - 02300-9 |
| 02390 | Mooring and Grounding Points for Aircraft | 02390-1 – 02390-7 |
| 02709 | Limerock Base Course | 02709-1 - 02709-6 |
| 02748 | Bituminous Tack and Prime Coats | 02748-1 – 02748-6 |
| 02749 | Hot-Mix Asphalt (HMA) for Airfields | 02749-1 – 02749-29 |
| 02754 | Concrete Pavements for Small Projects | 02754-1 – 02754-26 |
| 02760 | Field Molded Sealants for Sealing Joints in Rigid Pavements | 02760-1 – 02760-7 |
| 02763 | Pavement Markings | 02763-1 - 02763-8 |

# TABLE OF CONTENTS


SECTION 1 GENERAL PROVISIONS

| | | |
|---|---|---|
| 01015 | General Provisions (Airfield) | 01015-1 - 01015-5 |
| 01090 | Sources for Reference Publications | 01090-1 – 01090-15 |
| 01330 | Submittal Procedures | 01330-1 – 01330-4 |

SECTION 2 SITEWORK

| | | |
|---|---|---|
| 02220 | Demolition | 02220-1 – 02220-3 |
| 02300 | Earthwork | 02300-1 - 02300-9 |
| 02390 | Mooring And Grounding Points For Aircraft | 02390-1 – 02390-7 |
| 02709 | Limerock Base Course | 02709-1 - 02709-6 |
| 02748 | Bituminous Tack and Prime Coats | 02748-1 – 02748-6 |
| 02749 | Hot-Mix Asphalt (HMA) for Airfields | 02749-1 – 02749-29 |
| 02754 | Concrete Pavements for Small Projects | 02754-1 – 02754-26 |
| 2760 | Field Molded Sealants for Sealing Joints in Rigid Pavements | 02760-1 – 02760-10 |
| 02763 | Pavement Markings | 02763-1 - 02763-8 |

# SECTION 01015
# GENERAL PROVISIONS (AIRFIELD)

## PART 1 – GENERAL

1.1 SCOPE OF WORK: The project shall include but is not limited to: furnishing all labor, materials, equipment, and service required to perform all concrete pavement construction, maintenance, and restoration items included in bidding documents including soil excavation, limerock base installation, asphalt repair, airfield marking, and site work as specified.

1.2 DESCRIPTION OF WORK: The work to be performed includes, but is not limited to, the following principle features:

1.2.1. Painting of taxiways, and aprons.

1.2.1.1. Clean surfaces to be marked

1.2.1.2. Final cleaning of surfaces with air

1.2.1.3. Paint surfaces as shown on the construction drawings

1.2.1.4. Protect area until dry

1.2.2 . Construct asphalt pavement:

1.2.2.1. Remove old asphalt to the extent specified grade

1.2.2.2. Set grades

1.2.2.3. Excavate existing subgrade as required, compact

1.2.2.4. Install limerock base and compact

1.2.2.5. Pave asphalt pavement in accordance with plans and specifications.

1.2.3. Mill asphalt surfaces:

1.2.3.1. Mill surfaces to specified depth or grade

1.2.3.2. Slurry seal or pave with asphalt as specified

1.2.4. Repair Concrete Pavement

1.2.4.1. Sawcut a minimum of 6" deep, along joint of existing concrete pavement to remain

1.2.4.2. Demolish existing pavement as indicated and specified

1.2.4.3. Remove identified pavements as specified

1.2.4.4. Excavate existing subgrade to required depth, compact subgrade

1.2.4.5. Install limerock base and compact
1.2.4.6. Drill and epoxy grout in-place all dowels and reinforcing bars
1.2.4.7. Install expansion board
1.2.4.8. Pour replacement slabs by lane
1.2.4.9. Sawcut Joints to match Joints in adjacent pavements
1.2.4.10. Clean and seal Joints using Preformed Elastomeric or Elastomeric Type joint material as indicated

1.3 LOCATION: The work is located at Homestead ARS, Homestead, FL.

1.4. CONTRACTOR QUALIFICATIONS:

1.4.1. General Experience: The contractor shall have a minimum of five years experience constructing airfield pavement for the Department of Defense, the Federal Aviation Administration, or private industry. The minimum size previous work experience to be considered will be a minimum of 5000 cubic yards of new portland cement concrete placed.

1.4.2. Specific Experience: The use of a concrete batch plant or slipform paver equipment is subject to specific approval by the Contracting Officer. The Contractor shall provide a minimum of two references before consideration will be given by the Government to allow the use of the process or equipment. The references will be from people, or agencies, for work accomplished and similar to work described by this specification. The references must be for work accomplished within the past two years. One reference will be for work which has been in beneficial service for a minimum of 12-months. Satisfactory performance shall be verifiable.

1.5. ADDITIONAL HOURS OF WORK AND NIGHT OPERATIONS: The Contractor may elect to work hours other than normal duty hours if requested in writing at least five days in advance, and if approved by the Contracting Officer. The contractor will be allowed to run a 24 hour a day operation if approved by the Contracting Officer; however, the contractor must provide his own lighting for night operations at no cost to the government and no sealant shall be placed during the hours of darkness.

1.6. SUBMITTAL REQUIREMENTS:

1.6.1. Material Testing: All required material testing will be conducted by an independent approved and licensed laboratory at contractor's expense.

1.6.2. Reproducible shop drawings, manufacturers data, dated certifications and test reports, references, schedules, and samples constitute the project submittals. Required submittals are itemized on AF Form 66 and are to be forwarded by the contractor on or before the date indicated. All submittals shall have an AF Form 3000 attached.

1.6.3. As-Built Drawings shall be held on site and available for the Contracting Officer's inspection and approval at all times. The contractor shall up-date the drawings daily to reflect work accomplished during the prior day. A completed set of as-built drawings shall be submitted for approval at the conclusion of the project.

PART 2 - PRODUCTS Not Used

PART 3 - EXECUTION

3.1. WORK COORDINATION: All of the required coordination during the execution of the project will be with the Contracting Officer or a designated representative.

3.2. WORK CLEARANCE REQUEST: The contractor shall obtain AF Form 103, Base Civil Engineering Work Clearance Request, prior to work commencement from the Civil Engineering, Bldg 232, CEC/224-7938.

3.3. FIRE PROTECTION: The contractor shall adhere to NFPA 241 during construction and demolition operations. Operations involving welding soldering, or brazing, herein defined as "hot-work" shall not be started by the contractor until an AF Form 592 has been completed and signed by the Fire Inspector for each work area. Contractor shall give the Fire Inspection Section (224-7275) one work day's notice prior to any hot-work. Inflammables shall be stored in approved fireproof trailers or portable buildings at approved locations. Take precautionary measures to prevent fire hazards and spontaneous combustion.

3.4. SPECIAL COMMUNICATIONS REQUIREMENTS: The contractor shall provide sufficient hand-held portable radios to ensure safe construction operations on the airfield. A written "Safe Construction Operation" is subject to final approval by the government. The Contractor shall maintain the proper frequency to contact the control tower at all times prior to crossing active runways and taxiways. The Contractor will be allowed to cross runways and taxiways once clearance has been received from Homestead ARS Control Tower. Contractor operations will be "shut down" by the Contracting Officer if an unsafe condition exists.

3.5. SPECIAL CONDITIONS:

3.5.1. Vehicle Operation:

3.5.1.1. Airfield Pavement Access: The Contractor shall be shown the points of access to the airfield area and the work area at the preconstruction conference. Under no circumstances will the Contractor or sub-contractors use any other access to the airfield area or work areas.

3.5.1.2. Speed Limits: As vehicles approach and come near to taxiing aircraft, they shall slow to five miles per hour at least one hundred feet away from aircraft and shall yield as far away from aircraft as practical. However, the vehicles shall not leave the pavement. The speed limit on the flightline is 15 miles per hour.

3.5.1.3. All vehicles will come to a full stop before entering or crossing a taxiway. Before proceeding, the vehicle operator will determine visually that the way is clear.

3.5.1.4. Drivers will stop when emergency vehicles are seen or heard.

3.5.1.5. All vehicle operators, before driving on the flight line, will be given special instructions by the Airfield Manager on standard flight line traffic controls and signals and advised of the particular hazards involved.

3.5.1.6. The following standards shall be observed at all times when operating vehicles on the flight line. Careful attention and strict adherence to these precautions will prevent accidental damage to aircraft and possible injury to both flight and ground personnel.

3.5.1.6.1. Vehicles shall not be driven within 50 feet of an aircraft or under any part of an aircraft. Vehicles shall not be backed or driven forward in the immediate direction of any aircraft within 50 feet, nor shall a vehicle be driven within 50 feet of aircraft fueling or defueling operation. When parked on the flight line, vehicles and all equipment mounted on wheels, which do not have integral braking systems, shall be chocked when left unattended. Vehicles left unattended and parked on the flight line shall be left unlocked with keys in the ignition system.

3.5.1.6.2. Under no circumstances shall vehicles be allowed to stand in front of, or be driven into, the path of taxiing aircraft. No vehicle will be parked or driven closer than 50 feet in front or 200 feet to the rear of any aircraft when engines are in operation or about to be put in operation.

3.5.1.6.3. Before airfield operations, vehicle operators shall ensure that all equipment carried on their vehicles is properly stowed and secured and that the vehicles are inspected for objects that could damage aircraft. After dual-wheeled vehicles are operated on unpaved surfaces, operators shall stop when reaching the airfield pavement and remove any rocks that are wedged between the tires or treads.

3.5.1.6.4. Vehicle operations on the flight line or airfield are under the control of tower personnel. Control tower radio instructions shall be observed and obeyed by vehicle operators.

3.5.2. Severe Weather Warning: When notified by the Contracting Officer or the Construction Inspector that a severe weather warning has been issued for the area in which the project is being executed, the contractor shall immediately take necessary action to tie down and secure all structures and materials on the job site that could become missiles as a result of strong surface winds, thunderstorms, etc. The requirement also applies to all non- regular work periods.

3.5.3. Emergencies: In the case of an emergency, the Base Operations Officer or Airfield Manager shall have the authority to order the contractor to terminate all work and clear the area of personnel and equipment. The contractor shall comply to such an order as quickly as possible. The contractor shall notify the contracting officer of this occurrence as soon as possible.

3.5.4. Traffic Control: Temporary barricades shall consist of portable, reflectorized paint covered (orange and white striped), saw-horse type units approximately 3 feet wide, 2'6" high with an attached battery operated red or yellow flashing light unit. The contractor shall provide these units around all edges of the work exposed to vehicular or aircraft traffic. All barricades shall be sandbagged to prevent wind and aircraft blast from tipping them over. Lights shall be operable at all times.

3.5.5. The contractor shall provide and operate vacuum type power broom sweepers at all times on all airfield pavements in the work area and haul route to remove any accumulation of dust, sand or other debris. Contractor shall demonstrate the sweepers to show effectiveness and shall be approved by the Contracting Officer. The contractor shall also provide personnel at each area of these locations to monitor crossings. This person(s) will direct vehicles to stop before crossing, check for foreign objects (rocks) lodged within tire treads and ensure that no aircraft are within this particular area before permitting vehicles to cross.

3.6. CONSTRUCTION LIMITATIONS:

3.6.1. The contractor will be required to dewater all pavement areas within 12 hours after water accumulation.

3.6.2. The contractor shall coordinate the use of gates with the Contracting Officer and the Security Police. The contractor shall not allow non-contractor personnel to use the gate except as directed by the Security Police.

END OF SECTION

# SECTION 01090

## SOURCES FOR REFERENCE PUBLICATIONS

1 GENERAL

1.1 REFERENCES

Various publications are referenced in other sections of the specifications to establish requirements for the work. These references are identified in each section by document number, date and title. The document number used in the citation is the number assigned by the sponsoring organization, e.g. ASTM B 564 Nickel Alloy Forgings. However, when the sponsoring organization has not assigned a number to a document, an identifying number has been assigned for reference purposes.

1.2 ORDERING INFORMATION

The addresses of the organizations whose publications are referenced in other sections of these specifications are listed below, and if the source of the publications is different from the address of the sponsoring organization, that information is also provided. Documents listed in the specifications with numbers which were not assigned by the sponsoring organization should be ordered from the source by title rather than by number.

ACI INTERNATIONAL (ACI)

P.O. Box 9094
Farmington Hills, MI 48333-9094
Ph: 248-848-3700
Fax: 248-848-3801
Internet: http://www.aci-int.org
AOK6/99

AMERICAN ASSOCIATION OF STATE HIGHWAY AND TRANSPORTATION OFFICIALS (AASHTO)
444 N. Capital St., NW, Suite 249
Washington, DC 20001
Ph: 800-231-3475 202-624-5800
Fax: 800-525-5562 202-624-5806
Internet: www.aashto.org
NOTE: AASHTO documents with numbers beginning with M or T are available only in Standard Specifications for Transportation Materials and Methods of Sampling and Testing, 1998 @$289.00\X
AOK6/99

AMERICAN CONCRETE PIPE ASSOCIATION (ACPA)
222 West Las Colinas Blvd., Suite 641
Irving, TX 75039-5423
Ph: 972-506-7216
Fax: 972-506-7682
Internet: http://www.concrete-pipe.org
e-mail: info@concrete-pipe.org
AOK6/99

AMERICAN INSTITUTE OF STEEL CONSTRUCTION (AISC)
One East Wacker Dr., Suite 3100
Chicago, IL 60601-2001
Ph: 312-670-2400
Publications: 800-644-2400
Fax: 312-670-5403
Internet: http://www.aiscweb.com
AOK6/99

AMERICAN INSTITUTE OF TIMBER CONSTRUCTION (AITC)
7012 So. Revere Parkway, Suite 140
Englewood, CO 80112
Ph: 303-792-9559
Fax: 303-792-0669
AOK6/99

AMERICAN IRON AND STEEL INSTITUTE (AISI)
ATTN: Publication Orders
P.O. Box 4321
Chestertown, MD 21690
Ph: 800-277-3850
Fax: 410-810-0910
AOK6/99
01090-3

AMERICAN NATIONAL STANDARDS INSTITUTE (ANSI)
11 West 42nd St
New York, NY 10036
Ph: 212-642-4900
Fax: 212-398-0023
Internet: www.ansi.org/
Note: Documents beginning with the letter "S" can be ordered from:
Acoustical Society of America
P. O. Box 1020
Sweickley, PA 15143-9998
Ph: 412-741-1979
Fax: 412-741-0609
Internet:
AOK6/99

AMERICAN SOCIETY FOR NONDESTRUCTIVE TESTING (ASNT)
1711 Arlingate Lane
P.O. Box 28518
Columbus, OH 43228-0518
Ph: 800-222-2768
Fax: 614-274-6899
AOK6/99

AMERICAN SOCIETY FOR QUALITY (ASQ)
611 East Wisconsin Ave.
P.O. Box 3005
Milwaukee, WI 53201-3005
Ph: 800-248-1946
Fax: 414-272-1734
Internet: http://www.asq.org
AOK6/99

AMERICAN SOCIETY FOR TESTING AND MATERIALS (ASTM)
100 Barr Harbor Drive
West Conshohocken, PA 19428-2959
Ph: 610-832-9585
Fax: 610-832-9555
Internet: www.astm.org
NOTE: The annual ASTM Book of Standards (66 Vol) is available for $3500.00. Prices of individual standards vary.
AOK6/99

AMERICAN SOCIETY OF CIVIL ENGINEERS (ASCE)
1801 Alexander Bell Drive
Reston, VA 20190-4400
Ph: 703-295-6300
Fax: 703-295-6222
Internet: www.pubs.asce.org
e-mail: marketing@asce.org
AOK6/99

AMERICAN WATER WORKS ASSOCIATION(AWWA)
6666 West Quincy
Denver, CO 80235
Ph: 800-926-7337
Fax: 303-795-2114
Internet: www.awwa.org
AOK6/99

AMERICAN WELDING SOCIETY (AWS)
550 N.W. LeJeune Road
Miami, FL 33126
Ph: 800-443-9353
Fax: 305-443-7559
Internet: http://www.amweld.org
AOK6/99

AMERICAN WOOD-PRESERVERS' ASSOCIATION (AWPA)
3246 Fall Creek Highway, Suite 1900
Grandbury, TX 76049-7979
Ph: 817-326-6300

NOTE: AWPA Book of Standards is published yearly @$75.00; individual standards may be ordered separately for $12.00 to $28.00 each.
AOK6/99 Fax: 817-326-6306

APA - THE ENGINEERED WOOD ASSOCIATION (APA)
2130 Barrett Park Dr., Suite 102
Kennesaw, GA 30144-3681
Ph: 770-427-9371
Fax: 770-423-1703
Internet: www.apawood.org
Note: Prices are available only by calling APA
AOK6/99

ASME INTERNATIONAL (ASME)
Three Park Avenue
New York, NY 10016-5990
Ph: 212-591-7722
Fax: 212-591-7674
Internet: www.asme.org
AOK6/99

ASPHALT INSTITUTE (AI)
Research Park Dr.
P.O. Box 14052
Lexington, KY 40512-4052
Ph: 606-288-4960
Fax: 606-288-4999
Internet: www.asphaltinstitute.org
e-mail: asphalti@asphaltinstitute.org
AOK6/99

CAST IRON SOIL PIPE INSTITUTE (CISPI)
5959 Shallowford Rd., Suite 419
Chattanooga, TN 37421
Ph: 423-892-0137
Fax: 423-892-0817
AOK6/99

CODE OF FEDERAL REGULATIONS (CFR)
Order from:
Government Printing Office
Washington, DC 20402
Ph: 202-512-1800
Fax: 202-275-7703
Internet: http://www.pls.com:8001/his/cfr.html
AOK6/99

COMMERCIAL ITEM DESCRIPTIONS (CID)
Order from:
General Services Administration
Federal Supply Service Bureau
470 E L'Enfant Plaza, S.W., Suite 8100
Washington, DC 20407
Ph: 202-619-8925
Internet: http://pub.fss.gsa.gov/hl-pub.html
AOK6/99

COMPRESSED GAS ASSOCIATION (CGA)
1725 Jefferson Davis Highway, Suite 1004
Arlington, VA 22202-4102
Ph: 703-412-0900
Fax: 703-412-0128
Internet: www.cganet.com
e-mail: Customer_Service@cganet.com
AOK6/99

CONCRETE REINFORCING STEEL INSTITUTE (CRSI)
933 No. Plum Grove Rd.
Schaumburg, IL 60173-4758
Ph: 847-517-1200
Fax: 847-517-1206
Internet: http://www.crsi.org
AOK6/99

CONSUMER PRODUCT SAFETY COMMISSION (CPSC)
Washington, DC 20207
Ph: 301-504-0580
AOK6/99

CORPS OF ENGINEERS (COE)
Order from:
U.S. Army Engineer Waterways Experiment Station
ATTN: Technical Report Distribution Section, Services Branch, TIC
3909 Halls Ferry Rd.
Vicksburg, MS 39180-6199
Ph: 601-634-2571
Fax: 601-634-2506
NOTE: COE Handbook for Concrete and Cement (Documents w/prefix CRD-C) (1949-present; 2 Vol) free to Government offices; $10.00 plus $8.00 per yr for 4 qtrly supplements to others). Individual documents, single copies free. Order from address above.
AOK6/99

CORPS OF ENGINEERS (CEHNC)
Available on TECHINFO web page maintained by:

U.S. Army Engineer Corps of Engineers
Engineering and Support Center
P.O. Box 1600
ATTN: CEHNC-ED-ES
Ph: 256-895-1821
Fax: 256-895-1767

TECHINFO: http://www.hnd.usace.army.mil/techinfo/index.htmCOUNCIL OF AMERICAN BUILDING OFFICIALS (CABO)
5203 Leesburg Pike, Suite 708
Falls Church, VA 22041
Ph: 703-931-4533
Fax: 703-379-1546
AOK6/99

DUCTILE IRON PIPE RESEARCH ASSOCIATION (DIPRA)
245 Riverchase Parkway East, Suite 0
Birmingham, AL 35244
Ph: 205-402-8700
Fax: 205-402-8730
Internet: www.dipra.org
E-mail: info@dipra.org
AOK6/99

ENGINEERING MANUALS (EM)
USACE Publications Depot
Attn: CEIM-SP-D
2803 52nd Avenue
Hyattsville, MD 20781-1102
Ph: 301-394-0081
AOK6/99

ENGINEERING PAMPHLETS (EP)
USACE Publications Depot
Attn: CEIM-SP-D
2803 52nd Avenue
Hyattsville, MD 20781-1102
Ph: 301-394-0081
AOK6/99

ENGINEERING REGULATIONS (ER)
USACE Publications Depot
Attn: CEIM-SP-D 2803 52nd Avenue
Hyattsville, MD 20781-1102
Ph: 301-394-0081
AOK6/99

ENGINEERING GENERATING SYSTEMS ASSOCIATION (EGSA)
Ph: 561-750-5575
http://www.esga.org/stdabout.htm

ENVIRONMENTAL PROTECTION AGENCY (EPA)
Public Information Center
401 M St., SW
Washington, DC 20460
Ph: 800-490-9198
FAX: 202-260-6257
Internet: http://www.epa.gov
NOTE: Some documents are available only from: National Technical Information Services (NTIS)
5285 Port Royal Rd.
Springfield, VA 22161
Ph: 800-553-6847
Fax: 703-321-8547
Internet: http://www.fedworld.gov/ntis/ntishome.html
AOK6/99

EXPANSION JOINT MANUFACTURERS ASSOCIATION (EJMA)
25 No. Broadway
Tarrytown, NY 10591
Ph: 914-332-0040
AOK6/99

FEDERAL AVIATION ADMINISTRATION (FAA)
Order from:
Superintendant of Documents
U. S. Government Printing Office
Washington, DC 20402
Ph: 202-512-1800
Fax: 202-512-1356
For free documents, order from:
Federal Aviation Administration
Dept. of Transportation
ATTN: General Services Section M-45
400 Seventh St., SW
Washington, DC 20590-0001
Ph: 202-619-8925
Fax: 202-619-8978
Internet: www.faa.gov
AOK6/99

FEDERAL HIGHWAY ADMINISTRATION (FHWA)
Office of Highway Safety (HHS-31)
400 Seventh St., SW
Washington, DC 20590-0001
Ph: 202-366-0411
Fax: 202-366-2249
Order from:
Government Printing Office
Superintendent of Documents
Washington, DC 20402
Ph: 202-783-3238
AOK6/99

FEDERAL SPECIFICATIONS (FS)
Order from:
General Services Administration
Federal Supply Service Bureau
470 L'Enfant Plaza, S.W.
Washington, DC 20407
Ph: 202-619-8925
Fax: 202-619-8978
Internet: http://pub.fss.gsa.gov/
AOK6/99

FEDERAL STANDARDS (FED-STD)
Order from:
General Services Administration
Federal Supply Service Bureau
470 E L'Enfant Plaza, S.W.
Washington, DC 20407
Ph: 202-619-8925
Fax: 202-619-8978
Internet: http://pub.fss.gsa.gov/
AOK6/99

IBM CORPORATION (IBM)
Publications
P.O. Box 29570
Raleigh, NC 27626-0570
Ph: 800-879-2755, Option 1
Fax: 800-445-9269
Internet: www.ibmink.ibm.com
AOK6/99

ILLUMINATING ENGINEERING SOCIETY OF NORTH AMERICA (IESNA)
120 Wall St., 17th Floor
New York, NY 10005-4001
Ph: 212-248-5000
Fax: 212-248-5017
Internet: www.iesna.org
AOK6/99

INDUSTRIAL FASTENERS INSTITUTE (IFI)
1717 East 9th St., Suite 1105
Cleveland, OH 44114-2879
Ph: 216-241-1482
Fax: 216-241-5901
Internet: http://www.industrial-fasteners.org
e-mail: indfast@aol.com
AOK6/99

INSECT SCREENING WEAVERS ASSOCIATION (ISWA)
P.O. Box 1018
Ossining, NY 10562
Ph: 914-962-9052
Fax: 914-923-3031
AOK6/99

INSTITUTE FOR INTERCONNECTING AND PACKAGING ELECTRONIC CIRCUITS (IPC)
2215 Sanders Rd.
Northbrook, IL 60062-6135
Ph: 847-509-9700
Fax: 847-509-9798
Internet: www.ipc.org
e-mail: orderipc@ipc.org
AOK6/99

INSTITUTE OF CLEAN AIR COMPANIES (ICAC)
1660 L St., NW, Suite 1100
Washington, DC 20036-5603
Ph: 202-457-0911
Fax: 202-331-1388
E-mail: sjenkins@icac.com
Internet: icac.com
AOK6/99

INSTITUTE OF ELECTRICAL AND ELECTRONICS ENGINEERS (IEEE)
445 Hoes Ln, P. O. Box 1331
Piscataway, NJ 08855-1331
Ph: 732-981-0060 OR 800-701-4333
Fax: 732-981-9667
Internet: http//www.standards.ieee.org
E-mail: customer.service@ieee.org
AOK6/99

INSTITUTE OF ENVIRONMENTAL SCIENCES AND TECHNOLOGY (IEST)
940 East Northwest Highway
Mount Prospect, IL 60056
Ph: 847-255-1561
Fax: 847-255-1699
AOK6/99

INSULATED CABLE ENGINEERS ASSOCIATION (ICEA)
P.O. Box 440
South Yarmouth, MA 02664
Ph: 508-394-4424
Fax: 508-394-1194
E-mail: www.electricnet.com/orgs/insucbl.htm
AOK6/99

INTERNATIONAL APPROVAL SERVICES (IAS)
8501 East Pleasant Valley Rd.
Cleveland, OH 44131
Ph: 216-524-4990
Fax: 216-642-3463
Internet: www.iasapprovals.org
AOK6/99

NATIONAL ASSOCIATION OF PLUMBING-HEATING-COOLING CONTRACTORS (NAPHCC)
180 S. Washington Street
P.O. Box 6808
Falls Church, VA 22046
Ph: 800-533-7694
Fax: 703-237-7442
AOK6/99

NATIONAL CONCRETE MASONRY ASSOCIATION (NCMA)

2302 Horse Pen Road
Herndon, VA 20171-3499
Ph: 703-713-1900
Fax: 703-713-1910
Internet: http://www.ncma.org/

NATIONAL DRILLING ASSOCIATION (NDA)
3008 Millwood Avenue
Columbia, SC 29205
Ph: 800-445-8629 or 803-252-5646
Fax: 803-765-0860
email: info@nda4U.com
Internet: http://www.nda4U.com
AOK6/99

NATIONAL ELECTRICAL MANUFACTURERS ASSOCIATION (NEMA)
1300 N. 17th St., Suite 1847
Rosslyn, VA 22209
Ph: 703-841-3200
Fax: 703-841-3300
Internet: http//www.nema.org/
AOK6/99

NATIONAL ENVIRONMENTAL BALANCING BUREAU (NEBB)
8575 Grovemont Circle
Gaithersburg, MD 20877-4121
Ph: 301-977-3698
Fax: 301-977-9589
AOK6/99
NATIONAL FIRE PROTECTION ASSOCIATION (NFPA)
One Batterymarch Park P.O. Box 9101
Quincy, MA 02269-9101
Ph: 800-344-3555
Fax: 800-593-6372
Internet: http://www.nfpa.org
NOTE: The complete set of 1997 NFPA National Fire Codes (13 Vol.) is available for $835.00.
AOK6/99

NATIONAL INSTITUTE FOR CERTIFICATION IN ENGINEERING TECHNOLOGIES (NICET)
1420 King Street
Alexandria, VA 22314-2794
Ph: 888-476-4238
Internet: www.nicet.org
AOK6/9901090

NATIONAL INSTITUTE FOR OCCUPATIONAL SAFETY AND HEALTH (NIOSH)
Mail Stop C-13
4676 Columbia Parkway
Cincinnati, OH 45226-1998
Ph: 800-356-4676
Internet: http://www.cdc.gov/niosh/homepage.html
To order pubs for which a fee is charged, order from:
Superintendent of Documents
Government Printing Office
Washington, DC 20402-9325
Ph: 202-512-1800
Fax: 202-512-2250
AOK6/99

NATIONAL INSTITUTE OF STANDARDS AND TECHNOLOGY (NIST)
Department of Commerce
Gaithersburg, MD 20899-0001
Ph: 301-975-4025
Fax: 301-926-1630
Order Publications From:
Superintendent of Documents
U.S. Government Printing Office (GPO)
Washington, DC 20402
Ph: 202-512-1800
Fax: 202-512-2250
or
National Technical Information Services (NTIS)
5285 Port Royal Rd.
Springfield, VA 22161
Ph: 800-553-6847
Fax: 703-321-8547
Internet: http://ww.gov/ntis.gov
AOK6/99

NATIONAL READY-MIXED CONCRETE ASSOCIATION (NRMCA)
900 Spring St.
Silver Spring, MD 20910
Ph: 301-587-1400
Fax: 301-585-4219
AOK6/99

NAVAL FACILITIES ENGINEERING COMMAND (NAVFAC)
1510 Gilbert St.
Norfolk, VA 23511-2699
Ph: 757-322-4200
Fax: 757-322-4416
AOK6/99

NAVAL FACILITIES ENGINEERING SERVICE CENTER (NFESC)
560 Center Drive
Port Hueneme, CA 93043-4328
Ph: 805-982-5661
AOK6/99

NORTHEAST REGIONAL AGRICULTURAL ENGINEERING SERVICE (NRAES)
Cooperative Extension
152 Riley-Robb Hall
Ithaca, NY 14853-5701
Ph: 607-255-7654
Fax: 607-254-8770
Internet: http://rcwpsun.cas.psu.edu/nraes
E-mail: nraes@cornell.edu
AOK6/99

NSF INTERNATIONAL (NSF)
ATTN: Publications
789 Dixboro Rd.
P.O. Box 130140
789 Dixboro Rd.
Ann Arbor, MI 48113-0140
Ph: 734-769-8010
Fax: 734-769-0109
Toll Free; 800-NSF-MARK
Internet: www.nsf.org
AOK6/99

PIPE FABRICATION INSTITUTE (PFI)
3211 Jermantown Rd, Ste. 100, Fairfax, VA 22030
Ph: 514-634-3434
Fax: 514-634-9736
AOK6/99

01090-27

PLASTIC PIPE AND FITTINGS ASSOCIATION (PPFA)
800 Roosevelt Rd., Bldg C, Suite 20
Glen Ellyn, IL 60137
Ph: 630-858-6540
Fax: 630-790-3095
AOK6/99

PLASTICS PIPE INSTITUTE (PPI)
1801 L St. NW, Suite 600K
Washington, D. C. 20006-1301
Ph: 888-314-6774
Fax: 202-293-0048
Internet: http://www.plasticpipe.org
Order Publications from:
SPI
P. O. Box 753
Waldorf, MD 20604
Ph: 202-974-5332
Fax: 800-541-0736 or 202-296-7359
AOK6/99

PLUMBING AND DRAINAGE INSTITUTE (PDI)
45 Bristol Dr., Suite 101.
South Easton, MA 02375
Ph: 508-230-3516
Fax: 508-230-3529
E-Mail: pdhw@tiac.net
AOK6/99

PLUMBING AND PIPING INDUSTRY COUNCIL (PPIC)
501 Shatto Place, Suite 402
Los Angeles, CA 90020
Ph: 310-381-3040
Fax: 213-487-3880
AOK6/99

PRECAST/PRESTRESSED CONCRETE INSTITUTE (PCI)
175 West Jackson Blvd., Suite 1859
Chicago, IL 60604
Ph: 312-786-0300
Fax: 312-786-0353
Internet: www.pci.org
e-mail: info@pci.org
AOK6/99

RUBBER MANUFACTURERS ASSOCIATION (RMA)
1400 K St., NW
Washington, DC 20005
Ph: 202-682-4800
Fax: 202-682-4854
Order Publications from:
The Mail Room
P. O. Box 3147
Medina, OH 44258
Ph: 800-325-5098 or 330-723-2987
Fax: 330-725-0576
AOK6/99

SOUTHERN BUILDING CODE CONGRESS INTERNATIONAL (SBCCI)
900 Montclair Road
Birmingham, AL 35213-1206
Ph: 205-591-1853
Fax: 205-591-0775
AOK6/99

SOUTHERN PINE INSPECTION BUREAU (SPIB)
4709 Scenic Highway
Pensacola, FL 32504-9094
Ph: 850-434-2611
Fax: 850-433-5594
e-mail: spib@spib.org
AOK6/99

THE SOCIETY FOR PROTECTIVE COATINGS (SSPC)
40 24th Street, 6th Floor
Pittsburgh, PA 15222-4656
Ph: 412-281-2331
Fax: 412-281-9992
Internet: www.sspc.org
NOTE: SSPC documents, except as noted otherwise, are available only as a part of the 1995 Steel Structures Painting Manual, 7th Edition @ $115.00.
AOK6/99

TRUSS PLATE INSTITUTE (TPI)
583 D'Onofrio Dr., Suite 200
Madison, WI 53719
Ph: 608-833-5900
Fax: 608-833-4360

TUBULAR EXCHANGE MANUFACTURERS ASSOCIATION (TEMA)
25 N. Broadway
Tarrytown, NY 10591
Ph: 914-332-0040
Fax: 914-332-1541
AOK6/99

UNDERWRITERS LABORATORIES (UL)
333 Pfingsten Rd.
Northbrook, IL 60062-2096
Ph: 847-272-8800
Fax: 847-272-8129
Internet: http://www.ul.com/
AOK6/99

Note: First price is for the standard only. Second price is for the standard including the Revision Subscription Service.

UNI-BELL PVC PIPE ASSOCIATION (UBPPA)
2655 Villa Creek Dr., Suite 155
Dallas, TX 75234
Ph: 214-243-3902
Fax: 214-243-3907

U. S. ARMY ENVIORNMENTAL HYGIENE AGENCY (USAEHA)
Waste Disposal Engineering Division
Aberdeen Proving Ground, MD 21010-5422
Ph: 410-671-3652
AOK6/99

WATER ENVIRONMENT FEDERATION (WEF)
601 Wythe St.
Alexandria, VA 22314-1994
Ph: 703-684-2452
Fax: 703-684-2492
Internet: www.wef.org
AOK6/99

WATER QUALITY ASSOCIATION (WQA)
4151 Naperville Rd.
Lisle, IL 60532
Ph: 630-505-0160
Fax: 630-505-9637
AOK6/99

WEST COAST LUMBER INSPECTION BUREAU (WCLIB)
P.O. Box 23145
Portland, OR 97281
Ph: 503-639-0651
Fax: 503-684-8928
AOK/699

WESTERN WOOD PRESERVERS INSTITUTE (WWPI)
7017 N.E. Highway 99 # 108
Vancover, WA 98666
Ph: 360-693-9958
Fax: 360-693-9967
AOK6/99

WESTERN WOOD PRODUCTS ASSOCIATION (WWPA)
Yeon Bldg.
522 SW 5th Ave.
Suite 500
Portland, OR 97204-2122
Ph: 503-224-3930
Fax: 503-224-3934
AOK6/99

WOOD MOULDING AND MILLWORK PRODUCERS ASSOCIATION (WMMPA)
507 First Street
Woodland, CA 95695
Ph: 916-661-9591
Fax: 916-661-9586
AOK6/99

END OF SECTION

SECTION 01330

SUBMITTAL PROCEDURES

1 GENERAL

1.1 SUBMITTAL IDENTIFICATION

Submittals required are identified by SD numbers as follows:

SD-01 Data

SD-04 Drawings

SD-06 Instructions

SD-07 Schedules

SD-08 Statements

SD-09 Reports

SD-13 Certificates

SD-14 Samples

SD-18 Records

SD-19 Operation and Maintenance Manuals

1.2 SUBMITTAL CLASSIFICATION

Submittals are classified as follows:

1.2.1 Government Approved

Governmental approval is required for extensions of design, critical materials, deviations, equipment whose compatibility with the entire system must be checked, and other items as designated by the Contracting Officer. Within the terms of the Contract Clause entitled "Specifications and Drawings for Construction," they are considered to be "shop drawings."

1.2.2 Information Only

All submittals not requiring Government approval will be for information only. They are not considered to be "shop

drawings" within the terms of the Contract Clause referred to above.

## 1.3 APPROVED SUBMITTALS

The Contracting Officer's approval of submittals shall not be construed as a complete check, but will indicate only that the general method of construction, materials, detailing and other information are satisfactory. Approval will not relieve the Contractor of the responsibility for any error which may exist, as the Contractor under the CQC requirements of this contract is responsible for dimensions, the design of adequate connections and details, and the satisfactory construction of all work. After submittals have been approved by the Contracting Officer, no resubmittal for the purpose of substituting materials or equipment will be considered unless accompanied by an explanation of why a substitution is necessary.

## 1.4 DISAPPROVED SUBMITTALS

The Contractor shall make all corrections required by the Contracting Officer and promptly furnish a corrected submittal in the form and number of copies specified for the initial submittal. If the Contractor considers any correction indicated on the submittals to constitute a change to the contract, a notice in accordance with the Contract Clause "Changes" shall be given promptly to the Contracting Officer.

# 2 PRODUCTS (NOT APPLICABLE)

# 3 EXECUTION

## 3.1 GENERAL

The Contractor shall make submittals as required by the specifications. The Contracting Officer may request submittals in addition to those specified when deemed necessary to adequately describe the work covered in the respective sections. Units of weights and measures used on all submittals shall be the same as those used in the contract drawings. Each submittal shall be complete and in sufficient detail to allow ready determination of compliance with contract requirements. Prior to submittal, all items shall be checked and approved by the Contractor's Quality Control (CQC) representative and each item shall be stamped, signed, and dated by the CQC representative indicating action taken. Proposed deviations from the contract requirements shall be clearly identified. Submittals shall include items such as: Contractor's, manufacturer's, or fabricator's drawings; descriptive literature including (but not limited to) catalog cuts, diagrams, operating charts or curves; test reports; test cylinders; samples; O&M manuals (including parts list); certifications; warranties; and other such required submittals. Submittals requiring Government approval shall be scheduled and made prior to the acquisition of the material or equipment covered thereby. Samples remaining upon completion of the work shall be picked up and disposed of in accordance with manufacturer's Material Safety Data Sheets (MSDS) and in compliance with existing laws and regulations.

3.2 SUBMITTAL REGISTER (AF FORM 66)

At the end of this section is a listing of items identified in the specifications as requiring submittals. This list is to be used in preparing AF Form 66 Submittal Register or a computerized equivalent. The list is not all inclusive and additional submittals may be required by other parts of the contract. The contractor is required to complete AF Form 66 and submit to the Contracting Officer for approval within 30 calendar days after Notice to Proceed. The approved submittal register will serve as a scheduling document for submittals and will be used to control submittal actions throughout the contract period. The submit dates and need dates used in the submittal register shall be coordinated with dates in the contractor prepared progress schedule. Updates to the submittal register showing the contractor action codes and actual dates with government action codes and actual dates shall be submitted monthly or until all submittals have been satisfactorily completed. When the progress schedule is revised, the submittal register shall also be revised and both submitted for approval.

3.3 SCHEDULING

Submittals covering component items forming a system or items that are interrelated shall be scheduled to be coordinated and submitted concurrently. Certifications to be submitted with the pertinent drawings shall be so scheduled.

3.4 SUBMITTAL PROCEDURE

Submittals shall be made as follows:

3.4.1 Procedures

Detailed submittal procedures will be further discussed with the contractor at the pre-construction conference.

3.4.2 Deviations

For submittals which include proposed deviations requested by the Contractor, the column "variation" of ENG Form 4025 shall be checked. The Contractor shall set forth in writing the reason for any deviations and annotate such deviations on the submittal. The Government reserves the right to rescind inadvertent approval of submittals containing unnoted deviations.

3.5 CONTROL OF SUBMITTALS

The Contractor shall carefully control his procurement operations to ensure that each individual submittal is made on or before the Contractor scheduled submittal date shown on the approved "Submittal Register."

## 3.6 GOVERNMENT APPROVED SUBMITTALS

Upon completion of review of submittals requiring Government approval, the submittals will be identified as having received approval by being so stamped and dated. 4 copies of the submittal will be retained by the Contracting Officer and 2 copies of the submittal will be returned to the Contractor.

## 3.7 INFORMATION ONLY SUBMITTALS

Normally submittals for information only will not be returned. Approval of the Contracting Officer is not required on information only submittals. The Government reserves the right to require the Contractor to resubmit any item found not to comply with the contract. This does not relieve the Contractor from the obligation to furnish material conforming to the plans and specifications; will not prevent the Contracting Officer from requiring removal and replacement of nonconforming material incorporated in the work; and does not relieve the Contractor of the requirement to furnish samples for testing by the Government laboratory or for check testing by the Government in those instances where the technical specifications so prescribe.

END OF SECTION

SECTION 02220

DEMOLITION

# 1 GENERAL

## 1.1 REFERENCES

The publications listed below form a part of this specification to the extent referenced. The publications are referred to in the text by basic designation only.

ENGINEERING MANUALS (EM)

| | |
|---|---|
| EM 385-1-1 | (1996) U.S. Army Corps of Engineers Safety and Health Requirements Manual |

## 1.2 GENERAL REQUIREMENTS

The work includes demolition, salvage of identified items and materials, and removal of resulting rubbish and debris. Rubbish and debris shall be removed from Government property daily, unless otherwise directed, to avoid accumulation at the demolition site. Materials that cannot be removed daily shall be stored in areas specified by the Contracting Officer. In the interest of occupational safety and health, the work shall be performed in accordance with EM 385-1-1, Section 23, Demolition, and other applicable Sections. In the interest of conservation, salvage shall be pursued to the maximum extent possible; salvaged items and materials shall be disposed of as specified.

## 1.3 SUBMITTALS

Government approval is required for submittals with a "GA" designation; submittals having an "FIO" designation are for information only. The following shall be submitted in accordance with Section 01330 SUBMITTAL PROCEDURES:

SD-08 Statements

Work Plan; GA|CD

The procedures proposed for the accomplishment of salvage and demolition work shall be submitted for approval. The procedures shall provide for safe conduct of the work, including procedures and methods to provide necessary supports, lateral bracing and shoring when required, careful removal and disposition of materials specified to be salvaged, protection of property which is to remain undisturbed, coordination with other work in progress, and timely disconnection of utility services. The procedures shall include a detailed description of the methods and equipment to be used for each operation, and the sequence of operations in accordance with EM 385-1-1.

## 1.4 DUST CONTROL

The amount of dust resulting from demolition shall be controlled to prevent the spread of dust to occupied portions of the construction site and to avoid creation of a nuisance in the surrounding area. Use of water will not be permitted when it will result in, or create, hazardous or objectionable conditions such as ice, flooding and pollution.

## 1.5 PROTECTION

### 1.5.1 Protection of Existing Property

Before beginning any demolition work, the Contractor shall survey the site and examine the drawings and specifications to determine the extent of the work. The Contractor shall take necessary precautions to avoid damage to existing items to remain in place, to be reused, or to remain the property of the Government; any damaged items shall be repaired or replaced as approved by the Contracting Officer's Representative. The Contractor shall coordinate the work of this section with all other work and shall construct and maintain shoring, bracing, and supports as required. The Contractor shall ensure that structural elements are not overloaded and shall be responsible for increasing structural supports or adding new supports as may be required as a result of any cutting, removal, or demolition work performed under this contract.

### 1.5.2 Protection From the Weather

The salvageable materials and equipment shall be protected from the weather at all times.

### 1.5.3 Environmental Protection

All work and Contractor operations shall comply with the requirements of Section 01015 GENERAL PROVISIONS (AIRFIELD).

# 2 PRODUCTS (NOT APPLICABLE)

# 3 EXECUTION

## 3.1 EXISTING STRUCTURES

Existing structures indicated shall be removed to grade.

## 3.2 FILLING

Holes and other hazardous openings shall be filled in accordance with Section 02300 EARTHWORK.

## 3.3 DISPOSITION OF MATERIAL

Title to material and equipment to be demolished, except Government salvage and historical items, is vested in the Contractor upon receipt of notice to proceed. The Government will not be responsible for the condition, loss or damage to such property after notice to proceed.

### 3.3.1 Salvageable Items and Material

Contractor shall salvage items and material to the maximum extent possible.

#### 3.3.1.1 Material Salvaged for the Contractor

Material salvaged for the Contractor shall be stored as approved by the Contracting Officer and shall be removed from Government property before completion of the contract. Material salvaged for the Contractor shall not be sold on the site.

#### 3.3.1.2 Items Salvaged for the Government

Salvaged items to remain the property of the Government shall be removed in a manner to prevent damage, and packed or crated to protect the items from damage while in storage or during shipment. Items damaged during removal or storage shall be repaired or replaced to match existing items. Containers shall be properly identified as to contents

## 3.4 CLEAN UP

Debris and rubbish shall be removed from basement and similar excavations. Debris shall be removed and transported in a manner that prevents spillage on streets or adjacent areas. Local regulations regarding hauling and disposal shall apply.

## 3.5 PAVEMENTS

Existing pavements designated for removal shall be saw cut and removed in accordance with the details shown on the drawings and to the limits and depths indicated on the drawings.

END OF SECTION

# SECTION 02300

# EARTHWORK

## 1 GENERAL

### 1.1 REFERENCES

The publications listed below form a part of this specification to the extent referenced. The publications are referred to in the text by basic designation only.

AMERICAN SOCIETY FOR TESTING AND MATERIALS (ASTM)

| | |
|---|---|
| ASTM C 136 | (1996a) Sieve Analysis of Fine and Coarse Aggregates |
| ASTM D 422 | (1963; R 1998) Particle-Size Analysis of Soils |
| ASTM D 1140 | (1997) Amount of Material in Soils Finer than the No. 200 (75-micrometer) Sieve |
| ASTM D 1556 | (1990; R 1996) Density and Unit Weight of Soil in Place by the Sand-Cone Method |
| ASTM D 1557 | (1998) Laboratory Compaction Characteristics of Soil Using Modified Effort (56,000 ft-lbf/cu. ft. (2,700 kN-m/cu. m.)) |
| ASTM D 2487 | (1998) Classification of Soils for Engineering Purposes (Unified Soil Classification System) |
| ASTM D 2922 | (1996) Density of Soil and Soil-Aggregate in Place by Nuclear Methods (Shallow Depth) |
| ASTM D 3017 | (1988; R 1996el) Water Content of Soil and Rock in Place by Nuclear Methods (Shallow Depth) |
| ASTM D 4318 | (1998) Liquid Limit, Plastic Limit, and Plasticity Index of Soils |

### 1.2 PAYMENT

Payment for all work covered in this section and all costs in connection therewith shall be included in the contract lump sum price for sitework.

## 1.3 DEFINITIONS

### 1.3.1 Satisfactory Materials

Satisfactory materials shall comprise any materials classified by ASTM D 2487 as GW, GP, GM, GP-GM, GW-GM, GC, GP-GC, GM-GC, SW, SP, SM, SW-SM, SC, SW-SC, SP-SM, SP-SC. Satisfactory materials for grading shall be comprised of stones less than 8 inches, except for fill material for pavements and railroads which shall be comprised of stones less than 3 inches in any dimension.

### 1.3.2 Unsatisfactory Materials

Materials which do not comply with the requirements for satisfactory materials are unsatisfactory. Unsatisfactory materials also include man-made fills; trash; refuse; backfills from previous construction; and material classified as satisfactory which contains root and other organic matter or frozen material. The Contracting Officer shall be notified of any contaminated materials.

### 1.3.3 Cohesionless and Cohesive Materials

Cohesionless materials include materials classified in ASTM D 2487 as GW, GP, SW, and SP. Cohesive materials include materials classified as GC, SC, ML, CL, MH, and CH. Materials classified as GM and SM will be identified as cohesionless only when the fines are nonplastic. Testing required for classifying materials shall be in accordance with ASTM D 4318, ASTM C 136, ASTM D 422, and ASTM D 1140.

### 1.3.4 Degree of Compaction

Degree of compaction required is expressed as a percentage of the maximum density obtained by the test procedure presented in ASTM D 1557abbreviated as a percent of laboratory maximum density.

## 1.4 SUBMITTALS

Government approval is required for submittals with a "GA" designation; submittals having an "FIO" designation are for information only. The following shall be submitted in accordance with Section 01330 SUBMITTAL PROCEDURES:

SD-08 Statements

Testing; FIO.

Within 24 hours of conclusion of physical tests, 4 copies of test results, including calibration curves and results of calibration tests.

SD-13 Certificates

Testing; FIO.

Qualifications of the commercial testing laboratory or Contractor's testing facilities.

SD-18 Records

## 1.5 SUBSURFACE DATA

Subsurface soil boring logs are appended to the SPECIAL CONTRACT REQUIREMENTS. These data represent the best subsurface information available; however, variations may exist in the subsurface between boring locations.

## 1.6 CLASSIFICATION OF EXCAVATION

No consideration will be given to the nature of the materials, and all excavation will be designated as unclassified excavation.

## 1.7 UTILIZATION OF EXCAVATED MATERIALS

Unsatisfactory materials removed from excavations shall be disposed of in designated waste disposal or spoil areas. Satisfactory material removed from excavations shall be used, insofar as practicable, in the construction of fills, embankments, subgrades, shoulders, bedding (as backfill), and for similar purposes. No satisfactory excavated material shall be wasted without specific written authorization. Satisfactory material authorized to be wasted shall be disposed of in designated areas approved for surplus material storage or designated waste areas as directed. Newly designated waste areas on Government-controlled land shall be cleared and grubbed before disposal of waste material thereon. Coarse rock from excavations shall be stockpiled and used for constructing subgrades. No excavated material shall be disposed of to obstruct the flow of any stream, endanger a partly finished structure, impair the efficiency or appearance of any structure, or be detrimental to the completed work in any way.

## 2 PRODUCTS (NOT APPLICABLE)

## 3 EXECUTION

### 3.1 GENERAL EXCAVATION

The Contractor shall perform excavation of every type of material encountered within the limits of the project to the lines, grades, and elevations indicated and as specified. Grading shall be in conformity with the typical sections shown and the tolerances specified in paragraph FINISHING. Satisfactory excavated materials shall be transported to and placed in fill or embankment within the limits of the work. Unsatisfactory materials encountered within the limits of the work shall be excavated below grade and replaced with satisfactory materials as directed. Such excavated material and the satisfactory material ordered as replacement shall be included in excavation. Surplus satisfactory excavated material not required for fill or embankment shall be disposed of in areas approved for surplus material storage or designated waste areas. Unsatisfactory excavated material shall be disposed of in designated waste or spoil areas. During construction, excavation and fill shall be performed in a manner and sequence that will provide proper drainage at all times. Material required for fill or embankment in excess of that produced by excavation within the grading limits shall be excavated <TAI OPT=BORROW>from the borrow areas indicated or</TAI> from other approved areas selected by the Contractor as specified.

#### 3.1.1 Ditches, Gutters, and Channel Changes

Excavation of ditches, gutters, and channel changes shall be accomplished by cutting accurately to the cross sections, grades, and elevations shown. Ditches and gutters shall not be excavated below grades shown. Excessive open ditch or gutter excavation shall be backfilled with satisfactory, thoroughly compacted, material or with suitable stone or cobble to grades shown. Material excavated shall be disposed of as shown or as directed, except that in no case shall material be deposited less than 4 feet from the edge of a ditch. The Contractor shall maintain excavations free from detrimental quantities of leaves, brush, sticks, trash, and other debris until final acceptance of the work.

#### 3.1.2 Drainage Structures

Excavations shall be made to the lines, grades, and elevations shown, or as directed. Trenches and foundation pits shall be of sufficient size to permit the placement and removal of forms for the full length and width of structure footings and foundations as shown. Rock or other hard foundation material shall be cleaned of loose debris and cut to a firm, level, stepped, or serrated surface. Loose disintegrated rock and thin strata shall be removed. When concrete or masonry is to be placed in an excavated area, the bottom of the excavation shall not be disturbed. Excavation to the final grade level shall not be made until just before the concrete or masonry is to be placed

### 3.2 SELECTION OF BORROW MATERIAL

Borrow material shall be selected to meet the requirements and conditions of the particular fill or embankment for which it is to be used. Borrow material shall be obtained from the borrow

areas shown or from other approved sources, either private or within the limits of the project site, selected by the Contractor. Unless otherwise provided in the contract, the Contractor shall obtain from the owners the right to procure material, pay royalties and other charges involved, and bear the expense of developing the sources, including rights-of-way for hauling. Borrow material from approved sources on Government-controlled land may be obtained without payment of royalties. Unless specifically provided, no borrow shall be obtained within the limits of the project site without prior written approval. Necessary clearing, grubbing, and satisfactory drainage of borrow pits and the disposal of debris thereon shall be considered related operations to the borrow excavation.

## 3.3 GRADING AREAS

Where indicated, work will be divided into grading areas within which satisfactory excavated material shall be placed in embankments, fills, and required backfills. The Contractor shall not haul satisfactory material excavated in one grading area to another grading area except when so directed in writing.

## 3.4 BACKFILL

Backfill adjacent to any and all types of structures shall be placed and compacted to at least 90 percent laboratory maximum density for cohesive materials or 95 percent laboratory maximum density for cohesionless materials to prevent wedging action or eccentric loading upon or against the structure. Ground surface on which backfill is to be placed shall be prepared as specified in paragraph PREPARATION OF GROUND SURFACE FOR EMBANKMENTS. Compaction requirements for backfill materials shall also conform to the applicable portions of paragraphs PREPARATION OF GROUND SURFACE FOR EMBANKMENTS, EMBANKMENTS, and SUBGRADE PREPARATION. Compaction shall be accomplished by sheepsfoot rollers, pneumatic-tired rollers, steel-wheeled rollers, vibratory compactors, or other approved equipment.

## 3.5 PREPARATION OF GROUND SURFACE FOR EMBANKMENTS

### 3.5.1 General Requirements

Ground surface on which fill is to be placed shall be stripped of live, dead, or decayed vegetation, rubbish, debris, and other unsatisfactory material; plowed, disked, or otherwise broken up to a depth of 8; pulverized; moistened or aerated as necessary; thoroughly mixed; and compacted to at least 90 percent laboratory maximum density for cohesive materials or 95 percent laboratory maximum density for cohesionless materials. Compaction shall be accomplished by sheepsfoot rollers, pneumatic-tired rollers, steel-wheeled rollers, vibratory compactors, or other approved equipment. The prepared ground surface shall be scarified and moistened or aerated as required just prior to placement of embankment materials to assure adequate bond between embankment material and the prepared ground surface.

## 3.6 EMBANKMENTS

### 3.6.1 Earth Embankments

Earth embankments shall be constructed from satisfactory materials free of organic or frozen material and rocks with any dimension greater than 3 inches. The material shall be placed in successive horizontal layers of loose material not more than 8 inches in depth. Each layer shall be spread uniformly on a soil surface that has been moistened or aerated as necessary, and scarified or otherwise broken up so that the fill will bond with the surface on which it is placed. After spreading, each layer shall be plowed, disked, or otherwise broken up; moistened or aerated as necessary; thoroughly mixed; and compacted to at least 90 percent laboratory maximum density for cohesive materials or 95 percent laboratory maximum density for cohesionless materials. Compaction requirements for the upper portion of earth embankments forming subgrade for pavements shall be identical with those requirements specified in paragraph SUBGRADE PREPARATION. Compaction shall be accomplished by sheepsfoot rollers, pneumatic-tired rollers, steel-wheeled rollers, vibratory compactors, or other approved equipment.

## 3.7 SUBGRADE PREPARATION

### 3.7.1 Construction

Subgrade shall be shaped to line, grade, and cross section, and compacted as specified. This operation shall include plowing, disking, and any moistening or aerating required to obtain specified compaction. Soft or otherwise unsatisfactory material shall be removed and replaced with satisfactory excavated material or other approved material as directed. Rock encountered in the cut section shall be excavated to a depth of 6 inches below finished grade for the subgrade. Low areas resulting from removal of unsatisfactory material or excavation of rock shall be brought up to required grade with satisfactory materials, and the entire subgrade shall be shaped to line, grade, and cross section and compacted as specified. After rolling, the surface of the subgrade for airfields shall not show deviations greater than 1/4 inch when tested with a 10 foot straightedge applied both parallel and at right angles to the centerline of the area. The elevation of the finish subgrade shall not vary more than 0.05 foot from the established grade and cross section.

### 3.7.2 Compaction

Compaction shall be accomplished by sheepsfoot rollers, pneumatic-tired rollers, steel-wheeled rollers, vibratory compactors, or other approved equipment. Each layer of the embankment shall be compacted to at least 95 percent of laboratory maximum density.

#### 3.7.2.1 Subgrade for Pavements

Subgrade for pavements shall be compacted to at least 95 percentage laboratory maximum density for the depth below the surface of the pavement shown. When more than one soil classification is present in the subgrade, the top 8 inches of subgrade shall be scarified, windrowed, thoroughly blended, reshaped, and compacted.

3.7.2.2 Subgrade for Shoulders

Subgrade for shoulders shall be compacted to at least 95 percentage laboratory maximum density for the depth below the surface of the pavement shown.

## 3.8 SHOULDER CONSTRUCTION

Shoulders shall be constructed of satisfactory excavated <TAI OPT=BORROW>or borrow</TAI> material or as otherwise shown or specified. Shoulders shall be constructed as soon as possible after adjacent paving is complete, but in the case of rigid pavements, shoulders shall not be constructed until permission of the Contracting Officer has been obtained. The entire shoulder area shall be compacted to at least the percentage of maximum density as specified in paragraph SUBGRADE PREPARATION above, for specific ranges of depth below the surface of the shoulder. Compaction shall be accomplished by sheepsfoot rollers, pneumatic-tired rollers, steel-wheeled rollers, vibratory compactors, or other approved equipment. Shoulder construction shall be done in proper sequence in such a manner that adjacent ditches will be drained effectively and that no damage of any kind is done to the adjacent completed pavement. The completed shoulders shall be true to alignment and grade and shaped to drain in conformity with the cross section shown.

## 3.9 FINISHING

The surface of excavations, embankments, and subgrades shall be finished to a smooth and compact surface in accordance with the lines, grades, and cross sections or elevations shown. The degree of finish for graded areas shall be within 0.1 foot of the grades and elevations indicated except that the degree of finish for subgrades shall be specified in paragraph SUBGRADE PREPARATION. Gutters and ditches shall be finished in a manner that will result in effective drainage. The surface of areas to be turfed shall be finished to a smoothness suitable for the application of turfing materials.

## 3.10 <TAI OPT=TOPSOIL>3.12 PLACING TOPSOIL

On areas to receive topsoil, the compacted subgrade soil shall be scarified to a 2 inch depth for bonding of topsoil with subsoil. Topsoil then shall be spread evenly to a thickness of 2 inches and graded to the elevations and slopes shown. Topsoil shall not be spread when frozen or excessively wet or dry. Material required for topsoil in excess of that produced by excavation within the grading limits shall be obtained from offsite areas.

## 3.11 TESTING

Testing shall be performed by an approved commercial testing laboratory or by the Contractor subject to approval. If the Contractor elects to establish testing facilities, no work requiring testing will be permitted until the Contractor's facilities have been inspected and approved by the Contracting Officer. Field in-place density shall be determined in accordance with ASTM D 1556 or ASTM D 2922. When ASTM D 2922 is used, the calibration curves shall be checked and adjusted using only the sand cone method as described in ASTM D 1556. ASTM D 2922results in a wet unit weight of soil and when using this method ASTM D 3017 shall be

used to determine the moisture content of the soil. The calibration curves furnished with the moisture gauges shall also be checked along with density calibration checks as described in ASTM D 3017; the calibration checks of both the density and moisture gauges shall be made at the beginning of a job on each different type of material encountered and at intervals as directed by the Contracting Officer. When test results indicate, as determined by the Contracting Officer, that compaction is not as specified, the material shall be removed, replaced and recompacted to meet specification requirements. Tests on recompacted areas shall be performed to determine conformance with specification requirements. Inspections and test results shall be certified by a registered professional civil engineer. These certifications shall state that the tests and observations were performed by or under the direct supervision of the engineer and that the results are representative of the materials or conditions being certified by the tests. The following number of tests, if performed at the appropriate time, will be the minimum acceptable for each type operation.

3.11.1 Fill and Backfill Material Gradation

One test per 500 cubicyards stockpiled or in-place source material. Gradation of fill and backfill material shall be determined in accordance with ASTM C 136, ASTM D 422 or ASTM D 1140.

3.11.2 In-Place Densities

a. One test per 10,000 square feet, or fraction thereof, of each lift of fill or backfill areas compacted by other than hand-operated machines.

b. One test per 1,000 squarefeet, or fraction thereof, of each lift of fill or backfill areas compacted by hand-operated machines.

3.11.3 Check Tests on In-Place Densities

If ASTM D 2922 is used, in-place densities shall be checked by ASTM D 1556 as follows:

a. One check test per lift for each 100,000 squarefeet, or fraction thereof, of each lift of fill or backfill compacted by other than hand-operated machines.

b. One check test per lift for each 10,000 squarefeet, of fill or backfill areas compacted by hand-operated machines.

3.11.4 Moisture Contents

In the stockpile, excavation, or borrow areas, a minimum of two tests per day per type of material or source of material being placed during stable weather conditions shall be performed. During unstable weather, tests shall be made as dictated by local conditions and approved by the Contracting Officer.

3.11.5 Optimum Moisture and Laboratory Maximum Density

Tests shall be made for each type material or source of material including borrow material to determine the optimum moisture and laboratory maximum density values. One representative test per 500 cubicyards of fill and backfill, or when any change in material occurs which may affect the optimum moisture content or laboratory maximum density.

3.11.6 Tolerance Tests for Subgrades

Continuous checks on the degree of finish specified in paragraph SUBGRADE PREPARATION shall be made during construction of the subgrades.

3.12 SUBGRADE AND EMBANKMENT PROTECTION

During construction, embankments and excavations shall be kept shaped and drained. Ditches and drains along subgrade shall be maintained to drain effectively at all times. The finished subgrade shall not be disturbed by traffic or other operation and shall be protected and maintained by the Contractor in a satisfactory condition until subbase, base, or pavement is placed. The storage or stockpiling of materials on the finished subgrade will not be permitted. No subbase, base course, or pavement shall be laid until the subgrade has been checked and approved, and in no case shall subbase, base, surfacing, or pavement be placed on a muddy, spongy, or frozen subgrade.

END OF SECTION

# SECTION 02390

# MOORING AND GROUNDING POINTS FOR AIRCRAFT

## PART 1 GENERAL

### 1.1 REFERENCES

The publications listed below form a part of this specification to the extent referenced. The publications are referred to in the text by the basic designation only.

AMERICAN SOCIETY FOR TESTING AND MATERIALS (ASTM)

| | |
|---|---|
| ASTM A 436 (1984; R 1992) | Austenitic Gray Iron Castings |
| ASTM A 615/A 615M(1996a) | Deformed and Plain Billet-Steel Bars for Concrete Reinforcement |
| ASTM A 616/A 616M(1996) | Rail-steel Deformed and Plain Bars for Concrete Reinforcement |
| ASTM A 617/A 617M(1996a) | Axle-Steel Deformed and Plain Bars for Concrete Reinforcement |
| ASTM B 8(1995) | Concentric-Lay-Stranded Copper Conductors, Hard, Medium-Hard, or Soft |
| ASTM B 371(1996) | Copper-Zinc-Silicon Alloy Rod |
| ASTM C 94(1996) | Ready-Mixed Concrete |

AMERICAN WELDING SOCIETY (AWS)

| | |
|---|---|
| AWS D1.4(1992) | Structural Welding Code - Reinforcing steel |

CORPS OF ENGINEERS (COE)

| | |
|---|---|
| COE CRD-C 300(1990) | Specifications for Membrane-Forming Compounds for Curing Concrete |

NATIONAL FIRE PROTECTION ASSOCIATION (NFPA)

| | |
|---|---|
| NFPA 407(1996) | Aircraft Fuel Servicing |

UNDERWRITERS LABORATORIES (UL)

| | |
|---|---|
| UL 467(1993; Rev thru Aug 1996) | Grounding and Bonding Equipment |

1.2 SUBMITTALS

Government approval is required for submittals with a "GA" designation; submittals having an "FIO" designation are for information only. The following shall be submitted in accordance with Section 01330 SUBMITTAL PROCEDURES:

SD-04 Drawings

As-Built Drawings; FIO.

Drawings that provide current factual information, including deviations from and amendments to the drawings and changes in the work, concealed and visible.

SD-09 Reports

Concrete; GA.

Complete concrete mix design including all cement, aggregate, and concrete tests and compliance certificates.

Tests; FIO.

An independent testing agency's certified reports of inspections and tests, including analysis and interpretation of test results. Each report shall be properly identified. Test methods used and test standards shall be described.

SD-13 Certificates

Mooring Devices; FIO.

Certificate of compliance stating that the mooring devices meet the specified requirements.

Grounding Rods; FIO.

Certificate of compliance stating that the grounding rods meet the specified requirements.

Grounding Connectors; FIO.

Certificate of compliance stating that the grounding connectors meet the specified requirements.

Copper Conductors; FIO.

Certificate of compliance stating that the copper conductors meet the specified requirements.

Reinforcing Steel; FIO.

Certificate of compliance stating that the reinforcing steel meets the specified requirements.

## PART 2 PRODUCTS

### 2.1 METALS

Combination of materials that forms an electrolytic couple, which accelerates corrosion in the presence of moisture, shall not be used, unless moisture is permanently excluded from the junction of such metals.

### 2.2 MOORING DEVICES

Mooring devices shall be cast in ductile iron 80-55-06 conforming to ASTM A 436. The device shall be as shown in the contract drawings. The Contractor shall submit certificates of compliance on the devices.

### 2.3 GROUNDING RODS

Grounding rods shall conform to UL 467 and shall be made of copper-clad steel. The rods shall be not less than 19 mm 3/4 inch in diameter and not less than 3 m 10 feet long. The copper cladding shall conform to the applicable requirements of ASTM B 371, Copper Alloy UNS No's. c 69400, c 69430, c 69440 or c 69450. The copper cladding shall be not less than 0.25 mm 0.010 inches thick at any point and shall comply with adherence requirements and the banding requirements of UL 467. The Contractor shall submit certificates of compliance on the grounding rods. Rods shall be provided with a closed eye or shepherd's hook bend having an inside diameter of not less than 32 mm. 1-1/4 inches. The rods shall be pointed unless used for flexible pavement. For flexible pavement, the rods shall have 19 mm 3/4 inch American standard rolled threads for attachment of a bottom anchor and shall be equipped with a screw-type bottom having a wing diameter of not less than 152 mm. 6 inches.

### 2.4 COPPER CONDUCTORS

Copper conductors shall be bare number 4 AWG copper wire conforming to ASTM B 8. The Contractor shall submit certificates of compliance on the copper conductors.

### 2.5 GROUNDING CONNECTORS

Grounding connectors shall comply with UL 467 for the required application. The Contractor shall submit certificates of compliance on the grounding connectors.

### 2.6 CONCRETE

Concrete shall be in accordance with Section 02754.

### 2.7 REINFORCING STEEL

Reinforcing steel shall conform to ASTM A 615/A 615M, 60 for #4 tie bars and Grade 60 for #6 vertical bars. Steel shall be welded into cages in accordance with AWS D1.4 and inserted securely in the piers, in position and alignment, as shown, prior to concrete placement. The Contractor shall submit certificates of compliance of the reinforcing steel.

# PART 3 EXECUTION

## 3.1 MOORING POINTS IN NEW RIGID PAVEMENTS OR CONCRETE PADS

The mooring device shall be installed within plus or minus 50 mm 2 inches of the location shown on the contract drawings. The top of the mooring device shall be set within 6 mm 1/4 inch of the plan pavement surface elevation, but not higher than the pavement surface. The mooring device shall be installed prior to placement of the concrete pavement. Concrete and reinforcement shall be placed in accordance with Section 02754. Hand finishing of the concrete around the mooring devices shall be kept to a minimum.

## 3.2 MOORING POINTS IN EXISTING RIGID PAVEMENTS

The mooring points shall be installed in 305 plus or minus 13 mm 12 plus or minus 1/2 inch diameter holes cored through the pavement. The core holes shall be drilled within plus or minus 38 mm 1-1/2 inches of the location shown in the contract drawings. The mooring device and attached grounding rod shall be installed within plus or minus 13 mm 1/2 inch of the center of the core hole. The top of the mooring device shall be installed within 6 mm 1/4 inch of the surrounding pavement surfaces, but not higher.

### 3.2.1 Coring Requirements

The holes shall be cored using rotary, non-percussion drilling techniques. The sides of the core hole shall be perpendicular to the pavement surface. Once the pavement is cored the base course shall be excavated as shown in the drawings. The sides of the core hole shall be cleaned of latence and roughened by sand blasting. The Contractor shall place the concrete around the mooring device in two or more lifts. The first lift shall be placed to within 125 mm 5 inches of the pavement surface and thoroughly consolidated by spud vibrators. The second lift shall be placed and also consolidated by internal vibration. The surface of the concrete shall be finished and textured to match the adjacent pavement surface and elevation. White pigmented curing compound meeting the requirements of COE CRD-C 300 shall be uniformly applied at a coverage of not more than 4.5 square meters per liter. 200 square feet per gallon.

### 3.2.2 Cleanup

The Contractor shall control all operations to minimize the amount of dust, dirt, debris and laitance in the work area. The Contractor shall clean all dirt, dust, debris, or laitance from coring or concreting operations, from the pavement surfaces prior to final acceptance.

## 3.3 MOORING POINTS INSTALLED IN DRILLED PIERS

Excavation of piers shall be coordinated so that reinforcing steel and concrete placement is a continuous operation performed the same day that the excavation is completed. Excavations shall not be left open overnight. Concrete shall be placed within 3 hours after approval of the completed pier excavation. Pier drilling equipment shall have the minimum torque capacity and downward force capacity for the contract site conditions.

3.3.1 Government Inspection

The Contracting Officer will inspect each drilled pier excavation. Concrete shall not be placed until the excavation has been approved. The Contractor shall furnish the Contracting Officer all necessary equipment required for proper inspection of drilled pier excavations.

3.3.2 Installation Procedures

Piers shall be excavated to the depths and dimensions shown. Piers shall be core drilled through pavements. Bottoms of piers shall be cleaned of loose or soft material and leveled. Excavated material shall be disposed of in accordance with Section 02300 EARTHWORK. The following shall be performed:

a. The surrounding base courses, subgrade, and soil shall be adequately and securely protected against cave-ins, displacement of the surrounding earth, and retention of ground water by means of temporary steel casings. Casings shall have outside diameters not less than the indicated shaft sizes and shall be a minimum of 6 mm 1/4-inch thick. Steel casings shall be withdrawn, as the concrete is being placed, maintaining sufficient head of concrete within the casing to prevent extraneous material from falling in from the sides and mixing with the concrete. Casings may be jerked upward a maximum of 100 mm 4 inches to break the bottom seal; but, thereafter, shall be removed with a smooth, continuous motion.

b. The inside of steel casings shall be thoroughly cleaned and oiled before reuse.

c. Water that flows into the excavations shall be continuously removed and all water shall be removed from the excavation bottom, to the extent possible, prior to concrete placement. The maximum permissible depth of water shall be 50 mm. 2 inches. In the event of a severe water condition that makes it impossible or impractical to dewater the excavation, concrete shall be placed using underwater tremie after water movement has stabilized.

d. Concrete shall be continuously placed ensuring against segregation and dislodging of excavation sidewalls; concrete shall completely fill the shaft. Concrete shall be placed by pumping or drop chutes in dry holes and by tremie or pumping in wet holes. The discharge shall be kept a minimum of

305 mm 1 foot below the fresh concrete surface during placement. Concrete placement shall not be interrupted in any pier for more than 30 minutes. The upper 1.5 m 5 feet of the concrete pier shall be vibrated.

e. Any pier out of center or plumb beyond the specified tolerance shall be corrected as necessary for compliance and the Contractor shall bear any cost of correction. Cross sections of shafts shall not be less than design dimensions. Piers shall be installed with top location deviating a maximum of 50 mm 2 inches from centerline locations.

f. The mooring device shall be installed within plus or minus 25 mm 1 inch of the center of the drilled pier. The top of the mooring device shall be within 6 mm 1/4 inch of the top of the pier, but not higher.

g. The Contractor shall replace, at no additional cost to the Government, piers found out of tolerance.

h. The Contractor shall provide protection around top of the excavation to prevent debris from being dislodged into the excavation and concrete.

## 3.4 GROUNDING POINTS

The grounding points shall be located as shown on the contract drawings to within plus or minus 50 mm. 2 inches.

### 3.4.1 Pavement Recess

The top of the grounding rod shall be set at or not more than 6 mm 1/4 inch below the pavement surface grade. A recess 70 mm 2-3/4 inches wide, and not more than 150 mm 6 inches long, with a smooth rounded edge shall be provided in the pavement around the grounding point anchor eye to permit the entrance of lines into the eye and to allow for attachment of the grounding cable. The depth of the recess shall be no deeper than the bottom of the opening of the grounding point eye.

### 3.4.2 Installation

#### 3.4.2.1 Existing Rigid Pavement

Grounding rods shall be installed in holes cored through the rigid pavement using rotary, non-percussion drilling techniques. The core holes shall have a minimum diameter of 150 mm. 6 inches. The grounding rod shall be installed by pushing or driving the rod through the pavement base courses and subgrade. The installation technique chosen by the Contractor shall not damage the grounding rod or the pavement. Installation shall be completed by placing concrete around the grounding rod in two lifts with each lift consolidated with spud vibrators.

#### 3.4.2.2 New Rigid Pavement

The grounding rod shall be installed by pushing or driving the rod through the pavement base courses and subgrade prior to concrete placement. The installation technique chosen by the Contractor shall not damage the grounding rod. Hand finishing around the rod shall be kept to a minimum.

3.4.2.3 Flexible Pavement

Grounding rods shall be installed in portland cement concrete blockouts measuring 1.2 by 1.2 m 4 by 4 foot in plan dimensions. The thickness and reinforcing details are shown on the contract drawings. The grounding rod shall be installed by pushing or driving the rod through the pavement base courses and subgrade prior to concrete placement. The installation technique chosen by the Contractor shall not damage the grounding rod. Hand finishing around the rod shall be kept to a minimum.

3.4.3 Interconnection

Grounding rods within aircraft hangars shall be electrically interconnected to the hangar electrical grounding system with not less than a number 4 AWG bare copper conductor. Grounding rods installed at fueling hydrant outlets shall be electrically interconnected with the fuel piping with not less than a number 4 AWG bare copper conductor.

3.5 TESTS

Resistance to ground tests shall be measured as specified in NFPA 407. Test results shall be submitted to the Contracting Officer. Any ground rods that have more than 10,000 ohms of resistance shall be reported to the contracting officer immediately.

-- End of Section -

SECTION 02709

LIMEROCK BASE COURSE

1 GENERAL

1.1 REFERENCES

The publications listed below form a part of this specification to the extent referenced. The publications are referred to in the text by basic designation only.

AMERICAN SOCIETY FOR TESTING AND MATERIALS (ASTM)

| | |
|---|---|
| ASTM C 136 | (1996a) Sieve Analysis of Fine and Coarse Aggregates |
| ASTM D 1556 | (1990; R 1996) Density and Unit Weight of Soil in Place by the Sand-Cone Method |
| ASTM D 1557 | (1991) Laboratory Compaction Characteristics of Soil Using Modified Effort (56,000 ft-lbf/cu. ft. (2,700 kN-m/cu. m.) |
| ASTM D 2167 | (1994) Density and Unit Weight of Soil in Place by the Rubber Balloon Method |
| ASTM D 2922 | (1996) Density of Soil and Soil-Aggregate in Place by Nuclear Methods (Shallow Depth) |
| ASTM D 3017 | (1996) Water Content of Soil and Rock in Place by Nuclear Methods (Shallow Depth) |
| ASTM D 4318 | (1995a) Liquid Limit, Plastic Limit, and Plasticity Index of Soils |

FLORIDA DEPARTMENT OF TRANSPORTATION (FDOT)

| | |
|---|---|
| FLDOT | (2000) Florida Department of Transportation Standard Specifications for Road and Bridge Construction. |

## 1.2 SUBMITTALS

Government approval is required for submittals with a "GA" designation; submittals having an "FIO" designation are for information only. The following shall be submitted in accordance with Section 01330 SUBMITTAL PROCEDURES:

SD-01 Data

Plant, Equipment, Machines, and Tools; FIO.

List of proposed equipment to be used in performance of construction work, including descriptive data.

SD-08 Statements

Sources; FIO.

Limerock shall be from FDO approved sources. Notification of the selected source of limerock shall be submitted to the Contracting Officer's representative within 30 days after the award of the Notice to Proceed.

SD-09 Reports

Field Density Tests; FIO.

Sampling and Testing; GA|CD.

Calibration curves and related test results prior to using the device or equipment being calibrated. Copies of field test results within 24 hours after the tests are performed. Certified copies of test results not less than 30 days before material is required for the work.

## 1.3 DEGREE OF COMPACTION

Degree of compaction is expressed as a percentage of the maximum density obtained by the test procedure in accordance with ASTM D 1557, abbreviated in this specification as percent laboratory maximum density.

## 1.4 PLANT, EQUIPMENT, MACHINES, AND TOOLS

Plant, equipment, machines, and tools used in the work shall be subject to approval and shall be maintained in a satisfactory working condition at all times. The equipment shall have the capability of producing the required compaction, meeting grade controls, thickness control and smoothness requirements indicated.

# 2 PRODUCTS

## 2.1 MATERIALS

### 2.1.1 Limerock Material

Limerock material shall consist of broken fossiliferous limestone of uniform quality which conforms to the requirements for limerock base as specified in FDOT Standard Specification Section 911.

### 2.1.2 Water

Water for limerock base construction shall be clean, fresh, and potable.

# 3 EXECUTION

## 3.1 PREPARATION OF UNDERLYING MATERIAL

Immediately prior to constructing the limerock base course, the underlying material shall be cleaned of all foreign substances. Surface of the underlying material will be inspected by the Contracting Officer's representative for adequate compaction and surface tolerances. Ruts or soft yielding spots that appear in the underlying material, any areas having inadequate compaction, or any deviations of the surface from the requirements of Section 02300 EARTHWORK shall be corrected. Correction shall be performed by loosening the affected areas, removing unsatisfactory material and adding approved material where required, and by reshaping and recompacting to line and grade and to the specified density requirements, as directed.

## 3.2 INSTALLATION

### 3.2.1 Product Delivery and Handling

Limerock shall be delivered to the point of application only in a manner that will prevent damage to underlying materials and previously placed limerock course. Limerock shall be transported in approved vehicles over previously placed limerock course to the area under construction and shall be dumped on the end of the spread limerock. In no case shall the limerock be dumped directly on the underlying material, except at the start of base course construction. Limerock may be transported over underlying materials only as approved. Measures to prevent damage to underlying material shall be executed as directed.

### 3.2.2 Edges of Base Course

Approved material shall be placed along the edges of the base course in such quantity as will compact to the thickness of each layer of the course. Allow in each operation at least a 1-foot width of the shoulder to be rolled and compacted simultaneously with the rolling and compacting of each layer of the base course.

3.2.3 Placing and Spreading

After dumping the limerock, and prior to spreading, water shall be applied as required. The limerock shall be spread uniformly on the underlying material by means of rock spreaders, bulldozers, or other approved equipment. The loose thickness of the layer shall be such that the compaction requirements specified will be obtained with the compacting equipment used, and will conform to the thickness of the layer as shown. Portions of the layer that become segregated in spreading shall be corrected, or if necessary, replaced with satisfactory material, as directed. No more material for the first layer shall be spread and compacted than can be covered in one working day by spreading and compacting of the succeeding layer.

3.2.4 Initial Rolling

Immediately after spreading, the layer shall be compacted by rollers to prevent penetration of excessive moisture into the layer. During initial rolling operations, water shall be applied by sprinkling equipment as required for compaction. A uniform surface shall be maintained throughout the rolling operations by the use of blade graders.

3.2.5 Compaction

After initial rolling, the layer shall be scarified approximately 4 inches deep using scarifers, but in no case shall scarification be sufficiently deep to disturb underlying material. Limerock shall than be shaped to line and grade by blade graders. Each layer of base course shall be compacted using approved equipment. Rolling and blading shall continue until the entire depth of the layer is bonded and compacted to at least 100 percent maximum density. One roller shall be required to operate continuously for each 100 square yards of base course completed per hour. Additional rollers shall be provided, if required, to obtain the density specified and to complete the rolling in not more than 4-days after the limerock has been spread. In areas not accessible to rollers, the limerock shall be tamped thoroughly with approved hand-operated power tampers to the density specified. If, at any time, the underlying material becomes mixed with the limerock, the Contractor shall remove the affected mixture, reshape and compact the underlying material to the density specified, and replace and compact the limerock base course as specified herein. The surface of the layer shall be finished by blading and rolling with a steel-wheeled rollers, pneumatic-tired rollers, or both. Blading and rolling shall continue until the surface is smooth and free from waves and irregularities. Where cracks, checks, or failures appear in the finished base course, defects and failures shall be removed by rescarifying, reshaping, watering, rolling, and adding limerock, if required, as directed.

3.2.6 Layer Thickness

Thickness of the completed limerock base course shall be as shown on the drawings. No layer shall be in excess of 8 inches-, nor less than 3 inches in compacted thickness. First layer of multiple layer courses shall be less than 4 inches compacted thickness.

3.2.7 Multiple Layers

Each layer of base course placed in multiple layers shall be scarified to insure sufficient bond between the layers prior to spreading the succeeding layers. The scarification of the layer shall not exceed a 2-inch depth.

3.3 FIELD QUALITY CONTROL

Quality control for the limerock base course shall be maintained by laboratory and field sampling and testing, as specified. All sampling and testing shall be performed by an approved commercial testing laboratory, or by facilities furnished by the Contractor. No work requiring testing shall be permitted until the facilities have been inspected and approved. The first inspection shall be at the expense of the Government. Cost incurred for any subsequent inspection required because of failure of the facilities to pass the first inspection will be charged to the Contractor. Tests shall be performed in sufficient numbers and at locations and times adequate to insure that materials and the base course meet specified requirements.

3.3.1 Grade Control

Finished and completed base course shall conform to the lines, grades, cross section, and dimensions indicated.

3.3.2 Thickness Control

Completed thicknesses of the base course shall be within 1/2-inch of the thickness indicated. Thickness of the base course shall be measured at intervals that will provide at least one depth measurement for each 500 square yards of base course. Test holes shall be at least 3-inches in diameter through the base course. Where the measured thickness of the base course is more than 1/2-inch deficient, such areas shall be corrected by scarifying to a depth of 2-1/2 inches-, by adding coarse aggregate and choking materials of proper gradation, and by recompacting and finishing as directed. Where the measured thickness of the base course is more than 1/2-inch thicker than indicated, the thickness shall be considered as conforming to the specified thickness requirements plus 1/2-inch-. Average job thickness shall be the average of the job measurements determined as specified above, but shall be within 1/4-inch of the thickness indicated.

3.3.3 Moisture-density Relationships

Maximum density shall be determined in the laboratory in accordance with ASTM D 1557. Tests shall be performed for each source and type of material to be used to insure adequate control of field compaction.

### 3.3.4 Field Density Tests

Density shall be measured in the field in accordance with ASTM D 1556, ASTM D 2167, or ASTM D 2922. For the method presented in ASTM D 2922, the calibration curves shall be checked, and adjusted if necessary, using only the sand cone method as described in paragraph "Calibration" of the ASTM publication. ASTM D 2922 results in a wet unit weight of soil and when using this method ASTM D 3017 shall be used to determine the moisture content of the soil. The calibration curves furnished with the moisture gauges shall also be checked along with the density calibration checks as described in ASTM D 3017. The calibration checks of both the density and moisture gauges shall be made at the beginning of a job, on each different type of material encountered, and at intervals as directed by the Contracting Officer's representative. Testing shall be performed by an approved commercial testing laboratory or may be performed by the Contractor, subject to approval. At least one test shall be performed for every 250 square yards of each layer course placed, and as directed, to insure that the specified density is being obtained. Test results including calibration curves and results of calibration tests shall be submitted to the Government for information.

### 3.3.5 Gradation Tests

Gradations of limerock shall be determined in accordance with ASTM C 136. A minimum of one sieve analysis shall be performed for each 1000 tons tons of material to be placed. Tests shall be performed in accordance with paragraph SAMPLING AND TESTING. Results shall verify that the materials complies with the specifications.

### 3.3.6 Liquid Limit and Plasticity Requirements

Liquid limit and plasticity tests shall be in accordance with ASTM D 4318. One liquid limit and plasticity test shall be required for each 1000 tons tons of material to be placed.

### 3.3.7 Smoothness Tests

The surface of the top layer shall show no deviations in excess of 3/8 inches when tested with a 10-foot straightedge applied parallel with and at right angles to the centerline of the paved area. Deviations exceeding 3/8-inch shall be corrected by scarifying to a depth of 4 inches-, removing or adding limerock as required, reshaping, watering, and compacting, until approved. The surface of the underlying layers shall be finished reasonably parallel to the top surface grade.

## 3.4 MAINTENANCE

The limerock base course shall be maintained to meet all specified requirements until the prime coat is applied. If the finished surface of the base course has become so glazed such that the prime coat will not readily penetrate, the glaze shall be removed prior to applying the prime coat. Removal of the glaze shall be by blading, power brooms, or other approved equipment. Any pits, holes or other damage to the base course shall be repaired as directed prior to applying subsequent materials.

SECTION 02748

BITUMINOUS TACK AND PRIME COATS

PART 1 GENERAL

1.1 REFERENCES

The publications listed below form a part of this specification to the extent referenced. The publications are referred to in the text by basic designation only.

AMERICAN ASSOCIATION OF STATE HIGHWAY AND TRANSPORTATION OFFICIALS (AASHTO)

| | |
|---|---|
| AASHTO M 20 | (1970) Penetration Graded Asphalt Cement |
| AASHTO M 81 | (1992) Cut-Back Asphalt (Rapid-Curing Type) |
| AASHTO M 82 | (1975) Cut-Back Asphalt (Medium-Curing Type) |
| AASHTO M 226 | (1980) Viscosity Graded Asphalt Cement |
| AASHTO T 40 | (1978; R 1983) Sampling Bituminous Materials |

AMERICAN SOCIETY OF TESTING AND MATERIALS (ASTM)

| | |
|---|---|
| ASTM D 140 | (1993) Sampling Bituminous Materials |
| ASTM D 946 | (1982; R 1993) Penetration-Graded Asphalt Cement for Use in Pavement Construction |
| ASTM D 977 | (1991) Emulsified Asphalt |
| ASTM D 1250 | (1980; R 1990) Petroleum Measurement Tables |
| ASTM D 2026 | (1972; R 1993) Cutback Asphalt (Slow-Curing Type) |
| ASTM D 2027 | (1976; R 1992) Cutback Asphalt (Medium-Curing Type) |

AMERICAN SOCIETY OF TESTING AND MATERIALS (ASTM), Continued

| | |
|---|---|
| ASTM D 2028 | (1976; R 1992) Cutback Asphalt (Rapid-Curing Type) |
| ASTM D 2397 | (1994) Cationic Emulsified Asphalt |
| ASTM D 2995 | (1993) Determining Application Rate of Bituminous Distributors |
| ASTM D 3381 | (1992) Viscosity-Graded Asphalt Cement for Use in Pavement Construction |

## 1.2 PAYMENT

Payment for all work covered in this section and all costs in connection therewith shall be included in the contract lump sum price for sitework.

## 1.3 SUBMITTALS

Government approval is required for submittals with a "GA" designation; submittals having an "FIO" designation are for information only. The following shall be submitted in accordance with Section 01330 SUBMITTAL PROCEDURES:

SD-09 Reports

Tests; FIO.

Copies of all test results for bituminous materials, within 24 hours of completion of tests. Certified copies of the manufacturer's test reports indicating compliance with applicable specified requirements, not less than 30 days before the material is required in the work.

## 1.4 PLANT, EQUIPMENT, MACHINES AND TOOLS

### 1.4.1 General Requirements

Plant, equipment, machines and tools used in the work shall be subject to approval and shall be maintained in a satisfactory working condition at all times.

1.4.2 Bituminous Distributor

The distributor shall have pneumatic tires of such size and number to prevent rutting, shoving or otherwise damaging the base surface or other layers in the pavement structure. The distributor shall be designed and equipped to spray the bituminous material in a uniform coverage at the specified temperature, at readily determined and controlled rates with an allowable variation from the specified rate of not more than plus or minus 5 percent, and at variable widths. Distributor equipment shall include a separate power unit for the bitumen pump, full-circulation spray bars, tachometer, pressure gauges, volume-measuring devices, adequate heaters for heating of materials to the proper application temperature, a thermometer for reading the temperature of tank contents, and a hand hose attachment suitable for applying bituminous material manually to areas inaccessible to the distributor. The distributor shall be equipped to circulate and agitate the bituminous material during the heating process.

1.4.3 Power Brooms and Power Blowers

Power brooms and power blowers shall be suitable for cleaning the surfaces to which the bituminous coat is to be applied.

1.5 WEATHER LIMITATIONS

Bituminous coat shall be applied only when the surface to receive the bituminous coat is dry. Bituminous coat shall be applied only when the atmospheric temperature in the shade is 50 degrees For above and when the temperature has not been below 35 degrees F for the 12 hours prior to application.

PART 2 PRODUCTS

2.1 TACK COAT

Cutback asphalt or Emulsified asphalt shall conform to ASTM D 2028 or ASTM D 977, Grade RC-70, RC-250, RS-1, OR CRS-1.

2.2 PRIME COAT

Cutback asphalt ASTM D 2026, Grade MC-70 OR SC-250.

PART 3 EXECUTION

3.1 PREPARATION OF SURFACE

Immediately before applying the bituminous coat, all loose material, dirt, clay, or other objectionable material shall be removed from the surface to be treated. The surface shall be dry and clean at the time of treatment.

3.2 APPLICATION RATE

The exact quantities within the range specified, which may be varied to suit field conditions, will be determined by the Contracting Officer.

3.2.1 Tack Coat

Bituminous material for the tack coat shall be applied in quantities of not less than 0.05 gallon nor more than 0.15 gallon per square yard of pavement surface.

3.2.2 Prime Coat

Bituminous material for the prime coat shall be applied in quantities of not less than 0.15 gallon nor more than 0.40 gallon per square yard of pavement surface.

3.3 APPLICATION TEMPERATURE

3.3.1 Viscosity Relationship

Asphalt application temperature shall provide an application viscosity between 10 and 60 seconds, Saybolt Furol, or between 20 and 120 centistokes, kinematic. The temperature viscosity relation shall be furnished to the Contracting Officer.

3.3.2 Temperature Ranges

The viscosity requirements shall determine the application temperature to be used. The following is a normal range of application temperatures:

| | |
|---|---|
| Liquid Asphalts ------------------ | - |
| SC-250 | 165-270 degrees F |
| MC-70 | 120-225 degrees F |
| RC-70 | 120-200 degrees F* |
| RC-250 | 165-250 degrees F* |
| Emulsions ------------ | |
| RS-1 | 70-140 degrees F} |
| CRS-1 | 125-185 degrees F} |

*These temperature ranges exceed the flash point of the material and care should be taken in their heating.

3.4 APPLICATION

Following preparation and subsequent inspection of the surface, the bituminous coat shall be applied at the specified rate with uniform distribution over the surface to be treated. All areas and spots missed by the distributor shall be properly treated with the hand spray. Until the succeeding layer of pavement is placed, the surface shall be maintained by protecting the surface against damage and by repairing deficient areas at no additional cost to the Government. If required, clean dry sand shall be spread to effectively blot up any excess bituminous material. No smoking, fires, or flames other than those from the heaters that are a part of the equipment shall be permitted within 25 feet of heating, distributing, and transferring operations of bituminous material other than bituminous emulsions. To obtain uniform application of the prime coat on the surface treated at the junction of previous and subsequent applications, building paper shall be spread on the surface for a sufficient distance back from the ends of each application to start and stop the prime coat on the paper. Immediately after application, the building paper shall be removed and destroyed.

3.5 CURING PERIOD

Following application of the bituminous material and prior to application of the succeeding layer of pavement, the bituminous coat shall be allowed to cure and to obtain evaporation of any volatiles or moisture. Prime coat shall be allowed to cure without being disturbed for a period of at least 48 hours or longer, as may be necessary to attain penetration into the treated course.

3.6 FIELD QUALITY CONTROL

Samples of the bituminous materialused shall be obtained by the Contractor as directed, under the supervision of the Contracting Officer. The sample may be retained and tested by the Government at no cost to the Contractor.

3.7 SAMPLING AND TESTING

Sampling and testing shall be performed by an approved commercial testing laboratory or by facilities furnished by the Contractor. No work requiring testing will be permitted until the facilities have been inspected and approved.

3.7.1 Sampling

The samples of bituminous material, unless otherwise specified, shall be in accordance with ASTM D 140 or AASHTO T 40. Sources from which bituminous materials are to be obtained shall be selected and notification furnished the Contracting Officer within 15 days after the award of the contract.

3.7.2 Calibration Test

The Contractor shall furnish all equipment, materials, and labor necessary to calibrate the bituminous distributor. Calibration shall be made with the approved job material and prior to applying the bituminous coat material to the prepared surface. Calibration of the bituminous distributor shall be in accordance with ASTM D 2995.

3.7.3 Trial Applications

Before providing the complete bituminous coat, three lengths of at least 100 feet for the full width of the distributor bar shall be applied to evaluate the amount of bituminous material that can be satisfactorily applied.

3.7.3.1 Tack Coat Trial Application Rate

Unless otherwise authorized, the trial application rate of bituminous tack coat materials shall be applied in the amount of 0.05 gallons per square yard. Other trial applications shall be made using various amounts of material as may be deemed necessary.

3.7.3.2 Prime Coat Trial Application Rate

Unless otherwise authorized, the trial application rate of bituminous materials shall be applied in the amount of 0.25 gallon per square yard. Other trial applications shall be made using various amounts of material as may be deemed necessary.

3.7.4 Sampling and Testing During Construction

Quality control sampling and testing shall be performed as required in paragraph FIELD QUALITY CONTROL.

END OF SECTION

SECTION 02749

HOT-MIX ASPHALT (HMA) FOR AIRFIELDS

PART 1 GENERAL

1.1 REFERENCES

The publications listed below form a part of this specification to the extent referenced. The publications are referred to in the text by basic designation only.

AMERICAN ASSOCIATION OF STATE HIGHWAY AND TRANSPORTATION OFFICIALS (AASHTO)

| | |
|---|---|
| AASHTO MP1 | (1997) Performance Graded Asphalt Binder |
| AASHTO TP53 | (1995) Determining Asphalt Content of Hot Mix Asphalt by the Ignition Method |

AMERICAN SOCIETY FOR TESTING AND MATERIALS (ASTM)

| | |
|---|---|
| ASTM C 29/C 29M | (1997) Bulk Density (Unit Weight) and Voids in Aggregates |
| ASTM C 88 | (1998) Soundness of Aggregates by Use of Sodium Sulfate or Magnesium Sulfate |
| ASTM C 117 | (1995) Materials Finer than 75 micrometer (No. 200) Sieve in Mineral Aggregates by Washing |
| ASTM C 131 | (1996) Resistance to Degradation of Small-Size Coarse Aggregate by Abrasion and Impact in the Los Angeles Machine |
| ASTM C 136 | (1996a) Sieve Analysis of Fine and Coarse Aggregates |
| ASTM C 566 | (1997) Total Evaporable Moisture Content of Aggregate by Drying |
| ASTM C 1252 | (1998) Uncompacted Void Content of Fine Aggregate (as Influenced by Particle Shape, Surface Texture, and Grading) |



| | |
|---|---|
| ASTM D 140 | (1993) Sampling Bituminous Materials |

AMERICAN SOCIETY FOR TESTING AND MATERIALS (ASTM) Cont'd

| | |
|---|---|
| ASTM D 242 | (1995) Mineral Filler for Bituminous Paving Mixtures |
| ASTM D 946 | (1982; R 1993) Penetration-Graded Asphalt Cement for Use in Pavement Construction |
| ASTM D 995 | (1995b) Mixing Plants for Hot-Mixed, Hot-Laid Bituminous Paving Mixtures |
| ASTM D 1461 | (1985) Moisture or Volatile Distillates in Bituminous Paving Mixtures |
| ASTM D 1559 | (1989) Resistance to Plastic Flow of Bituminous Mixtures Using Marshall Apparatus |
| ASTM D 2041 | (1995) Theoretical Maximum Specific Gravity and Density of Bituminous Paving Mixtures |
| ASTM D 2172 | (1995) Quantitative Extraction of Bitumen from Bituminous Paving Mixtures |
| ASTM D 2419 | (1995) Sand Equivalent Value of Soils and Fine Aggregate |
| ASTM D 2489 | (1984; R 1994) Degree of Particle Coating of Bituminous-Aggregate Mixtures |
| ASTM D 2726 | (1996a) Bulk Specific Gravity and Density of Non-Absorptive Compacted Bituminous Mixture |
| ASTM D 2950 | (1997) Density of Bituminous Concrete in Place by Nuclear Method |
| ASTM D 3203 | (1994) Percent Air Voids in Compacted Dense and Open Bituminous Paving Mixtures |
| ASTM D 3381 | (1992) Viscosity-Graded Asphalt Cement for Use in Pavement Construction |
| ASTM D 3665 | (1994) Random Sampling of Construction Materials |
| ASTM D 3666 | (1996a) Minimum Requirements for Agencies Testing and Inspecting Bituminous Paving Materials |

AMERICAN SOCIETY FOR TESTING AND MATERIALS (ASTM) Cont'd

| | |
|---|---|
| ASTM D 4125 | (1994) Asphalt Content of Bituminous Mixtures by the Nuclear Method |
| ASTM D 4791 | (1995) Flat Particles, Elongated Particles, or Flat and Elongated Particles in Coarse Aggregate |
| ASTM D 4867/D 4867M | (1996) Effect of Moisture on Asphalt Concrete Paving Mixtures |
| ASTM D 5444 | (1994) Mechanical Size Analysis of Extracted Aggregate |
| ASTM D 6307 | (1999) Asphalt Content of Hot Mix Asphalt by Ignition Method |

ASPHALT INSTITUTE (AI)

| | |
|---|---|
| AI MS-2 | (1994) Mix Design Methods for Asphalt Concrete and Other Hot-Mix Types |

CALIFORNIA DEPARTMENT OF TRANSPORTATION (CDT)

| | |
|---|---|
| CDT Test 526 | (1978) Operation of California Profilograph and Evaluation of Profiles |

CORPS OF ENGINEERS (COE)

| | |
|---|---|
| COE CRD-C 171 | (1995) Test Method for Determining Percentage of Crushed Particles in Aggregate |

## 1.2 DESCRIPTION OF WORK

The work shall consist of pavement courses composed of mineral aggregate and asphalt material heated and mixed in a central mixing plant and placed on a prepared course. HMA designed and constructed in accordance with this section shall conform to the lines, grades, thicknesses, and typical cross sections shown on the drawings. Each course shall be constructed to the depth, section, or elevation required by the drawings and shall be rolled, finished, and approved before the placement of the next course.

## 1.3 SUBMITTALS

Government approval is required for submittals with a "GA" designation; submittals having an "FIO" designation are for information only. The following shall be submitted in accordance with Section 01330 SUBMITTAL PROCEDURES:

SD-09 Reports

Aggregates; GA|CD, QC Monitoring; FIO.

Aggregate and QC test results.

SD-13 Certificates

Asphalt Cement Binder; GA|CD.

Copies of certified test data.

Testing Laboratory; FIO.

Certification of compliance.

SD-14 Samples

Asphalt Cement Binder; GA|CD.

5 gallon sample for laboratory mix design verification.

Aggregates;GA|CD.

Sufficient materials to produce 200 lbs of blended mixture for laboratory mix design verification.

SD-18 Records

Mix Design; GA|CD.

Proposed JMF.

Contractor Quality Control; GA|CD.

Quality control plan.

## 1.4 METHOD OF MEASUREMENT

Asphalt shall be measured as compacted in placed thickness.

## 1.5 BASIS OF PAYMENT

Quantities of intermediate- and wearing-course mixtures will be paid for as specified in this section under Mat and Joint Densities.

## 1.6 ASPHALT MIXING PLANT

Plants used for the preparation of hot-mix asphalt shall conform to the requirements of ASTM D 995 with the following changes:

a. Truck Scales. The asphalt mixture shall be weighed on approved scales furnished by the Contractor, or on certified public scales at the Contractor's expense. Scales shall be inspected and sealed at least annually by an approved calibration laboratory.

b. Testing Facilities. The Contractor shall provide laboratory facilities at the plant for the use of the Government's acceptance testing and the Contractor's quality control testing.

c. Inspection of Plant. The Contracting Officer shall have access at all times, to all areas of the plant for checking adequacy of equipment; inspecting operation of the plant; verifying weights, proportions, and material properties; checking the temperatures maintained in the preparation of the mixtures and for taking samples. The Contractor shall provide assistance as requested, for the Government to procure any desired samples.

d. Storage Bins. The asphalt mixture may be stored in non-insulated storage bins for a period of time not exceeding 3 hours. The asphalt mixture may be stored in insulated storage bins for a period of time not exceeding 8 hours. The mix drawn from bins shall meet the same requirements as mix loaded directly into trucks.

## 1.7 HAULING EQUIPMENT

Trucks used for hauling hot-mix asphalt shall have tight, clean, and smooth metal beds. To prevent the mixture from adhering to them, the truck beds shall be lightly coated with a minimum amount of paraffin oil, lime solution, or other approved material. Petroleum based products shall not be used as a release agent. Each truck shall have a suitable cover to protect the mixture from adverse weather. When necessary to ensure that the mixture will be delivered to the site at the specified temperature, truck beds shall be insulated or heated and covers (tarps) shall be securely fastened.

## 1.8 ASPHALT PAVERS

Asphalt pavers shall be self-propelled, with an activated screed, heated as necessary, and shall be capable of spreading and finishing courses of hot-mix asphalt which will meet the specified thickness, smoothness, and grade. The paver shall have sufficient power to propel itself and the hauling equipment without adversely affecting the finished surface.

### 1.8.1 Receiving Hopper

The paver shall have a receiving hopper of sufficient capacity to permit a uniform spreading operation. The hopper shall be equipped with a distribution system to place the mixture uniformly in front of the screed without segregation. The screed shall effectively produce a finished surface of the required evenness and texture without tearing, shoving, or gouging the mixture.

### 1.8.2 Automatic Grade Controls

If an automatic grade control device is used, the paver shall be equipped with a control system capable of automatically maintaining the specified screed elevation. The control system shall be automatically actuated from either a reference line and/or through a system of mechanical sensors or sensor-directed mechanisms or devices which will maintain the paver screed at a predetermined transverse slope and at the proper elevation to obtain the required surface. The transverse slope controller shall be capable of maintaining the screed at the desired slope within plus or minus 0.1 percent. A transverse slope controller shall not be used to control grade. The controls shall be capable of working in conjunction with any of the following attachments:

a. Ski-type device of not less than 30 feet in length.

b. Taut stringline set to grade.

c. Short ski or shoe for joint matching.

d. Laser control.

## 1.9 ROLLERS

Rollers shall be in good condition and shall be operated at slow speeds to avoid displacement of the asphalt mixture. The number, type, and weight of rollers shall be sufficient to compact the mixture to the required density while it is still in a workable condition. Equipment which causes excessive crushing of the aggregate shall not be used.

## 1.10 WEATHER LIMITATIONS

The hot-mix asphalt shall not be placed upon a wet surface or when the surface temperature of the underlying course is less than specified in Table 1. The temperature requirements may be waived by the Contracting Officer, if requested; however, all other requirements, including compaction, shall be met.

Table 1. Surface Temperature Limitations of Underlying Course

| Mat Thickness, inches | Degrees |
|---|---|
| 3 or greater | 40 |
| Less than 3 | 45 |

# PART 2 PRODUCTS

## 2.1 AGGREGATES

Aggregates shall consist of crushed stone, crushed gravel, crushed slag, screenings, natural sand and mineral filler, as required. The portion of material retained on the No. 4 sieve is coarse aggregate. The portion of material passing the No. 4 sieve and retained on the No. 200 sieve is fine aggregate. The portion passing the No. 200 sieve is defined as mineral filler. All aggregate test results and samples shall be submitted to the <>Contracting Officer> at least 14 days prior to start of construction.

### 2.1.1 Coarse Aggregate

Coarse aggregate shall consist of sound, tough, durable particles, free from films of material that would prevent thorough coating and bonding with the asphalt material and free from organic matter and other deleterious substances. The coarse aggregate particles shall meet the following requirements:

a. The percentage of loss shall not be greater than 40 percent after 500 revolutions when tested in accordance with ASTM C 131.

b. The percentage of loss shall not be greater than 18 percent after five cycles when tested in accordance with ASTM C 88 using magnesium sulfate.

c. At least 75 percent by weight of coarse aggregate shall have at least two or more fractured faces when tested in accordance with COE CRD-C 171. Fractured faces shall be produced by crushing.

d. The particle shape shall be essentially cubical and the aggregate shall not contain more than 20 percent, by weight, of flat and elongated particles (3:1 ratio of maximum to minimum) when tested in accordance with ASTM D 4791.

e. Slag shall be air-cooled, blast furnace slag, and shall have a compacted weight of not less than 75 lb/cu ft when tested in accordance with ASTM C 29/C 29M.

2.1.2 Fine Aggregate

Fine aggregate shall consist of clean, sound, tough, durable particles. The aggregate particles shall be free from coatings of clay, silt, or any objectionable material and shall contain no clay balls. The fine aggregate particles shall meet the following requirements:

a. The quantity of natural sand (noncrushed material) added to the aggregate blend shall not exceed 15 percent by weight of total aggregate.

b. The individual fine aggregate sources shall have a sand equivalent value greater than 45 when tested in accordance with ASTM D 2419.

c. The fine aggregate portion of the blended aggregate shall have an uncompacted void content greater than 45.0 percent when tested in accordance with ASTM C 1252 Method A.

2.1.3 Mineral Filler

Mineral filler shall be nonplastic material meeting the requirements of ASTM D 242.

2.1.4 Aggregate Gradation

The combined aggregate gradation shall conform to gradations specified in Table 2, when tested in accordance with ASTM C 136 and ASTM C 117, and shall not vary from the low limit on one sieve to the high limit on the adjacent sieve or vice versa, but grade uniformly from coarse to fine.

Table 2. Aggregate Gradations

| Sieve Size, inch | Intermediate Course Percent Passing by Mass | Wearing Course Percent Passing by Mass |
|---|---|---|
| 1 | --- | --- |
| 3/4 | 100 | --- |
| 1/2 | 76-96 | 100 |
| 3/8 | 69-89 | 76-96 |
| No. 4 | 53-73 | 58-78 |
| No. 8 | 38-60 | 40-60 |
| No. 16 | 26-48 | 28-48 |
| No. 30 | 18-38 | 18-38 |
| No. 50 | 11-27 | 11-27 |
| No. 100 | 6-18 | 6-18 |
| No. 200 | 3-6 | 3-6 |

## 2.2 ASPHALT CEMENT BINDER

Asphalt cement binder shall conform to ASTM D 3381 Table 2, Viscosity Grade AC-30 . Test data indicating grade certification shall be provided by the supplier at the time of delivery of each load to the mix plant. Copies of these certifications shall be submitted to the Contracting Officer. The supplier is defined as the last source of any modification to the binder. The Contracting Officer may sample and test the binder at the mix plant at any time before or during mix production. Samples for this verification testing shall be obtained by the Contractor in accordance with ASTM D 140 and in the presence of the Contracting Officer. These samples shall be furnished to the Contracting Officer for the verification testing, which shall be at no cost to the Contractor. Samples of the asphalt cement specified shall be submitted for approval not less than 14 days before start of the test section.

## 2.3 MIX DESIGN

The Contractor shall develop the mix design. The asphalt mix shall be composed of a mixture of well-graded aggregate, mineral filler if required, and asphalt material. The aggregate fractions shall be sized, handled in separate size groups, and combined in such proportions that the resulting mixture meets the grading requirements of the job mix formula (JMF). No hot-mix asphalt for payment shall be produced until a JMF has been approved. The hot-mix asphalt shall be designed using procedures contained in AI MS-2 and the criteria shown in Table 3. If the Tensile Strength Ratio (TSR) of the composite mixture, as determined by ASTM D 4867/D 4867M is less than 75, the aggregates shall be rejected or the asphalt mixture treated with an approved anti-stripping agent. The amount of anti-stripping agent added shall be sufficient to produce a TSR of not less than 75. If an antistrip agent is required, it shall be provided by the Contractor at no additional cost. Sufficient materials to produce 200 pound of blended mixture shall be provided to the Contracting Officer for verification of mix design at least 14 days prior to construction of test section.

### 2.3.1 JMF Requirements

The job mix formula shall be submitted in writing by the Contractor for approval at least 14 days prior to the start of the test section and shall include as a minimum:

a. Percent passing each sieve size.

b. Percent of asphalt cement.

c. Percent of each aggregate and mineral filler to be used.

d. Asphalt viscosity grade, penetration grade, or performance grade.

e. Number of blows of hammer per side of molded specimen.

f. Laboratory mixing temperature.

g. Lab compaction temperature.

h. Temperature-viscosity relationship of the asphalt cement.

i. Plot of the combined gradation on the 0.45 power gradation chart, stating the nominal maximum size.

j. Graphical plots of stability, flow, air voids, voids in the mineral aggregate, and unit weight versus asphalt content as shown in AI MS-2.

k. Specific gravity and absorption of each aggregate.

l. Percent natural sand.

m. Percent particles with two or more fractured faces (in coarse aggregate).

n. Fine aggregate angularity.

o. Percent flat or elongated particles (in coarse aggregate).

p. Tensile Strength Ratio.

q. Antistrip agent (if required) and amount.

r. List of all modifiers and amount.

Table 3. Marshall Design Criteria

| Test Property | 75 Blow Mix |
|---|---|
| Stability, pounds minimum | *1800 |
| Flow, 0.01 inch | 8-16 |
| Air voids, percent | 3-5 |
| Percent Voids in mineral aggregate (minimum) | See Table 4 |
| TSR, minimum percent | 75 |

* This is a minimum requirement. The average during construction shall be significantly higher than this number to ensure compliance with the specifications.

Table 4. Minimum Percent Voids in Mineral Aggregate (VMA)**

| Aggregate (See Table 2) | Minimum VMA, percent |
|---|---|
| Gradation 2 | 14.0 |

** Calculate VMA in accordance with AI MS-2, based on ASTM D 2726 bulk specific gravity for the aggregate.

2.3.2 Adjustments to JMF

The JMF for each mixture shall be in effect until a new formula is approved in writing by the Contracting Officer. Should a change in sources of any materials be made, a new mix design shall be performed and a new JMF approved before the new material is used. The Contractor will be allowed to adjust the JMF within the limits specified below to optimize mix volumetric properties. Adjustments to the JMF shall be limited to plus or minus 3 percent on the 1/2 inch, No. 4, and No. 8 sieves; plus or minus 1.0 percent on the No. 200 sieve; and plus or minus 0.40 percent binder content. If adjustments are needed that exceed these limits, a new mix design shall be developed. Tolerances given above may permit the aggregate grading to be outside the limits shown in Table 2; this is acceptable.

## PART 3 EXECUTION

### 3.1 PREPARATION OF ASPHALT BINDER MATERIAL

The asphalt cement material shall be heated avoiding local overheating and providing a continuous supply of the asphalt material to the mixer at a uniform temperature. The temperature of unmodified asphalts shall be no more than 325 degrees F when added to the aggregates. Modified asphalts shall be no more than 350 degrees F when added to the aggregates.

### 3.2 PREPARATION OF MINERAL AGGREGATE

The aggregate for the mixture shall be heated and dried prior to mixing. No damage shall occur to the aggregates due to the maximum temperature and rate of heating used. The temperature of the aggregate and mineral filler shall not exceed 350 degrees F when the asphalt cement is added. The temperature shall not be lower than is required to obtain complete coating and uniform distribution on the aggregate particles and to provide a mixture of satisfactory workability.

## 3.3 PREPARATION OF HOT-MIX ASPHALT MIXTURE

The aggregates and the asphalt cement shall be weighed or metered and introduced into the mixer in the amount specified by the JMF. The combined materials shall be mixed until the aggregate obtains a uniform coating of asphalt binder and is thoroughly distributed throughout the mixture. Wet mixing time shall be the shortest time that will produce a satisfactory mixture, but no less than 25 seconds for batch plants. The wet mixing time for all plants shall be established by the Contractor, based on the procedure for determining the percentage of coated particles described in ASTM D 2489, for each individual plant and for each type of aggregate used. The wet mixing time will be set to at least achieve 95 percent of coated particles. The moisture content of all hot-mix asphalt upon discharge from the plant shall not exceed 0.5 percent by total weight of mixture as measured by ASTM D 1461.

## 3.4 PREPARATION OF THE UNDERLYING SURFACE

Immediately before placing the hot mix asphalt, the underlying course shall be cleaned of dust and debris. A prime coat shall be applied in accordance with the contract specifications.

## 3.5 TEST SECTION

Prior to full production, the Contractor shall place a test section for each JMF used. The contractor shall construct a test section 250 - 500 feet long and two paver passes wide placed in two lanes, with a longitudinal cold joint. The test section shall be of the same depth as the course which it represents. The underlying grade or pavement structure upon which the test section is to be constructed shall be the same as the remainder of the course represented by the test section. The equipment used in construction of the test section shall be the same equipment to be used on the remainder of the course represented by the test section. The test section shall be placed as part of the project pavement as approved by the Contracting Officer.

### 3.5.1 Sampling and Testing for Test Section

One random sample shall be taken at the plant, triplicate specimens compacted, and tested for stability, flow, and laboratory air voids. A portion of the same sample shall be tested for aggregate gradation and asphalt content. Four randomly selected cores shall be taken from the finished pavement mat, and four from the longitudinal joint, and tested for density. Random sampling shall be in accordance with procedures contained in ASTM D 3665. The test results shall be within the tolerances shown in Table 5 for work to continue. If all test results meet the specified requirements, the test section shall remain as part of the project pavement. If test results exceed the tolerances shown, the test section shall be removed and replaced at no cost to the Government and another test section shall be constructed.

Table 5. Test Section Requirements for Material and Mixture Properties

| Property | Specification Limit |
| --- | --- |
| Aggregate Gradation-Percent Passing (Individual Test Result) | |
| No. 4 and larger | JMF plus or minus 8 |
| No. 8, No. 16, No. 30, and No. 50 | JMF plus or minus 6 |
| No. 100 and No. 200 | JMF plus or minus 2.0 |
| Asphalt Content, Percent (Individual Test Result) | JMF plus or minus 0.5 |
| Laboratory Air Voids, Percent (Average of 3 specimens) | JMF plus or minus 1.0 |
| VMA, Percent (Average of 3 specimens) | 14 minimum |
| Stability, pounds (Average of 3 specimens) | 1800 minimum |
| Flow, 0.01 inches (Average of 3 specimens) | 8 - 18 |
| Mat Density, Percent of Marshall (Average of 4 Random Cores) | 97.0 - 100.5 |
| Joint Density, Percent of Marshall (Average of 4 Random Cores) | 95.5 - 100.5 |

3.5.2 Additional Test Sections

If the initial test section should prove to be unacceptable, the necessary adjustments to the JMF, plant operation, placing procedures, and/or rolling procedures shall be made. A second test section shall then be placed. Additional test sections, as required, shall be constructed and evaluated for conformance to the specifications. Full production shall not begin until an acceptable section has been constructed and accepted.

3.6 TESTING LABORATORY

The laboratory used to develop the JMF and for Government acceptance testing shall meet the requirements of ASTM D 3666. A certification signed by the manager of the laboratory stating that it meets these requirements or clearly listing all deficiencies shall be submitted to the Contracting Officer prior to the start of construction. The certification shall contain as a minimum:

a. Qualifications of personnel; laboratory manager, supervising technician, and testing technicians.

b. A listing of equipment to be used in developing the job mix.

c. A copy of the laboratory's quality control system.

d. Evidence of participation in the AASHTO Materials Reference Laboratory (AMRL) program.

3.7 TRANSPORTING AND PLACING

3.7.1 Transporting

The hot-mix asphalt shall be transported from the mixing plant to the site in clean, tight vehicles. Deliveries shall be scheduled so that placing and compacting of mixture is uniform with minimum stopping and starting of the paver. Adequate artificial lighting shall be provided for night placements. Hauling over freshly placed material will not be permitted until the material has been compacted as specified, and allowed to cool to 140 degrees F. To deliver mix to the paver, the Contractor shall use a material transfer vehicle which shall be operated to produce continuous forward motion of the paver.

### 3.7.2 Placing

The mix shall be placed and compacted at a temperature suitable for obtaining density, surface smoothness, and other specified requirements. Upon arrival, the mixture shall be placed to the full width by an asphalt paver; it shall be struck off in a uniform layer of such depth that, when the work is completed, it shall have the required thickness and conform to the grade and contour indicated. The speed of the paver shall be regulated to eliminate pulling and tearing of the asphalt mat. Unless otherwise permitted, placement of the mixture shall begin along the centerline of a crowned section or on the high side of areas with a one-way slope. The mixture shall be placed in consecutive adjacent strips having a minimum width of 10 feet. The longitudinal joint in one course shall offset the longitudinal joint in the course immediately below by at least 1 foot; however, the joint in the surface course shall be at the centerline of the pavement. Transverse joints in one course shall be offset by at least 10 feet from transverse joints in the previous course. Transverse joints in adjacent lanes shall be offset a minimum of 10 feet. On isolated areas where irregularities or unavoidable obstacles make the use of mechanical spreading and finishing equipment impractical, the mixture may be spread and luted by hand tools.

## 3.8 COMPACTION OF MIXTURE

After placing, the mixture shall be thoroughly and uniformly compacted by rolling. The surface shall be compacted as soon as possible without causing displacement, cracking or shoving. The sequence of rolling operations and the type of rollers used shall be at the discretion of the Contractor, with the exception that the Contractor shall not apply more than three passes with a vibratory roller in the vibrating mode. The speed of the roller shall, at all times, be sufficiently slow to avoid displacement of the hot mixture and be effective in compaction. Any displacement occurring as a result of reversing the direction of the roller, or from any other cause, shall be corrected at once. Sufficient rollers shall be furnished to handle the output of the plant. Rolling shall continue until the surface is of uniform texture, true to grade and cross section, and the required field density is obtained. To prevent adhesion of the mixture to the roller, the wheels shall be kept properly moistened but excessive water will not be permitted. In areas not accessible to the roller, the mixture shall be thoroughly compacted with hand tampers. Any mixture that becomes loose and broken, mixed with dirt, contains check-cracking, or is in any way defective shall be removed full depth, replaced with fresh hot mixture and immediately compacted to conform to the surrounding area. This work shall be done at the Contractor's expense. Skin patching will not be allowed.

## 3.9 JOINTS

The formation of joints shall be made ensuring a continuous bond between the courses and to obtain the required density. All joints shall have the same texture as other sections of the course and meet the requirements for smoothness and grade.

### 3.9.1 Transverse Joints

The roller shall not pass over the unprotected end of the freshly laid mixture, except when necessary to form a transverse joint. When necessary to form a transverse joint, it shall be made by means of placing a bulkhead or by tapering the course. The tapered edge shall be cut back to its full depth and width on a straight line to expose a vertical face prior to placing the adjacent lane. The cutback material shall be removed from the project. In both methods, all contact surfaces shall be given a light tack coat of asphalt material before placing any fresh mixture against the joint.

### 3.9.2 Longitudinal Joints

Longitudinal joints which are irregular, damaged, uncompacted, cold (less than 175 degrees F at the time of placing the adjacent lane), or otherwise defective, shall be cut back a minimum of 2 inches from the edge with a cutting wheel to expose a clean, sound vertical surface for the full depth of the course. All cutback material shall be removed from the project. All contact surfaces shall be given a light tack coat of asphalt material prior to placing any fresh mixture against the joint. The Contractor will be allowed to use an alternate method if it can be demonstrated that density, smoothness, and texture can be met.

## 3.10 CONTRACTOR QUALITY CONTROL

### 3.10.1 General Quality Control Requirements

The Contractor shall develop an approved Quality Control Plan. Hot-mix asphalt for payment shall not be produced until the quality control plan has been approved. The plan shall address all elements which affect the quality of the pavement including, but not limited to:

a. Mix Design

b. Aggregate Grading

c. Quality of Materials

d. Stockpile Management

e. Proportioning

f. Mixing and Transportation

g. Mixture Volumetrics

h. Moisture Content of Mixtures

i. Placing and Finishing

j. Joints

k. Compaction

l. Surface Smoothness

3.10.2 Testing Laboratory

The Contractor shall provide a fully equipped asphalt laboratory located at the plant or job site. The effective working area of the laboratory shall be a minimum of 150 square feet with a ceiling height of not less than 7.5 feet. Lighting shall be adequate to illuminate all working areas. It shall be equipped with heating and air conditioning units to maintain a temperature of 75 degrees F plus or minus 5 degrees F. Laboratory facilities shall be kept clean and all equipment shall be maintained in proper working condition. Contracting Officer shall be permitted unrestricted access to inspect the Contractor's laboratory facility, to witness quality control activities, and to perform any check testing desired. The Contracting Officer will advise the Contractor in writing of any noted deficiencies concerning the laboratory facility, equipment, supplies, or testing personnel and procedures. When the deficiencies are serious enough to adversely affect test results, the incorporation of the materials into the work shall be suspended immediately and will not be permitted to resume until the deficiencies are corrected.

3.10.3 Quality Control Testing

The Contractor shall perform all quality control tests applicable to these specifications and as set forth in the Quality Control Program. The testing program shall include, but shall not be limited to, tests for the control of asphalt content, aggregate gradation, temperatures, aggregate moisture, moisture in the asphalt mixture, laboratory air voids, stability, flow, in-place density, grade and smoothness. A Quality Control Testing Plan shall be developed as part of the Quality Control Program.

3.10.3.1 Asphalt Content

A minimum of two tests to determine asphalt content will be performed per lot (a lot is defined in paragraph MATERIAL ACCEPTANCE AND PERCENT PAYMENT) by one of the following methods: extraction method in accordance with ASTM D 2172, Method A or B, the ignition method in accordance with the AASHTO TP53, ASTM D 6307, or the nuclear method in accordance with ASTM D 4125, provided the nuclear gauge is calibrated for the specific mix being used. For the extraction method, the weight of ash, as described in ASTM D 2172, shall be determined as part of the first extraction test performed at the beginning of plant production; and as part of every tenth extraction test performed thereafter, for the duration of plant production. The last weight of ash value obtained shall be used in the calculation of the asphalt content for the mixture.

3.10.3.2 Gradation

Aggregate gradations shall be determined a minimum of twice per lot from mechanical analysis of recovered aggregate in accordance with ASTM D 5444. When asphalt content is determined by the nuclear method, aggregate gradation shall be determined from hot bin samples on batch plants, or from the cold feed on drum mix plants. For batch plants, aggregates shall be tested in accordance with ASTM C 136 using actual batch weights to determine the combined aggregate gradation of the mixture.

3.10.3.3 Temperatures

Temperatures shall be checked at least four times per lot, at necessary locations, to determine the temperature at the dryer, the asphalt cement in the storage tank, the asphalt mixture at the plant, and the asphalt mixture at the job site.

3.10.3.4 Aggregate Moisture

The moisture content of aggregate used for production shall be determined a minimum of once per lot in accordance with ASTM C 566.

3.10.3.5 Moisture Content of Mixture

The moisture content of the mixture shall be determined at least once per lot in accordance with ASTM D 1461 or an approved alternate procedure.

3.10.3.6 Laboratory Air Voids, Marshall Stability and Flow

Mixture samples shall be taken at least four times per lot and compacted into specimens, using 75 blows per side with the Marshall hammer as described in ASTM D 1559. After compaction, the laboratory air voids of each specimen shall be determined, as well as the Marshall stability and flow.

3.10.3.7 In-Place Density

The Contractor shall conduct any necessary testing to ensure the specified density is achieved. A nuclear gauge may be used to monitor pavement density in accordance with ASTM D 2950.

3.10.3.8 Grade and Smoothness

The Contractor shall conduct the necessary checks to ensure the grade and smoothness requirements are met in accordance with paragraph MATERIAL ACCEPTANCE AND PERCENT PAYMENT.

3.10.3.9 Additional Testing

Any additional testing, which the Contractor deems necessary to control the process, may be performed at the Contractor's option.

3.10.3.10 QC Monitoring

The Contractor shall submit all QC test results to the Contracting Officer on a daily basis as the tests are performed. The Contracting Officer reserves the right to monitor any of the Contractor's quality control testing and to perform duplicate testing as a check to the Contractor's quality control testing.

3.10.4 Sampling

When directed by the Contracting Officer, the Contractor shall sample and test any material which appears inconsistent with similar material being produced, unless such material is voluntarily removed and replaced or deficiencies corrected by the Contractor. All sampling shall be in accordance with standard procedures specified.

3.10.5 Control Charts

For process control, the Contractor shall establish and maintain linear control charts on both individual samples and the running average of last four samples for the parameters listed in Table 6, as a minimum. These control charts shall be posted as directed by the Contracting Officer and shall be kept current at all times. The control charts shall identify the project number, the test parameter being plotted, the individual sample numbers, the Action and Suspension Limits listed in Table 6 applicable to the test parameter being plotted, and the Contractor's test results. Target values from the JMF shall also be shown on the control charts as indicators of central tendency for the cumulative percent passing, asphalt content, and laboratory air voids parameters. When the test results exceed either applicable Action Limit, the Contractor shall take immediate steps to bring the process back in control. When the test results exceed either applicable Suspension Limit, the Contractor shall halt production until the problem is solved. The Contractor shall use the control charts as part of the process control system for identifying trends so that potential problems can be corrected before they occur. Decisions concerning mix modifications shall be made based on analysis of the results provided in the control charts. The Quality Control Plan shall indicate the appropriate action which shall be taken to bring the process into control when certain parameters exceed their Action Limits.

Table 6. Action and Suspension Limits for the Parameters to be Plotted on Individual and Running Average Control Charts

Individual Samples: Running Average of Last Four Samples

| Parameter to be Plotted | Action Limit | Suspension Limit | Action Limit | Suspension Limit |
|---|---|---|---|---|
| No. 4 sieve, Cumulative % Passing, deviation from JMF target; plus or minus values | 6 | 8 | 4 | 5 |
| No. 30 sieve, Cumulative % Passing, deviation from JMF target; plus or minus values | 4 | 6 | 3 | 4 |
| No. 200 sieve, Cumulative % Passing, deviation from JMF target; plus or minus values | 1.4 | 2.0 | 1.1 | 1.5 |
| Stability, pounds (minimum) | 1800 | 1700 | 1900 | 1800 |
| Flow, 0.01 inches | 8 min. 16 max. | 7 min. 17 max. | 9 min. 15 max. | 8 min. 16 max. |
| Asphalt content, % deviation from JMF target; plus or minus value | 0.4 | 0.5 | 0.2 | 0.3 |

| | |
|---|---|
| Laboratory Air Voids, % deviation from JMF target value | No specific action and suspension limits set since this parameter is used to determine percent payment |
| In-place Mat Density, % of Marshall density | No specific action and suspension limits set since this parameter is used to determine percent payment |
| In-place Joint Density, % of Marshall density | No specific action and suspension limits set since this parameter is used to determine percent payment |

## 3.11 MATERIAL ACCEPTANCE AND PERCENT PAYMENT

The Government's quality assurance (QA) program for this project, specified below, will be separate and distinct from the Contractor's quality control (QC) program specified above. Testing for acceptability of work will be performed by the Government or by an independent laboratory hired by the Contracting Officer, except for smoothness testing which shall be performed by the Contractor. Acceptance of the plant produced mix and in-place requirements will be on a lot to lot basis. A standard lot for all requirements will be equal to 2000 tons. Where appropriate, adjustment in payment for individual lots of hot-mix asphalt will be made based on in-place density, laboratory air voids, grade and smoothness in accordance with the following paragraphs. Grade and surface smoothness determinations will be made on the lot as a whole. Exceptions or adjustments to this will be made in situations where the mix within one lot is placed as part of both the intermediate and surface courses, thus grade and smoothness measurements for the entire lot cannot be made. In order to evaluate laboratory air voids and in-place (field) density, each lot will be divided into four equal sublots.

### 3.11.1 Percent Payment

When a lot of material fails to meet the specification requirements for 100 percent pay as outlined in the following paragraphs, that lot shall be removed and replaced, or accepted at a reduced price which will be computed by multiplying the unit price by the lot's pay factor. The lot pay factor is determined by taking the lowest computed pay factor based on either laboratory air voids, in-place density, grade or smoothness (each discussed below). Pay factors based on different criteria (i.e., laboratory air voids and in-place density) of the same lot will not be multiplied together to get a lower lot pay factor. At the end of the project, an average of all lot pay factors will be calculated. If this average lot pay factor exceeds 95.0 percent, then the percent payment for the entire project will be 100 percent of the unit bid price. If the average lot pay factor is less than 95.0 percent, then each lot will be paid for at the unit price multiplied by the lot's pay factor. For any lots which are less than 2000 pound tons, a weighted lot pay factor will be used to calculate the average lot pay factor.

3.11.2 Sublot Sampling

One random mixture sample for determining laboratory air voids, theoretical maximum density, and for any additional testing the Contracting Officer desires, will be taken from a loaded truck delivering mixture to each sublot, or other appropriate location for each sublot. All samples will be selected randomly, using commonly recognized methods of assuring randomness conforming to ASTM D 3665 and employing tables of random numbers or computer programs. Laboratory air voids will be determined from three laboratory compacted specimens of each sublot sample in accordance with ASTM D 1559. The specimens will be compacted within 2 hours of the time the mixture was loaded into trucks at the asphalt plant. Samples will not be reheated prior to compaction and insulated containers will be used as necessary to maintain the temperature.

3.11.3 Additional Sampling and Testing

The Contracting Officer reserves the right to direct additional samples and tests for any area which appears to deviate from the specification requirements. The cost of any additional testing will be paid for by the Government. Testing in these areas will be in addition to the lot testing, and the requirements for these areas will be the same as those for a lot.

3.11.4 Laboratory Air Voids

Laboratory air voids will be calculated in accordance with ASTM D 3203 by determining the Marshall density of each lab compacted specimen using ASTM D 2726 and determining the theoretical maximum density of every other sublot sample using ASTM D 2041. Laboratory air void calculations for each sublot will use the latest theoretical maximum density values obtained, either for that sublot or the previous sublot. The mean absolute deviation of the four laboratory air void contents (one from each sublot) from the JMF air void content will be evaluated and a pay factor determined from Table 7. All laboratory air void tests will be completed and reported within 24 hours after completion of construction of each lot.

3.11.5 Mean Absolute Deviation

An example of the computation of mean absolute deviation for laboratory air voids is as follows: Assume that the laboratory air voids are determined from 4 random samples of a lot (where 3 specimens were compacted from each sample). The average laboratory air voids for each sublot sample are determined to be 3.5, 3.0, 4.0, and 3.7. Assume that the target air voids from the JMF is 4.0. The mean absolute deviation is then:

Mean Absolute Deviation = (|3.5 - 4.0| + |3.0 - 4.0| + |4.0 - 4.0| + |3.7 - 4.0|)/4

= (0.5 + 1.0 + 0.0 + 0.3)/4 = (1.8)/4 = 0.45

The mean absolute deviation for laboratory air voids is determined to be 0.45. It can be seen from Table 7 that the lot's pay factor based on laboratory air voids, is 100 percent.

Table 7. Pay Factor Based on Laboratory Air Voids

| Mean Absolute Deviation of Lab Air Voids from JMF | Pay Factor, % |
|---|---|
| 0.60 or less | 100 |
| 0.61 - 0.80 | 98 |
| 0.81 - 1.00 | 95 |
| 1.01 - 1.20 | 90 |
| Above 1.20 | reject (0) |

3.11.6 In-place Density

3.11.6.1 General Density Requirements

For determining in-place density, one random core will be taken by the Government from the mat (interior of the lane) of each sublot, and one random core will be taken from the joint (immediately over joint) of each sublot. Each random core will be full thickness of the layer being placed. When the random core is less than 1 inch thick, it will not be included in the analysis. In this case, another random core will be taken. After air drying to a constant weight, cores obtained from the mat and from the joints will be used for in-place density determination.

3.11.6.2 Mat and Joint Densities

The average in-place mat and joint densities are expressed as a percentage of the average Marshall density for the lot. The Marshall density for each lot will be determined as the average Marshall density of the four random samples (3 specimens compacted per sample). The average in-place mat density and joint density for a lot are determined and compared with Table 8 to calculate a single pay factor per lot based on in-place density, as described below. First, a pay factor for both mat density and joint density are determined from Table 8. The area associated with the joint is then determined and will be considered to be 10 feet wide times the length of completed longitudinal construction joint in the lot. This area will not exceed the total lot size. The length of joint to be considered will be that length where a new lane has been placed against an adjacent lane of hot-mix asphalt pavement, either an adjacent freshly paved lane or one paved at any time previously. The area associated with the joint is expressed as a percentage of the total lot area. A weighted pay factor for the joint is determined based on this percentage (see example below). The pay factor for mat density and the weighted pay factor for joint density is compared and the lowest selected. This selected pay factor is the pay factor based on density for the lot. When the Marshall density on both sides of a longitudinal joint is different, the average of these two densities will be used as the Marshall density needed to calculate the percent joint density. All density results for a lot will be completed and reported within 24 hours after the construction of that lot.

Table 8. Pay Factor Based on In-place Density

| Average Mat Density (4 Cores) | Pay Factor, % | Average Joint Density (4 Cores) |
|---|---|---|
| 98.0 - 100 | 100.0 | Above 96.5 |
| 97.9 | 100.0 | 96.4 |
| 97.8 or 100.1 | 99.9 | 96.3 |
| 97.7 | 99.8 | 96.2 |
| 97.6 or 100.2 | 99.6 | 96.1 |
| 97.5 | 99.4 | 96.0 |
| 97.4 or 100.3 | 99.1 | 95.9 |
| 97.3 | 98.7 | 95.8 |
| 97.2 or 100.4 | 98.3 | 95.7 |
| 97.1 | 97.8 | 95.6 |
| 97.0 or 100.5 | 97.3 | 95.5 |
| 96.9 | 96.3 | 95.4 |
| 96.8 or 100.6 | 94.1 | 95.3 |
| 96.7 | 92.2 | 95.2 |
| 96.6 or 100.7 | 90.3 | 95.1 |
| 96.5 | 87.9 | 95.0 |
| 96.4 or 100.8 | 85.7 | 94.9 |
| 96.3 | 83.3 | 94.8 |
| 96.2 or 100.9 | 80.6 | 94.7 |
| 96.1 | 78.0 | 94.6 |
| 96.0 or 101.0 | 75.0 | 94.5 |
| below 96.0, above 101.0 | 0.0 (reject) | below 94.5 |

3.11.6.3 Pay Factor Based on In-place Density

An example of the computation of a pay factor (in I-P units only) based on in-place density, is as follows: Assume the following test results for field density made on the lot: (1) Average mat density = 97.2 percent (of lab density). (2) Average joint density = 95.5 percent (of lab density). (3) Total area of lot = 30,000 square feet. (4) Length of completed longitudinal construction joint = 2000 feet.

a. Step 1: Determine pay factor based on mat density and on joint density, using Table 8:

Mat density of 97.2 percent = 98.3 pay factor.

Joint density of 95.5 percent = 97.3 pay factor.

b. Step 2: Determine ratio of joint area (length of longitudinal joint x 10 ft) to mat area (total paved area in the lot): Multiply the length of completed longitudinal construction joint by the specified 10 ft. width and divide by the mat area (total paved area in the lot).

(2000 ft. x 10 ft.)/30000 sq.ft. = 0.6667 ratio of joint area to mat area (ratio).

c. Step 3: Weighted pay factor (wpf) for joint is determined as indicated below:

wpf = joint pay factor + (100 - joint pay factor) (1 - ratio) wpf = 97.3 + (100-97.3) (1-.6667) = 98.2%

d. Step 4: Compare weighted pay factor for joint density to pay factor for mat density and select the smaller:

Pay factor for mat density: 98.3%. Weighted pay factor for joint density: 98.2%

Select the smaller of the two values as pay factor based on density: 98.2%

3.11.7 Grade

The final wearing surface of pavement shall conform to the elevations and cross sections shown and shall vary not more than 0.03 foot for runways or 0.05 foot for taxiways and aprons from the plan grade established and approved at site of work. Finished surfaces at juncture with other pavements shall coincide with finished surfaces of abutting pavements. Deviation from the plan elevation will not be permitted in areas of pavements where closer conformance with planned elevation is required for the proper functioning of drainage and other appurtenant structures involved. The final wearing surface of the pavement will be tested for conformance with specified plan grade requirements. The grade will be determined by running lines of levels at intervals of 25 feet, or less, longitudinally and transversely, to determine the elevation of the completed pavement surface. Within 5 working days, after the completion of a particular lot incorporating the final wearing surface, the Contracting Officerwill inform the Contractor in writing, of the results of the grade-conformance tests. When more than 5 percent of all measurements made within a lot are outside the 0.03 or 0.05 foot tolerance, the pay factor based on grade for that lot will be 95 percent. In areas where the grade exceeds the tolerance by more than 50 percent, the Contractor shall remove the surface lift full depth; the Contractor shall then replace the lift with hot-mix asphalt to meet specification requirements, at no additional cost to the Government. Diamond grinding may be used to remove high spots to meet grade requirements. Skin patching for correcting low areas or planing or milling for correcting high areas will not be permitted.

3.11.8 Surface Smoothness

The Contractor shall use one of the following methods to test and evaluate surface smoothness of the pavement. All testing shall be performed in the presence of the Contracting Officer. Detailed notes of the results of the testing shall be kept and a copy furnished to the Government immediately after each day's testing. The profilograph method shall be used for all longitudinal and transverse testing, except where the runs would be less than 200 feet in length and the ends where the straightedge shall be used. Where drawings show required deviations from a plane surface (crowns, drainage inlets, etc.), the surface shall be finished to meet the approval of the Contracting Officer.

3.11.8.1 Smoothness Requirements

a. Straightedge Testing: The finished surfaces of the pavements shall have no abrupt change of 1/8 inch or more, and all pavements shall be within the tolerances specified in Table 9 when checked with an approved 12 foot straightedge.

Table 9. Straightedge Surface Smoothness--Pavements

| Pavement Category | Direction of Testing | Tolerance, inches |
|---|---|---|
| All airfield and helicopter paved areas | Longitudinal | 1/4 |
| | Transverse | 1/4 |

b. Profilograph Testing: The finished surfaces of the pavements shall have no abrupt change of 1/8 inch or more, and all pavement shall have a Profile Index not greater than specified in Table 10 when tested with an approved California-type profilograph. If the extent of the pavement in either direction is less than 200 feet, that direction shall be tested by the straightedge method and shall meet requirements specified above.

Table 10. Profilograph Surface Smoothness--Pavements

| Pavement Category | Direction of Testing | Maximum Specified Profile Index (inch/mile) |
|---|---|---|

| | | |
|---|---|---|
| Runways | Longitudinal | 7 |
| | Transverse | 9 |
| Taxiways | Longitudinal | 9 |
| | Transverse | (Use Straightedge) |
| Calibration Hardstands & Compass Swinging Bases | | (Use Straightedge) |
| All Other Airfield & Helicopter Paved Areas | Longitudinal | 9 |
| | Transverse | 9 |

3.11.8.2 Testing Method

After the final rolling, but not later than 24 hours after placement, the surface of the pavement in each entire lot shall be tested by the Contractor in such a manner as to reveal all surface irregularities exceeding the tolerances specified above. Separate testing of individual sublots is not required. If any pavement areas are ground, these areas shall be retested immediately after grinding. The entire area of the pavement shall be tested in both a longitudinal and a transverse direction on parallel lines. The transverse lines shall be 15 feet or less apart, as directed. The longitudinal lines shall be at the centerline of each paving lane for lines less than 20 feet and at the third points for lanes 20 feet or greater. Other areas having obvious deviations shall also be tested. Longitudinal testing lines shall be continuous across all joints.

a. Straightedge Testing. The straightedge shall be held in contact with the surface and moved ahead one-half the length of the straightedge for each successive measurement. The amount of surface irregularity shall be determined by placing the freestanding (unleveled) straightedge on the pavement surface and allowing it to rest upon the two highest spots covered by its length, and measuring the maximum gap between the straightedge and the pavement surface in the area between these two high points.

b. Profilograph Testing. Profilograph testing shall be performed using approved equipment and procedures described in CDT Test 526. The equipment shall utilize electronic recording and automatic computerized reduction of data to indicate "must-grind" bumps and the Profile Index for the pavement. The "blanking band" shall be 0.2 inches wide and the "bump template" shall span 1 inch with an offset of 0.4 inch. The profilograph shall be operated by an approved, factory-trained operator on the alignments specified above. A copy of the reduced tapes shall be furnished the Governmentat the end of each day's testing.

3.11.8.3 Payment Adjustment for Smoothness

a. Straightedge Testing. Location and deviation from straightedge for all measurements shall be recorded. When between 5.0 and 10.0 percent of all measurements made within a lot exceed the tolerance specified in paragraph Smoothness Requirements above, after any reduction of high spots or removal and replacement, the computed pay factor for that lot based on surface smoothness, will be 95 percent. When more than 10.0 percent of all measurements exceed the tolerance, the computed pay factor will be 90 percent. When between 15.0 and 20.0 percent of all measurements exceed the tolerance, the computed pay factor will be 75 percent. When 20.0 percent or more of the measurements exceed the tolerance, the lot shall be removed and replaced at no additional cost to the Government. Regardless of the above, any small individual area with surface deviation which exceeds the tolerance given above by more than 50 percent, shall be corrected by diamond grinding to meet the specification requirements above or shall be removed and replaced at no additional cost to the Government.

b. Profilograph Testing. Location and data from all profilograph measurements shall be recorded. When the Profile Index of a lot exceeds the tolerance specified in paragraph Smoothness Requirements above by 1.0 inch/mile, but less than 2.0 inches/mile, after any reduction of high spots or removal and replacement, the computed pay factor for that lot based on surface smoothness will be 95 percent. When the Profile Index exceeds the tolerance by 2.0 inches/mile, but less than 3.0 inches/mile, the computed pay factor will be 90 percent. When the Profile Index exceeds the tolerance by 3.0 inches/mile, but less than 4.0 inches/mile, the computed pay factor will be 75 percent. When the Profile Index exceeds the tolerance by 4.0 inches/mile or more, the lot shall be removed and replaced at no additional cost to the Government. Regardless of the above, any small individual area with surface deviation which exceeds the tolerance given above by more than 5.0 inches/mile or more, shall be corrected by grinding to meet the specification requirements above or shall be removed and replaced at no additional cost to the Government.

c. Bumps ("Must Grind" Areas). Any bumps ("must grind" areas) shown on the profilograph trace which exceed 0.4 inch in height shall be reduced by diamond grinding until they do not exceed 0.3 inch when retested. Such grinding shall be tapered in all directions to provide smooth transitions to areas not requiring grinding. The following will not be permitted: (1) skin patching for correcting low areas, (2) planing or milling for correcting high areas. At the Contractor's option, pavement areas, including ground areas, may be rechecked with the profilograph in order to record a lower Profile Index.

END OF SECTION

# SECTION 02754
# CONCRETE PAVEMENTS FOR SMALL PROJECTS

## 1 GENERAL

### 1.1 REFERENCES

The publications listed below form a part of this specification to the extent referenced. The publications are referred to in the text by basic designation only.

ACI INTERNATIONAL (ACI)

| | |
|---|---|
| ACI 211.1 | (1991) Standard Practice for Selecting Proportions for Normal, Heavyweight, and Mass Concrete |
| ACI 301 | (1996) Standard Specification for Structural Concrete |
| ACI 305R | (1991) Hot Weather Concreting |

AMERICAN SOCIETY FOR TESTING AND MATERIALS (ASTM)

| | |
|---|---|
| ASTM A 184/A 184M | (1996) Fabricated Deformed Steel Bar Mats for Concrete Reinforcement |
| ASTM A 615/A 615M | (1996a) Deformed and Plain Billet-Steel Bars for Concrete Reinforcement |
| ASTM C 31/C 31M | (1996) Making and Curing Concrete Test Specimens in the Field |
| ASTM C 33 | (1997) Concrete Aggregates |
| ASTM C 78 | (1984) Flexurai Strength of Concrete (Using Simple Beam with Third-Point Loading) |
| ASTM C 94 | (1997) Ready-Mixed Concrete |
| ASTM C 123 | (1996) Lightweight Pieces in Aggregate |
| ASTM C 143 | (1990a) Slump of Hydraulic Cement Concrete |
| ASTM C 150 | (1997) Portland Cement |
| ASTM C 192/C 192M | (1995) Making and Curing Concrete Test Specimens in the Laboratory |

## AMERICAN SOCIETY FOR TESTING AND MATERIALS (ASTM) Cont'd

| | |
|---|---|
| ASTM C 231 | (1997) Air Content of Freshly Mixed Concrete by the Pressure Method |
| ASTM C 260 | (1995) Air-Entraining Admixtures for Concrete |
| ASTM C 494 | (1992) Chemical Admixtures for Concrete |
| ASTM C 595 | (1998) Blended Hydraulic Cements |
| ASTM C 618 | (1997) Coal Fly Ash and Raw or Calcined Natural Pozzolan for Use as a Mineral Admixture in Concrete |
| ASTM C 666 | (1992) Resistance of Concrete to Rapid Freezing and Thawing |
| ASTM C 881 | (1990) Epoxy-Resin-Base Bonding Systems for Concrete |
| ASTM C 989 | (1997) Ground Granulated Blast-Furnace Slag for Use in Concrete and Mortars |
| ASTM C 1077 | (1997) Laboratories Testing Concrete and Concrete Aggregates for Use in Construction and Criteria for Laboratory Evaluation |
| ASTM D 1751 | (1983; R 1991) Preformed Expansion Joint Filler for Concrete Paving and Structural Construction (Nonextruding and Resilient Bituminous Types) |
| ASTM D 1752 | (1984; R 1996) Preformed Sponge Rubber and Cork Expansion Joint Fillers for Concrete Paving and Structural Construction |

## ARMY CORPS OF ENGINEERS (COE)

| | |
|---|---|
| COE CRD-C 130 | (1989) Scratch Hardness of Coarse Aggregate Particles |
| COE CRD-C 300 | (1990) Specifications for Membrane-Forming Compounds for Curing Concrete |
| COE CRD-C 540 | (1971; R 1981) Standard Specification for Nonbituminous Inserts for Contraction Joints in Portland Cement Concrete Airfield Pavements, Sawable Type |

ARMY CORPS OF ENGINEERS (COE) Cont'd

| | |
|---|---|
| COE CRD-C 572 | (1974) Corps of Engineers Specifications for Polyvinylchloride Waterstop |

NATIONAL READY-MIXED CONCRETE ASSOCIATION (NRMCA)

| | |
|---|---|
| NRMCA CPMB 100 | (1996) Concrete Plant Standards |

## 1.2 SYSTEM DESCRIPTION

This section is intended to stand alone for construction of concrete (rigid) pavement. However, where the construction covered herein interfaces with other sections, the construction at each interface shall conform to the requirements of both this section and the other section, including tolerances for both.

## 1.3 MEASUREMENT AND PAYMENT

Measurement and Payment shall be as stated in the Explanation of Bid Items, except as amended below.

## 1.4 ACCEPTABILITY OF WORK

The pavement will be accepted on the basis of tests made by the Contractor or its suppliers, as specified herein. The Government may, at its discretion, make check tests to validate the results of the Contractor's testing. Concrete samples shall be taken by the Contractor at the placement to determine the slump, air content, and strength of the concrete. Test beams shall be made for determining conformance with the strength requirements of these specifications and, when required, for determining the time at which pavements may be placed into service. All air content measurements shall be determined in accordance with ASTM C 231. All slump tests shall be made in accordance with ASTM C 143. All test beams shall be fabricated in accordance with ASTM C 192/C 192M, using only steel molds, cured in accordance with ASTM C 31/C 31M, and tested in accordance with ASTM C 78. Strength tests shall be made at the age of 28-days to determine conformity of the concrete with the specified strength requirement and at the age of 7-days for field control of the concrete mix. The cumulative average strength of all sets of specimens tested for determing compliance with the specified strength, and the average strength of any 5 consecutive sets of specimens representing each concrete mix shall be not less than the specified strength. The Contractor shall furnish all materials, labor, and facilities required for molding, curing, testing, and protecting test specimens at the site and in the laboratory.

1.4.1 Evaluation Sampling

Sampling, testing, and mixture proportioning shall be performed by a commercial Testing Laboratory, conforming with ASTM C 1077. The individuals who sample and test concrete and concrete constituents shall be certified as American Concrete Institute (ACI) Concrete Field Testing Technicians, Grade I. The individuals who perform the inspection of concrete shall be certified as ACI Concrete Construction Inspector, Level II. All mix design, weekly quality control reports, smoothness reports, and project certification reports shall be signed by a Registered Engineer.

1.4.2 Surface Testing

Surface testing for surface smoothness , edge slump and plan grade shall be performed as indicated below by the Testing Laboratory. The measurements shall be properly referenced in accordance with paving lane identification and stationing, and a report given to the Government within 24 hours after measurement is made. A final report of surface testing, signed by a Registered Engineer, containing all surface measurements and a description of all actions taken to correct deficiencies, shall be provided to the Government upon conclusion of surface testing.

1.4.2.1 Surface Smoothness Requirements

The finished surfaces of the pavements shall have no abrupt change of 1/8 inch or more, and all pavements shall be within the tolerances specified in Table 1 when checked with the straightedge.

TABLE 1
STRAIGHTEDGE SURFACE SMOOTHNESS--PAVEMENTS

| Direction Tolerances Pavement Category | of Testing | inches |
|---|---|---|
| All Other Airfield and | Longitudinal | 1/4 |
| Helicopter Paved Areas | Transverse | ¼ |

1.4.2.2 Surface Smoothness Testing Method

The surface of the pavement shall be tested with the straightedge to identify all surface irregularities exceeding the tolerances specified above. The entire area of the pavement shall be tested in both a longitudinal and a transverse direction on parallel lines approximately 15 feet apart. The straightedge shall be held in contact with the surface and moved ahead one-half the length of the straightedge for each successive measurement. The amount of surface irregularity shall be determined by placing the straightedge on the pavement surface and allowing it to rest upon the two highest spots covered by its length and measuring the maximum gap between the straightedge and the pavement surface, in the area between these two high points.

### 1.4.3 Edge Slump Testing and Conformance

When slip-form paving is used, not more than 15 percent of the total free edge of the slipformed portion of the pavement, shall have an edge slump exceeding 1/4 inch and no slab shall have an edge slump exceeding3/8 inch. Edge slump shall be determined as above for surface smoothness, at each free edge of each slipformed paving lane constructed. Measurements shall be made at 5 to 15 foot spacings, and as directed. When edge slump exceeding the limits specified above is encountered on either side of the paving lane, additional straightedge measurements shall be made, if required, to define the linear limits of the excessive slump. The concrete for the entire width of the paving lane within these limits of excessive edge slump shall be removed and replaced. Adding concrete or paste to the edge or otherwise manipulating the plastic concrete after the sliding form has passed, or patching the hardened concrete, shall not be used as a method for correcting excessive edge slump.

### 1.4.4 Plan Grade Testing and Conformance

The finished surface of the pavements shall conform, within the tolerances shown in Table 1, to the lines, grades, and cross sections shown. The finished surface of new abutting pavements shall coincide at their juncture. The surfaces of pavements shall vary not more than 0.06 foot above or below the plan grade line or elevation indicated. Each pavement category shall be checked by the Contractor for conformance with plan grade requirements by running lines of levels at intervals to determine the elevation at each joint intersection.

## 1.5 PRECONSTRUCTION TESTING OF MATERIALS

The Contractor shall not be entitled to any additional payment or extension of time because of delays caused by sampling and testing additional sources, or samples, necessitated by failure of any samples. Aggregates shall be sampled and tested by the Test Laboratory and shall be representative of the materials to be used for the project. Test results, signed by a Registered Engineer, shall be submitted 30 days before commencing paving. No aggregate shall be used unless test results show that it meets all requirements of these specifications, including compliance with ASTM C 33 and deleterious materials limitations.

## 1.6 SUBMITTALS

Government approval is required for submittals with a "GA" designation; submittals having an "FIO" designation are for information only. The following shall be submitted in accordance with Section 01330 SUBMITTAL PROCEDURES:

SD-01 Data

Equipment;FIO.

Manufacturer's literature on the concrete plant; mixing equipment; hauling equipment; placing and finishing, and curing equipment; at least 7 days prior to start of paving.

SD-07 Schedules

Paving; IO.

Paving Schedules at least 7 days prior to start of paving.

SD-08 Statements

Mixture Proportions; GA CD.

The report of the Contractor's mixture proportioning studies showing the proportions of all ingredients and supporting information on aggregate and other materials that will be used in the manufacture of concrete, at least 30 days prior to commencing concrete placing operations.

## 1.7 EQUIPMENT

### 1.7.1 Batching and Mixing

The batching plant shall conform to NRMCA CPMB 100, the equipment requirements in ASTM C 94, and as specified. Water shall not be weighed or measured cumulatively with another ingredient. All concrete materials batching shall meet ASTM C 94 requirements. Mixers shall be stationary mixers. Truck mixers shall not be used for mixing paving concrete. Batching, mixers, mixing time, permitted reduction of mixing time, and concrete uniformity shall meet the requirements of ASTM C 94, and shall be documented in the initial weekly QC Report.

### 1.7.2 Transporting Equipment

Transporting equipment shall be in conformance with ASTM C 94 and as specified herein. Concrete shall be transported to the paving site in rear-dump trucks, in truck mixers designed with extra large blading and rear opening specifically for low slump concrete, or in agitators. Bottom-dump trucks shall not be used for delivery of concrete.

### 1.7.3 Delivery Equipment

When concrete transport equipment cannot operate on the paving lane, side-delivery transport equipment consisting of self-propelled moving conveyors shall be used to deliver concrete from the transport equipment and discharge it in front of the paver. Front-end loaders, dozers, or similar equipment shall not be used to distribute the concrete.

1.7.4 Paver-Finisher

The paver-finisher shall be a heavy-duty, self-propelled machine designed specifically for paving and finishing high quality pavement. The paver-finisher shall weigh at least 2200 lb./foot of lane width, and shall be powered by an engine having at least 6.0 horsepower per foot of lane width. The paver-finisher shall spread, consolidate, and shape the plastic concrete to the desired cross section in one pass. The paver-finisher shall be equipped with a full width "knock-down" auger, capable of operating in both directions, which will evenly spread the fresh concrete in front of the screed or extrusion plate. Immersion vibrators shall be gang mounted at the front of the paver on a frame equipped with suitable controls so that all vibrators can be operated at any desired depth within the slab or completely withdrawn from the concrete. The vibrators shall be automatically controlled so that they will be immediately stopped as forward motion of the paver ceases. The spacing of the immersion vibrators across the paving lane shall be as necessary to properly consolidate the concrete, but the clear distance between vibrators shall not exceed 30 inches, and the outside vibrators shall not exceed 12 inches from the edge of the lane. The paver-finisher shall be equipped with a transversely oscillating screed or an extrusion plate to shape, compact, and smooth the surface.

1.7.4.1 Paver-Finisher with Fixed Forms

The paver-finisher shall be equipped with wheels designed to ride the forms, keep it aligned with the forms, and to spread the preventing deformation of the forms.

1.7.4.2 Slipform Paver-Finisher

The slipform paver-finisher shall be automatically controlled and crawler mounted with padded tracks. Horizontal alignment shall be electronically referenced to a taut wire guideline. Vertical alignment shall be electronically referenced on both sides of the paver to a taut wire guideline, to an approved laser control system, or to a ski operating on a completed lane. Control from a slope-adjustment control or control operating from the underlying material shall not be used.

1.7.5 Curing Equipment

Equipment for curing is specified in paragraph CURING.

1.7.6 Texturing Equipment

Texturing equipment shall be as specified below.

1.7.6.1 Fabric Drag

A fabric drag shall consist of a piece of fabric material as wide as the lane width securely attached to a separate wheel mounted frame spanning the paving lane or to one of the other similar pieces of equipment. The material shall be wide enough to provide 12 to 18 inches dragging flat on the pavement surface. The fabric material shall be clean, reasonably new burlap, kept clean and saturated during use.

1.7.7 Sawing Equipment

Equipment for sawing joints and for other similar sawing of concrete shall be standard diamond-tip-bladed concrete saws mounted on a wheeled chassis.

1.7.8 Straightedge

The Contractor shall furnish and maintain at the job site one 12 foot straightedge for testing concrete surface smoothness. The straightedge shall be constructed of aluminum or magnesium alloy and shall have blades of box or box-girder cross section with flat bottom, adequately reinforced to insure rigidity and accuracy. Straightedges shall have handles for operation on the pavement.

## 2 PRODUCTS

### 2.1 CEMENTITIOUS MATERIALS

Cementitious materials shall be portland cement or portland cement in combination with pozzolan, and shall conform to appropriate specifications listed below.

2.1.1 Portland Cement

Portland cement shall conform to ASTM C 150 Type II, low-alkali.

2.1.1.1 Cement Content: The minimum portland cement content shall be 335 Kg per cubic meter (564 pcy) of cement, when using <u>only</u> portland cement as the cementitious components of the concrete mixture. When pozzalanic materials such as fly ash are used in concrete, the minimum amount of portland cement shall be307 Kg per cubic meter (517 pcy) of concrete. The amount of cementitious material is determined by the amount of portland cement plus the amount of fly ash.

2.1.2 Pozzolan (Fly Ash)

Fly ash shall conform to ASTM C 618 Class C or F, with the optional requirements for multiple factor, drying shrinkage, and uniformity form Table 2A in ASTM C 618. The fly ash shall meet the optional requirements on limits of alkalies in Table IA of ASTM 618. Fly ash shall be used only at a rate between 15 and 25 percent of the total cementitious material by mass.

## 2.2 AGGREGATES

Aggregates shall consist of clean, hard, uncoated particles meeting the requirements of ASTM C 33, including deleterious materials, abrasion loss and soundness requirements of ASTM C 33, and other requirements specified herein. Aggregate not having a satisfactory demonstrable service record shall have a durability factor of 50 or more when subjected to freezing and thawing in concrete in accordance with ASTM C 666. In addition to the grading requirements specified for coarse aggregate and for fine aggregate, the combined aggregate grading shall meet the following requirements.

a. If necessary, a blending aggregate shall be used to meet the required combined grading. This blending aggregate shall be batched separately. The combined grading of all aggregates used, in the proportions selected, shall be computed on the basis of cumulative percent retained on each sieve specified for fine and coarse aggregate.

b. The materials selected and the proportions used shall be such that when the Coarseness Factor (CF) and the Workability Factor (W) are plotted on a diagram as described in d. below, the point thus determined shall fall within the parallelogram described therein.

c. The Coarseness Factor (CF) shall be determined from the following equation:

CF = (cumulative percent retained on the 3/8 in. sieve)(100)/(cumulative percent retained on the No. 8 sieve)

The Workability Factor (W) is defined as the cumulative percent passing the No. 8 sieve. However, W shall be adjusted, upwards only, by 2.5 percentage points for each 94 pounds of cementitious material per cubic yard greater than 564 pounds per cubic yard.

d. A diagram shall be plotted using a rectangular scale with W on the Y-axis with units from 20 (bottom) to 45 (top), and with CF on the X-axis with units from 80 (left side) to 30 (right side). On this diagram a parallelogram shall be plotted with corners at the following coordinates (CF-75, W-28), (CF-75, W-40), (CF-45, W-32.5), and (CF-45, W-41). If the point determined by the intersection of the computed CF and W does not fall within the above parallelogram, the grading of each size of aggregate used and the proportions selected shall be changed as necessary.

e. In addition, the individual percent retained on each sieve shall be plotted for the combined aggragate grading, on either rectangular or semi-log graph paper. The graph shall show a relative smooth transition between coarse and fine aggregate and shall have no major valleys or peaks in the area smaller than the No. 8 sieve.

If this plot does not meet the above criteria, the grading of each size aggregate used and the proportions selected shall be changed as necessary.

### 2.2.1 Coarse Aggregate

Coarse aggregate shall consist of crushed stone. The nominal maximum size of the coarse aggregate shall be 1 inch. When the nominal maximum size is greater than 3/4 inch, the aggregates shall be furnished in two ASTM C 33 size groups, No. 67 and No. 4. The amount of deleterious material in each size of coarse aggregate shall not exceed the limits shown in ASTM C 33 Class 1N, 4M or 4S, depending on the weathering region, and the following limits:

a. Lightweight particles 1.0 max. percent by mass (ASTM C 123).

b. Other soft particles 2.0 max. percent by mass (COE CRD-C 130).

c. Total of all deleterious 3.0 max. percent by mass (substances listed in ASTM C 33 and above, exclusive of material finer than No. 200 sieve).

d. The separation medium for lightweight particles shall have a density of Sp. Gr. of 2.0.

### 2.2.2 Fine Aggregate

Fine aggregate shall consist of natural sand, manufactured sand, or a combination of the two, and shall be composed of clean, hard, durable particles. All fine aggregate shall be composed of clean, hard, durable particles meeting the requirements of ASTM C 33 and the requirements herein. The amount of deleterious material in the fine aggregate shall not exceed the limits in ASTM C 33 Class 4M, and shall not exceed the following limits:

a. Lightweight particles (ASTM C 123) 1.0 percent max. by mass using a medium with a density of Sp. Gr. of 2.0.

b. The total of all deleterious material types, listed in ASTM C 33 and above, shall not exceed 3.0 percent of the mass of the fine aggregate.

## 2.3 CHEMICAL ADMIXTURES

Air-entraining admixture shall conform to ASTM C 260. An accelerator shall be used only when specified in paragraph SPECIFIED CONCRETE STRENGTH AND OTHER PROPERTIES and shall not be used to reduce the amount of cementitious material used. Accelerator shall conform to ASTM C 494Type C. Calcium chloride and admixtures containing calcium chloride shall not be used. A water-reducing or retarding admixture shall meet the requirements of ASTM C 494. Type G or H admixtures are not allowed.

## 2.4 CURING MATERIALS

Membrane forming curing compound shall be a white pigmented compound conforming to COE CRD-C 300. Burlap shall be new or shall be clean material never used for anything other than curing concrete.

## 2.5 WATER

Water for mixing and curing shall be clean, potable, and free of injurious amounts of oil, acid, salt, or alkali.

## 2.6 JOINT MATERIALS

### 2.6.1 Expansion Joint Material

Expansion joint filler shall be a preformed material conforming to ASTM D 1751 or ASTM D 1752 Type I. Expansion joint filler shall be 3/4 inch thick.

## 2.7 REINFORCING

### 2.7.1 General

Reinforcing bars shall conform to ASTM A 615/A 615M Grade 60. Bar mats shall conform to ASTM A 184/A 184M. Reinforcement shall be free from loose, flaky rust, loose scale, oil, grease, mud, or other coatings that might reduce the bond with concrete.

## 2.8 DOWELS AND TIE BARS

### 2.8.1 Dowels

Dowels shall be single piece, plain (non-deformed) steel bars conforming to ASTM A 615/A 615M Grade 40 or higher. Dowels shall be free of loose, flaky rust and loose scale and shall be clean and straight.

### 2.8.2 Tie Bars

Tie bars shall be deformed steel bars conforming to ASTM A 615/A 615M Grade 40 or 60. Grade 60 or higher shall not be used for bars that are bent and straightened during construction.

## 2.9 EPOXY RESIN

All epoxy-resin materials shall be two-component materials conforming to ASTM C 881, Class as appropriate for each application temperature to be encountered; except, that in addition, the materials shall meet the following requirements:

a. Material for use for embedding dowels and anchor bolts shall be Type IV, Grade 3.

b. Material for use as patching for complete filling of spalls, wide cracks, and other voids and for use in preparing epoxy resin mortar shall be Type III, Grade as approved.

c. Material for injecting cracks shall be Type IV, Grade 1.

d. Material for bonding freshly mixed portland cement concrete, mortar, or freshly mixed epoxy resin concrete to hardened concrete shall be Type V, Grade as approved.

## 2.10 SPECIFIED CONCRETE STRENGTH AND OTHER PROPERTIES

Specified flexural strength, for concrete is 650 psi at 28 days. Maximum allowable water-cementitious material ratio is 0.45. The water-cementitious material ratio is based on absolute volume equivalency, where the ratio is determined using the weight of cement for a cement only mix, or using the total volume of cement plus pozzolan converted to an equivalent weight of cement by the absolute volume equivalency method described in ACI 211.1. The concrete shall be air-entrained with a total air content of 4 plus or minus 1 percent. The maximum allowable slump of the concrete shall be 3 inches for pavement constructed with fixed forms. For slipformed pavement, the maximum allowable slump shall be 1-1/4 inches. MIXTURE PROPORTIONS

### 2.10.1 Composition Concrete

Composition concrete shall be composed of cementitious material, water, fine and coarse aggregates, and admixtures. Fly ash, if used, shall be used only at a rate between 15 and 25 percent by mass of the total cementitious material. Admixtures shall consist of air entraining admixture and may also include retarder or water-reducing admixture. High range water-reducing admixtures and admixtures to produce flowable concrete shall not be used. No substitutions shall be made in the materials used in the mixture proportions without additional tests to show that the quality of the concrete is satisfactory.

2.10.2 Concrete Mixture Proportioning Studies

Trial design batches, mixture proportioning studies, and testing shall be the responsibility of the Contractor, and shall be performed by the Test Laboratory and signed by a Registered Engineer. No concrete pavement shall be placed until the Contracting Officer has approved the Contractor's mixture proportions. All materials used in mixture proportioning studies shall be representative of those proposed for use on the project. If there is a change in materials, additional mixture design studies shall be made using the new materials. Trial mixtures having proportions, slumps, and air content suitable for the work shall be based on methodology described in ACI 211.1. At least three different water-cementitious ratios, which will produce a range of strength encompassing that required on the project, shall be used. Laboratory trial mixtures shall be proportioned for maximum permitted slump and air content. Maximum sand content shall be 40 percent of the total aggregate SSD weight. Aggregate quantities shall be based on the mass in a saturated surface dry condition.

3 EXECUTION

3.1 CONDITIONING OF UNDERLYING MATERIAL

Underlying material upon which concrete is to be placed shall be clean, damp, and free from debris, waste concrete or cement, frost, ice, and standing or running water. After the underlying material has been prepared for concrete placement, no equipment shall be permitted thereon.

3.2 WEATHER LIMITATIONS

3.2.1 Hot Weather Paving

The temperature of concrete shall not exceed 90 degrees F. Steel forms, dowels and reinforcing shall be cooled prior to concrete placement when steel temperatures are greater than 120 degrees F.

3.2.2 Cold Weather Paving

The ambient temperature of the air at the placing site and the temperature of surfaces to receive concrete shall be not less 40 degrees F. The temperature of the concrete when placed shall be not less than 50 degrees F. Materials entering the mixer shall be free from ice, snow, or frozen lumps. Salt, chemicals or other materials shall not be incorporated in the concrete to prevent freezing. Calcium chloride shall not be used at any time. Covering and other means shall be provided for maintaining the concrete at a temperature of at least 50 degrees F for not less than 72 hours after placing, and at a temperature above freezing for the remainder of the curing period. Pavement damaged by freezing shall be completely removed and replaced at the Contractor's expense as specified in paragraph, REPAIR, REMOVAL, AND REPLACEMENT OF SLABS.

## 3.3 CONCRETE PRODUCTION

### 3.3.1 General Requirements

Concrete shall be deposited in front of the paver within 45 minutes from the time cement has been charged into the mixing drum. except that if the ambient temperature is above 90 degrees F, the time shall be reduced to 30 minutes. Every load of concrete delivered to the paving site shall be accompanied by a batch ticket from the operator of the batching plant. Tickets shall show at least the mass, or volume, of all ingredients in each batch delivered, the water meter and revolution meter reading on truck mixers and the time of day. Tickets shall be delivered to the placing foreman who shall keep them on file and deliver them to the Government daily.

### 3.3.2 Transporting and Transfer-Spreading Operations

Non-agitating equipment shall be used only on smooth roads and for haul time less than 15 minutes. Equipment shall be allowed to operate on the underlying material only if no damage is done to the underlying material and its degree of compaction. Any disturbance to the underlying material that does occur shall be corrected before the paver-finisher reaches the location of the disturbance and the equipment shall be replaced or procedures changed to prevent any future damage. Additional water may be added to truck mixers to bring the slump within the specified range provided the mixture water-cement ratio is not exceeded.

## 3.4 PAVING

Pavement shall be constructed with paving and finishing equipment utilizing fixed forms or slipforms.

### 3.4.1 Consolidation

The paver vibrators shall be inserted into the concrete not closer to the underlying material than 2 inches. The vibrators or any tamping units in front of the paver shall be automatically controlled so that they shall be stopped immediately as forward motion ceases. Excessive vibration shall not be permitted. Concrete in small, odd-shaped slabs or in locations inaccessible to the paver mounted vibration equipment shall be vibrated with a hand-operated immersion vibrator. Vibrators shall not be used to transport or spread the concrete.

### 3.4.2 Operation

When the paver is operated between or adjacent to previously constructed pavement (fill-in lanes), provisions shall be made to prevent damage to the previously constructed pavement, including keeping the existing pavement surface free of any debris, and placing rubber mats beneath the paver tracks. Transversely oscillating screeds and extrusion plates shall overlap the existing pavement the minimum possible, but in no case more than 8 inches.

3.4.3 Required Results

The paver-finisher shall be operated to produce a thoroughly consolidated slab throughout, true to line and grade within specified tolerances. The paver-finishing operation shall produce a surface finish free of irregularities, tears, voids of any kind, and any other discontinuities. It shall produce only a very minimum of paste at the surface. Multiple passes of the paver-finisher shall not be permitted. The equipment and its operation shall produce a finished surface requiring no hand finishing, other than the use of cutting straightedges, except in very infrequent instances. No water, other than true fog sprays (mist), shall be applied to the concrete surface during paving and finishing.

3.4.4 Fixed Form Paving

Forms shall be steel, except that wood forms may be used for curves having a radius of 150 feet or less, and for fillets. Forms may be built up with metal or wood, added only to the base, to provide an increase in depth of not more than 25 percent. The base width of the form shall be not less than eight-tenths of the vertical height of the form, except that forms 8 inches or less in vertical height shall have a base width not less than the vertical height of the form. Wood forms for curves and fillets shall be adequate in strength and rigidly braced. Forms shall be set on firm material cut true to grade so that each form section when placed will be firmly in contact with the underlying layer for its entire base. Forms shall not be set on blocks or on built-up spots of underlying material.

Slipform Paving

The slipform paver shall shape the concrete to the specified and indicated cross section in one pass, and shall finish the surface and edges so that only a very minimum amount of hand finishing is required. Dowels shall not be installed by dowel inserters attached to the paver or by any other means of inserting the dowels into the plastic concrete.

Placing Reinforcing Steel

Reinforcement shall be positioned on suitable chairs securely fastened to the subgrade prior to concrete placement, or may be placed on an initial layer of consolidated concrete, with the subsequent layer placed within 30 minutes of the first layer placement.

Placing Dowels and Tie Bars

Dowels shall be installed with alignment not greater than 1/8 inch per ft. Except as otherwise specified below, location of dowels shall be within a horizontal tolerance of plus or minus 5/8 inch and a vertical tolerance of plus or minus 3/16 inch. The portion of each dowel intended to move within the concrete or expansion cap shall be painted with one coat of rust inhibiting primer paint, and then oiled just prior to placement. Dowels and tie bars in joints shall be omitted when the center of the dowel or tie bar is located within a horizontal distance from an intersecting joint equal to or less than one-fourth of the slab thickness.

3.4.4.1 Construction Joints-Fixed Form Paving

Installation of dowels and tie bars shall be by the bonded-in-place method, supported by means of devices fastened to the forms. Installation by removing and replacing in preformed holes will not be permitted.

3.4.4.2 Dowels Installed in Hardened Concrete

Installation shall be by bonding the dowels into holes drilled into the hardened concrete. Holes approximately 1/8 inch greater in diameter than the dowels shall be drilled into the hardened concrete. Dowels shall be bonded in the drilled holes using epoxy resin injected at the back of the hole before installing the dowel and extruded to the collar during insertion of the dowel so as to completely fill the void around the dowel. Application by buttering the dowel shall not be permitted. The dowels shall be held in alignment at the collar of the hole, after insertion and before the grout hardens, by means of a suitable metal or plastic collar fitted around the dowel. The vertical alignment of the dowels shall be checked by placing the straightedge on the surface of the pavement over the top of the dowel and measuring the vertical distance between the straightedge and the beginning and ending point of the exposed part of the dowel.

3.4.4.3 Expansion Joints

Dowels in expansion joints shall be installed by the bonded-in-place method or by bonding into holes drilled in hardened concrete, using procedures specified above.

3.5 FINISHING

Clary screeds, "bridge deck" finishers, or other rotating pipe or tube type equipment shall not be permitted. The sequence of machine operations shall be transverse finishing, longitudinal machine floating if used, straightedge finishing, texturing, and then edging of joints. Hand finishing shall be used only infrequently and only on isolated areas of odd slab shapes and in the event of a breakdown of the mechanical finishing equipment. Supplemental hand finishing for machine finished pavement shall be kept to an absolute minimum. Equipment to be used for supplemental hand finishing shall primarily be 10 to 12 feet cutting straightedges; only very sparing use of bull floats shall be allowed. At no time shall water be added to the surface of the slab in any way, except for fog (mist) sprays to prevent plastic shrinkage cracking.

3.5.1 Machine Finishing With Fixed Forms

The machine shall be designed to ride the forms. Machines that cause displacement of the forms shall be replaced. The machine shall make only one pass over each area of pavement. If the equipment and procedures do not produce a surface of uniform texture, true to grade, in one pass, the operation shall be immediately stopped and the equipment, mixture, and procedures adjusted as necessary.

### 3.5.2 Machine Finishing With Slipform Pavers

If there is sufficient concrete slurry or fluid paste on the surface that it runs over the edge of the pavement, the paving operation shall be immediately stopped and the equipment, mixture, or operation modified to prevent formation of such slurry. Any slurry which does run down the vertical edges shall be immediately removed. No slurry, concrete or concrete mortar shall be used to build up along the edges of the pavement to compensate for excessive edge slump, either while the concrete is plastic or after it hardens.

### 3.5.3 Surface Correction

While the concrete is still plastic, irregularities and marks in the pavement surface shall be eliminated by means of cutting straightedges, 10 to 12 feet in length. Depressions shall be filled with freshly mixed concrete, struck off, consolidated, and refinished. Projections above the required elevation shall also be struck off and refinished. Long-handled, flat "bull floats" shall be used sparingly and only as necessary to correct minor, scattered surface defects. Finishing with hand floats and trowels shall be held to the absolute minimum necessary. Joints and edges shall not be overfinished.

### 3.5.4 Hand Finishing

Hand finishing operations shall be used only for those unusual slabs as specified previously. Grate tampers (jitterbugs) shall not be used. As soon as placed and vibrated, the concrete shall be struck off and screeded. The surface shall be tamped with a strike-off and tamping screed, or vibratory screed. Immediately following the final tamping of the surface, the pavement shall be floated longitudinally. Long-handled, flat bull floats shall be used sparingly and only as necessary to correct surface defects. Finishing with hand floats and trowels shall be held to the absolute minimum necessary. Joints and edges shall not be overfinished. No water shall be added to the pavement during finishing operations.

### 3.5.5 Texturing

Before the surface sheen has disappeared and before the concrete hardens, the surface of the pavement shall be given a texture as described herein. Following initial texturing on the first day of placement, the Placing Foreman, Contracting Officer representative, and a representative of the Using Agency shall inspect the texturing for compliance with design requirements. After curing is complete, all textured surfaces shall be thoroughly power broomed to remove all debris. The concrete in areas of recesses for tie-down anchors, lighting fixtures, and other outlets in the pavement shall be finished to provide a surface of the same texture as the surrounding area.

3.5.5.1 Fabric-Drag Surface Finish

Surface texture shall be applied by dragging the surface of the pavement, in the direction of the concrete placement, with a moist fabric drag. The dragging shall produce a uniform finished surface having a fine sandy texture without disfiguring marks.

3.5.6 Edging

The edges of slipformed lanes shall not be edged. After texturing has been completed, the edge of the slabs along the forms shall be carefully finished with an edging tool to form a smooth rounded surface of 1/8 inch radius. No water shall be added to the surface during edging.

3.6 CURING

Concrete shall be continuously protected against loss of moisture and rapid temperature changes for at least 7 days from the completion of finishing operations. Unhardened concrete shall be protected from rain and flowing water. During hot weather with low humidity and/or wind, the Contractor shall institute measures to prevent plastic shrinkage cracks from developing. ACI 305R contains means of predicting plastic shrinkage cracking and preventative measures. Plastic shrinkage cracks that occur shall be filled by injection of epoxy resin after the concrete hardens. Plastic shrinkage cracks shall never be troweled over or filled with slurry. Curing shall be accomplished by one of the following methods.

3.6.1 Membrane Curing

A uniform coating of white-pigmented membrane-forming curing compound shall be applied to the entire exposed surface of the concrete including pavement edges as soon as the free water has disappeared from the surface after finishing. If evaporation is high and no moisture is present on the surface even though bleeding has not stopped, fog sprays shall be used to keep the surface moist until setting of the cement occurs. Curing compound shall then be immediately applied. Curing compound shall be applied to the finished surfaces by means of a self-propelled automatic spraying machine, equipped with multiple spraying nozzles with wind shields, spaning the newly paved lane. The curing compound shall be applied at a maximum application rate of 200 square feet per gallon. The application of curing compound by hand-operated, mechanical powered pressure sprayers will be permitted only on odd widths or shapes of slabs where indicated and on concrete surfaces exposed by the removal of forms. The compound shall form a uniform, continuous, cohesive film that will not check, crack, or peel and that will be free from pinholes and other discontinuities. Areas where the curing compound develops the above defects or is damaged by heavy rainfall, sawing or other construction operations within the curing period, shall be immediately resprayed.

3.6.2 Moist Curing

Concrete to be moist-cured shall be maintained continuously wet for the entire curing period, commencing immediately after finishing. Surfaces shall be cured by ponding, by continuous sprinkling, by continuously saturated burlap or cotton mats, or by continuously saturated plastic coated burlap. Impervious sheet curing shall not be used.

3.7 JOINTS

No deviation from the jointing pattern shown on the drawings shall be made without written approval of the Design District Pavement or Geotechnical Engineer. All joints shall be straight, perpendicular to the finished grade of the pavement, and continuous from edge to edge or end to end of the pavement with no abrupt offset and no gradual deviation greater than 1/2 inch.

3.7.1 Longitudinal Construction Joints

Dowels shall be installed in the longitudinal construction joints, or the edges shall be thickened as indicated.

Transverse Construction Joints

Transverse construction joints shall be installed at a planned transverse joint, at the end of each day's placing operations and when concrete placement is interrupted. Transverse construction joints shall be constructed either by utilizing headers and hand placement and finishing techniques, or by placing concrete beyond the transverse construction joint location and then saw cutting full depth and removing concrete back to the transverse construction joint location. For the latter case, dowels shall be installed using methods for dowels installed in hardened concrete described above. All transverse construction joints shall be dowelled.

3.7.2 Expansion Joints

Expansion joints shall be formed where indicated, and about any structures and features that project through or into the pavement, using preformed joint filler of the type, thickness, and width indicated, and shall extend the full slab depth. Edges of the concrete at the joint face shall be edged. The joint filler strips shall be installed to form a recess at the pavement surface to be filled with joint sealant. Expansion joints shall be constructed, as shown, with dowels or thickened edges for load transfer.

3.7.3 Slip Joints

Slip joints shall be installed the full depth of the slab using expansion joint preformed joint filler material attached to the face of the original concrete placement. A reservoir for joint sealant shall be constructed at the top of the joint. Edges of the joint face shall be edged.

3.7.4 Contraction Joints

Transverse and longitudinal contraction joints shall be of the weakened-plane or dummy type. Longitudinal contraction joints shall be constructed by sawing a groove in the hardened concrete with a power-driven saw. Transverse contraction joints shall be constructed in conformance with requirements for sawed joints.

3.7.4.1 Sawed Joints

Sawed contraction joints shall be constructed by sawing a groove in the concrete with a 1/8 inch blade to the indicated depth. The time of initial sawing shall vary depending on existing and anticipated weather conditions and shall be such as to prevent uncontrolled cracking of the pavement. Sawing of the joints shall commence as soon as the concrete has hardened sufficiently to permit cutting the concrete without chipping, spalling, or tearing. The joints shall be sawed at the required spacing consecutively in the sequence of the concrete placement. Sawing at a given joint location shall be discontinued when a crack develops ahead of the saw cut. Immediately after the joint is sawed, the saw cut and adjacent concrete surface shall be thoroughly flushed with water until all waste from sawing is removed from the joint. The surface shall be resprayed with curing compound as soon as free water disappears. The top of the joint opening and the joint groove at exposed edges shall be tightly sealed with cord or backer rod before the concrete in the region of the joint is resprayed with curing compound.

3.7.5 Thickened Edge Joints

Underlying material in the transition area shall meet the requirements for smoothness and compaction specified for all other areas of the underlying material.

3.7.6 Special Joints

Special joints (undercut joints) shall be constructed adjacent to existing pavement as indicated. The concrete shall be worked under the edge of the existing pavement to completely fill the void and shall be thoroughly consolidated by the use of hand-held vibrators.

## 3.8 REPAIR, REMOVAL, AND REPLACEMENT OF SLABS

New pavement slabs that contain full-depth cracks shall be removed and replaced, as specified herein at no cost to the Government. Removal and replacement shall be full depth, shall be full width of the paving lane, and the limit of removal shall be from each original transverse joint. The Contracting Officer will determine whether cracks extend full depth of the pavement and may require minimum 6 inch diameter cores to be drilled on the crack to determine depth of cracking. Cores shall be drilled and the hole later filled by the Contractor with a well consolidated concrete mixture bonded to the walls of the hole with epoxy resin. Drilling of cores and refilling holes shall be at no expense to the Government. Cracks that do not extend full depth of slab shall be cleaned and then pressure injected with epoxy resin, Type IV, Grade 1. The Contractor shall ensure that the crack is not widened during epoxy resin injection. Where a full depth crack intersects the original transverse joint, the slab(s) containing the crack shall be removed and replaced, with dowels installed, as required below. Spalls along joints shall be repaired as specified.

### 3.8.1 Removal and Replacement of Full Slabs

Unless there are keys or dowels present, all edges of the slab shall be sawcut full depth. If keys, dowels, or tie bars are present along any edges, these edges shall be sawed full depth 6 inches from the edge if only keys are present, or just beyond the end of dowels or tie bars if they are present. These joints shall then be carefully sawed on the joint line to within 1 inch of the depth of the dowel or key. The main slab shall be further divided by sawing full depth, at appropriate locations, and each piece lifted out and removed. The narrow strips along keyed or doweled edges shall be carefully broken up and removed. Care shall be taken to prevent damage to the dowels, tie bars, or keys or to concrete to remain in place. Protruding portions of dowels shall be painted and lightly oiled. The joint face below keys or dowels shall be suitably trimmed so that there is no abrupt offset. If underbreak occurs at any point along any edge, the area shall be hand-filled with concrete, producing an even joint face from top to bottom, before replacing the removed slab. If underbreak over 4 inches deep occurs, the entire slab containing the underbreak shall be removed and replaced. Where there are no dowels, tie bars, or keys on an edge, or where they have been damaged, dowels of the size and spacing as specified for other joints in similar pavement shall be installed by epoxy grouting them into holes drilled into the existing concrete. Original damaged dowels or tie bars shall be cut off flush with the joint face. All four edges of the new slab shall thus contain dowels or original keys or original tie bars. Prior to placement of new concrete, the underlying material shall be graded and recompacted, and the surfaces of all four joint faces shall be cleaned of all loose material and contaminants, and coated with a double application of membrane forming curing compound as bond breaker. Placement of concrete shall be as specified for original construction. The resulting joints around the new slab shall be prepared and sealed as specified.

3.8.2 Repairing Spalls Along Joints

Spalls along joints and cracks shall be repaired by first making a vertical saw cut at least 1 inch outside the spalled area and to a depth of at least 2 inches. Saw cuts shall be straight lines forming rectangular areas. The concrete between the saw cut and the joint, or crack, shall be chipped out to remove all unsound concrete. The cavity shall be thoroughly cleaned with high pressure water jets supplemented with compressed air to remove all loose material. Immediately before filling the cavity, a prime coat shall be applied to the dry cleaned surface of all sides and bottom of the cavity, except any joint face. The prime coat shall be applied in a thin coating and scrubbed into the surface with a stiff-bristle brush. Prime coat for portland cement repairs shall be a neat cement grout and for epoxy resin repairs shall be epoxy resin, Type III, Grade 1. The cavity shall be filled with low slump portland cement concrete or mortar, or with epoxy resin concrete or mortar. Portland cement concrete shall be used for larger spalls, those more than 1/3 cu. ft. in size after removal operations; portland cement mortar shall be used for spalls between 0.03 and 1/3 cu. ft; and epoxy resin mortar or Type III, Grade 3 epoxy resin for those spalls less than 0.03 cu. ft. in size after removal operations. Portland cement concretes and mortars shall be very low slump mixtures, proportioned, mixed, placed, tamped, and cured. Epoxy resin mortars shall be made with Type III, Grade 1, epoxy resin, using proportions, mixing, placing, tamping and curing procedures as recommended by the manufacturer. Any repair material on the surrounding surfaces of the existing concrete shall be removed before it hardens. Where the spalled area abuts a joint, an insert or other bond-breaking medium shall be used to prevent bond at the joint face. A reservoir for the joint sealant shall be sawed to the dimensions required for other joints. In lieu of sawing, spalls not adjacent to joints, and popouts, both less than 6 inches in maximum dimension, may be prepared by drilling a core 2 inches in diameter greater than the size of the defect, centered over the defect, and 2 inches deep or 1/2 inch into sound concrete, whichever is greater. The core hole shall be repaired as specified above for other spalls.

3.8.3 Areas Defective in Plan Grade or Smoothness

In areas not meeting the specified limits for surface smoothness and plan grade, high areas shall be reduced to attain the required smoothness and grade, except as depth is limited below. High areas shall be reduced by grinding the hardened concrete with a surface grinding machine after the concrete is 14 days or more old. The depth of grinding shall not exceed 1/4 inch. All pavement areas requiring plan grade or surface smoothness corrections in excess of the specified limits, shall be removed and replaced. In pavement areas given a wire comb or tined texture, areas exceeding 25 square feet that have been corrected by rubbing or grinding shall be retextured by grooving machine sawn grooves meeting the requirements for the wire comb or tined texture. All areas in which grinding has been performed will be subject to the thickness tolerances specified in paragraph Thickness. Any grinding performed on individual slabs with excessive deficiencies shall be performed at the Contractor's own decision without entitlement to additional compensation if eventual removal of the slab is required.

## 3.9 EXISTING CONCRETE PAVEMENT REMOVAL AND REPAIR

Existing concrete pavement shall be removed as indicated and as specified in Section 02220 DEMOLITION modified, and expanded as specified herein. Removal, repair and replacement shall be made as indicated and as specified in paragraph REPAIR, REMOVAL, AND REPLACEMENT OR SLABS.

## 3.10 PAVEMENT PROTECTION

The Contractor shall protect the pavement against all damage prior to final acceptance of the work. Traffic shall be excluded from the new pavement. As a construction expedient in paving intermediate lanes between newly paved pilot lanes, operation of the hauling equipment will be permitted on the new pavement after the pavement has been cured for 7 days and the joints have been sealed or otherwise protected. All new and existing pavement carrying construction traffic or equipment shall be continuously kept completely clean. Special cleaning and care shall be used where Contractor's traffic uses or crosses active airfield pavement.

## 3.11 TESTING AND INSPECTION FOR CONTRACTOR QUALITY CONTROL (CQC)

Paragraph ACCEPTABILITY OF WORK contains additional CQC requirements. The Contractor shall perform the inspection and tests described below and, based upon the results of these inspections and tests, shall take the action required and submit reports as specified. When, in the opinion of the Contracting Officer, the paving operation is out of control, concrete placement shall cease.

### 3.11.1 Batch Plant Control

A daily report shall be prepared indicating checks made for scale accuracy with test weights, checks of batching accuracy, and corrective action taken prior to and during placement for weighing or batching, type and source of cement used, type and source of pozzolan or slag used, amount and source of admixtures used, aggregate source, the required aggregate and water masses per cubic yd, amount of water as free moisture in each size of aggregate, and the batch aggregate and water masses per cubic yd. for each class of concrete batched during each day's plant operation.

3.11.2 Concrete Mixture

a. Air Content Testing. Air content tests shall be made on randomly selected batches of each class of concrete for each 500 cubic yards, or fraction thereof, of concrete placed during each shift production. Additional tests shall be made when excessive variation in workability is reported by the placing foreman or Goverment inspector. Whenever air content reaches specified limits, an immediate confirmatory test shall be made. If the second test also shows air content at or exceeding specified limits, an adjustment shall immediately be made in the amount of air-entraining admixture batched to bring air content within specified limits. If the next adjusted batch of concrete is not within specified limits, concrete placement shall be halted until concrete air content is within specified limits.

b. Slump Testing. Slump tests shall be made on randomly selected batches of each class of concrete for each 500 cubic yards, or fraction thereof, of concrete placed during each shift production. . Additional tests shall be made when excessive variation in workability is reported by the placing foreman or Government inspector. Whenever slump approaches the maximum limit, an adjustment shall immediately be made in the batch masses of water and fine aggregate, without exceeding the maximum w/(c+p). When a slump result exceeds the specification limit, no further concrete shall be delivered to the paving site until adjustments have been made and slump is again within the limit.

c. Temperature. The temperature of the concrete shall be measured when strength specimens are fabricated.

d. Concrete Strength Testing. Six (6) beams from the same batch shall be fabricated for each shift of concrete placement, cured and tested for flexural strength, testing three beams at 7-day and three beams at 28-day age. A minimum of one set of four (4) cylinders shall be fabricated, cured and tested for each shift of concrete placement. Control charts for strength, showing the 7-day and 28-day CQC flexural strengths, and the 28-day required flexural strength, shall be maintained and submitted with weekly CQC Reports.

e. Control. The Contractor shall determine the flexural strength of the concrete during the progress of construction. Strength tests shall be made at the age of 28-days to determine conformity of the concrete with the specified strength requirement and at the age of 7-days for field control of the concrete mix. The cumulative average strength of all sets of specimens tested for determing compliance with the specified strength, and the average strength of any 5 consecutive sets of specimens representing each concrete mix shall be not less than the specified strength. The initial concrete mix proportion will be based on laboratory mix design studies as indicated necessary to meet the specified 28-day strength requirement. Modification of the mix design will be made by the Contracting Officer on the basis of strength determination made on laboratory mix design studies as indicated necessary to meet the specified 28-day strength requirement. Modification of the mix design will be made by the Contracting Officer on the basis of strength determination made on field test beams as hereinafter specified. Initial Adjustments in the mix proportions with increase or decrease in cement content will be made on the basis of 7-day strength tests when the average strength of the last 5 sets of specimens tested fails to meet the desired strength furnished with the mix design or when this desired strength is exceeded by more than 10%. After 28-day test results become available, adjustments in concrete mix proportions with increase or decrease in cement content, as necessary, will be made when the average 28-day flexural strength of the last five sets of specimens representing the concrete mix fails to meet the specified strength requirement and when the desired strength is exceeded by more than ten percent.

3.11.3 Inspection Before Placing

Underlying materials, joint locations and types, construction joint faces, forms, reinforcing, dowels, and embedded items shall be inspected by a Registered Engineer in sufficient time prior to each paving operation in order to certify to the Contracting Officer that they are ready to receive concrete. The results of each inspection shall be reported in writing, and the certification signed by the Registered Engineer, prior to each days' paving.

3.11.4 Paving Operations

The placing foreman shall supervise all placing and paving operations, shall determine that the correct quality of concrete is placed in each location as shown, shall insure that the concrete is consolidated full depth and that finishing is performed as specified. The placing foreman shall be responsible for measuring and recording concrete temperatures and ambient temperature hourly during placing operations, weather conditions, time of placement, volume of concrete placed, and method of paving and any problems encountered.

3.11.5 Curing Inspection

a. Moist Curing Inspections. Each day on both work and non-work days, an inspection shall be made of all areas subject to moist curing. The surface moisture condition shall be noted and recorded. When any inspection finds an area of inadequate curing, immediate corrective action shall be taken, and the required curing period for the area shall be extended by 1 day.

b. Membrane Curing Inspection. At the end of each day's placement, the CQC Representative shall determine the quantity of compound used by measurement of the container; shall determine the area of concrete surface covered; shall then compute the rate of coverage in square feet per gallon and shall also note whether or not coverage is uniform. When the coverage rate of the curing compound is less than that specified or when the coverage is not uniform, the entire surface shall be sprayed again.

3.11.6 Cold-Weather Protection

At least once per day, an inspection shall be made of all areas subject to cold-weather protection. Any deficiencies shall be noted, corrected, and reported.

3.11.7 Reports

All results of tests or inspections conducted shall be reported informally as they are completed and in writing daily. A weekly report, signed by a registered engineer, shall be prepared for the updating of control charts and test data, and all CQC inspections and actions covering the entire period from the start of the construction through the current week. Reports of failures and the action taken shall be confirmed in writing in the routine reports. The Contracting Officer has the right to examine all CQC records. A copy of weekly reports shall be faxed to the Design District Pavement or Geotechnical Engineer. At the completion of concrete placement, a certification report shall be prepared containing mix designs, all updated control charts and concrete test data, quality control reports, smoothness reports, and other pertinent data on the concrete, with a certification by a registered engineer that the concrete placed meets all specification requirements. A copy of the certification report shall be mailed to the Design District pavement or Geotechnical Engineer.

END OF SECTION

# SECTION 02760
# RESEALING OF JOINTS AND CRACKS IN CONCRETE PAVEMENTS FOR AIRFIELDS

## 1 - GENERAL

1.1 APPLICABLE PUBLICATIONS: The following specifications, test methods, and standards in effect on the date of solicitation form a part of this specification to the extent specified herein

1.1.1. American Society for Testing and Materials (ASTM) Standards:

1. D-5893-96 — Standard Specification for Cold Applied, Single Component, Chemically Curing Silicone Joint Sealant for Portland Cement Concrete Pavements

1.2 SUBMITTALS: Prior to the use of materials, certified copies of the test reports of all tests required shall be submitted and approved. Where installation procedures or any part thereof are required to be in accordance with the recommendations of the manufacturer of the materials, printed copies of these recommendations shall be furnished prior to use on the project. Installation of the material shall not be allowed until the recommendations are received.

1.2.1. Samples: Samples and manufacturer's data for the following materials shall be submitted to and approved by the Contracting Officer before work is started: Sealant ASTM D-5893, joint backer rod and separating materials.

1.2.2. Manufacturer's Recommendations: Where installation procedures or any part thereof are required to be in accordance with the recommendations of the manufacturer of the material, printed copies of these recommendations shall be furnished to the Contracting Officer prior to use on the project. Installation of the material will not be allowed until the recommendations are received. Failure to furnish these recommendations can be cause for rejection of the material. Existing joint widths will vary. The manufacturer's recommendations shall include recommended depths for all joint widths encountered to include blocking media.

1.2.3. Certified Laboratory Test Reports: Before delivery of materials, four certified copies of the reports of all tests required in the sealant used shall be submitted to and approved by the Contracting Officer. The testing shall have been performed by an independent and licensed laboratory approved by the Contracting Officer. Certified test reports are required for the following:

1.2.3.1. Sealant ASTM D-5893.

1.2.3.2. Sealant Primer (if required by manufacturer).

1.2.4. Sampling and Testing:

1.2.4.1. Sampling and Testing Procedures: Joint sealants shall be tested for conformance with the referenced applicable material specification. The Contracting Officer shall be notified in writing of the proposed sources of joint sealants at least 21 days prior to the date the materials will be required at the project site. Joint sealants will be sampled and tested by the contractor. No material shall be used at the project prior to receipt by the government of written notice that the material meets the laboratory requirements. If the sample fails to meet specification requirements, the material represented by the sample shall be replaced, and the new material will be tested. Cost of sampling and testing of all material will be borne by the contractor. Testing shall be performed by an approved independent laboratory and certified copies of the test reports shall be submitted and approved prior to the use of the sealant at the job site. If the use of a primer is recommended for the proposed sealing system, the laboratory test for bond shall be conducted using the primer in accordance with the manufacturer's instructions. Conformance with the requirements of laboratory tests specified will not constitute final acceptance of in-place sealant.

1.2.4.2. Trial Joint Sealant Installation: Prior to the cleaning and resealing of joints for the entire project, the contractor shall select a length of not less than 400 feet of joint in an approved location and clean and reseal the joint with the specified sealant in a manner proposed for resealing joints for the entire project. Following the resealing of the 400-foot trial length, and before any other joint is resealed, the trial joint installation shall be inspected to determine that the sealant and installation meet the requirements specified. If it is determined that the material or installation do not meet the specified requirements, the contractor shall remove the sealant and reclean and reseal the joint at no additional cost to the government. After approval of the 400-foot trial joint, all other joints shall be cleaned and resealed in the same manner.

1.2.5. Equipment: The contractor shall submit a list of equipment to be used in the project. Each item on the list shall be followed by a statement of whether requirements in paragraph 2.01, EQUIPMENT are met for that type of equipment. Compliance of paragraph 2.01 will also be verified by the Construction Inspector at the project site prior to use.

1.3 DELIVERY AND STORAGE: Materials delivered to the site shall be inspected for damage, unloaded, and stored with a minimum of handling. Materials shall be handled in such a manner that joint sealant materials will not be damaged. Contractor shall provide storage facilities located as indicated on Sheet G-1. Facility shall be provided to maintaining materials at temperatures recommended by the manufacturer.

1.4 MEASUREMENT: The quantity of each sealing item shall be determined by actual measurement of the number of linear feet of sealed joint in place.

PART 2 - PRODUCTS

2.1 EQUIPMENT: Machines, tools, and equipment used in the performance of the work required by this section shall be approved before the work is started and shall be maintained in satisfactory condition.

2.1.1. Joint-Cleaning Equipment:

2.1.1.1. Tractor-Mounted Joint Plow: Routing tool for removing old sealant from the joints shall be of such shape and dimensions and so mounted on the tractor that it will not damage the sides of the joints and can be adjusted to remove the old material to varying depths as specified by the Contracting Officer. The use of V-shaped tools or rotary impact routing devices will not be permitted for cleaning joints, but may be used to clean and enlarge random cracks. Several sizes of tool shall be required for varying widths of joints.

2.1.1.2. Concrete Saw: A self-propelled power saw with water-cooled diamond or abrasive saw blades shall be provided for cutting joints for the widths and depths specified, or for refacing joints where surface films of old sealants cannot be readily removed by sandblasting.

2.1.1.3. Sandblasting Equipment: Sandblasting equipment shall include an air compressor, hose and long-wearing 1/4-inch, venturi-type nozzles of proper size, shape and opening. The air compressor shall be portable and shall be capable of furnishing not less than 150 cubic feet per minute of air and maintaining a line pressure of not less than 90 pounds per square inch at the nozzle while in use. Compressor capability under job conditions shall be demonstrated before approval. Compressor shall be equipped with traps that will maintain the compressed air system free of oil and water. The nozzle, or nozzles, shall have an adjustable guide that will hold the nozzle aligned with the joint about one-inch above the pavement surface. The height, angle of inclination and size of the nozzles shall be adjusted as necessary to secure satisfactory results.

2.1.1.4. High-Pressure Water Jet: High-pressure water jet equipment shall include trailer-mounted water tank, pumps, high-pressure hose, wands with safety release cutoff controls, nozzles, and auxiliary water resupply equipment. Water tank and auxiliary resupply equipment shall be of sufficient capacity to permit continuous operations. Pumps, hoses, wands, and nozzles shall be of such design, and operate at such water pressure and rate of discharge, to clean the bottom and both walls of the joint, and the pavement surface on both sides of the joint for a width of at least 1/2 inch. A pressure gage shall be mounted at the pump which will show at all times the pressure in pounds per square inch at which the equipment is operating.

2.1.1.5. Sealant Removal and Joint Preparation with Hand Tools: For small repairs, with the approval of the Contracting Officer, hand tools may be used for removing defective sealant from a joint and repairing and/or cleaning the joint faces.

2.1.1.6. Routing Tool: Provide a vertical spindle router with a variety of bits for use in removing sealant, cleaning, and widening random cracks. Bits in various sizes should be available to provide the proper size joint reservoir for various random crack widths. The router shall not cause excessive spalling, and shall leave smooth vertical faces after routing. Rotary impact routing devices will not be permitted. Routing tool shall be approved by the Contracting Officer before use on the project.

2.1.1.7. A vacuum type power broom shall be present on the job site to keep the pavement surface free from debris. Power broom shall be approved by the Contracting Officer, and shall be kept in good working order at all times. Refer to Section 01015,paragraph 3.05E of the General Provisions.

2.1.2. Sealing Equipment: Cold-Applied Sealant: The equipment for proportioning, mixing, and installing cold-applied joint sealants shall be designed for delivering with an accuracy of 5 percent. Before using the equipment in this work, the contractor shall furnish the supplier's certification that the specific equipment model and serial number is recommended for use with the sealing compound to be installed. The initially approved equipment shall be maintained in good working condition in all respects, serviced in accordance with the supplier's instruction, and shall not be altered in any way without obtaining prior approval from the Contracting Officer.

2.2 SEALANTS shall conform to the following requirements: ASTM D-5893 Dow Corning 888 SL for Portland Concrete Cement (PCC) and Dow Corning 890 or 890SL for both Asphaltic Concrete Cement(ACC) and PCC, or approved equal. Where areas are designated as a liquid oxygen storage (LOX), the only USAF approved sealants are: Deck-O-Seal One Step, manufacture: W.R. Meadows (800-542-POOL), Jeene, and E-Bond 1018. No other sealant for LOX areas will be approved.

2.3 PRIMERS: The use of primers when recommended by the manufacturer of the proposed sealant is authorized in accordance with the manufacturer's instructions.

2.4 SEPARATING BACKER ROD MATERIAL: Use a flexible, compressible, non-shrinking, nonreactive, material which will not absorb moisture, such as polychloroprene rod, foam rubber rod, or soft butyl rubber rods. Hard rubber, paper, and soft fiber rods shall not be used. Backer material shall be approved by the Contracting Officer before use on any portion of this project. Backer material shall be thick, approximately 125 percent larger than the width of the crack/joint.

2.5 BOND BREAKER TAPE: The bond breaker medium shall be a flexible, non-shrinkable, nonabsorptive, and nonreactive adhesive-backed tape. The bond breaker tape shall be 1/8-inch wider than the nominal width of the joint.

## PART 3 - EXECUTION

3.1 PREPARATION OF EXISTING JOINTS: Joints shall be prepared for resealing as follows.

3.1.1. Existing Sealant Removal: The in-place sealant shall be cut loose from both joint faces and to the depth shown on the drawings, using the tractor mounted joint plow equipment specified in paragraph 2.1, EQUIPMENT of this section. Depth shall be sufficient to accommodate any separating and/or blocking medium used to maintain the depth of new sealant to be installed. Prior to further cleaning operations, all loose old sealant remaining in the joint opening shall be completely removed by sandblasting and blowing with compressed air.

3.1.2. Refacing of Joints: Refacing of joints shall be accomplished using a power-driven concrete saw with diamond or abrasive blades to remove all residual old sealant and a minimum of concrete from the joint faces to provide exposure of newly cleaned concrete and, if required, to widen the joint space to the width and depth shown on the drawings. A sufficient number of used or dummy blades shall be mounted on the same arbor as the cutting blade to assist in straight-line sawing and to provide stiffness to avoid blade distortion. Immediately following the sawing operation, the joint faces and opening shall be thoroughly cleaned using a water jet to remove all saw cuttings or debris remaining on the faces or in the joint opening.

3.1.3. Sandblast Cleaning: The newly exposed concrete joint faces and the pavement surfaces extending about 1/2 inch from the joint edges shall be sand-blast cleaned. A multiple-pass technique shall be used until the surfaces are free of any traces of old sealant and free of saw-cutting fines that might prevent bonding of the sealant to the concrete. After final cleaning and immediately prior to sealing, the joints shall be blown out with compressed air and left completely free of sand and water.

3.1.4. High-Pressure Water Jet Cleaning: The in-place sealant shall be removed from both joint faces and to the depth shown on the drawings, using the high-pressure water jet equipment specified in paragraph 2.01, EQUIPMENT of this section. Depth of removal shall be sufficient to accommodate any separating and blocking medium used to maintain the depth of new sealant to be installed. All loose old sealant not removed by the water jet shall be completely removed by blowing with compressed air. Loosening of the sealer with a router to facilitate water jet cleaning is permissible.

3.1.5. Separating and Blocking Media: When the joint groove or opening is of greater depth than indicated, the lower portion of the groove shall be plugged or sealed off to prevent entrance of the sealant below the depth specified. The blocking medium shall not be stretched during insertion in the joint.

3.1.6. Bond Breaker Tape: When the separating and blocking media specified in this paragraph are not placed on the bottom of the joints, a nonreactive adhesive-backed tape shall be inserted. The tape shall be securely bonded so it will not float up into the new sealant.

3.1.7. Rate of Progress of Joint Preparation: The work required for the removal of existing joint sealant, widening and/or deepening of joint openings, if required, and refacing of joint walls may proceed at any rate of progress approved by the Contracting Officer. The final stages of joint preparation, which include sandblasting of the joint faces, air pressure cleaning of joints, and placement of separating and/or blocking media, shall be limited to only that lineal footage of joint that can be resealed during the same workday.

3.2 PREPARATION OF SEALANT: ASTM D-5893, cold-applied sealant components and containers shall be inspected by the contractor and the Contracting Officer prior to use, and any materials that contain water, hard caking of any separated constituents, nonreversible jell, or materials that are otherwise unsatisfactory shall be rejected. Settlement of constituents in a soft mass that can be readily and uniformly remixed in the field with simple tools shall not be cause for rejection. Prior to transfer of components from the shipping containers to the appropriate reservoirs of the application equipment, the materials in the shipping containers shall be thoroughly mixed to ensure homogeneity of the components and incorporation of all constituents at the time of transfer. When necessary for remixing prior to transfer to the application equipment reservoirs, the components of the sealant shall be warmed to a temperature not exceeding 90 degrees F by placing the components in heated storage or by other approved methods, but in no case shall the components be heated by direct flames, or in a single-walled kettle, or a kettle without oil bath.

3.3 INSTALLATION OF SEALANT:

3.3.1. Time of Application: Joints shall be sealed immediately following final cleaning of the joint walls and following the placement of separating and blocking media. The concrete walls of the joint shall be surface dry, and the atmospheric temperature and pavement temperature within the joint opening shall both be above 50 degrees F and rising at the time of application of the sealant. Open joints ready for resealing that cannot be sealed under the conditions specified or when rains interrupt sealing operations shall be blown out and allowed to dry prior to installing the sealant.

3.3.2. Sealing Joints: No joint sealant shall be installed until the cleaned joints have been inspected and approved. The joints shall be filled from the bottom up to within 1/8 inch of the pavement surface, plus or minus 1/16 inch, using equipment specified in paragraph 2.01, EQUIPMENT of this section for the type of sealant to be installed. Excess or spilled sealant shall be removed from the pavement by approved methods and shall be discarded. Traffic shall not be permitted over newly sealed pavement until authorized by the Contracting Officer. When a primer is supplied by the manufacturer of a sealant, it shall be applied evenly to the joint faces in accordance with the manufacturer's recommendations. Material used for these checks may be returned to the proper component reservoir. Joints shall be checked frequently to ensure that the newly installed sealant is cured to a tack-free condition within manufacturer's recommended times.

3.3.3. Protection of Sealant: Just prior to installation of sealant, the contractor shall mark off and barricade the work area for the day. This will keep vehicles off areas that have not cured to a tack-free condition.

3.4 INSPECTIONS:

3.4.1. Joint Inspection: Joints shall be inspected during cleaning to correct improper equipment and cleaning techniques that widen, develop, or increase V-shaped cross section, or spall concrete. Cleaned joints shall be approved prior to installing joint sealant.

3.4.2. Sealing Inspection: Application equipment shall be inspected to assure conformance to temperature requirements, type sealant, and installation. Evidence of bubbling, improper installation, failure to cure or set shall be cause to suspend operations until causes of deficiencies are determined and corrected.

3.4.3. Sealant Inspection: Sealant shall be inspected for proper rate of cure and set, bonding to concrete surfaces of joint walls, cohesive separation within the sealant, reversion to liquid, entrapped air and voids. Sealants exhibiting any of these deficiencies will be rejected. Sealants may be rejected at any time prior to final acceptance of the project. Sealant which is rejected shall be removed from the joint, discarded, and replaced in a manner satisfactory to the Contracting Officer at no additional cost to the government.

End of Section

# SECTION 02763

## PAVEMENT MARKINGS

1 GENERAL

1.1 REFERENCES

The publications listed below form a part of this specification to the extent referenced. The publications are referred to in the text by basic designation only.

AMERICAN ASSOCIATION OF STATE HIGHWAY AND TRANSPORTATION OFFICIALS (AASHTO)

| | |
|---|---|
| AASHTO M 247 | (1981) Glass Beads Used in Traffic Paint |

AMERICAN SOCIETY FOR TESTING AND MATERIALS (ASTM)

| | |
|---|---|
| ASTM D 792 | (1991) Density and Specific Gravity (Relative Density) of Plastics by Displacement |
| ASTM D 4280 | (1996) Extended Life Type, Nonplowable, Prismatic, Raised, Retroreflective Pavement Markers |
| ASTM D 4505 | (1996) Preformed Plastic Pavement Marking Tape for Extended Service Life |
| ASTM E 28 | (1997) Softening Point of Resins by Ring and Ball Apparatus |

FEDERAL SPECIFICATIONS (FS)

| | |
|---|---|
| FS TT-B-1325 | (Rev C; Notice 1) Beads (Glass Spheres) Retro-Reflective (Metric) |
| FS TT-P-1952 | (Rev D) Paint, Traffic and Airfield Marking, Waterborne (Metric) |

## 1.2 PAYMENT

Payment for all work covered in this section and all costs in connection therewith shall be included in the contract lump sum price for sitework.

## 1.3 SUBMITTALS

Government approval is required for submittals with a "GA" designation; submittals having an "FIO" designation are for information only. The following shall be submitted in accordance with Section 01330 SUBMITTAL PROCEDURES:

SD-01 Data

Equipment Lists; GA CD.

Lists of proposed equipment, including descriptive data, and notifications of proposed Contractor actions as specified in this section. List of removal equipment shall include descriptive data indicating area of coverage per pass, pressure adjustment range, tank and flow capacities, and safety precautions required for the equipment operation.

SD-06 Instructions

Mixing, Thinning and Application; FIO.

Manufacturer's current printed product description and Material Safety Data Sheets (MSDS) for each type paint/color proposed for use.

SD-08 Statements

Qualifications; FIO.

Document certifying that personnel are qualified for equipment operation and handling of chemicals.

SD-09 Reports

Material Tests; FIO.

Certified copies of the test reports, prior to the use of the materials at the jobsite. Testing shall be performed in an approved independent laboratory.

SD-13 Certificates

Volatile Organic Compound (VOC) Content; FIO.

Certificate stating that the proposed pavement marking paint meets the VOC regulations of the local Air Pollution Control District having jurisdiction over the geographical area in which the project is located.

## 1.3 DELIVERY AND STORAGE

All materials shall be delivered and stored in sealed containers that plainly show the designated name, formula or specification number, batch number, color, date of manufacture, manufacturer's name, and directions, all of which shall be plainly legible at time of use.

## 1.4 EQUIPMENT

All machines, tools and equipment used in the performance of the work shall be approved and maintained in satisfactory operating condition. Equipment operating on roads and runways shall display low speed traffic markings and traffic warning lights.

### 1.4.1 Paint Application Equipment

The equipment to apply paint to pavements shall be a self-propelled or mobile-drawn pneumatic spraying machine with suitable arrangements of atomizing nozzles and controls to obtain the specified results. The machine shall have a speed during application not less than 5 mph, and shall be capable of applying the stripe widths indicated, at the paint coverage rate specified in paragraph APPLICATION, and of even uniform thickness with clear-cut edges. The equipment used to apply the paint binder to airfield pavements shall be a self-propelled or mobile-drawn pneumatic spraying machine with an arrangement of atomizing nozzles capable of applying a line width at any one time in multiples of 6 inches, from 6 inches to 36 inches. The paint applicator shall have paint reservoirs or tanks of sufficient capacity and suitable gauges to apply paint in accordance with requirements specified. Tanks shall be equipped with suitable air-driven mechanical agitators. The spray mechanism shall be equipped with quick-action valves conveniently located, and shall include necessary pressure regulators and gauges in full view and reach of the operator. Paint strainers shall be installed in paint supply lines to ensure freedom from residue and foreign matter that may cause malfunction of the spray guns. The paint applicator shall be readily adaptable for attachment of an air-actuated dispenser for the reflective media approved for use. Pneumatic spray guns shall be provided for hand application of paint in areas where the mobile paint applicator cannot be used.

1.4.2 Surface Preparation Equipment

1.4.2.1 Sandblasting Equipment

Sandblasting equipment shall include an air compressor, hoses, and nozzles of proper size and capacity as required for cleaning surfaces to be painted. The compressor shall be capable of furnishing not less than 150 cfm of air at a pressure of not less than 90 psi at each nozzle used, and shall be equipped with traps that will maintain the compressed air free of oil and water.

1.4.2.2 Waterblast Equipment

The water pressure shall be specified at 2600 psi at 140 degrees F in order to adequately clean the surfaces to be marked.

1.4.3 Marking Removal Equipment

Equipment shall be mounted on rubber tires and shall be capable of removing markings from the pavement without damaging the pavement surface or joint sealant. Waterblasting equipment shall be capable of producing an adjustable, pressurized stream of water. Sandblasting equipment shall include an air compressor, hoses, and nozzles. The compressor shall be equipped with traps to maintain the air free of oil and water.

1.4.3.1 Shotblasting Equipment

Shotblasting equipment shall be capable of producing an adjustable depth of removal of marking and pavement. Each unit shall be self-cleaning and self-contained, shall be able to confine dust and debris from the operation, and shall be capable of recycling the abrasive for reuse.

1.4.3.2 Chemical Equipment

Chemical equipment shall be capable of application and removal of chemicals from the pavement surface, and shall leave only non-toxic biodegradeable residue.

1.4.4 Traffic Controls

Suitable warning signs shall be placed near the beginning of the worksite and well ahead of the worksite for alerting approaching traffic from both directions. Small markers shall be placed along newly painted lines or freshly placed raised markers to control traffic and prevent damage to newly painted surfaces or displacement of raised pavement markers. Painting equipment shall be marked with large warning signs indicating slow-moving painting equipment in operation.

### 1.5 HAND-OPERATED, PUSH-TYPE MACHINES

All machines, tools, and equipment used in performance of the work shall be approved and maintained in satisfactory operating condition. Hand-operated push-type machines of a type commonly used for application of paint to pavement surfaces will be acceptable for marking small streets and parking areas. Applicator machine shall be equipped with the necessary paint tanks and spraying nozzles, and shall be capable of applying paint uniformly at coverage specified. Sandblasting equipment shall be provided as required for cleaning surfaces to be painted. Hand-operated spray guns shall be provided for use in areas where push-type machines cannot be used.

### 1.6 MAINTENANCE OF TRAFFIC

#### 1.6.1 Airfield

The performance of work in the controlled zones of airfields shall be coordinated with the Contracting Officer and with the Flight Operations Officer. Verbal communications shall be maintained with the control tower before and during work in the controlled zones of the airfield. The control tower shall be advised when the work is completed. A radio for this purpose shall be provided by the Contractor and approved by the Contracting Officer.

### 1.7 WEATHER LIMITATIONS FOR REMOVAL

Pavement surface shall be free of snow, ice, or slush. Surface temperature shall be at least 40 degrees F and rising at the beginning of operations, except those involving shot or sand blasting. Operation shall cease during thunderstorms. Operation shall cease during rainfall, except for waterblasting and removal of previously applied chemicals. Waterblasting shall cease where surface water accumulation alters the effectiveness of material removal.

## 2 PRODUCTS

### 2.1 PAINT

The paint shall be homogeneous, easily stirred to smooth consistency, and shall show no hard settlement or other objectionable characteristics during a storage period of 6 months. Paints for airfields shall conform to FS TT-P-1952, color shall be yellow. Pavement marking paints shall comply with applicable state and local laws enacted to ensure compliance with Federal Clean Air Standards. Paint materials shall conform to the restrictions of the local Air Pollution Control District.

### 2.2 SAMPLING AND TESTING

Materials proposed for use shall be stored on the project site in sealed and labeled containers, or segregated at source of supply, sufficiently in advance of needs to allow 60 days for testing. Upon notification by the Contractor that the material is at the site or source of supply, a sample shall be taken by random selection from sealed containers by the Contractor in the presence of a representative of the Contracting Officer. Samples shall be clearly identified by designated name, specification number, batch number, manufacturer's formulation number, project contract number, intended use, and quantity involved. Testing shall be performed in an approved independent laboratory. If materials are approved based on reports furnished by the Contractor, samples will be retained by the Government for possible future testing should the material appear defective during or after application.

## 3 EXECUTION

### 3.1 SURFACE PREPARATION

Surfaces to be marked shall be thoroughly cleaned before application of the pavement marking material. Dust, dirt, and other granular surface deposits shall be removed by sweeping, blowing with compressed air, rinsing with water or a combination of these methods as required. Rubber deposits, surface laitance, existing paint markings, and other coatings adhering to the pavement shall be completely removed with scrapers, wire brushes, sandblasting, approved chemicals, or mechanical abrasion as directed. Areas of old pavement affected with oil or grease shall be scrubbed with several applications of trisodium phosphate solution or other approved detergent or degreaser, and rinsed thoroughly after each application. After cleaning, oil-soaked areas shall be sealed with cut shellac to prevent bleeding through the new paint. Pavement surfaces shall be allowed to dry, when water is used for cleaning, prior to striping or marking. Surfaces shall be recleaned, when work has been stopped due to rain.

#### 3.1.1 Cleaning Existing Pavement Markings

In general, markings shall not be placed over existing pavement marking patterns. Existing pavement markings, which are in good condition but interfere or conflict with the newly applied marking patterns, shall be removed. Deteriorated or obscured markings that are not misleading or confusing or interfere with the adhesion of the new marking material do not require removal. Whenever grinding, scraping, sandblasting or other operations are performed the work must be conducted in such a manner that the finished pavement surface is not damaged or left in a pattern that is misleading or confusing. When these operations are completed the pavement surface shall be blown off with compressed air to remove residue and debris resulting from the cleaning work.

3.2 APPLICATION

All pavement markings and patterns shall be placed as shown on the plans.

3.2.1 Paint

Paint shall be applied to clean, dry surfaces, and only when air and pavement temperatures are above 40 degrees F and less than 95 degrees F. Paint temperature shall be maintained within these same limits. New asphalt pavement surfaces and new Portland concrete cement shall be allowed to cure for a period of not less than 30 days before applications of paint. Paint shall be applied pneumatically with approved equipment at rate of coverage specified . The Contractor shall provide guide lines and templates as necessary to control paint application. Special precautions shall be taken in marking numbers, letters, and symbols. Edges of markings shall be sharply outlined.

3.2.1.1 Rate of Application
Nonreflective Markings: Paint shall be applied evenly to the pavement surface to be coated at a rate of 105 plus or minus 5 square feet per gallon.

3.2.1.2 Drying

The maximum drying time requirements of the paint specifications will be strictly enforced to prevent undue softening of bitumen, and pickup, displacement, or discoloration by tires of traffic. If there is a delay in drying of the markings, painting operations shall be discontinued until cause of the slow drying is determined and corrected.

## 3.3 MARKING REMOVAL

Pavement marking shall be removed in the areas shown on the drawings. Removal of marking shall be as complete as possible without damage to the surface. Aggregate shall not be exposed by the removal process. After the markings are removed, the cleaned pavement surfaces shall exhibit adequate texture for remarking as specified in paragraph SURFACE PREPARATION. Contractor shall demonstrate removal of pavement marking in an area designated by the Contracting Officer. The demonstration area will become the standard for the remainder of the work.

### 3.3.1 Equipment Operation

Equipment shall be controlled and operated to remove markings from the pavement surface, prevent dilution or removal of binder from underlying pavement, and prevent emission of blue smoke from asphalt or tar surfaces.

### 3.3.2 Cleanup and Waste Disposal

The worksite shall be kept clean of debris and waste from the removal operations. Cleanup shall immediately follow removal operations in areas subject to air traffic. Debris shall be disposed of at approved sites.

SOLICITATION NUMBER: FA6648-00-R0015
CONTRACT NUMBER:

# DD FORM 2051
# CAGE CODE

ATTACHMENT 6
2 PAGES

# REQUEST FOR ASSIGNMENT OF A COMMERCIAL AND GOVERNMENT ENTITY (CAGE) CODE

*(See Instructions on Reverse)*

Form Approved
OMB No. 0704-0225
Expires Oct 31, 1991

Public reporting burden for this collection of information is estimated to average [illegible] minutes per response, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. Send comments regarding this burden estimate or any other aspect of this collection of information, including suggestions for reducing this burden, to Department of Defense, Washington Headquarters Services, Directorate for Information Operations and Reports, 1215 Jefferson Davis Highway, Suite 1204, Arlington, VA 22202-4302, and to the Office of Management and Budget, Paperwork Reduction Project (0704-0225), Washington, DC 20503. Please DO NOT RETURN your form to either of these addresses. Send completed form to address on reverse.

## SECTION A - TO BE COMPLETED BY INITIATOR

1. REQUESTING GOVERNMENT AGENCY / ACTIVITY

a. NAME

177

b. ADDRESS *(Street, City, State and Zip Code)*

2. TYPE CODE REQUESTED *(X one)*
- a. TYPE A
- XX b. TYPE F

3. EXCEPTION CODES
- a. CAO
- b. ADP

4. INITIATOR

| a. TYPED NAME *(Last, First, Middle Initial)* | b. OFFICE SYMBOL | c. SIGNATURE | d. TELEPHONE NO. |
|---|---|---|---|
| | | | |

## SECTION B - TO BE COMPLETED BY FIRM TO BE CODED

1. FIRM

a. NAME *(Include Branch of, Division of, etc.)*

b. ADDRESS *(Street, City, State and Zip Code)*

c. CAGE CODE *(If previously assigned)*

2. IF FIRM PREVIOUSLY OPERATED UNDER OTHER NAME(S) OR OTHER ADDRESS(ES) SPECIFY THE PREVIOUS NAME(S) AND/OR ADDRESS(ES) *(Use separate sheet of paper, if necessary)*

3. PARENT COMPANY AND AFFILIATED FIRMS *(X one, and complete as applicable)*
- a. NONE
- b. CURRENTLY AFFILIATED WITH OTHER FIRMS *(List name(s) and address(es) of such firms on a separate sheet of paper)*
- c. PREVIOUSLY AFFILIATED WITH OTHER FIRMS *(List name(s) and address(es) of such firms on a separate sheet of paper)*

4. PRIMARY BUSINESS CATEGORY *(X one)*
- a. MANUFACTURER
- b. DEALER/DISTRIBUTOR
- c. CONSTRUCTION FIRM
- d. SERVICE COMPANY
- e. SALES OFFICE
- f. OTHER *(Specify)*

5. DISADVANTAGED SMALL BUSINESS STATUS *(X one)*
- a. APPROVED BY SMALL BUSINESS ADMINISTRATION (SBA) FOR SECTION 8(a) PROGRAM
- b. OTHER DISADVANTAGED SMALL BUSINESS FIRM
- c. NOT DISADVANTAGED SMALL BUSINESS FIRM

6. NUMBER OF EMPLOYEES

7. WOMAN OWNED BUSINESS *(X one)*
- a. YES
- b. NO

8. STANDARD INDUSTRIAL CLASSIFICATION (SIC) CODE(S)
- a. PRIMARY
- b. OTHER *(Specify)*

9. REMARKS

10. FIRM OFFICIAL

| a. TYPED NAME *(Last, First, Middle Initial)* | b. DATE SIGNED *(YYMMDD)* | c. SIGNATURE | d. TELEPHONE NO. |
|---|---|---|---|
| | | | |

DD Form 2051, [illegible] 90

Previous editions are obsolete.

ATTACHMENT 6

PAGE 1 OF 2

# INSTRUCTIONS FOR COMPLETING DD FORM 2051

## GENERAL NOTE FOR PERSONNEL PREPARING OR PROCESSING THIS REPORT

Coding must be as indicated in the instructions. In cases where specific coding instructions are provided, reference must be made to the Department of Defense Manual for Standard Data Elements, DoD 5000.12-M. Noncompliance with either the coding instructions contained herein or those published in referenced manual will make the organization which fails to comply responsible for required concessions in data base communication.

## SPECIFIC INSTRUCTIONS

### SECTION A - TO BE COMPLETED BY THE INITIATING GOVERNMENT ACTIVITY

Item 1: Self-explanatory.

Item 2: Mark the type of code being requested.

a. Type A - Manufacturers Code which is used in the Federal Catalog System to identify a certain facility at a specific location which is a possible source for the manufacture and/or design control of items cataloged by the Federal Government; or,

b. Type F - Non-manufacturers Code which is required for identifying an organization/function in MILSCAP. These are assigned to contractors which are non-manufacturers or are manufacturers not qualifying for a Type A Code.

Item 3: If applicable, enter the exception DoD Activity Address Code for the Servicing Contract Administration Office (CAO) or ADP point.

Item 4: Self-explanatory.

### SECTION B - TO BE COMPLETED BY THE FIRM TO WHICH THE CODE WILL BE ASSIGNED

Items 1a and 1b: Self-explanatory.

Item 1c: If a CAGE Code (Type A or Type F) was previously assigned, enter it in this block.

Item 2: Self-explanatory.

Item 3: If a block other than "None" is marked, identify the Parent company by a (P) beside the firm name.

### SECTION B - (Continued)

Item 4: Self-explanatory.

Item 5: A disadvantaged business firm is defined as a firm that is 51%, or more, owned, controlled, and operated by a person(s) who is socially and economically disadvantaged. "Controlled" is defined as exercising the power to make policy decisions. "Operated" is defined as actively involved in the day-to-day management of the firm.

Item 6: Enter the number of employees. This number should include the employees of all affiliates.

Item 7: A woman-owned business is defined as a firm that is 51%, or more, owned, controlled, and operated by a woman or women. "Controlled" and "Operated" are as defined in Item 5.

Item 8: The SIC Code is a Government Index used to identify business activity and indicates the function (manufacturer, wholesaler, retailer, or service) and the line of business in which the company is engaged. If multiple SIC Codes, indicate the primary first, next important, etc.

Items 9 and 10: Self-explanatory.

NOTE: When any future changes are made to the coded facility; i.e., name change, location change, business sold or operations discontinued, etc., written notification stating the appropriate change should be sent to:

Commander
Defense Logistics Services Center
ATTN: DLSC-FBA
Federal Center
74 North Washington
Battle Creek, MI 49017-3084

DD Form 2051 Reverse, DEC 87

SOLICITATION NUMBER: FA6648-00-R0015
CONTRACT NUMBER:

# DRAWINGS

# UNDER SEPARATE COVER

ATTACHMENT 7
9 PAGES

EXHIBIT 2

THE Redland COMPANY INC.

Office: (305) 247-3226 23799 S.W. 167 Avenue • Homestead, Florida 33031 Fax: (305) 247-175

September 8, 2006 **VIA FEDERAL EXPRESS**

**Mr. Henry Burgains**
**OPERATIONAL CONTRACTING OFFICE**
**482ND LSS/LGC**
**29050 Coral Sea Blvd., Box 50**
**Homestead AFR, Fl. 33039-1299**

| | | |
|---|---|---|
| **RE:** | **Contract No:** | **FA6648-01-C0001** |
| | **Project No:** | **KYJM 99-9037** |
| | **Titled:** | **Mill/Overlay Asphalt Ramp, FANG** |
| | **TRC No:** | **4-024** |

**SUBJECT: Delivery of Certified Claims No. 1, 2, 3, 4, and 5**

Dear Mr. Burgains:

Enclosed are Certified Claims 1, 2, 3, 4, and 5. The Contractor continues to seek equitable adjustment and additional compensation in connection to these Claims.

Prior Claims were submitted and the Government has failed to respond. Your timely review and response to these Claims is required.

Please let me know if you have any questions, comments, or require anything further.

Sincerely,
THE REDLAND COMPANY, INC.

James A. Easom
Vice President
Preconstruction

Cc: TRC distribution

P:\2004\4-024\Owner\Letters to Owner\4-024 Owner_Letter 58.doc

**Operational Contract Office**
**482nd LSS/LGC**

**The Redland Company, Inc. Claim No. 1/RFCO No. 1**
**Contract No. FA6648-01-C0001**
**Project No. KYJM 99-9037**
**TRC No. 4-024**
**Mill/Overlay Asphalt Ramp, FANG**
**Claim No. 1**

---

## STATEMENT OF CLAIM

The Redland Company, Inc. ("Redland") contracted with the United States Government ("Owner") for work relating to asphalt ramp mill/overlay, FANG ("Project"). The Project Contract was originally signed in 2000, and the Notice to Proceed was issued on December 1, 2000, but the work was then suspended on the same day. Redland's work was suspended until the Notice to Proceed was re-issued on October 18, 2004. Redland had to stand by, ready to perform, until the Notice to Proceed was re-issued on about October 18, 2004.

Redland's claim for unabsorbed home office overhead damages for this period of suspension was submitted under RFCO No. 1 on December 20, 2004 with the appropriate Certification. The claim has never been decided by the Owner. As such, Redland resubmits this Claim No. 1 for decision. A copy of the Claim No. 1 is attached hereto.

By way of further background, Redland submitted its interim claim for extended unabsorbed home office overhead for the suspension period utilizing the recognized *Eichleay Formula* for the first portion of the standby period on January 22, 2004, in the amount of $404,998.85. Subsequent to the October 18, 2004 Notice to Proceed, Redland calculated its total unabsorbed *Eichleay Formula* damages for the period from December 1, 2000 through October 18, 2004, when work actually commenced on the Project.

The audited overhead percentage shows the Company overhead to be 6% of total revenue. For this contract, this computes to overhead costs of $18,185.10 for the contract period (.06 X $303,085), which divided by the original contract performance period of sixty days equals costs of $303.09 per day.

The total number of days of standby suspension/delay from December 1, 2000 to October 18, 2004 is 1,417 days. The daily rate of $303.09 times 1,417 days results in a total of $429,478.53 in incurred extended unabsorbed overhead costs.

See Exhibit "A" attached and incorporated herein.

THE Redland COMPANY INC.

Office: (305) 247-3226 23799 S.W. 167 Avenue • Homestead, Florida 33031 Fax: (305) 247-17

December 20, 2004

Via: Federal Express

Mr. Henry Burgains
OPERATIONAL CONTRACTING OFFICE
482ND LSS/LGC
29050 Coral Sea Blvd., Box 50
Homestead AFR, Fl. 33039-1299

RE: Contract No: FA6648-01-C0001
Project No: KYJM 99-9037
Titled: Mill/Overlay Asphalt Ramp, FANG
TRC No: 4-024

SUBJECT: RFCO/Claim No. 01

Dear Mr. Burgains:

This letter transmits The Redland Company, Inc.'s ("Redland"/"Contractor") claim for unabsorbed home office overhead on its Homestead Asphalt Ramp Project No. KYJM 99-9037, Contract No. FA6648-01-C001, previously designated RFCO No. 01, in the amount of $429,478.53. Since Redland's Contract work was completely suspended pending notice to resume work and since Redland could not take on other work during this suspension period, Redland is entitled to be paid for unabsorbed home office overhead incurred during this period. Enclosed is the calculation of Redland's Eichleay Formula claim for unabsorbed home office overhead along with Redland's certification of claim.

Thank you for your attention to this matter.

Sincerely,
THE REDLAND COMPANY, INC.

James A. Easom
Vice-President
Estimating & Project Management

Cc: TRC distribution

P:\2004\4-024\Owner\Letters to Owner\4-024_Owner_Letter_42.doc

THE Redland COMPANY INC.

Office: (305) 247-3226 23799 S.W. 167 Avenue • Homestead, Florida 33031 Fax: (305) 247-175

## CERTIFICATION OF CLAIM

RE: Contract No: FA6648-01-C0001
Project No: KYJM 99-9037
Titled: Mill/Overlay Asphalt Ramp, FANG
TRC No: 20-44/4-024

I certify that the claim is made in good faith; that the supporting data are accurate and complete to the best of my knowledge and belief; that the amount requested accurately reflects the contract adjustment for which the Contractor believes the Government is liable; and that I am duly authorized to certify the claim on behalf of the Contractor.

James A. Easom
Vice-President
Estimating and Project Management
The Redland Company, Inc.

P:\2004\4-024\Owner\Letters to Owner\4-024_Owner_Letter_42.doc

The acceptable method for determining unabsorbed overhead or indirect costs is the Eichleay Formula. The Court of Apeals for the Federal Circuit has specifically ruled that the Eichlaey formula is the exclusive means for calculating unabsorbed overhead in

## THE EICHLEAY FORMULA

$$\frac{\text{Contact Value or Billings}}{\text{Total Value of Contracts or Billings for Contract Period}} \times \text{Total Overhead for Original Contract Period} = \text{Overhead Allocable to the Contract}$$

$$\frac{\text{Overhead Allocable to the Contract}}{\text{Scheduled Days of Performance}} = \text{Daily Contract Overhead}$$

$$\text{Daily Contract Overhead} \times \text{Days of Compensable Delay} = \text{Recoverable Unabsorbed Overhead}$$

cases arising out of construction contracts. The Armed Services Board of Contract Appeals has supported the application of the Eichlaey formula.

The Eichleay Formula is calculated as follows:

The audited Overhead Allocable to the Contract as per Porter & Associates, PA accountants is 6% of total revenue or 6% of $303,085 (the anticipated total revenue on the project). This is equivalent to $18,185.10.

The Daily Contract Overhead is $18,185.10 divided by 60 calendar days which is equivalent to $303.09. For every day the project is delayed and the project performance bond is active and carried on the books of TRC, the overhead costs associated is $303.09.

The Redland Company has been delayed 1,417 calendar days as of the date of this letter. TRC is requesting compensation for 1,417 calendar days of suspension. The compensation, strictly for Home Office Overhead Cost that are attributable to the project is (1,417 days X $303.09) is $429,478.53.

13301 SW 124th STREET
MIAMI, FLORIDA 33186
TEL: (305) 234-6944
FAX: (305) 234-7664
EMAIL: BRIZUELA.COM
brizuela

**Operational Contract Office**
**482nd LSS/LGC**

**The Redland Company, Inc. Claim and**
**Pass-Through Claims for**
**the Use and Benefit of**
**Homestead Paving Co.,**
**APAC, Inc., Speedy Concrete Cutting, Inc.,**
**and Schwebke Shisken & Associates, Inc.**
**RFCO Nos. 3, 4, 5, 7, and 8**
**Claim No. 2**
**Contract No. FA6648-01-C0001**
**Project No. KYJM 99-9037**
**TRC No. 4-024**
**Mill/Overlay Asphalt Ramp, FANG**

---

## STATEMENT OF CLAIM

### I. Introduction

The Redland Company, Inc. ("Redland") contracted with the United States Government ("Owner") for work relating to asphalt ramp mill/overlay, FANG ("Project").

Redland and its subcontractors incurred additional costs as set forth herein as a result of delays in security clearance (RFCO No. 3), concrete duct bank demolition (RFCO No. 4), additional asphalt milling/grading (RFCO No. 5), footing/rebar removal (RFCO No. 7), and asphalt grade elevation (RFCO No. 8). Redland's claims for concrete rejection/rework (RFCO No. 9) (not previously submitted), and concrete slab repair (RFCO No. 10), as well as an additional claim for extended overhead costs incurred due to extended performance (RFCO No. 11) (not previously submitted) will be submitted under separate cover.

Redland therefore submits this claim on the Project for additional costs incurred relating to RFCOs 3, 4, 5, 7 and 8 as set forth herein.

## II. Claim

### A. Delay in Security Clearance (RFCO No. 3)

On October 18, 2004, Redland was delayed due to the unreasonable denial of security clearance to Redland and its subcontractors. After submitting all required paperwork for clearance to enter the designated work site, Redland and its subcontractors were denied access, causing unforeseen delay through no fault of Redland and its subcontractors. RFCO No. 3 requested $1,803.63 for this delay.

See Exhibit "A" attached and incorporated herein.

### B. Delay, Removal and Disposal Costs for Duct Bank (RFCO No. 4)

On October 20, 2004, Redland was excavating and performing the contractual demolition of the existing tie down pads when Redland encountered an unforeseen duct bank that was not shown on the contract drawings and that was not identified by positive locates. This delayed Redland's work and caused Redland to incur additional expense to demolish, remove and dispose of the duct bank. RFCO No. 4 requested $7,013.87 for this additional unforeseen work.

See Exhibit "B" attached and incorporated herein.

### C. Additional Asphalt Milling and Grading Costs (RFCO No. 5)

During the performance of the work, Redland and its subcontractor, APAC, incurred unforeseen additional costs in milling and removing asphalt that was thicker than shown by the contract specifications. RFCO No. 5 requested $30,749.00 for this additional unforeseen work.

See Exhibit "C" attached and incorporated herein.

### D. Additional Costs of Footing and Rebar Removal/Repair (RFCO No. 7)

As a result of the footing and rebar encountered (see above), and the duct banks contained therein, Redland and its subcontractor, Hamker Electric, incurred unforeseen additional costs for repairs to the duct bank and to chip and remove concrete footings to a depth of 13 inches below finish grade. RFCO No. 7 requested $8,000.28 for this unforeseen additional work.

See Exhibit "D" attached and incorporated herein.

### E. Additional Costs of Finish Grade Elevations for Paving and Drainage (RFCO No. 8)

The owner requested that Redland and its subcontractor, Schwebke-Shishkin & Associates, Inc. provide finish grade elevations for paving and drainage, which was not included in the Contract price. As a result, Redland and its subcontractor incurred additional costs. RFCO No. 8 requested $3,525.00 for this unforeseen additional work.

See Exhibit "E" attached and incorporated herein.

## III. Claim Amount

The claim amounts are as set forth in Exhibits A through E and are summarized below:

| | |
|---|---|
| **RFCO No. 3** | **$ 1,803.63** |
| **RFCO No. 4** | **$ 7,013.87**[1] |
| **RFCO No. 5** | **$ 30,748.75** |
| **RFCO No. 7** | **$ 8,000.28** |
| **RFCO No. 8** | **$ 3,525.00** |
| **Total Claim RFCOs 3, 4, 5, 7, 8** | **$ 51,091.53** |

[1] The cover page of RFCO 4 has a typographical error that uses the same number as RFCO No. 3 (1,803.63), but the breakdown page has the correct total of $7,013.87.

## CERTIFICATION OF CLAIM

| | | |
|---|---|---|
| **RE:** | **Contract No.:** | **FA6648-01-C0001** |
| | **Project No.:** | **KYJM 99-9037** |
| | **Titled:** | **Mill/ Overlay Asphalt Ramp, FANG** |
| | **TRC No.:** | **20-44/4-024** |
| | **RFCO Nos.** | **03, 04, 05, 07, 08** |
| | **Claim No.** | **02** |

I certify that the claim is made in good faith; that the supporting data are accurate and complete to the best of my knowledge and belief; that the amount requested accurately reflects the contract adjustment for which the Contractor believes the Government is liable; and that I am duly authorized to certify the claim on behalf of the Contractor.

The Redland Company, Inc. notes that to the extent that this claim is being filed by our subcontractor and inasmuch as they do not have contract privity with you, we are acting as a conduit on their behalf in this matter. We do not have access to their books and records and, therefore, cannot make any statement with respect to the amount of their claim. However, we have no reason to believe that their cost figures and delay estimates are incorrect.

**James A. Easom**
**Vice President**
**The Redland Company, Inc.**

EXHIBIT A

THE Redland COMPANY INC.

Office: (305) 247-3226 23799 S.W. 167 Avenue • Homestead, Florida 33031 Fax: (305) 247-175

October 26, 2004

Via: U.S. Mail and Fax

Mr. Henry Burgains
OPERATIONAL CONTRACTING OFFICE
482ND LSS/LGC
29050 Coral Sea Blvd., Box 50
Homestead AFR, Fl. 33039-1299

**RE:**

| | |
|---|---|
| **Contract No:** | **FA6648-01-C0001** |
| **Project No:** | **KYJM 99-9037** |
| **Titled:** | **Mill/Overlay Asphalt Ramp, FANG** |
| **TRC No:** | **4-024 – RFCO #3** |

**SUBJECT:** **Delay originating from Security Clearance**

Dear Mr. Burgains,

On the morning of October 18th 2004, The Redland Company Inc. experienced a delay beyond the control of and at no fault on the behalf of the contractor.

After scheduling the start of the project and submitting all required paperwork for the clearance to enter our designated work site, our forces and subcontractors were denied access creating this delay that was beyond our control and have added unforeseen burden that The Redland Company Inc., seeks fair and equitable compensation for, in both time and money, now that the full impact of these damages have been realized.

Sincerely,

Steven t. Pfon
Project Manager

THE REDLAND COMPANY, INC.

Cc: TRC distribution

P:\2004\4-024\Owner\4-024_Owner_Letter_24.doc

THE Redland COMPANY INC.

Office: (305) 247-3226 23799 S.W. 167 Avenue • Homestead, Florida 33031 Fax: (305) 247-175c

# REQUEST FOR CHANGE ORDER

TO: Operation Contracting Office
482nd LSS/LGC
29050 Coral Sea Blvd, Box 50
Homestead ARB, FL 33039-1299
ATTN: Mr. Henry Burgains

Via: U.S. Mail

PROJECT: Mill/Overlay Asphalt Ramp FANG
Contract No.: FA6648-01-C0001
Project No.: KYJM 99-9037
TRC Project No.: 20-44 (discontinued)
TRC Project No.: 4-024 (updated)

October 26, 2004

RFCO NO.: 03

Additional direct costs resulting from delay caused by security clearance to the FANG beyond the control of the contractor:

Total Amount: $ 1,803.63.00 Lump Sum

**NOTES:**

1. No additional permit or submittal items are included.
2. No work shall proceed until this RFCO is approved in writing.
3. Payment is to be by Lump Sum (percent complete) and shall be placed as a billable change order on the current billing documents.
4. A contract time extension in the amount of 0 work day(s) is required for the above work completed onsite once work has started upon authorization to proceed.
5. This RFCO is only valid if the work included herein is completed simultaneously with the corresponding similar work throughout the remainder of the project and prior to construction of subsequent activities.
6. This RFCO does not include any related delays to other activities as a result of this added/unforeseen work.
7. All work is based on normal working days and hours (M-F, 7am-3:30pm) and does not include any overtime, night work, weekend, or holiday work.
8. The Contractor reserves its right to modify this RFCO/Claim as may be required.
9. This RFCO includes no provisions for additional limerock material for subgrade/base, if required.
10. See attached details for further breakdown.

By: ______________________ Steven T. Pfoh, The Redland Co., Inc.

APPROVED BY: ______________________ DATE: ______________

APPROVED IN THE AMOUNT OF:

CHANGE ORDER NO. _______ TO BE ISSUED BY: [ ] (OWNER) [ ] (CONTRACTOR)

Cc: TRC distribution

P:\2004\4-024\Owner\RFCO\4-024_RFCO_03.doc

The Redland Company, Inc.
Mill/Overlay Asphalt Ramp FANG
HARB, FL
TRC Project No.: 20-44; 4-024
RFCO No.: 03

Additional Direct Costs to Resulting from delay
Caused by security clearance to the FANG
beyond the control of the contractor

| Item | Quantity | Unit | | Unit Price | Amount |
|---|---|---|---|---|---|
| Material/Other | | | | | |
| | | | | | $0.00 |
| | | | | | $0.00 |
| | | | | | $0.00 |
| | | | | | $0.00 |
| | | | Subtotal: | | $0.00 |
| | | | Tax (7.0%): | | $0.00 |
| | | | Total Material: | | $0.00 |
| Subcontract | | | | | |
| Concrete Cutting Subcontractor | 5 | HR | | $175.00 | $875.00 |
| | | | | | $0.00 |
| | | | | | $0.00 |
| | | | | | $0.00 |
| | | | Total Subcontract: | | $875.00 |
| Labor | | | | | |
| Superintendent | 5 | HR | | $31.00 | $155.00 |
| Operator | 5 | HR | | $18.00 | $90.00 |
| labor x 3 | 15 | | | $13.00 | $195.00 |
| | | | | | $0.00 |
| | | | | | $0.00 |
| | | | | | $0.00 |
| | | | | | $0.00 |
| | | | Subtotal: | | $440.00 |
| | Overtime Factor: | | | 1.0 | $440.00 |
| | | | Subtotal: | | $440.00 |
| | Labor Burden: | | | 50.00% | $220.00 |
| | | | Total Labor: | | $660.00 |
| Equipment | | | | | |
| | | | | | $0.00 |
| | | | | | $0.00 |
| | | | | | $0.00 |
| | | | | | $0.00 |
| | | | | | $0.00 |
| | | | | | $0.00 |
| | | | Total Equipment: | | $0.00 |
| Subtotal Material, Subcontract, Labor, and Equipment: | | | | | $1,535.00 |
| Allowable Markup (6% OH + 10% Profit + 1.5% Bond) | | | | 17.50% | $268.63 |
| | | | TOTAL: | | $1,803.63 |

10/26/2004
4:49 PM
P:\2004\4-024\Owner\RFCO\4-024_RFCO_03

P. 1

* * * COM[illegible]CATION RESULT REPORT ( OCT. 27. 2[illegible] 7:35AM ) * * *

FAX HEADER:

TRANSMITTED/STORED : OCT. 27. 2004 7:30AM

| FILE MODE | OPTION | ADDRESS | RESULT | PAGE |
|---|---|---|---|---|
| 006 MEMORY TX | | 3052247055 | OK | 4/4 |

REASON FOR ERROR
E-1) HANG UP OR LINE FAIL
E-3) NO ANSWER
E-2) BUSY
E-4) NO FACSIMILE CONNECTION

THE Redland COMPANY INC.

Phone (305) 247-3226 23799 S.W. 157 Avenue • Homestead, Florida 33031 Fax (305) 247-1756

# FAX TRANSMITTAL

TO: Operational Contracting Office

DATE: 10/27/04

ATTN: Henry Burgains

FAX #: (305) 224-7055

NO. OF PAGES: 4
(INCLUDING COVER PAGE)

RE: Mill / Overlay Asphalt Ramp

MESSAGE:

RFCO # 03

THE REDLAND COMPANY, INC.

EXHIBIT B

THE Redland COMPANY INC.

Office: (305) 247-3226 23799 S.W. 167 Avenue • Homestead, Florida 33031 Fax: (305) 247-17.

October 26, 2004

Via: U.S. Mail and Fax

Mr. Henry Burgains
OPERATIONAL CONTRACTING OFFICE
482ND LSS/LGC
29050 Coral Sea Blvd., Box 50
Homestead AFR, Fl. 33039-1299

| RE: | Contract No: | FA6648-01-C0001 |
|---|---|---|
| | Project No: | KYJM 99-9037 |
| | Titled: | Mill/Overlay Asphalt Ramp, FANG |
| | TRC No: | 4-024 - RFCO #04 |

**SUBJECT:** **Delay and burdens created by un-located duct bank**

Dear Mr. Burgains,

On the morning of October 20th 2004, The Redland Company Inc. experienced a delay beyond the control of and at no fault on the behalf of the contractor.

While excavating and performing the contractual demolition of the existing tie down pads, we encountered an unforeseen duct bank that was not identified through positive locates after receiving the required "dig permits", and was not shown to be in existence on the supplied contract drawings.

The Redland Company Inc. seeks fair and equitable compensation in both time and money for the delay created beyond our control and the additional burdens that resulted from the demolition, removal and disposal of the duct bank, now that the full impact of these damages has been realized.

Sincerely,

Steven L. Pfob
Project Manager

THE REDLAND COMPANY, INC.

Cc: TRC distribution

P:\2004\4-024\Owner\4-024_Owner_Letter_25.doc

THE Redland COMPANY INC.

Office: (305) 247-3226 23799 S.W. 167 Avenue • Homestead, Florida 33031 Fax: (305) 247-1

# REQUEST FOR CHANGE ORDER

TO: Operation Contracting Office
482nd LSS/LGC
29050 Coral Sea Blvd, Box 50
Homestead ARB, FL 33039-1299
ATTN: Mr. Henry Burgains

Via: U.S. Mail

PROJECT: Mill/Overlay Asphalt Ramp FANG
Contract No.: FA6648-01-C0001
Project No.: KYJM 99-9037
TRC Project No.: 20-44 (discontinued)
TRC Project No.: 4-024 (updated)

October 26, 2004

RFCO NO.: 04

Additional direct costs resulting from delays caused by an unforeseen pre existing concrete encased duct bank that was located inside the concrete tie down pads and the removal and disposal of this unforeseen condition:

Total Amount: $ 1,803.63.00 Lump Sum

NOTES:

1. No additional permit or submittal items are included.
2. No work shall proceed until this RFCO is approved in writing.
3. Payment is to be by Lump Sum (percent complete) and shall be placed as a billable change order on the current billing documents.
4. A contract time extension in the amount of 0 work day(s) is required for the above work completed onsite once work has started upon authorization to proceed.
5. This RFCO is only valid if the work included herein is completed simultaneously with the corresponding similar work throughout the remainder of the project and prior to construction of subsequent activities.
6. This RFCO does not include any related delays to other activities as a result of this added/unforeseen work.
7. All work is based on normal working days and hours (M-F, 7am-3:30pm) and does not include any overtime, night work, weekend, or holiday work.
8. The Contractor reserves its right to modify this RFCO/Claim as may be required.
9. This RFCO includes no provisions for additional limerock material for subgrade/base, if required.
10. See attached details for further breakdown.

By: [signature] Steven T. Pfoh, The Redland Co., Inc.

APPROVED BY:________________________ DATE: ________________

APPROVED IN THE AMOUNT OF:

CHANGE ORDER NO.______ TO BE ISSUED BY: [ ] (OWNER) [ ] (CONTRACTOR)

Cc: TRC distribution

P:\2004\4-024\Owner\RFCO\4-024_RFCO_04.doc

The Redland Company, Inc.
Mill/Overlay Asphalt Ramp FANG
HARB, FL
TRC Project No.: 20-44; 4-024
RFCO No.: 04

Additional Direct Costs to Resulting from delay due to an unforseen condition of a pre existing duct bank encountered while performing demolition And the removal and desposal of the additional work

| Item | Quantity | Unit | Unit Price | Amount |
|---|---|---|---|---|
| Material/Other | | | | |
| Disposal of Debri Duct Bank | 5 | load | $280.00 | $1,400.00 |
| | | | | $0.00 |
| | | | | $0.00 |
| | | | | $0.00 |
| | | | Subtotal: | $1,400.00 |
| | | | Tax (7.0%): | $98.00 |
| | | | Total Material: | $1,498.00 |
| Subcontract | | | | |
| | | | | $0.00 |
| | | | | $0.00 |
| | | | | $0.00 |
| | | | | $0.00 |
| | | | Total Subcontract: | $0.00 |
| Labor | | | | |
| Superintendent | 14 | HR | $31.00 | $434.00 |
| Excavator Operator | 14 | HR | $18.00 | $252.00 |
| Loader Operator | 14 | HR | $18.00 | $252.00 |
| Labor x 2 | 28 | HR | $13.00 | $364.00 |
| Truck Driver | 3.50 | HR | $13.00 | $45.50 |
| | | | | $0.00 |
| | | | | $0.00 |
| | | | Subtotal: | $1,347.50 |
| | Overtime Factor: | | 1.0 | $1,347.50 |
| | | | Subtotal: | $1,347.50 |
| | Labor Burden: | | 50.00% | $673.75 |
| | | | Total Labor: | $2,021.25 |
| Equipment | | | | |
| Excavator | 14 | HR | $90.00 | $1,260.00 |
| Loader | 14 | HR | $75.00 | $1,050.00 |
| Dump Truck | 3.5 | HR | $40.00 | $140.00 |
| | | | | $0.00 |
| | | | | $0.00 |
| | | | | $0.00 |
| | | | Total Equipment: | $2,450.00 |
| Subtotal Material, Subcontract, Labor, and Equipment: | | | | $5,969.25 |
| Allowable Markup (6% OH + 10% Profit + 1.5% Bond) | | | 17.50% | $1,044.62 |
| | | | TOTAL: | $7,013.87 |

10/28/2004
4:48 PM
P:\2004\4-024\Owner\RFCO\4-024_RFCO_04

* * * COMMUNICATION RESULT REPORT ( OCT 27 2004 7:35AM ) * * *

P. 1

FAX HEADER:

TRANSMITTED/STORED : OCT. 27. 2004 7:3 AM

| FILE | MODE | OPTION | ADDRESS | RESULT | PAGE |
| --- | --- | --- | --- | --- | --- |
| 637 | MEMORY TX | | 3052247055 | OK | 4/4 |

REASON FOR ERROR
E-1) HANG UP OR LINE FAIL
E-3) NO ANSWER
E-2) BUSY
E-4) NO FACSIMILE CONNECTION

THE Redland COMPANY INC.

Office: (305) 247-3226
23799 S.W. 167 Avenue • Homestead, Florida 33031
Fax: (305) 247-1756

# FAX TRANSMITTAL

**TO:** Operational Contracting Office

**DATE:** 10/27/04

**ATTN:** Henry Burgains

**FAX #:** (305) 224-7055

**RE:** Mill / Overlay Asphalt Ramp

**NO. OF PAGES:** 4
(INCLUDING COVER PAGE)

**MESSAGE:**

RFCO #04

THE REDLAND COMPANY, INC.

# EXHIBIT C

THE Redland COMPANY INC.

Office: (305) 247-3226 23799 S.W. 167 Avenue • Homestead, Florida 33031 Fax: (305) 247-17

# REQUEST FOR CHANGE ORDER

TO: Operation Contracting Office
482nd LSS/LGC
29050 Coral Sea Blvd, Box 50
Homestead ARB, FL 33039-1299
ATTN: Mr. Henry Burgains

Via: U.S. Mail

PROJECT: Mill/Overlay Asphalt Ramp FANG
Contract No.: FA6648-01-C0001
Project No.: KYJM 99-9037
TRC Project No.: 20-44 (discontinued)
TRC Project No.: 4-024 (updated)

November 1, 2004

RFCO NO.: 05

Additional direct costs for the extra work as a result from the additional asphalt that was thicker than the contract requirements to be milled and removed along the NE portion of the project.

Total Amount: $ 30,749.00 Lump Sum

NOTES:

1. No additional permit or submittal items are included.
2. No work shall proceed until this RFCO is approved in writing.
3. Payment is to be by Lump Sum (percent complete) and shall be placed as a billable change order on the current billing documents.
4. A contract time extension in the amount of 5 work day(s) is required for the above work completed onsite once work has started upon authorization to proceed.
5. This RFCO is only valid if the work included herein is completed simultaneously with the corresponding similar work throughout the remainder of the project and prior to construction of subsequent activities.
6. This RFCO does not include any related delays to other activities as a result of this added/unforeseen work.
7. All work is based on normal working days and hours (M-F, 7am-3:30pm) and does not include any overtime, night work, weekend, or holiday work.
8. The Contractor reserves its right to modify this RFCO/Claim as may be required.
9. This RFCO includes provisions for additional limerock material for subgrade/base, if required.
10. See attached details for further breakdown.
11. Asphalt overrun quantities are to be billed at $94.00 dollars per ton.

By: [signature] Steven T. Pfoh, The Redland Co., Inc.

APPROVED BY:__________________ DATE: ____________

APPROVED IN THE AMOUNT OF:

CHANGE ORDER NO.______ TO BE ISSUED BY: [ ] (OWNER) [ ] (CONTRACTOR)

Cc: TRC distribution

P:\2004\4-024\Owner\Faxes to Owner\RFCO\4-024_RFCO_05.doc

The Redland Company, Inc.
Mill/Overlay Asphalt Ramp FANG
HARB, FL
TRC Project No.: 20-44; 4-024
RFCO No.: 05

Additional Direct Costs Resulting from additional asphalt that was thicker than contract amount to be removed by milling and will require additional milling and removal/disposal, embankment and grading

| Item | Quantity | Unit | Unit Price | Amount |
|---|---|---|---|---|
| Material/Other | | | | |
| Limerock | 125 | ton | $13.80 | $1,725.00 |
| | | | | $0.00 |
| | | | | $0.00 |
| | | | | $0.00 |
| | | Subtotal: | | $1,725.00 |
| | | Tax (7.0%): | | $120.75 |
| | | Total Material: | | $1,845.75 |
| Subcontract | | | | |
| APAC/Milling machine (MOBILIZATION) | 1 | ls | $2,500.00 | $2,500.00 |
| APAC/Mill remaining asphalt base and dispose | 1,114 | sy | $3.10 | $3,453.40 |
| | | | | $0.00 |
| | | | | $0.00 |
| | | Total Subcontract: | | $5,953.40 |
| Labor | | | | |
| Superintendent | 40 | HR | $31.00 | $1,240.00 |
| Grader Operator | 40 | HR | $18.00 | $720.00 |
| Loader Operator | 40 | HR | $18.00 | $720.00 |
| Labor x 2 | 80 | HR | $13.00 | $1,040.00 |
| Truck Driver | 20 | HR | $13.00 | $260.00 |
| | | | | $0.00 |
| | | | | $0.00 |
| | | Subtotal: | | $3,980.00 |
| Overtime Factor: | | | 1.0 | $3,980.00 |
| | | Subtotal: | | $3,980.00 |
| Labor Burden: | | | 50.00% | $1,990.00 |
| | | Total Labor: | | $5,970.00 |
| Equipment | | | | |
| Excavator | 40 | HR | $90.00 | $3,600.00 |
| Loader | 40 | HR | $75.00 | $3,000.00 |
| Dump Truck | 20 | HR | $40.00 | $800.00 |
| Grader | 40 | HR | $125.00 | $5,000.00 |
| | | | | $0.00 |
| | | | | $0.00 |
| | | Total Equipment: | | $12,400.00 |
| Subtotal Material, Subcontract, Labor, and Equipment: | | | | $26,169.15 |
| Allowable Markup (6% OH + 10% Profit + 1.5% Bond) | | | 17.50% | $4,579.60 |
| | | TOTAL: | | $30,748.75 |

11/1/2004
7:48 AM
P:\2004\4-024\Owner\RFCO\4-024_RFCO_05

EXHIBIT D

THE Redland COMPANY INC.

Office: (305) 247-3226 23799 S.W. 167 Avenue • Homestead, Florida 33031 Fax: (305) 247-175

# REQUEST FOR CHANGE ORDER

TO: Operation Contracting Office
482nd LSS/LGC
29050 Coral Sea Blvd, Box 50
Homestead ARB, FL 33039-1299
ATTN: Mr. Henry Burgains

Via: U.S. Mail

PROJECT: Mill/Overlay Asphalt Ramp FANG
Contract No.: FA6648-01-C0001
Project No.: KYJM 99-9037
TRC Project No.: 20-44 (discontinued)
TRC Project No.: 4-024 (updated)

November 30, 2004

RFCO NO.: 07

Additional direct costs for the extra work as a result from the un-located and unforeseen electrical conduits that will require repair by our electrical subcontractor resulting in additional cost and burden from the change condition previously encountered in RFCO # 6. Additionally, concrete footing and rebar/beams that were found while removing the existing asphalt base in place to the required thickness along the NE portion of the project contain duct banks and the unforeseen condition will require our forces to chip and remove the concrete footings to the depth of 13 inches below proposed finish grade.

Total Amount: $ 8,000.00 Lump Sum

**NOTES:**

1. No additional permit or submittal items are included.
2. No work shall proceed until this RFCO is approved in writing.
3. Payment is to be by Lump Sum (percent complete) and shall be placed as a billable change order on the current billing documents.
4. A contract time extension in the amount of 7 work day(s) is required for the above work completed onsite once work has started upon authorization to proceed.
5. This RFCO is only valid if the work included herein is completed simultaneously with the corresponding similar work throughout the remainder of the project and prior to construction of subsequent activities.
6. This RFCO does not include any related delays to other activities as a result of this added/unforeseen work.
7. All work is based on normal working days and hours (M-F, 7am-3:30pm) and does not include any overtime, night work, weekend, or holiday work.
8. The Contractor reserves its right to modify this RFCO/Claim as may be required.
9. This RFCO includes provisions for additional limerock material for subgrade/base, if required.
10. See attached details for further breakdown.
11. See attached proposal from Hamker Electric.
12. P rice does not include any additional scope relating to wiring replacement or splicing.
13. Quote is for conduit repair and concrete encasement only.

By: [signature] Steven T. Pfoh, The Redland Co., Inc.

APPROVED BY: ____________________ DATE: ____________

P:\2004\4-024\Owner\RFCO\4-024_RFCO_07.doc

**APPROVED IN THE AMOUNT OF:**

**CHANGE ORDER NO._______ TO BE ISSUED BY: [ ]** (OWNER) **[ ]** (CONTRACTOR)

---

Cc: TRC distribution

The Redland Company, Inc.
Mill/Overlay Asphalt Ramp FANG
HARB, FL
TRC Project No.: 20-44; 4-024
RFCO No.: 07

Additional Direct Costs Resulting from unforseen electrical conduit and water main found demoing the concrete footings at the RAMP at the FANG

| Item | Quantity | Unit | | Unit Price | Amount |
|---|---|---|---|---|---|
| Material/Other | | | | | |
| | | | | $0.00 | $0.00 |
| | | | | | $0.00 |
| | | | | | $0.00 |
| | | | | | $0.00 |
| | | | Subtotal: | | $0.00 |
| | | | Tax (7.0%): | | $0.00 |
| | | | Total Material: | | $0.00 |
| Subcontract | | | | | |
| HAMKER ELECTRIC | 1 | ls | | $2,400.00 | $2,400.00 |
| | | | | | $0.00 |
| | | | | | $0.00 |
| | | | | | $0.00 |
| | | | Total Subcontract: | | $2,400.00 |
| Labor | | | | | |
| Superintendent | 13 | HR | | $31.00 | $387.50 |
| Skidsteer with hammer operator | 13 | HR | | $18.00 | $225.00 |
| Loader Operator | 13 | HR | | $18.00 | $225.00 |
| Labor x 2 | 13 | HR | | $13.00 | $162.50 |
| Truck Driver | 13 | HR | | $13.00 | $162.50 |
| | | | | | $0.00 |
| | | | | | $0.00 |
| | | | Subtotal: | | $1,162.50 |
| | Overtime Factor: | | | 1.0 | $1,162.50 |
| | | | Subtotal: | | $1,162.50 |
| | Labor Burden: | | | 50.00% | $581.25 |
| | | | Total Labor: | | $1,743.75 |
| Equipment | | | | | |
| Skidsteer with hydrolic Hammer | 13 | HR | | $90.00 | $1,170.00 |
| Loader | 13 | HR | | $75.00 | $975.00 |
| Dump Truck | 13 | HR | | $40.00 | $520.00 |
| | | | | | $0.00 |
| | | | | | $0.00 |
| | | | | | $0.00 |
| | | | Total Equipment: | | $2,665.00 |
| Subtotal Material, Subcontract, Labor, and Equipment: | | | | | $6,808.75 |
| Allowable Markup (8% OH + 10% Profit + 1.5% Bond) | | | | 17.50% | $1,191.53 |
| | | | TOTAL: | | $8,000.28 |

HAMKER
ENTERPRISES CORP.
ELECTRICAL CONTRACTORS

HEC

520 N.W. 9th AVENUE
HOMESTEAD, FL 33030
Phone: (305) 247-8281
Fax: (305) 248-6836

This proposal was quote by Joseph H Hamker

# PROPOSAL

| | |
|---|---|
| To: The Redland Company | Site: 27707 South Dixie Highway |
| Attention: Steve Pfoh | Date: 12-01-04 Proposal No 108 |
| Address: 23799 SW 167 Avenue<br>Homestead Fl 33030 | Type: Electrical |
| Fax Number: 305-247-1756 | Phone Number: 305-247-3226 |

**Hamker Enterprises Corp. hereby proposes to furnish all electrical, labor complete for emergency repair of duct bank at Homestead Air Reserve Base:**

**Demo and clean approximately 4 areas in existing duct bank to expose good pipe. Remove old conduit and provide a split conduit and couplings. Repair and wrap pipe and couplings to seal up system. Encapsulate pipe in 3000 PSI concrete, form and return duct bank to original condition.**

**Quotation of $2400.00**

Acceptance of Proposal by: ______________________ Date:______________
Please print name: ______________________
All work to be completed in a workmanlike manner. Any alteration or deviation from above proposal involving extra costs, will be executed only upon written/signed orders, and will become an extra charge over and above estimate. Payment to be made to Hamker Enterprises Corp.

* * * COM ICATION RES T REPORT ( DEC. 2. 2 4:57PM ) * * *

FAX HEADER:

TRANSMITTED/STORED : DEC. 2. 2004 4:49PM

| FILE | MODE | OPTION | ADDRESS | RESULT | PAGE |
|---|---|---|---|---|---|
| 387 | MEMORY TX | | 3052247055 | OK | [illegible] |

REASON FOR ERROR
E-1) HANG UP OR LINE FAIL
E-3) NO ANSWER
E-2) BUSY
E-4) NO FACSIMILE CONNECTION

THE Redland COMPANY INC.

Office: (305) 247-3226 23799 S.W. 167 Avenue • Homestead, Florida 33031 Fax: (305) 247-1

# FAX TRANSMITTAL

TO: Operational Contracting Office

DATE: 12-02-04

ATTN: Henry Burgains

FAX #: 305-224-7055

NO. OF PAGES: 5
(INCLUDING COVER PAGE)

RE:

MESSAGE:

THE REDLAND COMPANY, INC.

[signature]

Complete Land Development
aring • Drainage • Water & Sewer

Lake Exca...

Asphalt & Concrete ...

EXHIBIT E

THE Redland COMPANY INC.

Office: (305) 247-3226 23799 S.W. 167 Avenue • Homestead, Florida 33031 Fax: (305) 247

# REQUEST FOR CHANGE ORDER

TO: Operation Contracting Office
482nd LSS/LGC
29050 Coral Sea Blvd, Box 50
Homestead ARB, FL 33039-1299
ATTN: Mr. Henry Burgains

Via: U.S. Mail

PROJECT: Mill/Overlay Asphalt Ramp FANG
Contract No.: FA6648-01-C0001
Project No.: KYJM 99-9037
TRC Project No.: 20-44 (discontinued)
TRC Project No.: 4-024 (updated)

December 13, 2004

RFCO NO.: 08

Direct costs reflect addition work to be performed at the owners request to provide Finish Grade elevations for paving and drainage. Information required to perform this work, as requested in our correspondence dated 11/10/2004, is not included within the contract documents nor is it included in the Contractors' scope of work in order to complete the final restoration of the FANG/RAMP.

Total Amount: $ 3,525.00 Lump Sum

NOTES:

1. No additional permit or submittal items are included.
2. No work shall proceed until this RFCO is approved in writing.
3. Payment is to be by Lump Sum (percent complete) and shall be placed as a billable change order on the current billing documents.
4. A contract time extension will be required in the amount of days that The Redland Company Inc was impacted due to the delays beyond the control of the contractor once the full impact of these damages has been realized.
5. This RFCO is only valid if the work included herein is completed simultaneously with the corresponding similar work throughout the remainder of the project and prior to construction of subsequent activities.
6. This RFCO does not include any related delays to other activities as a result of this added/unforeseen work.
7. All work is based on normal working days and hours (M-F, 7am-3:30pm) and does not include any overtime, night work, weekend, or holiday work.
8. The Contractor reserves its right to modify this RFCO/Claim as may be required.
9. This RFCO includes provisions for additional limerock material for subgrade/base, if required.
10. See attached details for further breakdown.
11. The data supplied is not a design or engineered plan.
12. No surface water drainage analysis for offsite capacities or impacts is included.
13. This data is furnished for informational purposes only and will require the Governments approval, review and written direction of how to proceed.

By: [signature] Steven T. Pfoh, The Redland Co., Inc.

APPROVED BY: ______________________ DATE: ______________

P:\2004\4-024\Owner\RFCO\4-024_RFCO_08.doc

**APPROVED IN THE AMOUNT OF:**

**CHANGE ORDER NO._______ TO BE ISSUED BY: [ ]** (OWNER) **[ ]** (CONTRACTOR)

---

Cc: TRC distribution

The Redland Company, Inc.
Mill/Overlay Asphalt Ramp FANG
HARB, FL
TRC Project No.: 20-44; 4-024
RFCO No.: 08

Additional Direct Costs Resulting from the request of the owner to provide elevations for the finish asphalt for the FANG/RAMP

| Item | Quantity | Unit | Unit Price | Amount |
|---|---|---|---|---|
| Material/Other | | | | |
| | | | $0.00 | $0.00 |
| | | | | $0.00 |
| | | | | $0.00 |
| | | | | $0.00 |
| | | | Subtotal: | $0.00 |
| | | | Tax (7.0%): | $0.00 |
| | | | Total Material: | $0.00 |
| Subcontract | | | | |
| Schwebke-Shishkin & Associates, Inc | 1 | ls | $3,000.00 | $3,000.00 |
| | | | | $0.00 |
| | | | | $0.00 |
| | | | | $0.00 |
| | | | Total Subcontract: | $3,000.00 |
| Labor | | | | |
| | | | | $0.00 |
| | | | | $0.00 |
| | | | | $0.00 |
| | | | | $0.00 |
| | | | | $0.00 |
| | | | | $0.00 |
| | | | | $0.00 |
| | | | Subtotal: | $0.00 |
| | Overtime Factor: | | 1.0 | $0.00 |
| | | | Subtotal: | $0.00 |
| | Labor Burden: | | 50.00% | $0.00 |
| | | | Total Labor: | $0.00 |
| Equipment | | | | |
| | | | | $0.00 |
| | | | | $0.00 |
| | | | | $0.00 |
| | | | | $0.00 |
| | | | | $0.00 |
| | | | | $0.00 |
| | | | Total Equipment: | $0.00 |
| Subtotal Material, Subcontract, Labor, and Equipment: | | | | $3,000.00 |
| Allowable Markup (6% OH + 10% Profit + 1.5% Bond) | | | 17.50% | $525.00 |
| | | | TOTAL: | $3,525.00 |

12/13/2004
6:26 PM
P:\2004\4-024\Owner\RFCO\4-024_RFCO_08

Schwebke - Shiskin & Associates, Inc.

Robert F. Jackson, P.S.M.
Mark S. Johnson, P.S.M.
Ronald A. Fritz, P.S.M.
Pierre E. Calvet, P.S.M.
Txomin M. Ibarluzea, P.S.M.
Michael J. Alley, P.S.M.

LAND SURVEYORS - ENGINEERS - LAND PLANNERS
3240 CORPORATE WAY - MIRAMAR, FLORIDA 33025
BROWARD PHONE: (954) 435-7010
DADE PHONE: (305) 652-7010
BROWARD FAX: (954) 438-3288 • DADE FAX: (305) 652-8284
WWW.SHISKIN.COM

Alfonso C. Tello, P.E.,
Ken W. Groce, P.E.
Hernando J. Navas, P.
Luis F. Leon, P.E.
Alberto A. Mora, P.E.

December 13, 2004

Mr. Steve Pfoh
**The Redland Company**
5082 Coconut Creek Parkway
Margate, Florida 33083

Phone: (305) 247-3226
Fax: (305) 247-1756
via fax & mail

**Re: Homestead Air Base**
**Tarmac Parking**

Dear Mr. Mc Pfoh:

Pursuant to our conversation please accept this proposal for the above referenced project.

**SCOPE OF SERVICES & SCHEDULE OF FEES:**

1. Prepare a grading plan for the subject area as described by your office and the attached aerial. The grading plan shall be submitted to the governmental office in charge of the Air Base by your office for review and approval. Our fee to provide this service will be at this firm's hourly rates with a not to exceed amount of **$2,000.00.**

2. Perform a specific purpose survey to obtain additional grades in and around the subject site as designated by this office for the purpose of preparing the grading plan. Our fee to provide this service will be at this firm's hourly rates with a not to exceed amount of **$1,000.00.**

3. Should you require additional services not provided in the aforementioned item, we will provide the additional services at this firm's hourly rates as shown below.

| | |
|---|---|
| Survey Field Crew | $115.00 |
| Principal Professional Engineer/Land Surveyor | $125.00 |
| Senior Engineer/Land Surveyor | $105.00 |
| Professional Land Surveyor /Engineer (Project Manager) | $ 95.00 |
| Land Surveyor Computer/Engineer Designer | $ 75.00 |
| Draftsman or CAD Technician | $ 65.00 |
| Geotechnical Engineer | $ 90.00 |
| Engineer Inspector | $ 65.00 |

Proposal Qualifications

1. The grading plan does not include the design of proposed drainage facilities or modification of existing drainage facilities (i.e. catch basins, drainage pipes, culverts).

CLOSURE:

**Lump Sum Fee** - Lump Sum Fees are fixed for a period of three months from the date of this proposal. If the work has not been initiated on any lump sum item within the three month period, Consultant reserves the right to terminate or renegotiate this agreement as it relates to said item. All Lump Sum fees are based upon services being performed during regular business hours. Any services requested by the client to be performed outside of regular business hours will carry a surcharge of 0.50 times the hourly rate of the employee(s) performing said service.

**Invoicing and Payment** - Work will be invoiced monthly based upon a proration of work completed to date, with payment expected upon receipt of the invoice by the client. If payment is not received within 30 days of the invoice date, a late charge may be added to the invoice in an amount not to exceed 1% per month on the outstanding balance.

If payment is not received within 45 days of the invoice date, Schwebke-Shiskin & Associates, Inc., may suspend or terminate this agreement until payments have been made in full. If Schwebke-Shiskin & Associates, Inc., commences legal proceedings to collect any monies due under this agreement, then the Client agrees to pay any costs or attorneys fees incurred by Schwebke-Shiskin & Associates, Inc., in connection with such legal proceedings, including such as are incurred in any appellate proceedings.

**Reproduction and Outside Service Fees** - Unless otherwise specified, the above service fees do not include the cost of printing, postage, copies, long distance phone calls, facsimiles or reproductions, nor do they include the cost for outside services by others. These fees are separate charges and will be invoiced to you as direct charges, plus a 10% carrying charge for outside services.

**Deliveries & Special Handling** - Federal Express handling and special orders will be invoiced to the Client as direct charges, plus a 10% carrying charge. Hand deliveries requested by the Client and performed by Schwebke-Shiskin & Associates, Inc., will be invoiced at a rate of $25 per hour.

**Limitation of Consultant's Liability** - Consultant shall procure and maintain insurance policies with such coverages and in such amounts and for such period of time, as it deems appropriate, or as required by and set forth in this agreement. Owner hereby agrees that to the fullest extent permitted by law consultant's total liability to owner for any and all injuries, claims, losses, expenses or damages whatsoever arising out of or in any way related to the project or this agreement from any cause or causes including but not limited to consultant's negligence, errors, omissions, strict liability, breach of contract or breach of warranty (hereafter "Owner's Claims") shall not exceed the total sum paid on behalf of or to

consultant by consultant's insurers in settlement or satisfaction of owner's claims under the terms and conditions of consultant's insurance policies applicable thereto (excluding fees, costs and expenses of investigation, claims adjustment, defense and appeal). If no such insurance coverage is provided with respect to owner's claims, then consultant's total liability to owner for any and all such uninsured owner's claims shall not exceed the total compensation received by consultant under this agreement.

<u>Project Termination</u> - Should at any time during the project the Client find it necessary to discontinue the services described above, or if the parties mutually decide to terminate this agreement, the Client will compensate Schwebke-Shiskin & Associates, Inc., on an hourly basis for the percentage of work completed plus reimbursable expenses.

I would like to thank you for giving us the opportunity to offer you this proposal. If this proposal is acceptable to you, execute the original and return it to our office, so we can proceed with the work.

Respectfully submitted,

**Schwebke-Shiskin & Associates, Inc.**

Ken W. Groce, P.E.
Vice President

*Accepted For:* **The Redland Company, Inc.**

*Accepted By:* ______________________________
(Signature) (Title)

______________________________
(Print Name) (Date)

* * * COMMUNICATION RESULT REPORT ( DEC. 14 04 8:13AM ) * * *

FAX HEADER:

TRANSMITTED/STORED : DEC. 14. 2004 8:10AM

| FILE | MODE | OPTION | ADDRESS | RESULT | PAGE |
|---|---|---|---|---|---|
| 816 | MEMORY TX | | 3052247055 | OK | 6 |

REASON FOR ERROR
E-1) HANG UP OR LINE FAIL
E-3) NO ANSWER
E-2) BUSY
E-4) NO FACSIMILE CONNECTION

The Redland Company Inc.

Office: (305) 247-3226
23799 S.W. 167 Avenue • Homestead, Florida 33031
Fax: (305) 247-

# REQUEST FOR CHANGE ORDER

TO: Operation Contracting Office
482nd LSS/LGC
29050 Coral Sea Blvd, Box 50
Homestead ARB, FL 33039-1299
ATTN: Mr. Henry Burgains

Via: U.S. Mail

PROJECT: Mill/Overlay Asphalt Ramp FANG
Contract No.: FA6648-01-C0001
Project No.: KYJM 99-9037
TRC Project No.: 20-44 (discontinued)
TRC Project No.: 4-024 (updated)

December 13, 2004

RFCO NO.: 08

Direct costs reflect addition work to be performed at the owners request to provide Finish Grade elevations for paving and drainage. Information required to perform this work, as requested in our correspondence dated 11/10/2004, is not included within the contract documents nor is it included in the Contractors' scope of work in order to complete the final restoration of the FANG/RAMP.

Total Amount: $ 3,525.00 Lump Sum

**NOTES:**

1. No additional permit or submittal items are included.
2. No work shall proceed until this RFCO is approved in writing.
3. Payment is to be by Lump Sum (percent complete) and shall be placed as a billable change order on the current billing documents.
4. A contract time extension will be required in the amount of days that The Redland Company Inc was impacted due to the delays beyond the control of the contractor once the full impact of these damages has been realized.
5. This RFCO is only valid if the work included herein is completed simultaneously with the corresponding similar work throughout the remainder of the project and prior to construction of subsequent activities.
6. This RFCO does not include any related delays to other activities as a result of this added/unforeseen work.
7. All work is based on normal working days and hours (M-F, 7am-3:30pm) and does not include any overtime, night work, weekend, or holiday work.
8. The Contractor reserves its right to modify this RFCO/Claim as may be required.
9. This RFCO includes provisions for additional limerock material for subgrade/base, if required.
10. See attached details for further breakdown.
11. The data supplied is not a design or engineered plan.
12. No surface water drainage analysis for offsite capacities or impacts is included.
13. This data is furnished for informational purposes only and will require the Governments approval, review and written direction of how to proceed.

By: [signature] Steven T. Pfoh, The Redland Co., Inc.

APPROVED BY: ______________________ DATE: ______________

P:\2004\4-024\Owner\RFCO\4-024_RFCO_08.doc

**Operational Contract Office**
**482nd LSS/LGC**

**The Redland Company, Inc. Claim and**
**Pass-Through Claims for**
**the Use and Benefit of**
**Homestead Paving Co.**
**and Schwebke Shisken & Associates, Inc.**
**RFCO No. 9**
**Claim No. 3**
**Claim for Outer Lane Concrete Removal and Replacement**
**Contract No. FA6648-01-C0001**
**Project No. KYJM 99-9037**
**TRC No. 4-024**
**Mill/Overlay Asphalt Ramp, FANG**

---

## I. Introduction

The Redland Company, Inc. ("Redland") contracted with the United States Government ("Owner") for work relating to asphalt ramp mill/overlay, FANG ("Project"). Redland subcontracted certain Project concrete work to Homestead Paving Co., Inc. ("Homestead Paving"). The first lane of concrete was poured on about November 4, 2004. During and after the performance of this concrete work, the Owner and its Engineer raised certain concerns, even though the work was performed in conformance to industry standards. The government required removal and replacement of certain work as a result. Redland is obligated to pay its subcontractor, Homestead Paving, for additional costs incurred relating to removal and replacement of concrete placed and rejected.

The Owner's November 8, 2004 "Memorandum for the Redland Company, Inc." stated that the government rejected this first lane of concrete. The government stated the following reasons for rejecting the concrete:

1. Violation of Specification 02754-14, 3.3.1, *General Requirements*, requiring that concrete shall be deposited in front of the paver within 45 minutes from the time cement has been charged into the mixing drum.

2. Violation of Specification 02754-14.3.4.1, *Consolidation*, requiring that concrete must be poured with vibration.

3. Violation of Specification 02754-15, 3.4.3, *Required Results*, requiring that no water shall be added to mix.

The Owner mandated that no additional concrete could be placed until all rejected concrete was removed and replaced with concrete meeting the specifications.

Redland and Homestead Paving objected to the rejection. Redland's November 11, 2004 correspondence highlighted Specification Section 02754, *Concrete Pavement for Small Projects*, Subsection 1.4, *Acceptability of Work*, that states that the pavement "***shall be accepted on the basis of tests made by the Contractor or its supplier, as specified herein. The Government may, at its discretion, make check tests to validate the results of the Contractors testing . . . .***" The specifications require strength testing through the twenty-eighth day, and it is arbitrary and unreasonable to require removal prior to the completion of all required testing, particularly in the event that such testing demonstrates that the concrete meets or exceeds requirements.

Redland's November 11, 2004 correspondence also noted that the forty-five minute concrete placement time is effectively impossible on this site. The government cannot enforce an impossible and commercially unreasonable standard that no contractor could meet. The government recognized as much when it changed the written specification to ninety minutes, and when the government indicated at the pre-placement meeting that the ninety minute requirement would govern.

Regarding the vibration issue, all concrete placed was vibrated per specification. The hand operated immersion vibrator was not used in areas where there were no odd shaped slabs or inaccessible locations, pursuant to the specification. This second basis for rejection was arbitrary and unreasonable.

The "added water" basis for concrete rejection is also arbitrary and unreasonable. The water was only used to wet the chute as needed for concrete flow, per standard industry practices. The water was not added to the concrete so as to "water down" the concrete. The government cannot impose commercially unreasonable and impractical restrictions that render performance unreasonably difficult by commercial standards. Further, the government shut down of the work, and the concrete removal and replacement requirement, delayed Redland's and Homestead's Project work and caused them to incur additional costs from delay.

## II. The Claim

Redland submits this claim for additional compensation for costs incurred by its subcontractor, Homestead Paving, and incurred by Redland, as a result of the arbitrary and unreasonable rejection of the first lane of concrete work on the Project. The government imposed unreasonable restrictions that rendered performance literally and/or commercially impossible, and made false and inaccurate representations regarding concrete vibration. Redland seeks to be compensated for this claim for costs relating to the removal and replacement of the first lane of concrete work, for itself and for the use and benefit of Redland's subcontractor, Homestead Paving.

**A. The Forty-Five Minute Concrete Placement Specification is Arbitrary, Unreasonable and Impossible Under the Site Conditions**

The first basis asserted for the concrete rejection is the government's assertion that concrete must be deposited in front of the paver within forty-five minutes of discharge from the mixing drum. This requirement is both impossible as a practical matter and commercially impractical, and is contrary to the representations made by the Owner's representative at the pre-placement meeting. Such an arbitrary and impractical requirement is not enforceable, and the resulting concrete rejection imposes unreasonable additional costs on Redland and on Homestead Paving.

This problem is most vividly illustrated by the concrete truck travel times on the Project. The travel time alone from the hopper at the plant where it is charged into the drum to the site is over thirty (30) minutes, depending on traffic, and this does not include security gate delays that are not within the control of the contractor. The original Project coordination as agreed by the Owner included leaving the gate open closest to FANG (by the Northwest corner of the runway), as well as the gate to the FANG/RAMP so as to expedite concrete delivery. This promised coordination did not occur. As a result, it is effectively impossible for **ANY** contractor to meet the forty five minute requirement within the physical and logistical constraints of the Project. **Such arbitrary government action contrary to good faith performance constitutes active interference in Redland's work, which interference is a violation of the government's contractual obligations.**

Further, as stated in Redland's November 23, 2004 Burgains correspondence, the government is utilizing an outdated and impractical specification. Specification 02754, 3.3 *Concrete Specifications*, 3.3.1, *General Requirements*, should be replaced by the current specification currently utilized by the government at Homestead (*Runway, Taxiway, and Lighting Repair,* Section 03300, 3.5—*Placing Concrete)*, which reads as follows:

> Mixed concrete shall be discharged within 1 and ½ hours or before the mixer drum has revolved 300 revolutions, whichever comes first after the introduction of the mixing water to the cement and aggregates. When the concrete temperature exceeds 85 degrees F, the time shall be reduced to 45 minutes. Concrete shall be placed within 15 minutes after it has been discharged from the transporting unit. Concrete shall be handled from mixer or transporting units to forms in a continuous manner until the approved unit of operation is completed. Adequate scaffolding, ramps and walkways shall be provided so that personnel and equipment are not supported by in-place reinforcement. Placing will not be permitted when the sun, heat, wind, or limitations of facilities furnished by the Contractor prevent proper consolidation, mixing and curing. Sufficient placing capacity shall be provided so that concrete can be kept free of cold joints.

The government clearly recognizes that the more stringent specification used on this Project is impractical and unnecessary. Otherwise, the new revised specification

would not allow such an extended period for concrete placement. In the face of the new, revised specification, the government's insistence on the old forty-five minute placement time, and the government's demand for concrete removal on that basis, is simply arbitrary and unreasonable.

### B. Redland and Homestead Paving Relied on the Government's Representations that Concrete Placement Times Longer Than Thirty Minutes Would be Accepted

During the pre-concrete placement meeting the parties agreed that the allowable concrete discharge time would be ninety minutes, not thirty minutes. Redland and Homestead Paving performed the concrete work in reliance on that representation. It is arbitrary, unreasonable, and bad faith for the government to change its mind on the concrete discharge time during or after the performance of the work.

While the concrete pour was in process, the government observed the concrete pour and informed Redland that the government would accept concrete discharge times of up to sixty minutes (not thirty or ninety), and that the government would "look at everything that exceeds that time." Even at this point, however, the government gave no indication that the concrete would be rejected.

Finally, after the concrete was in place, the government changed its mind again and rejected all of the concrete placed. The government asserts that because the discharge time exceeded thirty minutes, all of the concrete placed must be removed and replaced. The government takes this arbitrary and unreasonable position even though the government indicated that longer discharge times would be acceptable, and even though the government observed the pour and did not insist on the thirty minute discharge time while the pour was ongoing. Redland and Homestead Paving relied on the government's representations, and have been damaged by the government's arbitrary shifting positions. Redland and Homestead Paving are entitled to be compensated for these damages.

### C. Redland and Homestead Paving Conformed to the Vibration Specification

The concrete placed was properly vibrated by the Paver Mounted Vibration Equipment. No concrete was placed without vibration. The government's concerns apparently arose from the fact that the hand operated immersion vibrator was not used in all areas. However, under Specification Section 3.4.1, *Consolidation*, the hand operated immersion vibrator was only required for "small, odd shaped slabs or in locations inaccessible to the paver mounted vibration equipment shall be vibrated with a hand operated immersion vibrator." For all areas of concrete placed, Redland and Homestead Paving used the proper applicable vibration methodology as required by the specifications. Therefore, the government's assertion that the concrete was not properly vibrated is arbitrary, unreasonable, and groundless.

**D. Redland and Homestead Paving Did Not Improperly Add Water to the Concrete**

Specification 02754-15, 3.4.3, *Required Results*, states that "no water, other than true fog sprays, shall be applied to the concrete surface during paving and finishing." The government stated that it observed that water was "added to the mix." This statement is inaccurate.

Standard operating procedure in the industry includes the use of water to "wet down" the concrete chutes. Redland and Homestead followed this standard industry operating procedure after consultation with Redland's engineering and testing firm, Wingerter Laboratories, which observed the placement of concrete and stated that the chute wetting procedure did not compromise the mix design or the integrity of the concrete. Since the chute wetting is a standard industry procedure that is used to maintain and facilitate the concrete mixing process, and since it does not compromise the mix design, the government's rejection of the concrete on that basis is arbitrary, unreasonable and commercially impractical.

**E. The Government Inspectors Did Not Stop the Work**

Specification section 3.11.1, *Testing and Inspection for Contractor Quality Control*, states that "[w]hen, in the opinion of the Contracting Officer, the paving operations are out of control, concrete placement shall cease." Instead, the government here merely instructed that time from batch to placement was to be improved to 60 minutes or less, and if this did not happen, the concrete pour would not be allowed to continue. Only after the concrete was placed did the government arbitrarily decide that the concrete placement procedures were unacceptable, and that the concrete already placed must be removed and replaced. As shown above, such a decision is unreasonable and unjustified.

**F. The Concrete Performance Should Be Measured by the Specified Testing**

Sections A through C of this claim demonstrate that there was no reasonable basis for the government's rejection of the concrete work, and for the demand that the concrete be removed and replaced. Additionally, the government did not exercise its power to stop the work for the performance that is now asserted to be fatally deficient.

Specification 02754-3, 1.4, *Acceptability of Work*, specifies that "[t]he pavement will be accepted on the basis of tests made by the Contractor, or its suppliers, as specified herein. The government may, at its discretion, make check tests to validate the results of the Contractor's testing." Thus, the contract specifically provides the standard for acceptance of the work, which does not include arbitrary after-the-fact rejection based on unreasonable or misinterpreted contract provisions.

Based on these facts, the proper measurement for the acceptability of the concrete work is the specified contract testing criteria. Since the concrete meets all specified testing and performance requirements, it must be considered to be acceptable, and the government must therefore bear all costs relating to the arbitrary and unreasonable removal and replacement of the rejected concrete.

**III. Claim Amount (see Exhibit 1 for Complete Detail)**

| | |
|---|---|
| **Labor and Burden (Homestead Paving)** | **$ 4,522.36** |
| **Concrete** | **$23,180.86** |
| **Other Materials** | **$ 2,654.72** |
| **Concrete Cutting (Speedy Concrete Cutting)** | **$ 1,015.00** |
| **Core Testing (Wingerter Laboratories)** | **$ 5,400.00** |
| **Consulting (Felix A. Peguero Guerroro PE)** | **$ 4,762.50** |
| **Demolition Back Charge (Redland)** | **$18,648.74** |
| **Legal Fees** | **$ 2,961.75** |
| **Gross Profit 18% based on financials** | **$13,861.30** |
| ***Eichleay* Extended Home Office OH (5 days @ $1,258.98)** | **$ 6,294.90** |
| **Schwebke-Shishkin & Associates, Inc.** | **$ 2,200.00** |
| **Redland (Project Manager)** | **$ 2,700.00** |
| **Allowable Mark-up (OH, Profit, Bond)** | **$15,435.37** |
| **Total** | **$103,637.50** |

# CERTIFICATION OF CLAIM

| | | |
|---|---|---|
| **RE:** | **Contract No.:** | **FA6648-01-C0001** |
| | **Project No.:** | **KYJM 99-9037** |
| | **Titled:** | **Mill/ Overlay Asphalt Ramp, FANG** |
| | **TRC No.:** | **20-44/4-024** |
| | **RFCO No.** | **09** |
| | **Claim No.** | **03** |

I certify that the claim is made in good faith; that the supporting data are accurate and complete to the best of my knowledge and belief; that the amount requested accurately reflects the contract adjustment for which the Contractor believes the Government is liable; and that I am duly authorized to certify the claim on behalf of the Contractor.

The Redland Company, Inc. notes that to the extent that this claim is being filed by our subcontractor and inasmuch as they do not have contract privity with you, we are acting as a conduit on their behalf in this matter. We do not have access to their books and records and, therefore, cannot make any statement with respect to the amount of their claim. However, we have no reason to believe that their cost figures and delay estimates are incorrect.

**James A. Easom**
**Vice President**
**The Redland Company, Inc.**

# EXHIBIT 1

# Revised Claim for RFCO No. 9

The Redland Company, Inc.
Mill/Overlay Asphalt Ramp FANG
HARB, FL
TRC Project No.: 20-44; 4-024
RFCO No.: 09 Claim
REVISED

| Item | Quantity | Unit | | Unit Price | Amount |
|---|---|---|---|---|---|
| Material/Other | | | | | |
| | | | | $0.00 | $0.00 |
| | | | | | $0.00 |
| | | | | | $0.00 |
| | | | | | $0.00 |
| | | | Subtotal: | | $0.00 |
| | | | Tax (7.0%): | | $0.00 |
| | | | Total Material: | | $0.00 |
| Subcontract | | | | | |
| Schwebke-Shishkin & Associates, Inc | 2 | ls | | $1,100.00 | $2,200.00 |
| Homestead Paving Claim | 1 | ls | | $83,302.13 | $83,302.13 |
| | | | | | $0.00 |
| | | | | | $0.00 |
| | | | Total Subcontract: | | $85,502.13 |
| Labor | | | | | |
| Project Manager (Redland) for concrete replacement | 24 | hr | | $75.00 | $1,800.00 |
| | | | | | $0.00 |
| | | | | | $0.00 |
| | | | | | $0.00 |
| | | | | | $0.00 |
| | | | | | $0.00 |
| | | | | | $0.00 |
| | | | Subtotal: | | $1,800.00 |
| | Overtime Factor: | | | 1.0 | $1,800.00 |
| | | | Subtotal: | | $1,800.00 |
| | Labor Burden: | | | 50.00% | $900.00 |
| | | | Total Labor: | | $2,700.00 |
| Equipment | | | | | |
| | | | | | $0.00 |
| | | | | | $0.00 |
| | | | | | $0.00 |
| | | | | | $0.00 |
| | | | | | $0.00 |
| | | | | | $0.00 |
| | | | Total Equipment: | | $0.00 |
| Subtotal Material, Subcontract, Labor, and Equipment: | | | | | $88,202.13 |
| Allowable Markup (6% OH + 10% Profit + 1.5% Bond) | | | | 17.50% | $15,435.37 |
| | | | TOTAL: | | $103,637.50 |

8/10/2006
3:35 PM
P:\2004\4-024\Owner\RFCO\4-024_RFCO_09_Claim_Rev_01'.xls

3/1/2006 9:26 AM

**Homestead Paving Co., Inc.**
**Analysis HARB Job # 05-016**

| | | | | | |
|---|---|---|---|---|---|
| Labor & burden (includes payroll taxes and workers' comp) | | P/R Week Ending date | | | |
| Preparation and set forms- replacement lane | | 12/21/2004 | | 1,566.96 | |
| Install replacement lane | | 12/28/2004 | | 2,955.40 | |
| | | | | | 4,522.36 |
| Concrete | | | | | |
| Replacement lane | CSR America | 12/22/04 | 9405273086 | 11,960.24 | |
| Replacement lane | CSR America | 12/29/04 | 9405310085 | 11,220.62 | |
| | | | | | 23,180.86 |
| Other materials | | | | | |
| Dowels | John Abell Corp | 10/20/04 | 319384 | 1,775.66 | |
| Tie Down Rods | B & K Installations | 10/29/04 | 0008934-IN | 293.30 | |
| Wood Shim Shingles | MCR Lumber | 11/01/04 | 170476 | 52.16 | |
| Curing Compound | John Abell Corp | 11/03/04 | 321365 | 371.50 | |
| Miscellaneous materials | John Abell Corp | 11/03/04 | 321469 | 162.10 | |
| | | | | | 2,654.72 |
| Concrete cutting: | Speedy Concrete Cutting | 12/14/04 | 0052526-IN | | 1,015.00 |
| Core Testing | Wingerter Laboratories | 12/31/04 | 51531 | | 5,400.00 |
| Consulting | Felix A. Peguero Guerrero PE | 12/29/04 | PE-04001 | | 4,762.50 |
| Demolition back charge (The Redland Company) | | | | | 18,648.74 |
| Legal fees | | | | | 2,961.75 |
| | | | Subtotal | | 63,145.93 |
| Gross profit @ 18% based on fiscal year company financial statements | | | | | 13,861.30 |
| | | | | | 77,007.23 |
| Extended home office overhead based on Eichleay formula | 5 days @ | $ 1,258.98 | | | 6,294.90 |
| | | | | | 83,302.13 |

O:\Wayne's folder\HARB 05-016\Replacement lane installation 3.01.06\

Original Claim Documentation for
RFCO NO. 9

August 22, 2005

Via: Federal Express

**Mr. Henry Burgains**
**OPERATIONAL CONTRACTING OFFICE**
**482ND LSS/LGC**
**29050 Coral Sea Blvd., Box 50**
**Homestead AFR, Fl. 33039-1299**

| | | |
|---|---|---|
| **RE:** | **Contract No:** | **FA6648-01-C0001** |
| | **Project No:** | **KYJM 99-9037** |
| | **Titled:** | **Mill/Overlay Asphalt Ramp, FANG** |
| | **TRC No:** | **4-024** |

**SUBJECT: RFCO No. 9/Claim No. 02**

Dear Mr. Burgains:

This letter transmits The Redland Company, Inc.'s ("Redland"/"Contractor") claim for the removal and replacement of the outer lane concrete tie down surface on its Homestead Asphalt Ramp Project No. KYJM 99-9037, Contract No. FA6648-01-C001, RFCO No. 09, Claim No. 2, in the amount of $122,148.96

Thank you for your attention to this matter.

Sincerely,
**THE REDLAND COMPANY, INC.**

Steven T, Pfoh
Project Manager

Cc: TRC distribution

P:\2004\4-024\Owner\Letters to Owner\4-024_Owner_Letter_54.doc

# CERTIFICATION OF CLAIM

RE: **Contract No: FA6648-01-C0001**
**Project No: KYJM 99-9037**
**Titled: Mill/Overlay Asphalt Ramp, FANG**
**TRC No: 20-44/4-024**

I certify that the claim is made in good faith; that the supporting data are accurate and complete to the best of my knowledge and belief; that the amount requested accurately reflects the contract adjustment for which the Contractor believes the Government is liable; and that I am duly authorized to certify the claim on behalf of the Contractor.

**Steven T. Pfoh**
**Project Manager**
**The Redland Company, Inc.**

The Redland Company, Inc.
Mill/Overlay Asphalt Ramp FANG
HARB, FL
TRC Project No.: 20-44; 4-024
RFCO No.: 09 Claim

| Item | Quantity | Unit | | Unit Price | Amount |
|---|---|---|---|---|---|
| Material/Other | | | | | |
| | | | | $0.00 | $0.00 |
| | | | | | $0.00 |
| | | | | | $0.00 |
| | | | | | $0.00 |
| | | | Subtotal: | | $0.00 |
| | | | Tax (7.0%): | | $0.00 |
| | | | Total Material: | | $0.00 |
| Subcontract | | | | | |
| Schwebke-Shishkin & Associates, Inc | 2 | ls | | $1,100.00 | $2,200.00 |
| Homestead Paving Claim | 1 | ls | | $99,056.56 | $99,056.56 |
| | | | | | $0.00 |
| | | | | | $0.00 |
| | | | Total Subcontract: | | $101,256.56 |
| Labor | | | | | |
| Project Manager (Redland) for concrete replacemer | 24 | hr | | $75.00 | $1,800.00 |
| | | | | | $0.00 |
| | | | | | $0.00 |
| | | | | | $0.00 |
| | | | | | $0.00 |
| | | | | | $0.00 |
| | | | | | $0.00 |
| | | | Subtotal: | | $1,800.00 |
| Overtime Factor: | | | | 1.0 | $1,800.00 |
| | | | Subtotal: | | $1,800.00 |
| Labor Burden: | | | | 50.00% | $900.00 |
| | | | Total Labor: | | $2,700.00 |
| Equipment | | | | | |
| | | | | | $0.00 |
| | | | | | $0.00 |
| | | | | | $0.00 |
| | | | | | $0.00 |
| | | | | | $0.00 |
| | | | | | $0.00 |
| | | | Total Equipment: | | $0.00 |
| Subtotal Material, Subcontract, Labor, and Equipment: | | | | | $103,956.56 |
| Allowable Markup (6% OH + 10% Profit + 1.5% Bond) | | | | 17.50% | $18,192.40 |
| | | | TOTAL: | | $122,148.96 |

8/19/2005
11:49 AM
P:\2004\4-024\Owner\RFCO\4-024_RFCO_09_Claim.xls

**Homestead Paving Co., Inc.**
**Analysis HARB Job # 05-016**

3/2/2005 10:58 AM

| | | | | | |
|---|---|---|---|---|---|
| Labor & burden (includes payroll taxes and workers' comp) | | P/R Week Ending date | | | |
| Original lane set forms | | 11/5/2004 | | 1,138.88 | |
| Original lane pour | | 11/9/2004 | | 2,226.67 | |
| Remove forms | | 12/14/2004 | | 307.14 | |
| Preparation and set forms- replacement lane | | 12/21/2004 | | 1,566.96 | |
| Install replacement lane | | 12/28/2004 | | 2,955.40 | |
| | | | | | 8,195.05 |
| Concrete | | | | | |
| Original pour | RMC Florida Group | 11/04/04 | 709943 | 9,245.94 | |
| Replacement lane | CSR America | 12/22/04 | 9405273086 | 11,960.24 | |
| Replacement lane | CSR America | 12/29/04 | 9405310085 | 11,220.62 | |
| | | | | | 32,426.80 |
| Other materials | | | | | |
| Dowels | John Abell Corp | 10/20/04 | 319384 | 1,775.66 | |
| Tie Down Rods | B & K Installations | 10/29/04 | 0008934-IN | 293.30 | |
| Wood Shim Shingles | MCR Lumber | 11/01/04 | 170476 | 52.16 | |
| Curing Compound | John Abell Corp | 11/03/04 | 321365 | 371.50 | |
| Miscellaneous materials | John Abell Corp | 11/03/04 | 321469 | 162.10 | |
| | | | | | 2,654.72 |
| Concrete cutting: | Speedy Concrete Cutting | 12/14/04 | 0052528-IN | | 1,015.00 |
| Core Testing | Wingerter Laboratories | 12/31/04 | 51531 | | 5,400.00 |
| Consulting | Felix A. Peguero Guerrero PE | 12/29/04 | PE-04001 | | 4,762.50 |
| Demolition back charge (The Redland Company) | | | | | 18,648.74 |
| Legal fees | | | | | 2,961.75 |
| | | Subtotal | | | 76,064.56 |
| Gross profit @ 18% based on fiscal year company financial statements | | | | | 16,697.10 |
| | | | | | 92,761.66 |
| Extended home office overhead based on Eichleay formula 5 days @ $ 1,258.98 | | | | | 6,294.90 |
| | | | | | 99,056.56 |

THE Redland COMPANY INC.

ce: (305) 247 3226 23799 S.W. 167 Avenue • Homestead, Florida 33031 Fax: (305) 247-175

# MEMO

DATE: November 4, 2004

Via Fax: (305) 258-2267
& U.S. Mail

TO: Homestead Paving

ATTN: Mike Rhodes

FROM: James A. Easom

RE: HARB Mill/Overlay FANG
TRC Project No.: 20-44 (Old #)
TRC Project No.: 4-024 (New #)

SUBJECT: Specification for Timing of Concrete Placement

Dear Mike:

As discussed previously today, the Engineer is concerned about the placement time of the concrete with respect to Specification 02754-14, Section 3.3.1 General Requirements. A copy of this section, which you are already in receipt of, is attached and clouded.

What will be done to ensure this specification is adhered to in upcoming pours?

If these areas are rejected by the Government/Engineer, how do you differentiate where each load was placed in case you must perform selective replacement? Please provide a remediation plan.

What tests can be done to convince the Government/Engineer that the concrete placed beyond the 45 minute requirement is acceptable?

Sincerely,
THE REDLAND COMPANY, INC.

James A. Easom
Estimating and Project Management

Cc: TRC distribution

## 3.3 CONCRETE PRODUCTION

### 3.3.1 General Requirements

Concrete shall be deposited in front of the paver within 45 minutes from the time cement has been charged into the mixing drum, except that if the ambient temperature is above 90 degrees F, the time shall be reduced to 30 minutes. Every load of concrete delivered to the paving site shall be accompanied by a batch ticket from the operator of the batching plant. Tickets shall show at least the mass, or volume, of all ingredients in each batch delivered, the water meter and revolution meter reading on truck mixers and the time of day. Tickets shall be delivered to the placing foreman who shall keep them on file and deliver them to the Government daily.

### 3.3.2 Transporting and Transfer-Spreading Operations

~~Non-agitating equipment shall be used only on smooth roads and for haul time less than 15~~ minutes. Equipment shall be allowed to operate on the underlying material only if no damage is done to the underlying material and its degree of compaction. Any disturbance to the underlying material that does occur shall be corrected before the paver-finisher reaches the location of the disturbance and the equipment shall be replaced or procedures changed to prevent any future damage. Additional water may be added to truck mixers to bring the slump within the specified range provided the mixture water-cement ratio is not exceeded.

## 3.4 PAVING

Pavement shall be constructed with paving and finishing equipment utilizing fixed forms or slipforms.

### 3.4.1 Consolidation

The paver vibrators shall be inserted into the concrete not closer to the underlying material than 2 inches. The vibrators or any tamping units in front of the paver shall be automatically controlled so that they shall be stopped immediately as forward motion ceases. Excessive vibration shall not be permitted. Concrete in small, odd-shaped slabs or in locations inaccessible to the paver mounted vibration equipment shall be vibrated with a hand-operated immersion vibrator. Vibrators shall not be used to transport or spread the concrete.

### 3.4.2 Operation

When the paver is operated between or adjacent to previously constructed pavement (fill-in lanes), provisions shall be made to prevent damage to the previously constructed pavement, including keeping the existing pavement surface free of any debris, and placing rubber mats beneath the paver tracks. Transversely oscillating screeds and extrusion plates shall overlap the existing pavement the minimum possible, ~~but~~ in no case more than 8 inches.

P. 01

# DEPARTMENT OF THE AIR FORCE

AIR FORCE RESERVE COMMAND

8 Nov 04

MEMORANDUM FOR THE REDLAND COMPANY, INC.
ATTENTION: JAMES A. EASOM
23799 S.W. 167 AVE.
Homestead, Florida 33031

FROM: Operational Contracting Office
482nd CONF/LGC
29050 Coral Sea Blvd, Box 50
Homestead ARB, FL 33039-1299

SUBJECT: Contract Number FA6648-01-C0001, Mill/Overlay Asphalt Ramp FANG
Project Number KYJM 99-9037

RE: Rejection of Concrete Work

1. You are hereby notified that IAW with FAR Clause 52.246 –12 Inspection of Construction the government is rejecting the first lane of concrete work poured on 04 Nov 04 (i.e., the lane poured nearest to the FANG Alert Shelter, Bldg. 877). The concrete work failed to meet the requirements of contract specification 02754. Following are noted discrepancies in the Concrete Production portion of the contract specification:

a. Page 02754-14, 3.3.1 General Requirements "Concrete shall be deposited in front of the paver within 45 minutes from the time cement has been charged into the mixing drum, except that if the ambient temperature is above 90 degrees F, the time shall be reduced to 30 minutes. Numerous delivery tickets reflect times well in excess of the specified 45-minute requirement.

b. Page 02754-14, 3.4.1 Consolidation " The pave "vibrator" shall be inserted into the concrete not closer to the underlying material than 2 inches. The vibrators or any tampering units in front of the paver shall be automatically controlled so that they shall be stopped immediately as forward motion ceases. Excessive vibration shall not be permitted. Concrete in small, odd-shaped slabs or in locations inaccessible to the paver mounted vibration equipment shall be vibrated with hand-operated immersion vibrator. Vibrators shall not be used to transport or spread the concrete". The government observed sections of the concrete being poured with no vibration.

c. Page 02754-15, 3.4.3 Required Results " No water, other than true fog sprays (mist), shall be applied to the concrete surface during paving and finishing". The government observed workers adding water to the mix, after being instructed by the government not to do so.

2. No additional concrete work shall be placed until all rejected concrete as described in paragraph 1 has been removed and replaced with concrete meeting the specifications.

3. The above discrepancies indicate improvement to your quality control system and are required to insure work performed conforms to contract requirements FAR Clause 52-246-12 (b) Inspection of Construction.

4. Please provide the government with a written reply of the corrective action being taken by your company on the noted discrepancies not later than 18 Nov 04.

5. If you have any questions concerning the above, please contact the undersigned at 305-224-7406.

HENRY BURGAINS
Contracting Officer

THE Redland COMPANY INC.

Office: (305) 247-3226 23799 S.W. 167 Avenue • Homestead, Florida 33031 Fax: (305) 247-17

November 11, 2004

Via: U.S. Mail and Fax

Mr. Henry Burgains
OPERATIONAL CONTRACTING OFFICE
482ND LSS/LGC
29050 Coral Sea Blvd., Box 50
Homestead AFR, Fl. 33039-1299

RE: Contract No: FA6648-01-C0001
Project No: KYJM 99-9037
Titled: Mill/Overlay Asphalt Ramp, FANG
TRC No: 4-024

SUBJECT: Rejection of Concrete Work

Dear Mr. Burgains,

We are in receipt of your letter dated 8 Nov 04, RE: Rejection of Concrete Work, and disagree with its contents entirely. Our firm's position is that the finish product will meet all contract requirements as specified and as outlined in Specification Section 02754, *CONCRETE PAVEMENT FOR SMALL PROJECTS*, Subsection 1.4, *ACCEPTABILITY OF WORK*, *"The Pavement will be accepted on the basis of tests made by the Contractor or its supplier, as specified herein. The Government may, at its discretion, make check tests to validate the results of the Contractors testing...."*

Further, we add the following to each of your outlined bullets;

1. *A. – Numerous delivery tickets reflect times well in excess of the specified 45 – minute requirement.* - A pre concrete pavement placement meeting was held in advance where it was stated to all who were attending and agreed upon, that the time allowed was 90 Minutes.

   During the course of the pour and after the placement time that was previously stated as 90 minutes, it was conveyed to me and James Easom that the time for placement in front of the paver was going to be accepted up to 60 minutes and "we will look at everything that exceeds that time". This was stated after more than half of the 1st bay that is referenced in your letter was placed.

(Continued on page 2)

In preparation for the installation of the concrete tie down pads, we scheduled concrete and placement times well in advance of the concrete pour as well as with the Government and the security personnel required for the timely access in all attempts to comply with this unreasonable specification. The travel time from the hopper at the plant where it is "charged into the drum" is well in access of 30 minutes by concrete truck depending on traffic to the Air Base which does not include the security gate delays that were encountered all which is beyond the control of the contractor. It was further coordinated that the gate closest to the FANG, by the NW corner of the runway, was to remain open as well as the gate to the FANG/RAMP so as not to add additional undue delay to the delivery of the concrete truck placement of material in front of the paver. This scheduled activity did not happen as was to the stated regret of SGT Moore after his return from his untimely absence.

*B. – The Government observed sections of the concrete being poured with no vibration.* All concrete placed to date was vibrated by the Paver Mounted Vibration Equipment. There are no areas placed that did not receive vibration. What the Government witnessed was that the hand operated immersion vibrator was not used in all areas and as there are not any "odd-shaped slabs" or any "locations inaccessible to the Paver Mounted Vibration Equipment". This observation is by contract not applicable.

*C. – The Government observed workers adding water to the mix, after being instructed by the government not to do so.* – At no time was water added to the mix of the concrete. What was witnessed was water being used to "wet down the shute" which is standard operating procedures for all concrete trucks and after consultation with our Engineering and testing firm, and there witnessed presence while placement of the concrete occurred, Wingerter Laboritories Inc., stated that there was no compromise of the mix design or the integrity of the concrete.

At no time was the concrete placement of the Tie down pads directed to cease in accord with specification section 3.11.1, *TESTING AND INSPECTION FOR CONTRACTOR QUALTY CONTROL (CQC) – "When, in the opinion of the Contracting Officer, the paving operation is out of control, concrete placement shall cease.* It was only stated that the quality control time from batch to placement was to be improved to 60 minutes or less, and if this did not happen they would not allow the pour to continue.

The Contractor intends to comply with the specified quality control required and will provide adequate documentation to substantiate that the concrete placed to date meets all required performance criteria. The contractor believes the concrete placed should remain in place and the subsequent concrete placement should commence.

(Continued on Page 3)

After providing our written response to your initial rejection we ask that you review the sequences of events that have transpired and from that review we respectfully request that your final decision is forwarded in writing within 24 hours from receipt of this letter as our delay still continues.

Sincerely,
THE REDLAND COMPANY, INC.

Steven L. Pfoh
Project Manager
Cc: TRC distribution

DEPARTMENT OF THE AIR FORCE

AIR FORCE RESERVE

18 Nov 04

MEMORANDUM FOR THE REDLAND COMPANY, INC.
ATTENTION: JAMES A. EASOM
23799 S.W. 167 AVE
Homestead, Florida 33031

FROM: Operational Contracting Office
482nd CONF/LGC
29050 Coral Sea Blvd, Box 50
Homestead ARB, FL 33039-1299

SUBJECT: Contract Number FA6648-01-C0001, Mill/Overlay Asphalt Ramp FANG
Project Number KYJM 99-9037

In response to Redland Company letter dated 11 Nov 04.

1. The Contracting Officer has rendered his final decision. You are hereby notified that IAW with FAR Clause 52.246 –12 Inspection of Construction the government is rejecting the first lane of concrete work poured on 04 Nov 04 (i.e., the lane poured nearest to the FANG Alert Shelter, Bldg. 877). The concrete work failed to meet the requirements of contract specification 02754 for the reasons in my letter dated 08 Nov 04. Therefore, it is the Government's decision to reject the entire lane one concrete pour.

2. No additional concrete work shall be placed until all rejected concrete as described in paragraph 1 has been removed and replaced with concrete meeting the specifications.

3. Please provide the government with a written reply of the corrective action being taken by your company on the noted discrepancies not later than 22 Nov 04.

4. If you have any questions concerning the above, please contact the undersigned at 305-224-7406.

HENRY BURGAINS
Contracting Officer

THE Redland COMPANY INC.

Office: (305) 247-3226 23799 S.W. 167 Avenue • Homestead, Florida 33031 Fax: (305) 247-17

November 19, 2004

**Via: U.S. Mail and Fax**

**Mr. Henry Burgains**
**OPERATIONAL CONTRACTING OFFICE**
**482ND LSS/LGC**
**29050 Coral Sea Blvd., Box 50**
**Homestead AFR, FL 33039-1299**

**RE:** **Contract No: FA6648-01-C0001**
**Project No: KYJM 99-9037**
**Titled: Mill/Overlay Asphalt Ramp, FANG**
**TRC No: 4-024**

**SUBJECT: Response to Government Letter dated 18 Nov 04**

Dear Mr. Burgains,

Please consider this as the Contractor's response to the Government's letter dated 18 Nov 04 regarding the Contracting Officer's final decision to reject the concrete pavement completed adjacent to the existing concrete pavement east of the FANG hanger and to direct the Contractor to remove and replace such concrete.

The Contractor maintains its position that the concrete pavement has been reasonably constructed per the Contract requirements. However, the Contractor will proceed as directed by the Government to replace such concrete.

Removal of the concrete pavement will begin as soon as possible. Replacement will follow some time thereafter. Construction means and methods will be similar to efforts already represented. Water will not be added to the mix beyond as called for in the Contract Specifications. Vibration during concrete placement will be performed as required in the Contract Specifications. Discharge of the concrete mix from the delivery trucks will be completed as previously discussed which may exceed the unreasonable time stated in the Contract Specifications of 45 minutes. Please ensure security does not delay the delivery trucks as before. Quality Control testing will be implemented as before.

Be advised that the initial testing of the concrete placed to date by the Contractor's Quality Control team has been found to meet and/or exceed the early expected test strengths. The

*(Continued on Page 2)*

Contractor is certain that the Quality Control testing per the Contract Specifications will prove to show that the concrete pavement placed thus far is in conformance with the Contract Specifications for acceptability. As such, the Contractor will be submitting a Claim for additional costs due to the direction received today from the Government. The Claim will seek compensation from the Government for any and all additional direct costs, indirect costs, fees, damages, and delays attributed to this additional work which the Contractor is proceeding with per direction from the Government.

Sincerely,
THE REDLAND COMPANY, INC.

James A. Easom
Estimating and Project Management

Cc: Mike Rhodes, Homestead Paving (via fax: 305-258-2267)
TRC distribution

THE Redland COMPANY INC.

Office: (305) 247-3226 23799 S.W. 167 Avenue • Homestead, Florida 33031 Fax: (305) 247-175

November 23, 2004

Via: U.S. Mail and Fax

Mr. Henry Burgains
OPERATIONAL CONTRACTING OFFICE
482ND LSS/LGC
29050 Coral Sea Blvd., Box 50
Homestead AFR, Fl. 33039-1299

RE: Contract No: FA6648-01-C0001
Project No: KYJM 99-9037
Titled: Mill/Overlay Asphalt Ramp, FANG
TRC No: 4-024

SUBJECT: . Request for Specification revision

Dear Mr. Burgains,

The Redland Company Inc, respectfully request that the outdated specification *02754, 3.3 CONCRETE PRODUCTIONS, 3.3.1 – General Requirements*, be replaced by the revised current specification that the Government is currently utilizing dated 11/01, *Runway, Taxiway and Lighting Repair, section 03300, 3.5 – PLACING CONCRETE.*

The trip time from the plant where it is batched is in excess of 30 minutes alone by concrete truck and that is not including any other unforeseeable delays that the supplier might incur while in transit as well as what may incur on the Air Base Property.

Sincerely,
THE REDLAND COMPANY, INC.

Steven T. Pfohl
Project Manager

Cc: Mike Rhodes, Homestead Paving (via fax: 305-258-2267)
TRC distribution

P:\2004\4-024\Owner\Letters to Owner\4-024_Owner_Letter_36.doc

# HOMESTEAD PAVING COMPANY, INC.

14550 Mable Street, Naranja, Florida 33032
Phone: 305-258-1972 FAX: 305-258-2267
Web Site: www.homesteadpaving.com

11/19

*Quality and Service First*

Steve,
HPC would request that the Specification on time requirements for the placement of concrete in Section 02754, 3.3 Concrete Production, 3.3.1 General Requirements be updated to the time requirements of Specifications for Runway, Taxiway and Lighting Repairs Homestead ARB, Dated, 11/01. Section 0300, Section 3.5 Placing Concrete, which allows for the concrete to be delivered and placed within 90 min.

Respectfully,

Michael Rhodes

3.4.2 Transfer Hoppers

Concrete may be charged into nonagitating hoppers for transfer to other conveying devices. Transfer hoppers shall be capable of receiving concrete directly from delivery vehicles and shall have conical-shaped discharge features. The transfer hopper shall be equipped with a hydraulically operated gate and with a means of external vibration to effect complete discharge. Concrete shall not be held in nonagitating transfer hoppers more than 30 minutes.

3.4.3 Trucks

Truck mixers operating at agitating speed or truck agitators used for transporting plant-mixed concrete shall conform to the requirements of ASTM C 94/C 94M. Nonagitating equipment shall be used only for transporting plant-mixed concrete over a smooth road and when the hauling time is less than 15 minutes. Bodies of nonagitating equipment shall be smooth, watertight, metal containers specifically designed to transport concrete, shaped with rounded corners to minimize segregation, and equipped with gates that will permit positive control of the discharge of the concrete.

3.4.4 Chutes

When concrete can be placed directly from a truck mixer, agitator, or nonagitating equipment, the chutes normally attached to this equipment by the manufacturer may be used. A discharge deflector shall be used when required by the Contracting Officer. Separate chutes and other similar equipment will not be permitted for conveying concrete.

3.4.5 Belt Conveyors

Belt conveyors shall be designed and operated to assure a uniform flow of concrete from mixer to final place of deposit without segregation of ingredients or loss of mortar and shall be provided with positive means, such as discharge baffle or hopper , for preventing segregation of the concrete at the transfer points and the point of placing. Belt conveyors shall be constructed such that the idler spacing shall not exceed 36 inches. The belt speed shall be a minimum of 300 feet per minute and a maximum of 750 feet per minute. If concrete is to be placed through installed horizontal or sloping reinforcing bars, the conveyor shall discharge concrete into a pipe or elephant truck that is long enough to extend through the reinforcing bars.

3.4.6 Concrete Pumps

Concrete may be conveyed by positive displacement pump when approved. The pumping equipment shall be piston or squeeze pressure type; pneumatic placing equipment shall not be used. The pipeline shall be rigid steel pipe or heavy-duty flexible hose. The inside diameter of the pipe shall be at least 3 times the nominal maximum-size coarse aggregate in the concrete mixture to be pumped but not less than 4 inches. Aluminum pipe shall not be used.

3.5 PLACING CONCRETE

Mixed concrete shall be discharged within 1-1/2 hours or before the mixer drum has revolved 300 revolutions, whichever comes first after the introduction of the mixing water to the cement and aggregates. When the concrete temperature exceeds 85 degrees F, the time shall be reduced to 45

minutes. Concrete shall be placed within 15 minutes after it has been discharged from the transporting unit. Concrete shall be handled from mixer or transporting unit to forms in a continuous manner until the approved unit of operation is completed. Adequate scaffolding, ramps and walkways shall be provided so that personnel and equipment are not supported by in-place reinforcement. Placing will not be permitted when the sun, heat, wind, or limitations of facilities furnished by the Contractor prevent proper consolidation, finishing and curing. Sufficient placing capacity shall be provided so that concrete can be kept free of cold joints.

3.5.1 Depositing Concrete

Concrete shall be deposited as close as possible to its final position in the forms, and there shall be no vertical drop greater than 5 feet except where suitable equipment is provided to prevent segregation and where specifically authorized. Depositing of the concrete shall be so regulated that it will be effectively consolidated in horizontal layers not more than 12 inches thick, except that all slabs shall be placed in a single layer. Concrete to receive other construction shall be screeded to the proper level. Concrete shall be deposited continuously in one layer or in layers so that fresh concrete is deposited on in-place concrete that is still plastic. Fresh concrete shall not be deposited on concrete that has hardened sufficiently to cause formation of seams or planes of weakness within the section. Concrete that has surface dried, partially hardened, or contains foreign material shall not be used. When temporary spreaders are used in the forms, the spreaders shall be removed as their service becomes unnecessary. Concrete shall not be placed in slabs over columns and walls until concrete in columns and walls has been in-place at least two hours or until the concrete begins to lose its plasticity. Concrete for beams, girders, brackets, column capitals, haunches, and drop panels shall be placed at the same time as concrete for adjoining slabs.

3.5.2 Consolidation

Immediately after placing, each layer of concrete shall be consolidated by internal vibrators, except for slabs 4 inches thick or less. The vibrators shall at all times be adequate in effectiveness and number to properly consolidate the concrete; a spare vibrator shall be kept at the jobsite during all concrete placing operations. The vibrators shall have a frequency of not less than 10,000 vibrations per minute, an amplitude of at least 0.025 inch, and the head diameter shall be appropriate for the structural member and the concrete mixture being placed. Vibrators shall be inserted vertically at uniform spacing over the area of placement. The distance between insertions shall be approximately 1-1/2 times the radius of action of the vibrator so that the area being vibrated will overlap the adjacent just-vibrated area by a reasonable amount. The vibrator shall penetrate rapidly to the bottom of the layer and at least 6 inches into the preceding layer if there is such. Vibrator shall be held stationary until the concrete is consolidated and then vertically withdrawn slowly while operating. Form vibrators shall not be used unless specifically approved and unless forms are constructed to withstand their use. Vibrators shall not be used to move concrete within the forms. Slabs 4 inches and less in thickness shall be consolidated by properly designed vibrating screeds or other approved technique. Excessive vibration of lightweight concrete resulting in segration or flotation of coarse aggregate shall be prevented. Frequency and amplitude of vibrators shall be determined in accordance with COE CRD-C 521. Grate tampers ("jitterbugs") shall not be used.

P. 1

* * * COMMUNICATION RESULT REPORT ( NOV. 23. 2004 5:49PM ) * * *

FAX HEADER:

TRANSMITTED/STORED : NOV. 23. 2004 5:42PM

| FILE | MODE | OPTION | ADDRESS | RESULT | PAGE |
|---|---|---|---|---|---|
| 36 | MEMORY TX | | 2052247055 | OK | 4/4 |

REASON FOR ERROR
E-1) HANG UP OR LINE FAIL
E-3) NO ANSWER
E-2) BUSY
E-4) NO FACSIMILE CONNECTION

THE Redland COMPANY INC.

Office: (305) 247-3225 23799 S.W. 167 Avenue • Homestead, Florida 33031 Fax: (305) 247-1

November 23, 2004

Via: U.S. Mail and Fax

Mr. Henry Burgains
OPERATIONAL CONTRACTING OFFICE
482ND LSS/LGC
29050 Coral Sea Blvd., Box 50
Homestead AFR, FL 33039-1299

**RE:** **Contract No:** **FA6648-01-C0001**
**Project No:** **KYJM 99-9037**
**Titled:** **Mill/Overlay Asphalt Ramp, FANG**
**TRC No:** **4-024**

**SUBJECT:** **Request for Specification revision**

Dear Mr. Burgains,

The Redland Company Inc, respectfully request that the outdated specification *02754, 3.3 CONCRETE PRODUCTIONS, 3.3.1 – General Requirements,* be replaced by the revised current specification that the Government is currently utilizing dated 11/01, *Runway, Taxiway and Lighting Repair, section 03300, 3.5 – PLACING CONCRETE.*

The trip time from the plant where it is batched is in excess of 30 minutes alone by concrete truck and that is not including any other unforeseeable delays that the supplier might incur while in transit as well as what may incur on the Air Base Property.

Sincerely,
THE REDLAND COMPANY, INC.

Steven F. Piloti
Project Manager

Cc: Mike Rhodes, Homestead Paving (via fax: 305-258-2267)
TRC distribution

P:\2004\4-024\Owner\Letters to Owner\4-024_Owner_Letter_36.doc

P. 1

* * * COMMUNICATION RESULT REPORT ( NOV. 23. 20_ 5:52PM ) * * *

FAX HEADER:

TRANSMITTED/STORED : NOV. 23. 2004 5:48PM

| FILE MODE | OPTION | ADDRESS | RESULT | PAGE |
|---|---|---|---|---|
| 37 MEMORY TX | | 3052582267 | OK | 4/4 |

REASON FOR ERROR
E-1) HANG UP OR LINE FAIL
E-3) NO ANSWER
E-2) BUSY
E-4) NO FACSIMILE CONNECTION

THE Redland COMPANY INC.

Office: (305) 247-3226 23799 S.W. 167 Avenue • Homestead, Florida 33031 Fax: (305) 247-1_

November 23, 2004 Via: U.S. Mail and Fax

Mr. Henry Burgains
OPERATIONAL CONTRACTING OFFICE
482ND LSS/LGC
29050 Coral Sea Blvd., Box 50
Homestead AFR, Fl. 33039-1299

RE: Contract No: FA6648-01-C0001
Project No: KYJM 99-9037
Titled: Mill/Overlay Asphalt Ramp, FANG
TRC No: 4-024

SUBJECT: Request for Specification revision

Dear Mr. Burgains,

The Redland Company Inc, respectfully request that the outdated specification *02754, 3.3 CONCRETE PRODUCTIONS, 3.3.1 – General Requirements*, be replaced by the revised current specification that the Government is currently utilizing dated 11/01, *Runway, Taxiway and Lighting Repair, section 03300, 3.5 – PLACING CONCRETE.*

The trip time from the plant where it is batched is in excess of 30 minutes alone by concrete truck and that is not including any other unforeseeable delays that the supplier might incur while in transit as well as what may incur on the Air Base Property.

Sincerely,
THE REDLAND COMPANY, INC.

Steven T. Pfohl
Project Manager

Cc: Mike Rhodes, Homestead Paving (via fax: 305-258-2267)
TRC distribution

P:\2004\4-024\Owner\Letters to Owner\4-024_Owner_Letter_36.doc

Asphalt & Concrete Construction

THE Redland COMPANY INC.

'ffice: (305) 247-3226 23799 S.W. 167 Avenue • Homestead, Florida 33031 Fax: (305) 247-17

December 1, 2004

Via: U.S. Mail and Fax

Mr. Henry Burgains
OPERATIONAL CONTRACTING OFFICE
482ND LSS/LGC
29050 Coral Sea Blvd., Box 50
Homestead AFR, Fl. 33039-1299

**RE:** **Contract No: FA6648-01-C0001**
**Project No: KYJM 99-9037**
**Titled: Mill/Overlay Asphalt Ramp, FANG**
**TRC No: 4-024**

**SUBJECT: Submittals for new supplier**

Dear Mr. Burgains,

The Redland Company Inc, respectfully request the expedition of the submittals that are being transmitted by hand delivery.

Our subcontractors previously approved supplier Florida Rock & Sand is refusing to supply concrete to the homestead Air Base due solely to the specification requiring the concrete to be placed in front of the Vibratory Screed within 45 minutes from time of batch into concrete drum. The supplier will not assume the responsibility for delays that is created by other, and is beyond the control of the supplier while in transit from unforeseen conditions to include traffic, emergency, and weather as well as delays from entering the airbase.

Sincerely,
**THE REDLAND COMPANY, INC.**

Steven T. Pfoh
Project Manager

Cc: Mike Rhodes, Homestead Paving (via fax: 305-258-2267)
TRC distribution

P:\2004\4-024\Owner\Letters to Owner\4-024_Owner_Letter_36.doc

THE Redland COMPANY INC.

Office: (305) 247-3226 23799 S.W. 167 Avenue • Homestead, Florida 33031 Fax: (305) 247

December 2, 2004

Via: FEDEX

Mr. Joseph W. Lawrence II, Esq.
VEZINA, LAWRENCE & PISCITELLI, P.A.
350 E. Las Olas Blvd., Suite 1130
Fort Lauderdale, FL 33301

RE: Contract No: FA6648-01-C0001
Project No: KYJM 99-9037
Titled: Mill/Overlay Asphalt Ramp, FANG
TRC No: 4-024 (New)
20-44 (Old)

SUBJECT: Claim for Defective Concrete

Dear Mr. Lawrence:

Per your request, attached are several copies of documents concerning the Government's assertion regarding the defective concrete pavement at the above referenced project.

Please proceed in preparing the necessary certified claim which will need to be presented to the Government. For inclusion into the claim, TRC will provide the necessary cost related information to you once we've had a chance to review such information at a later date.

Should you have any questions, comments, or require anything further, please let me know.

Sincerely,
THE REDLAND COMPANY, INC.

James A. Easom
Estimating and Project Management

P:\2004\4-024\Subs_Suppliers\VLP\VLP_01.doc

THE Redland COMPANY INC.

'fice: (305) 247-3226 23799 S.W. 167 Avenue • Homestead, Florida 33031 Fax: (305) 247-17:

December 6, 2004

Via: U.S. Mail and Fax

Mr. Henry Burgains
OPERATIONAL CONTRACTING OFFICE
482ND LSS/LGC
29050 Coral Sea Blvd., Box 50
Homestead AFR, Fl. 33039-1299

RE: Contract No: FA6648-01-C0001
Project No: KYJM 99-9037
Titled: Mill/Overlay Asphalt Ramp, FANG
TRC No: 4-024

SUBJECT: Notice to Government to Conduct Tests

Dear Mr. Burgains:

Pursuant to receipt of a letter dated today from the Contractor's Subcontractor, Homestead Paving Co., Inc., the Contractor is advising that the Subcontractor intends to begin removal of the previously constructed concrete pavement per the Government's recent letter of direction. Such removal will commence as early as 07 Dec 2004. The Government may want to take its own samples and/or tests of the concrete prior to such removal. Please do so if you deem necessary.

The Contractor and Subcontractor are completing testing to substantiate that the concrete placed is in conformance with the performance requirements and QC Specifications.

Sincerely,
THE REDLAND COMPANY, INC.

James A. Easom
Estimating and Project Management

Cc: Mike Rhodes, Homestead Paving (via fax: 305-258-2267)
Joseph W. Lawrence II, Esq.,
Vezina, Lawrence & Piscitelli, P.A. (via fax: 954-728-1271)
TRC distribution

P:\2004\4-024\Owner\Letters to Owner\4-024_Owner_Letter_39.doc

THE Redland COMPANY INC.

ffice: (305) 247-3226 23799 S.W. 167 Avenue • Homestead, Florida 33031 Fax: (305) 247-17.

# MEMO

DATE: December 6, 2004 Via Fax: (305) 258-2267 & U.S. Mail

TO: Homestead Paving
14550 Mable Street
Naranja, FL 33032

ATTN: Mike Rhodes

FROM: James A. Easom

RE: HARB Mill/Overlay FANG
TRC Project No.: 20-44 (Old #)
TRC Project No.: 4-024 (New #)

SUBJECT: Homestead Paving Letter Received Today

---

Dear Mr. Rhodes:

Today, the Contractor received Homestead Paving Co., Inc.'s, the Subcontractor's, undated letter which was pursuant the Contractor's Memo to the Subcontractor dated November 19, 2004.

The Contractor understands that the Subcontractor will respond further to the Contractor's previous Memo. Please do so as soon as possible.

In response to the Subcontractor's letter received today by the Contractor, the Subcontractor has already been advised to proceed per the Government's prior written directive to remove and replace the claimed defective concrete pavement. The Subcontractor may take whatever tests it deems necessary but a time extension will not be granted unless done so by the Government. The Government has been advised to take its own tests if it deems necessary. The Subcontractor is responsible for its own testing costs and other costs and time impacts as stipulated in the Memo dated November 19, 2004.

Again, please proceed as soon as possible with the corrective work per the Government's prior directive.

*(Continued on Page 2)*

If you should have any questions or comments, please advise in writing as soon as possible.

Sincerely,
THE REDLAND COMPANY, INC.

James A. Easom
Estimating and Project Management

Cc: Joseph W. Lawrence II, Esq.,
Vezina, Lawrence & Piscitelli, P.A. (via fax: 954-728-1271)
TRC distribution

HOMESTEAD PAVING CO. INC.

305-258-1972-PHONE 305-258-2267- FAX

FAX COVER SHEET

DATE: 12-06-04

TO: JAMES EASOM

COMPANY: REDLAND CONSTRUCTION

FROM: FRAN / MIKE

FAX NUMBER : 305-305-247-1756

NUMBER OF PAGES INCLUDING COVER SHEET:3

HARB/ FANG

RESPONSE TO MEMO

# HOMESTEAD PAVING CO.INC.

14550 Mable Street, Naranja, FL 33032-7494
Phone: 305-258-1972 FAX: 305-258-2267
Web Site: www.homesteadpaving.com

*Quality and Service First*

Via Facsimile No: (305) 247-1756
Mr. James A. Easom
The Redland Company, Inc.
23799 S.W. 167th Avenue
Homestead, Fl 33031

Re: HARB Mill/Overlay FANG
Your November 19, 2004 Memo Concerning Rejection of Concrete

Dear Mr. Easom:

Homestead Paving Co. is in receipt of your Memo dated November 19, 2004. By this letter, it is not Homestead Paving's intention to respond to the substance of that Memo. We will do that subsequently.

Rather, the purpose of this letter is to request that Homestead Paving not be required to commence removal of the concrete until 12/ 2. That date is the 28th day following the placement of the concrete which is the date for the final required flexural strength test called for in the specifications the Government appears to feel are applicable. Homestead Paving has no doubt that the 28 day test will reveal the concrete meets or exceeds all strength specifications.

Homestead Paving fully intends to pursue all avenues of relief available to it to recover all appropriate damages resulting from the wrongful rejection of the concrete and the Directive issued to Homestead Paving that it remove and replace the concrete. As such, Homestead Paving does not want to take actions which will essentially destroy the evidence of the wrongful rejection, until the appropriate testing is done. Homestead Paving invites The Redland Company to conduct whatever testing it may wish prior to the removal of the concrete. Homestead Paving also requests that The Redland Company advise the government that it should conduct whatever testing it wishes to perform prior to the removal of the concrete.

We note from The Redland Company's contract with the Government, that The Redland Company is obligated to pay the Government $338.42 as liquidated damages for each day of delay in completion of the work beyond the completion time specified in the contract. Although Homestead Paving has no obligation to do so, given the wrongful rejection of the concrete work (and other substantive reasons not relevant to this discussion) if in fact the work is not completed within the time specified in the contract, Homestead Paving agrees to absorb 8 days of delay (at $338.42 per day) in return for the granting of this request.

Homestead Paving fully intends to present this letter to the trier of fact in connection with its damage claim for the wrongful rejection of the concrete. All parties have an obligation to mitigate their damages and the procedure Homestead Paving is suggesting will certainly accomplish that.

Although Homestead Paving urges The Redland Company to reconsider the Directive it has issued to Homestead Paving, unless Homestead Paving receives contrary instructions, it will commence removing the concrete on 12/7 - 12/8 .

Sincerely,

Michael H. Rhodes

Michael H. Rhodes
Vice President

THE Redland COMPANY INC.

ffice: (305) 247-3226 23799 S.W. 167 Avenue • Homestead, Florida 33031 Fax: (305) 247-17.

December 8, 2004

Via: U.S. Mail and Fax

Mr. Henry Burgains
OPERATIONAL CONTRACTING OFFICE
482ND LSS/LGC
29050 Coral Sea Blvd., Box 50
Homestead AFR, Fl. 33039-1299

RE:

| | |
|---|---|
| Contract No: | FA6648-01-C0001 |
| Project No: | KYJM 99-9037 |
| Titled: | Mill/Overlay Asphalt Ramp, FANG |
| TRC No: | 4-024 |

SUBJECT: **Request for Proper Access**

Dear Mr. Burgains:

Pursuant to receipt of a letter dated today from the Contractor's Subcontractor, Homestead Paving Co., Inc., the Contractor is advising of the Subcontractors intent not to develop, schedule, nor place concrete pavement, until the government can give assurance that there will be no delay or interferences from circumstances originating beyond the control of, and by no fault on the contractors, subcontractors, or suppliers behalf in the deliverance and conveyance of the concrete materials from such interferences as traffic, uncoordinated entrances, access, security and traffic at the gates preventing materials in delay from placement.

It is from such circumstances that The Redland Company Inc, such requests that the Government acknowledge that circumstances beyond the control of all parties may interfere with the successful completion of the delivery operation, and exercise the Governments Contract Administrators right to amend the contract delivery placement time and allow the variance to be applied in time that is equal to that from the time of arrival at the entrance to the Homestead Airbase to the time that the concrete truck successfully enters the confines of the FANG/RAMP.

Further we request that the closest gate from the concrete suppliers plant to the FANG/RAMP is dedicated as an access point with personnel stationed to assure timely entrance to the Homestead Air Reserve Base as well as the gate to the FANG/RAMP remains open while the concrete placement is in operation.

(Continued on Page 2)

Sincerely,
THE REDLAND COMPANY, INC.

Steven T. Pfoh
Project Management

Cc: Mike Rhodes, Homestead Paving (via fax: 305-258-2267)
Joseph W. Lawrence II, Esq.,
Vezina, Lawrence & Piscitelli, P.A. (via fax: 954-728-1271)
TRC distribution

HOMESTEAD PAVING CO. INC.

305-258-1972-PHONE 305-258-2267- FAX

FAX COVER SHEET

DATE: 12-08-04

TO: James

COMPANY: THE REDLAND COMPANY

FROM: FRAN / MIKE

FAX NUMBER : 305-247-1756

NUMBER OF PAGES INCLUDING COVER SHEET: 3

# HOMESTEAD PAVING CO., INC.

14550 Mable Street, Naranja, FL 33032-7494
Phone: 305-258-1972 FAX: 305-258-2267
Web Site: www.homesteadpaving.com

December 7, 2004

*Quality and Service First*

**Via Facsimile No: (305) 247-1756**
Mr. James A. Easom
The Redland Company, Inc.
23799 S.W. 167th Avenue
Homestead, Fl 33031

Re: HARB Mill/Overlay FANG

Dear Mr. Easom:

This letter confirms our conversation of this morning wherein The Redland Company requested a schedule from Homestead Paving to complete the concrete pour on the job. We advised that under the present circumstances, a schedule cannot be developed as the owner is actively interfering with Homestead Paving's work on the job. This interference includes the owner impeding the access of concrete trucks to the project. Without conceding that the 45 minute requirement is in fact a criteria Homestead Paving is required to comply with and, while expressly rejecting the proposition that failure to meet the 45 minute requirement supplies a valid basis for rejection of the concrete, the owner's active interference with the delivery of the concrete renders it virtually impossible to meet the 45 minute requirement.

Because, prior to the placement of the concrete, the owner had verbally advised both Homestead Paving and Redland Construction, that 90 minutes would be the applicable criteria, the owner's interference with the deliveries, while troublesome, did not render performance virtually impossible. Now that the owner has changed its position, and the Redland Company has directed Homestead Paving to comply with the 45 minute requirement, the owner's interference is no longer tolerable

Without question, it is the owner's obligation to make the work accessible to The Redland Company and for both, The Redland Company and the owner, to make the work accessible to Homestead Paving. That is not being done.

So that the record is clear, Homestead Paving is ready, willing and able to complete the work and deliver a product that meets and exceeds every applicable strength specification. Under the conditions present at the project, the placement of concrete within 45 minutes has absolutely no relationship to the ability of the concrete to meet and exceed the strength specifications. We repeat our prior request that The Redland Company (and the owner) reconsider the decision to reject the concrete work.

Homestead Paving is prepared to immediately provide the schedule requested and continue with the work once The Redland Company and the owner have delivered written assurances to

Homestead Paving that the concrete trucks will no longer be interfered within gaining access to the project.

An alternative solution that Homestead Paving would consider is a modification to the 45 minute requirement, such that the 45 minutes would be extended by the amount of delay incurred by the concrete trucks, measured from the time a truck gets in line to gain access to the property, until the truck is able to reach the site of the pour. The amount of this delay is beyond the control of Homestead Paving but is within the control of the owner (and perhaps The Redland Company as well). It is the position of Homestead Paving that it is inappropriate for the owner to reject work based upon what is an arbitrary time limit, while the owner at the same time causes, or substantially contributes to, delays in the concrete reaching the site of the pour.

Homestead Paving is anxious to complete the work Accordingly, your prompt response will be appreciated.

This letter is written to expedite the completion of the job. Homestead Paving expressly reserves all rights, claims and defenses available to it in connection with the pending issues.

By close of business today, Homestead Paving will provide The Redland Company with a summary of the damages Homestead Paving will incur in responding to the rejection of the concrete and as a result, the removal and replacement of the concrete.

Sincerely,

Michael Rhodes, Vice President

THE Redland COMPANY INC.

fice: (305) 247-3226 23799 S.W. 167 Avenue • Homestead, Florida 33031 Fax: (305) 247-17:

February 11, 2005

Via: FAX 305-224-7055

Col. Randall Falcon, Commander, 482nd Fighter Wing
Homestead Air Reserve Base
United States Air Force
Homestead, Fl. 33039

RE: **Contract No:** FA6648-01-C0001
**Project No:** KYJM 99-9037
**Titled:** Mill/Overlay Asphalt Ramp, FANG
**TRC No:** 4-024

SUBJECT: **Request for Meeting to Resolve Ongoing Issues**

Dear Colonel Falcon:

I write to request a meeting with you regarding several concerns that remain outstanding respective to the above referenced Contract.

The Redland Company, Inc. is the Contractor currently completing the Contract to perform the milling, concrete replacement, and asphalt paving at the FANG shelter at HARB. During our attempt to execute this Contract, we have faced several unreasonable obstacles which the Government has caused:

- Project was suspended approximately four years due to Government issues which resulted in increased costs
- Certified Claim for additional indirect costs (Government has not responded after several requests)
- Project was to be completed in December 2004 but is still delayed due to some of the following Government issues
  - Rejection and replacement of concrete which has been verified as passing
  - Security delays
  - Failure of Government to make timely decision concerning unforeseen conditions (duct bank removals, etc.)
  - Rejection of limerock base which as been verified as passing
  - Government did not supply sufficient grading plan and caused the Contractor to furnish such design info for additional costs

*(Continued on Page 2)*

- Delay of payment to the Contractor (First invoice in Oct 2004-receive payment last week)
- Failure of Government to fund authorized Change Orders

At his request, we met last week with Col. Daley to update him on the current limerock issue and we all left the meeting confident of our direction. However, the CO has rejected our most recent work which has been tested and verified as passing.

Numerous other contractors have expressed their discontent with the inspection and contracting process at HARB over the last several years. Having always maintained a valued relationship with HARB, we proceeded on with this work in good faith. We have come to realize the other contractor's concerns and are now caught in a process which we believe deserves your attention.

Though there are legal means of pursuing our rights, we prefer to resolve our concerns with reasonable people. As such, we respectfully request a meeting with you and all parties involved to resolve the outstanding issues and move forward in completing this project.

Sincerely,
THE REDLAND COMPANY, INC.

James A. Easom
Vice-President
Estimating and Project Management

Enc.: copy of Contractor letter date February 11, 2004
copy of Government letter dated 9 Feb 05

Cc: TRC distribution

THE Redland COMPANY INC.

ne: (305) 247-3226 23799 S.W. 167 Avenue • Homestead, Florida 33031 Fax: (305) 247-175

February 11, 2005

Via: FAX 305-224-7055
& U.S. Mail

Mr. Henry Burgains, Contracting Officer
OPERATIONAL CONTRACTING OFFICE
482ND LSS/LGC
29050 Coral Sea Blvd., Box 50
Homestead AFR, Fl. 33039-1299

RE:

Contract No: FA6648-01-C0001
Project No: KYJM 99-9037
Titled: Mill/Overlay Asphalt Ramp, FANG
TRC No: 4-024

SUBJECT: **Response to Government Letter Dated 9 Feb 05 Which Makes Claims of Deficiency in Contractor's Limerock Base ("base") Performance**

Dear Mr. Burgains:

The Contractor has received the above referenced letter yesterday via facsimile. The Contractor contests the entire theme and offers the following <u>facts</u>:

1. The Government's letter offers no specific deficiencies that relate to the Contract Specifications but simply and broadly rejects the work as not in compliance with the stated Contract Specifications. The claimed deficiencies such as "[segregated aggregates, voids, depressions, loose material, foreign material]" is not language referenced in the Contract Specifications (Please note that the Contractor neither concurs nor denies that the Government's referenced claimed issues even exist which are attributable to the poor quality of the existing base material.). For example, should the base be found to be purple in color, that is not necessarily a problem because the color of the base is not specified as a requirement. The Government needs to cite specific deficiencies, if any, using similar language from the Contract Specifications and deviations thereof.

   Furthermore, base material being utilized is existing material. The Contractor was directed to utilize the existing base material per the Contract Documents. Both the Drawings and the Bid Forms were clear in requesting that the Contractor quote an

*(Continued on Page 2)*

ALTERNATE price to remove and replace the existing material. Obviously, the intent of the Government was to consider upgrading the existing material for additional cost. It does not seem logical that the Government would consider spending money to replace base that is perfectly fine. Mr. Burgains stated to the Contractor during the award process that the Government currently had insufficient funds to award the Alternate to replace the base material. Instead of placing the blame on the Contractor for perceived imperfections that are the result of the Government's own material and the Government's own decision not to replace such material, the Government should accept the "less than perfect" quality of the existing material in light of the fact that it did not elect to pay for the industry standard quality material which is normally required.

The existing limerock base material can still be removed and replaced with FDOT approved crushed limerock base material for additional costs to the Government. Please advise if the Government wishes for the Contractor to price such additional work.

2. The Government has referenced non-compliance with Specification 02709, Paragraph 3.2.5 COMPACTION. This Specification has been executed as required. The Contractor is not aware that any inspections have occurred.

3. The Government has referenced non-compliance with Specification 02709 Paragraph 3.3 FIELD QUALITY CONTROL. This Specification has been executed as required.

4. The Government has referenced non-compliance with Specification 02709, Paragraph 3.3.7 SMOOTHNESS TEST. Though requested by the Contractor, such inspection has never been completed by the Engineer. The Contractor cannot be deficient in an inspection that never occurred.

5. The Government has referenced non-compliance with Specification 02709, Paragraph 3.4 MAINTENANCE. The Government has prevented the Contractor from placing prime/tack. The Contractor cannot be deficient in performance of an activity when such activity has not even occurred. When such prime/tack is placed, inspection can be made at that time to determine if the Contractor has performed in accordance with the Contract.

*(Continued on Page 3)*

Prime coat is required to protect the underlying base from deterioration due to wind, rain, and minor traffic. By delaying the Contractor from completing the prime coat, the Government is causing lack of maintenance and further degradation of the finished product.

Quality Control of this project is completed by the Contractor per the Contract. The required Quality Control testing for the Limerock Base is realized though density tests. Such test have been completed, found Passing, and have previously been forwarded to the Government. If the CO and Engineer or Record are so concerned with the performance of the Contractor, why did both of them leave approximately 10 minutes prior to the scheduled density compaction test inspection?

Additionally, the Contractor has never been notified of nor present for any official inspection by the Contracting Officer nor by the Engineer of Record. Please advise if any such inspections have taken place and provide copies of the written results.

Please consider this as additional Notice that the Contractor intends to seek relief and/or equitable adjustment in both time and money for all attributable impacts resulting from the Government's actions respective to this matter. If necessary, a Certified Claim will be processed once a full assessment is made available. The Contractor hereby requests a copy of all correspondence, whether written or electronic, between the Contracting Officer and Engineer of Record and all correspondence, whether written or electronic, originating from the office of the Engineer of Record prior to this date and any subsequent information relating to this project. Also, please provide written proof that the Engineer of Record is qualified per Government requirements.

On the whole, the Government's letter seems at the very least to be a continued act of non-cooperation and citing of ambiguities. Such interference is thwarting the goal of the project which is to complete the project on time and per the Contract. Additionally, the Government is interfering with the ability of the Contractor to conduct business and is causing financial hardship to the Contractor, a local and Government Registered **Small Business**. This project was suspended approximately four (4) years due the Government's actions and now it continues to unreasonably delay the project's completion.

The Contractor requests that the Contracting Officer reconsider the Government's position and not rely solely on the opinion of the Engineer of Record to determine whether or not the

*(Continued on Page 4)*

Contractor has met the requirements of the Contract. Should the Government not waiver in its current position, all "remedial" work requested in the Government's above mentioned letter will be considered additional to the Contractor and the Contractor will seek equitable adjustment, via Certified Claim if necessary, in both time and money for any such impacts. Please consider this as Notice of such intent.

The project and the Contractor will be in delay until this urgent matter is resolved and will await your timely response.

Sincerely,
THE REDLAND COMPANY, INC.

James A. Easom
Vice-President
Estimating and Project Management

Enc.: copy of Government letter dated 9 Feb 05
copy of Bid Form indicating Alternate to replace existing material

Cc: Col. Randall Falcon, Commander, 482nd Fighter Wing (via fax: 305-224-7024)
Col. Dennis Daley, Commander, 482nd Mission Support Group (via fax: 305-224-7443)
TRC distribution

DEPARTMENT OF THE AIR FORCE
AIR FORCE RESERVE COMMAND

9 Feb 05

MEMORANDUM FOR THE REDLAND COMPANY INC.
23799 SW 167TH AVE
HOMESTEAD, FL 33031

FROM: 482 MSG CONF/LGC
29050 CORAL SEA BLVD., BLDG 360
HOMESTEAD ARB, FL 33039-1299

SUBJECT: Letter of Non-Compliance, Contract No. FA6648-01-C-0001, Project No. KYJM 99-9037, Mil/Overlay Fang Ramp, Homestead, FL

1. This letter constitutes the Government's rejection of compaction, scarification, and grading work accomplished under the subject contract. The rejection is a direct result of your company's non-compliance with the contract specifications; Section 02709, Paragraphs 3.2.5 COMPACTION, 3.3 FIELD QUALITY CONTROL, 3.3.7 SMOOTHNESS TEST, and 3.4 MAINTENANCE. Significant deficiencies have been identified with the surface of the compacted material [segregated aggregates, voids depressions, loose material, foreign material], which will result in additional damage to the base (i.e., depressions, rutting) during pavement construction and ultimately premature pavement failure.

2. You are hereby directed to re-accomplish the grading and scarification effective immediately, in accordance with FAR 52.246-12(f), INSPECTION OF CONSTRUCTION, "The Contractor shall, without charge, replace or correct work found by the Government not to conform to contract requirements..."

3. Please resubmit a work plan and schedule to reflect actual grading and pavement placement dates within 10 calendar days of receipt of this notification, but not later than 23 Feb 2005 at 1:00 pm EST. Failure to respond in accordance with the terms and conditions stated in the contract and as requested per this letter may result in issuance of a cure notice.

4. If you have any questions or concerns, please contact the undersigned at 305-224-7406.

HENRY BURGAINS
Contracting Officer

THE Redland COMPANY INC.

.ice: (305) 247-3226 23799 S.W. 167 Avenue • Homestead, Florida 33031 Fax: (305) 247-175

February 21, 2005

Via Fax: 305-224-7055
And U.S. mail

Mr. Henry Burgains, Contracting Officer
OPERATIONAL CONTRACTING OFFICE
482ND LSS/LGC
29050 Coral Sea Blvd., Box 50
Homestead AFR, Fl. 33039-1299

Re: FANG Shelter Work at HARB
TRC Project No.: 20-44 (Abandoned)
TRC Project No.: 4-024 (New)

Subject: Government's contract modifications

Dear Mr. Burgains:

We have reviewed the Government's "Contract Modification" and find the terms and conditions not acceptable to reserve our firm's rights to, or for any, future time extensions and or monetary compensations for the unrecognized work and delays.

Additionally, There are still several outstanding additional costs due to delays previously documented and additional work performed with direction but have not been formally requested by claim and/or change ordered with contract modifications for which our firm requests to be stated in the documents.

TRC is requesting The Government's comments that are attached to their contract modification be revised to "by accepting these contract modifications, The Redland Company Incorporated, will not forfeit any and all rights for future compensation on any portion of the change orders and or claims not compensated or negotiated by these contract modifications, or any claims that might arise out of these delays and or pending claims that are still pending or not finalized or any future claims outstanding or that we may submit".

Should you have any questions or comments, please give me a call.

Sincerely,
THE REDLAND COMPANY, INC.

Steven T. Pfon
Project Management
Cc: TRC distribution

P:\2004\4-024\Owner\Letters to Owner\4-024_Owner_Letter_47_Claim.doc

JAN-03-05 MON 03:41 PM 482 LSS/LGC HARB, FL. FAX NO. 3 224 7055 P. 01/04

# AMENDMENT OF SOLICITATION/MODIFICATION OF CONTRACT

1. CONTRACT ID CODE: J
PAGE OF PAGES: 1 | 4

2. AMENDMENT/MODIFICATION NO.: P00006
3. EFFECTIVE DATE: 23 Dec 2004
4. REQUISITION/PURCHASE REQ. NO.: SEE SCHEDULE
5. PROJECT NO. (If applicable): KYJM 03-9037

6. ISSUED BY CODE: FA6648
482 LSS/LGC
29050 CORAL SEA BLVD, BOX 50
HARB FL 33039 1299

7. ADMINISTERED BY (If other than Item 6) CODE:
See Item 6

8. NAME AND ADDRESS OF CONTRACTOR (No., Street, County, State and Zip Code)
THE REDLAND COMPANY
F. BRADLEY, SR.
23705 SW 167TH AVE
HOMESTEAD FL 33031

CODE: 0ER681L FACILITY CODE

9A. AMENDMENT OF SOLICITATION NO.
9B. DATED (SEE ITEM 11)
X 10A. MOD. OF CONTRACT/ORDER NO. FA6648-01-C-0001
X 10B. DATED (SEE ITEM 13) 15-Mar-2001

11. THIS ITEM ONLY APPLIES TO AMENDMENTS OF SOLICITATIONS

☐ The above numbered solicitation is amended as set forth in Item 14. The hour and date specified for receipt of Offer ☐ is extended, ☐ is not extended.

Offer must acknowledge receipt of this amendment prior to the hour and date specified in the solicitation or as amended by one of the following methods: (a) By completing Items 8 and 15, and returning _____ copies of the amendment; (b) By acknowledging receipt of this amendment on each copy of the offer submitted; or (c) By separate letter or telegram which includes a reference to the solicitation and amendment numbers. FAILURE OF YOUR ACKNOWLEDGMENT TO BE RECEIVED AT THE PLACE DESIGNATED FOR THE RECEIPT OF OFFERS PRIOR TO THE HOUR AND DATE SPECIFIED MAY RESULT IN REJECTION OF YOUR OFFER. If by virtue of this amendment you desire to change an offer already submitted, such change may be made by telegram or letter, provided each telegram or letter makes reference to the solicitation and this amendment, and is received prior to the opening hour and date specified.

12. ACCOUNTING AND APPROPRIATION DATA (If required)
See Schedule

13. THIS ITEM APPLIES ONLY TO MODIFICATIONS OF CONTRACTS/ORDERS. IT MODIFIES THE CONTRACT/ORDER NO. AS DESCRIBED IN ITEM 14.

A. THIS CHANGE ORDER IS ISSUED PURSUANT TO: (Specify authority) THE CHANGES SET FORTH IN ITEM 14 ARE MADE IN THE CONTRACT ORDER NO. IN ITEM 10A.

B. THE ABOVE NUMBERED CONTRACT/ORDER IS MODIFIED TO REFLECT THE ADMINISTRATIVE CHANGES (such as changes in paying office, appropriation date, etc.) SET FORTH IN ITEM 14, PURSUANT TO THE AUTHORITY OF FAR 43.103(B).

X C. THIS SUPPLEMENTAL AGREEMENT IS ENTERED INTO PURSUANT TO AUTHORITY OF:
FAR 52.236-2: DIFFERING SITE CONDITIONS

D. OTHER (Specify type of modification and authority)

E. IMPORTANT: Contractor ☐ is not, [X] is required to sign this document and return 1 copies to the issuing office.

14. DESCRIPTION OF AMENDMENT/MODIFICATION (Organized by UCF section headings, including solicitation/contract subject matter where feasible.)

Differing Site Conditions and Time Extension: (1) Due to the differing site conditions and time extension, the contract perfromance period is extended 44 calendar days: (a) 14 calendar days are required to correct the differing sites conditions, (b) 30 calendar day is required to cure the asphalt, and (c) 2 calendar day are needed for the stripping.. Change the contract completion date from 4 Jan 2004 to read 17 feb 2004. (2) RELEASE OF CLAIM FOR THIS MODIFICATION: THE UNDERSIGNED CONTRACTOR DOES RELEASE AND DISCHARGE THE GOVERNMENT, ITS OFFICERS, AGENTS, AND EMPLOYEES FROM ALL LIABILITIES, AND CLAIM WHATSOEVER IN LAW AND EQUITY ARISING OUT OF THE OR BY VIRTUE OF SAID MODIFICATION TO THE ABOVE-CITED CONTRACT NUMBER.

Except as provided herein, all terms and conditions of the document referenced in Item 9A or 10A, as heretofore changed, remains unchanged and in full force and effect.

15A. NAME AND TITLE OF SIGNER (Type or print)

16A. NAME AND TITLE OF CONTRACTING OFFICER (Type or print)
HENRY BURGAINS / CONTRACT OFFICER
TEL: (305) 224-7406 EMAIL: henry.burgains@homestead.af.mil

15B. CONTRACTOR/OFFEROR
(Signature of person authorized to sign)

15C. DATE SIGNED

16B. UNITED STATES OF AMERICA
BY
(Signature of Contracting Officer)

16C. DATE SIGNED
23-Dec-2004

EXCEPTION TO SF30
APPROVED BY OIRM 11-84

30-105 04

STANDARD FORM 30 (Rev. 10-83)
Prescribed by GSA
FAR (48 CFR) 53.243

SECTION SF 30 BLOCK 14 CONTINUATION PAGE

SUMMARY OF CHANGES

SECTION 00010 - SOLICITATION CONTRACT FORM

The total cost of this contract was increased by $9,825.00 from $397,743.37 to $407,568.37.

CLIN 0003 is added as follows:

| ITEM NO | SUPPLIES/SERVICES | QUANTITY | UNIT | UNIT PRICE | AMOUNT |
|---|---|---|---|---|---|
| 0003 | | 1 | Lot | $7,000.00 | $7,000.00 |

Remove 320 SF of old concrete
FFP
Modify contract FA 6648-01-C-0001, To remove 320 SF of old concrete foundations with rebar and other millscellaneous steel imbedded. Backfill to grade.
NSN: Z199-98-0VE-RLAY
MILSTRIP: FQ48AB43480100
MFR PART NR: Z199-98-OVE-RLAY
PURCHASE REQUEST NUMBER: FQ48AB43480100
PROJECT: KYJM 99-9037
SIGNAL CODE: A

NET AMT $7,000.00

ACRN AB Funded Amount $7,000.00

FOB: Destination

CLIN 0004 is added as follows:

| ITEM NO | SUPPLIES/SERVICES | QUANTITY | UNIT | UNIT PRICE | AMOUNT |
|---|---|---|---|---|---|
| 0004 | | 1 | Lot | $2,825.00 | $2,825.00 |

Miscellaneous changes
FFP
Repair damaged electrical conduit.
NSN: Z199-98-OVE-RLAY
MILSTRIP: FQ48AB43480101
MFR PART NR: Z199-98-OVE-RLAY
PURCHASE REQUEST NUMBER: FQ48AB43480101
PROJECT: KYJM 99-9037
SIGNAL CODE: A

NET AMT $2,825.00

ACRN AB Funded Amount $2,825.00

FOB: Destination

DELIVERIES AND PERFORMANCE

The following Delivery Schedule item for CLIN 0001 has been changed from:

| DELIVERY DATE | QUANTITY | SHIP TO ADDRESS | UIC |
|---|---|---|---|
| POP 28-FEB-2001 TO 28-JUN-2001 | N/A | 482 LSS/LGC<br>HENRY BURGAINS<br>29050 CORAL SEA BLVD, BOX 50<br>HARS FL 33039-1299<br>305/224-7406<br>FOB: Destination | FA6648 |

To:

| DELIVERY DATE | QUANTITY | SHIP TO ADDRESS | UIC |
|---|---|---|---|
| POP 28-FEB-2001 TO 17-FEB-2005 | N/A | 482 LSS/LGC<br>HENRY BURGAINS<br>29050 CORAL SEA BLVD, BOX 50<br>HARS FL 33039-1299<br>305/224-7406<br>FOB: Destination | FA6648 |

The following Delivery Schedule item has been added to CLIN 0002:

| DELIVERY DATE | QUANTITY | SHIP TO ADDRESS | UIC |
|---|---|---|---|
| 17-FEB-2005 | 1 | 482 CIVIL ENGINEERS (BCE) - FQ48AB<br>232 WESTOVER STREET<br>HOMESTEAD ARS FL 33039-1299<br>FOB: Destination | FQ48AB |

INSPECTION AND ACCEPTANCE

The following Acceptance/Inspection Schedule was added for CLIN 0003:

| INSPECT AT | INSPECT BY | ACCEPT AT | ACCEPT BY |
|---|---|---|---|
| Destination | N/A | Destination | Government |

The following Technical Office was added for CLIN 0003:
482 CIVIL ENGINEERS (BCE) - FQ48AB
232 WESTOVER STREET
HOMESTEAD ARS FL 33039-1299

The following Acceptance/Inspection Schedule was added for CLIN 0004:

| INSPECT AT | INSPECT BY | ACCEPT AT | ACCEPT BY |
|---|---|---|---|
| Destination | N/A | Destination | Government |

The following Technical Office was added for CLIN 0004:
482 CIVIL ENGINEERS (BCE) - FQ4SAB
232 WESTOVER STREET
HOMESTEAD ARS FL 33039-1299

SECTION 00800 - SPECIAL CONTRACT REQUIREMENTS

Accounting and Appropriation

Summary for the Payment Office

As a result of this modification, the total funded amount for this document was increased by $9,825.00 from $397,743.37 to $407,568.37.

CLIN 0003:
Funding on CLIN 0003 is initiated as follows:

ACRN: AB

Acctng Data: 5713740 541 6223 134420 010000 52104 52578F 503000 F03000 WO:20845

Increase: $7,000.00

Total: $7,000.00

CLIN 0004:
Funding on CLIN 0004 is initiated as follows:

ACRN: AB

Acctng Data: 5713740 541 6223 134420 010000 52104 52578F 503000 F03000 WO:20845

Increase: $2,825.00

Total: $2,825.00

(End of Summary of Changes)

# AMENDMENT OF SOLICITATION/MODIFICATION OF CONTRACT

1. CONTRACT ID CODE: J
PAGE OF PAGES: 1 | 2

2. AMENDMENT/MODIFICATION NO.: P00005
3. EFFECTIVE DATE: 16-Dec-2004
4. REQUISITION/PURCHASE REQ. NO.: SEE SCHEDULE
5. PROJECT NO. (If applicable): KYJM 99-9037

6. ISSUED BY — CODE: FA6648
[illegible] CONF/LGC [illegible]
[illegible] CORAL SEA BLVD
[illegible] FL 33039-1299

7. ADMINISTERED BY (If other than item 6) — CODE: FA6648
482 LCS/LGC
29050 CORAL SEA BLVD, BOX 50
HARB FL 33039-1299

8. NAME AND ADDRESS OF CONTRACTOR (No., Street, County, State and Zip Code)
THE REDLAND COMPANY
F. BRADLEY, SR.
23799 SW 167TH AVE
HOMESTEAD FL 33031

9A. AMENDMENT OF SOLICITATION NO.
9B. DATED (SEE ITEM 11)
X 10A. MOD. OF CONTRACT/ORDER NO. FA6648-01-C-0001
X 10B. DATED (SEE ITEM 13) 15-Mar-2001

CODE 0ER581L | FACILITY CODE

11. THIS ITEM ONLY APPLIES TO AMENDMENTS OF SOLICITATIONS

☐ The above numbered solicitation is amended as set forth in Item 14. The hour and date specified for receipt of Offer ☐ is extended, ☐ is not extended.

Offer must acknowledge receipt of this amendment prior to the hour and date specified in the solicitation or as amended by one of the following methods:
(a) By completing Items 8 and 15, and returning ______ copies of the amendment; (b) By acknowledging receipt of this amendment on each copy of the offer submitted; or (c) By separate letter or telegram which includes a reference to the solicitation and amendment numbers. FAILURE OF YOUR ACKNOWLEDGMENT TO BE RECEIVED AT THE PLACE DESIGNATED FOR THE RECEIPT OF OFFERS PRIOR TO THE HOUR AND DATE SPECIFIED MAY RESULT IN REJECTION OF YOUR OFFER. If by virtue of this amendment you desire to change an offer already submitted, such change may be made by telegram or letter, provided each telegram or letter makes reference to the solicitation and this amendment, and is received prior to the opening hour and date specified.

12. ACCOUNTING AND APPROPRIATION DATA (If required)

13. THIS ITEM APPLIES ONLY TO MODIFICATIONS OF CONTRACTS/ORDERS.
IT MODIFIES THE CONTRACT/ORDER NO. AS DESCRIBED IN ITEM 14.

A. THIS CHANGE ORDER IS ISSUED PURSUANT TO: (Specify authority) THE CHANGES SET FORTH IN ITEM 14 ARE MADE IN THE CONTRACT ORDER NO. IN ITEM 10A.

B. THE ABOVE NUMBERED CONTRACT/ORDER IS MODIFIED TO REFLECT THE ADMINISTRATIVE CHANGES (such as changes in paying office, appropriation date, etc.) SET FORTH IN ITEM 14, PURSUANT TO THE AUTHORITY OF FAR 43.103(B).

C. THIS SUPPLEMENTAL AGREEMENT IS ENTERED INTO PURSUANT TO AUTHORITY OF:
X LAW FAR 52.249-10 DEFAULT

D. OTHER (Specify type of modification and authority)

E. IMPORTANT: Contractor [X] is not, ☐ is required to sign this document and return ______ copies to the issuing office.

14. DESCRIPTION OF AMENDMENT/MODIFICATION (Organized by UCF section headings, including solicitation/contract subject matter where feasible.)
SEE SUMMARY OF CHANGES

Except as provided herein, all terms and conditions of the document referenced in Item 9A or 10A, as heretofore changed, remains unchanged and in full force and effect.

15A. NAME AND TITLE OF SIGNER (Type or print)

16A. NAME AND TITLE OF CONTRACTING OFFICER (Type or print)
HENRY BURGAINS / CONTRACT OFFICER
TEL: (305) 224-7408 EMAIL: henry.burgains@homestead.af.mil

15B. CONTRACTOR/OFFEROR
(Signature of person authorized to sign)

15C. DATE SIGNED

16B. UNITED STATES OF AMERICA
BY
(Signature of Contracting Officer)

16C. DATE SIGNED
17-Dec-2004

EXCEPTION TO SF 30
APPROVED BY OIRM 11-84

30-105-04

STANDARD FORM 30 (Rev. 10-83)
Prescribed by GSA
FAR (48 CFR) 53.243

SUMMARY OF CHANGES

The purpose of this modification is to:

1 Extend the completion date of the contract.

2. The completion date of the contract is hereby extended by 19 calendar days from 16 Dec 04 to 4 Jan 05.

3 The total contract price remains unchanged.

4. All other terms and conditions remain unchanged.

(End of Summary of Changes)

THE Redland COMPANY INC.

Office: (305) 247-3226 23799 S.W. 167 Avenue • Homestead, Florida 33031 Fax: (305) 247-17

# MEMO

**DATE:** February 22, 2005

**Via Fax: (305) 258-2267 & U.S. Mail**

**TO:** Homestead Paving
14550 Mable Street
Naranja, FL 33032

**ATTN:** Mike Rhodes

**FROM:** Steven T. Pfoh

**RE:** HARB Mill/Overlay FANG
TRC Project No.: 20-44 (Old #)
TRC Project No.: 4-024 (New #)

**SUBJECT:** Back Charge of Contractors costs for removal of rejected Concrete Pavement per Government

Dear Mr. Rhodes:

As you are previously aware, the Government had dictated several problems with the concrete pavement placed to date by Homestead Paving, the Subcontractor. Please reference previous correspondence by The Redland Company Inc. dated November 19, 2004 with attached letter dated 18 Nov 04 by the Government and the subsequent response from the Contractor to the Government of the same date.

Homestead Paving and The Redland Company Inc. had previously coordinated in agreement, that TRC was to remove the referenced concrete pavement adjacent to the existing concrete pavement near the FANG Shelter/Hanger and that such removal and replacement is being directed due to the Government's asserted deficiency

Additionally, in agreement, the Subcontractor is responsible for any and all of the Contractor's additional costs, delays, and damages attributable to the Subcontractor's failure to meet the Contract Specifications.

*(Continued on Page 2)*

Please see attached our cumulative charges for the work as described above. It is your right to contest the Governments final decision and seek fair and equitable compensation for the damages occurred, and if applicable, please forwards a Claim for the Contractor's and Government's review. Any such Claim will be subject to approval by the Government or that of a higher governing agency.

If you should have any questions or comments, please advise in writing as soon as possible.

Sincerely,
**THE REDLAND COMPANY, INC.**

Steven T. Pfoh
Project Management

Cc: TRC distribution

The Redland Company, Inc.
Mill/Overlay Asphalt Ramp FANG
HARB, FL
TRC Project No.: 20-44; 4-024
Back Charge.: 01

Additional Direct Costs Resulting from the direction of the owner to demo and remove Concrete Tie Down pads before Quality Control Perfomnce reults were issued by the approved independent testing laboratory

| Item | Quantity | Unit | | Unit Price | Amount |
|---|---|---|---|---|---|
| Material/Other | | | | | |
| | | | | $0.00 | $0.00 |
| | | | | | $0 00 |
| | | | | | $0.00 |
| | | | | | $0.00 |
| | | | Subtotal: | | $0.00 |
| | | | Tax (7.0%): | | $0.00 |
| | | | Total Material: | | $0.00 |
| Subcontract | | | | | |
| Schwebke-Shishkin & Associates, Inc | 2 | day | | $1,100.00 | $2,200.00 |
| Debrie Removal (by dump truck) | 14 | Loads | | $250.00 | $3,500.00 |
| | | | | | $0.00 |
| | | | | | $0.00 |
| | | | Total Subcontract: | | $5,700.00 |
| Labor | | | | | |
| Formen | 30 | hr | | $31.00 | $930.00 |
| Excavater Operator | 9 | hr | | $18.00 | $162.00 |
| Loader Operator | 21 | hr | | $18.00 | $378.00 |
| Skidster Operator | 11 | hr | | $18.00 | $198.00 |
| Laborer | 49 | hr | | $13.00 | $637.00 |
| Grader Operator | 12 | hr | | $18.00 | $216.00 |
| Roller Operator | 10 | hr | | $18.00 | $180.00 |
| Project Manager | 10 | hr | | $40.00 | $400.00 |
| | | | Subtotal: | | $3,101.00 |
| | Overtime Factor: | | | 1.0 | $3,101.00 |
| | | | Subtotal: | | $3,101.00 |
| | Labor Burden: | | | 50.00% | $1,550.50 |
| | | | Total Labor: | | $4,651.50 |
| Equipment | | | | | |
| Medium Excavator | 9 | hr | | $90.00 | $810.00 |
| Medium Front End Loader | 21 | hr | | $75.00 | $1,575.00 |
| Skidsteer with Hammer Attachment | 11 | hr | | $90.00 | $990.00 |
| Motor Grader | 12 | hr | | $125.00 | $1,500.00 |
| Dynopac Roller | 10 | hr | | $55.00 | $550.00 |
| F-250 Pickup | 30 | hr | | $10.00 | $300.00 |
| | | | Total Equipment: | | $5,725.00 |
| Subtotal Material, Subcontract, Labor, and Equipment: | | | | | $16,076.50 |
| Allowable Markup (6% OH + 10% Profit ) | | | | 16.00% | $2,572.24 |
| | | | TOTAL: | | $18,648.74 |

The Redland Company, Inc.
Mill/Overlay Asphalt Ramp FANG
HARB, FL
TRC Project No.: 20-44; 4-024
Back Charge.: 01

Additional Direct Costs Resulting from the direction of the owner to demo and remove Concrete Tie Down pads before Quality Control Parfomnce reults were issued by the approved independant testing laboratory

| Item | Quantity | Unit | | Unit Price | Amount |
|---|---|---|---|---|---|
| **Material/Other** | | | | | |
| | | | | $0.00 | $0.00 |
| | | | | | $0.00 |
| | | | | | $0.00 |
| | | | | | $0.00 |
| | | | Subtotal: | | $0.00 |
| | | | Tax (7.0%): | | $0.00 |
| | | | Total Material: | | $0.00 |
| **Subcontract** | | | | | |
| Schwebke-Shishkin & Associates, Inc | 2 | day | | $1,100.00 | $2,200.00 |
| Debrie Removal (by dump truck) | 14 | Loads | | $250.00 | $3,500.00 |
| | | | | | $0.00 |
| | | | | | $0.00 |
| | | | Total Subcontract: | | $5,700.00 |
| **Labor** | | | | | |
| Formen | 30 | hr | | $31.00 | $930.00 |
| Excavater Operator | 9 | hr | | $18.00 | $162.00 |
| Loader Operator | 21 | hr | | $18.00 | $378.00 |
| Skidster Operator | 11 | hr | | $18.00 | $198.00 |
| Laborer | 49 | hr | | $13.00 | $637.00 |
| Grader Operator | 12 | hr | | $18.00 | $216.00 |
| Roller Operator | 10 | hr | | $18.00 | $180.00 |
| Project Manager | 10 | hr | | $40.00 | $400.00 |
| | | | Subtotal: | | $3,101.00 |
| | Overtime Factor: | | | 1.0 | $3,101.00 |
| | | | Subtotal: | | $3,101.00 |
| | Labor Burden: | | | 50.00% | $1,550.50 |
| | | | Total Labor: | | $4,651.50 |
| **Equipment** | | | | | |
| Medium Excavator | 9 | hr | | $90.00 | $810.00 |
| Medium Front End Loader | 21 | hr | | $75.00 | $1,575.00 |
| Skidsteer with Hammer Attachment | 11 | hr | | $90.00 | $990.00 |
| Motor Grader | 12 | hr | | $125.00 | $1,500.00 |
| Dynopac Roller | 10 | hr | | $55.00 | $550.00 |
| F-250 Pickup | 30 | hr | | $10.00 | $300.00 |
| | | | Total Equipment: | | $5,725.00 |
| Subtotal Material, Subcontract, Labor, and Equipment: | | | | | $16,076.50 |
| Allowable Markup (6% OH + 10% Profit ) | | | | 16.00% | $2,572.24 |
| | | | TOTAL: | | $18,648.74 |

2/22/2005
8:42 AM
P:\2004\4-024\Subs_Suppliers\Homestead Paving\4-024_Back Charge_01.xls

**Operational Contract Office**
**482nd LSS/LGC**

**The Redland Company, Inc. Claim and Pass-Through Claim for the Use and Benefit of Homestead Paving Co., RFCO No. 10 Claim No. 4 Claim for 4X4 Concrete Slab Repair Contract No. FA6648-01-C0001 Project No. KYJM 99-9037 TRC No. 4-024 Mill/Overlay Asphalt Ramp, FANG**

---

## I. Introduction

The Redland Company, Inc. ("Redland") contracted with the United States Government ("Owner") for work relating to asphalt ramp mill/overlay, FANG ("Project"). This claim is for the direct costs of unforeseen additional work performed at the owner's direction to saw cut and remove a 4X4 section of concrete where a partial depth crack occurred. This work was performed in lieu of repair, as the contract specifications provide for a partial depth crack.

## II. Claim

Redland's subcontractor, Homestead Paving, performed this work under the oversight of Redland's project manager. As a result of the additional work, Homestead and Redland incurred additional costs.

See Exhibit "1" attached and incorporated herein.

## III. Claim Amount

The claim amount, as set forth in Exhibit 1, is **$6,256.88.**

# CERTIFICATION OF CLAIM

| | | |
|---|---|---|
| RE: | Contract No.: | FA6648-01-C0001 |
| | Project No.: | KYJM 99-9037 |
| | Titled: | Mill/ Overlay Asphalt Ramp, FANG |
| | TRC No.: | 20-44/4-024 |
| | RFCO No. | 10 |
| | Claim No. | 04 |

I certify that the claim is made in good faith; that the supporting data are accurate and complete to the best of my knowledge and belief; that the amount requested accurately reflects the contract adjustment for which the Contractor believes the Government is liable; and that I am duly authorized to certify the claim on behalf of the Contractor.

James A. Easom
Vice President
The Redland Company, Inc.

# EXHIBIT 1

THE Redland COMPANY INC.

247-3226 23799 S.W. 167 Avenue • Homestead, Florida 33031 Fax: (305) 247-173

# REQUEST FOR CHANGE ORDER

TO: Operations Contracting Office Via: U.S. Mail
482nd LSS/LGC
29050 Coral Sea Blvd, Box 50
Homestead ARB, FL 33039-1299
ATTN: Mr. Henry Burgains

PROJECT: Mill/Overlay Asphalt Ramp FANG August 31, 2005
Contract No.: FA6648-01-C0001
Project No.: KYJM 99-9037
TRC Project No.: 20-44 (discontinued)
TRC Project No.: 4-024 (updated) RFCO NO.: 10

Direct costs reflect addition work to be performed at the owners request to saw cut and remove a 4 x 4 section of concrete where the partial depth crack occurred. This work is performed in lieu of a repair as the contract specifications require for a partial depth crack. This RFCO is inclusive only of the scope of work as listed below and no other services will be rendered without approval by change order.

1. Saw-cut, demo and remove 4' by 4' section where crack occurred
2. Drill, Epoxy and install Dowels and Tie Bars
3. Install 750 Flex Concrete
4. Saw-cut and install backer rod and sealant

Total Amount: $ 6257.00 Lump Sum

NOTES:

1. No additional permit or submittal items are included.
2. No work shall proceed until this RFCO is approved in writing.
3. Payment is to be by Lump Sum (percent complete) and shall be placed as a billable change order on the current billing documents.
4. A contract time extension will be required in the amount of days that The Redland Company Inc was impacted due to the delays beyond the control of the contractor once the full impact of these damages has been realized.
5. This RFCO is only valid if the work included herein is completed simultaneously with the corresponding similar work throughout the remainder of the project and prior to construction of subsequent activities.
6. This RFCO does not include any related delays to other activities as a result of this added/unforeseen work.
7. All work is based on normal working days and hours (M-F, 7am-3:30pm) and does not include any overtime, night work, weekend, or holiday work.
8. The Contractor reserves its right to modify this RFCO/Claim as may be required.

By: [signature] Steven T. Pfoh, The Redland Co., Inc.

APPROVED BY: ______________________ DATE: ______________

APPROVED IN THE AMOUNT OF:

CHANGE ORDER NO.________ TO BE ISSUED BY: [ ] (OWNER) [ ] (CONTRACTOR)

---

Cc: TRC distribution

The Redland Company, Inc.
Mill/Overlay Asphalt Ramp FANG
HARB, FL
TRC Project No.: 20-44; 4-024
RFCO No.: 10

This RFCo is for the removal and replacement of a 4X4 section of concrete that the Government is requiring to be removed after a core was performed proving the crack was not full depth

| Item | Quantity | Unit | | Unit Price | Amount |
|---|---|---|---|---|---|
| Material/Other | | | | | |
| | | | | $0.00 | $0.00 |
| | | | | | $0.00 |
| | | | | | $0.00 |
| | | | | | $0.00 |
| | | | Subtotal: | | $0.00 |
| | | | Tax (7.0%): | | $0.00 |
| | | | Total Material: | | $0.00 |
| Subcontract | | | | | |
| Homestead Paving Claim | 1 | ls | | $4,200.00 | $4,200.00 |
| | | | | | $0.00 |
| | | | | | $0.00 |
| | | | | | $0.00 |
| | | | Total Subcontract: | | $4,200.00 |
| Labor | | | | | |
| Project Manager (Redland) for concrete replacemer | 10 | hr | | $75.00 | $750.00 |
| | | | | | $0.00 |
| | | | | | $0.00 |
| | | | | | $0.00 |
| | | | | | $0.00 |
| | | | | | $0.00 |
| | | | | | $0.00 |
| | | | Subtotal: | | $750.00 |
| | Overtime Factor: | | | 1.0 | $750.00 |
| | | | Subtotal: | | $750.00 |
| | Labor Burden: | | | 50.00% | $375.00 |
| | | | Total Labor: | | $1,125.00 |
| Equipment | | | | | |
| | | | | | $0.00 |
| | | | | | $0.00 |
| | | | | | $0.00 |
| | | | | | $0.00 |
| | | | | | $0.00 |
| | | | | | $0.00 |
| | | | Total Equipment: | | $0.00 |
| Subtotal Material, Subcontract, Labor, and Equipment: | | | | | $5,325.00 |
| Allowable Markup (6% OH + 10% Profit + 1.5% Bond) | | | | 17.50% | $931.88 |
| | | | TOTAL: | | $6,256.88 |

8/31/2005
7:40 AM
P:\2004\4-024\Owner\RFCO\4-024_RFCO_10_.xls

P. 1

* * * COM... .ICATION RESULT REPORT ( AUG. 31. 2. 5 8:34AM ) * * *

FAX HEADER:

TRANSMITTED/STORED : AUG. 31. 2005 8:31AM

| ILE MODE | OPTION | ADDRESS | RESULT | PAGE |
|---|---|---|---|---|
| 781 MEMORY TX | | 3052247055 | OK | 4/4 |

REASON FOR ERROR
E-1) HANG UP OR LINE FAIL
E-3) NO ANSWER
E-2) BUSY
E-4) NO FACSIMILE CONNECTION

THE Redland COMPANY INC.

Office: (305) 247-3226 23799 S.W. 167 Avenue • Homestead, Florida 33031 Fax: (305) 247-17.

# FAX TRANSMITTAL

TO: Operation Contracting Office

DATE: 8-31-05

ATTN: Henry Burgoine

FAX #: 305-224-7055

NO. OF PAGES: 4
(INCLUDING COVER PAGE)

RE:

MESSAGE:

THE REDLAND COMPANY, INC.

[signature]

Complete Land Development
Clearing • Drainage • ...

Asphalt & Concrete Construction

P. 1

* * * COMM. ICATION RESULT REPORT ( SEP. 7. 2. 10:26AM ) * * *

FAX HEADER:

TRANSMITTED/STORED : SEP. 7. 2005 10:19AM
FILE MODE OPTION

| FILE MODE | OPTION | ADDRESS | RESULT | PAGE |
|---|---|---|---|---|
| 23 MEMORY TX | | 3052247055 | OK | 4/4 |

REASON FOR ERROR
E-1) HANG UP OR LINE FAIL
E-3) NO ANSWER
E-2) BUSY
E-4) NO FACSIMILE CONNECTION

THE Redland COMPANY INC.

Office: (305) 247-3226

23799 S.W. 167 Avenue • Homestead, Florida 33031

Fax: (305) 247-17

# FAX TRANSMITTAL

TO: Operation Contracting Office

DATE: 9-7-05

ATTN: Henry Burgaiaa

FAX #: (305) 224-7055

RE:

NO. OF PAGES: 4
(INCLUDING COVER PAGE)

MESSAGE:

THE REDLAND COMPANY, INC.

[signature]

Complete Land Development
Clearing • Drainage • Water & Sewer

Lake Excavation

Equipment Rentals

Asphalt & Concrete Construction

**Operational Contract Office**
**482nd LSS/LGC**

**The Redland Company, Inc. Claim and**
**RFCO No. 11**
**Home Office and Job Site Overhead for Extended Performance**
**Beyond the Sixty Day Contract Period**
**Claim No. 5**
**Contract No. FA6648-01-C0001**
**Project No. KYJM 99-9037**
**TRC No. 4-024**
**Mill/Overlay Asphalt Ramp, FANG**

---

## I. Introduction

The Redland Company, Inc. ("Redland") contracted with the United States Government ("Owner") for work relating to asphalt ramp mill/overlay, FANG ("Project"). The original Contract time was sixty (60) days. The Notice to Proceed was re-issued on October 18, 2004.

Due to unforeseen factors beyond Redland's control, including without limitation concrete duct bank demolition, concrete rework directed by owner despite the impossibility of meeting the unreasonable specifications imposed, additional asphalt milling and grading, footing and rebar removal, and concrete slab repair, Redland's work was delayed beyond the original sixty day performance period. As a result, Redland incurred additional home office overhead costs and job site overhead costs. The original Contract completion date based on the sixty day performance period would have been December 19, 2004, but as a result of the unforeseen delay factors beyond Redland's control, the final Project work was performed on January 11, 2006.

## II. Claim

The re-notice of commencement was issued on October 20, 2004. The original specified performance time was sixty days, which meant the work should have been completed by December 19, 2004.

However, the owner began to delay the work almost immediately. The owner required rework of the outer lane concrete tie down surfaces due to, among other things, the supposed excessive time between charging of the mixer and placement of concrete. The owner required this rework despite the fact that the concrete work conformed to other, more current specifications and despite the fact that the owner imposed logistics rendered conformance to the more stringent time specification effectively impossible.

Concrete placement began on November 5, 2004, but because of the required rework, was delayed well into December 2004. Redland's original work passed the contractually specified concrete tests and the owner's rejection of the work and requirement for rework was arbitrary and unreasonable.

Other factors also delayed the work. Security delays delayed and hindered Redland's work. Redland encountered unforeseen conditions, including duct banks and rebar, for which the government failed to provide timely direction. The owner further unreasonably rejected concrete base which passed the required testing. The government did not furnish a sufficient grading plan and Redland had to furnish this design at additional time and cost.

RFCOs Nos. 3, 4, 5, 6, 7, 8 and 10, incorporated by reference herein, provide the detail on these delay causing factors. All of these factors caused Redland to remain on the Project for 387 additional days through January 11, 2006. Redland submits this claim for the home office overhead and job site overhead incurred during this period.

## III. Claim Amount

As a result of the government-caused delays, Redland was compelled to remain on the Project for 387 additional days so as to complete its work and incurred additional home office and job site overhead for this period.

This shall serve as Redland's indirect rate cost proposal pursuant to F.A.R. Section 42-705-1.

These damages are calculated using Redland's audited overhead as follows:

Redland audited overhead rate at 6% of original contract amount:

(.06) X ($303,085), which divided by the original contract performance period of sixty days is $303.09 per day.

$303.09 per day X 387 additional days = $117,295.83 additional home office overhead costs incurred.

Total additional/extended unabsorbed home office overhead costs incurred:

**$117,295.83.**

# CERTIFICATION OF CLAIM

| | | |
|---|---|---|
| RE: | Contract No.: | FA6648-01-C0001 |
| | Project No.: | KYJM 99-9037 |
| | Titled: | Mill/ Overlay Asphalt Ramp, FANG |
| | TRC No.: | 20-44/4-024 |
| | RFCO No. | 11 |
| | Claim No. | 04 |

I certify that the claim is made in good faith; that the supporting data are accurate and complete to the best of my knowledge and belief; that the amount requested accurately reflects the contract adjustment for which the Contractor believes the Government is liable; and that I am duly authorized to certify the claim on behalf of the Contractor.

James A. Easom
Vice President
The Redland Company, Inc.