# United States Court of Federal Claims

No. 08-606 C
April 7, 2011

| | |
|---|---|
| **The Redland Company, Inc.,** | Contract Disputes Act; *Eichleay* Damages; Unabsorbed Overhead; Standard for "Standby" Damages; Equitable Adjustment; Breach of Contract; Constructive Change; Commercial Impracticability; Doctrine of Economic Waste |
| *Plaintiff,* | |
| v. | |
| **United States of America,** | |
| *Defendant.* | |

*Joseph W. Lawrence, II*, Vezina, Lawrence, & Piscitelli, P.A., Fort Lauderdale, FL, for plaintiff.

*Austin M. Fulk*, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, DC, for defendant.

**OPINION *and* ORDER**

**Block, *Judge*.**

The ancient Romans used an extensive system of roads such as the Via Appia, the famed cobbled Appian Way, to connect their vast empire. The empire spanned at its height much of Britain, Gaul (modern day France), Italy, and other lands surrounding the Mediterranean including North Africa, and Asia Minor up to the boundaries of the Tigris and Euphrates Rivers. Truly, all roads led to Rome.

Because they were paved, these roads could withstand heavy traffic and allowed the Romans to move their Legions quickly and efficiently to wherever they were needed to ensure the empire's security. *See* Logan Thompson, *Roman Roads*, History Today, Feb. 1997, at 21, 21–22. In order to build and maintain these roads, the Romans depended, at least in part, on master-builder construction workers called "*redemptores*" to do the digging and paving pursuant to contract. *See id.* at 25; Cornelius van Tilburg, *Traffic and Congestion in the Roman Empire* 36–39 (2007); 2 *A Dictionary of Greek and Roman Antiquities* 947 (William Smith et al. eds., 3d ed., London, John Murray 1891). Today, the United States military also relies on contractors, modern day *redemptores*, to meet its paving needs. To be sure, these paving needs include projects well beyond those even contemplated by the ancient Romans, such as the project giving rise to the dispute in this case—the repaving of a parking area for jet aircraft.

Plaintiff, the Redland Company, Inc. ("Redland"), filed this complaint pursuant to the Contract Disputes Act ("CDA"),[1] seeking compensation on various claims arising from a paving contract with the United States Department of the Air Force ("the Air Force"). The Air Force awarded the contract to plaintiff in October 2000. Pl.'s Resp. to Def.'s Proposed Findings of Uncontroverted Fact ("Pl.'s Resp. to Def.'s Proposed Findings") ¶ 1. The contract required plaintiff to resurface an aircraft parking area at Homestead Air Reserve Base ("HARB") in Florida, by removing the existing asphalt and concrete and then laying new asphalt and concrete. *Id.*; *see* Compl. Ex. 1.

Performance was to begin soon after the contract award. Pl.'s Resp. to Def.'s Proposed Findings ¶ 11. However, a work-suspension order from the Air Force delayed the start of performance for nearly four years. Compl. ¶ 7. Plaintiff alleges that it is entitled to compensation as a result of this four-year suspension of performance. *Id.* Plaintiff further alleges that, once work began, the Air Force's actions substantially delayed project completion, prolonging the period of performance from an anticipated sixty-one days to well over a year. *Id.* ¶ 14. Finally, plaintiff alleges that it was required to perform additional work, *i.e.*, work not contemplated under the contract, for which it was either inadequately compensated or not compensated at all. *Id.* ¶¶ 9–13. On these facts, plaintiff asserts multiple claims against defendant.

For the sake of convenience and clarity, the court has enumerated plaintiff's various claims. These begin with a claim for compensation for unabsorbed home office overhead during the four-year period of suspension (Claim 1). Thereafter, plaintiff asserts a claim for compensation for delayed project completion (Claim 2), removal of additional asphalt (Claim 3), removal and replacement of additional concrete (Claim 4), delayed access to HARB (Claim 5), removal of unanticipated buried metal and concrete (Claim 6), repairing an electrical duct bank (Claim 7), providing finish grade elevations (Claim 8), and, finally, repairing a crack in the concrete (Claim 9). *Id.* ¶¶ 7–14.

Before the court are the parties' cross-motions for summary judgment pursuant to Rule 56 of the Rules for the Court of Federal Claims ("RCFC"). Defendant seeks summary judgment on

---

[1] On January 4, 2011, Public Law No. 111-350 was signed into law, reorganizing Title 41 of the United States Code. *See* Act of Jan. 4, 2011, Pub. L. No. 111-350, 124 Stat. 3677 (2011). The original location of the Contract Disputes Act of 1978, 41 U.S.C. §§ 601–13, has been replaced by 41 U.S.C. §§ 7101–09. *See* Pub. L. No. 111-350, § 7, 124 Stat. at 3860; *Envtl. Safety Consultants, Inc. v. United States*, No. 10-191C, 2011 WL 488685, at *3–4 (Fed. Cl. Feb. 11, 2011) (recognizing the change in statutory provisions). While Public Law No. 111-350 provides for the repeal of §§ 601–13, it does so with an "except[ion] for . . . proceedings that were begun before the date of enactment of this Act." Pub. L. No. 111-350, § 7, 124 Stat. at 3855. However, this court's jurisdictional statute, the Tucker Act, now points to the new sections, §§ 7101–09, in referencing jurisdiction over contract disputes. 28 U.S.C. § 1491(a)(2), *amended by* Pub. L. No. 111-350, § 5(g)(7), 124 Stat. at 3848 (providing jurisdiction for contract disputes arising under 41 U.S.C. § 7104(b)(1)). Accordingly, the court cites to the new sections, where the pertinent language is identical to the previous sections. Although the new codification removes nearly all references to the "Contract Disputes Act," the court continues, for the sake of familiarity, to refer to the new sections as the Contract Disputes Act or CDA. *See* Pub. L. No. 111-350, § 5, 124 Stat. at 3841–50.

Claims 1, 2, and 3. Def.'s Mot. for Partial Summ. J. ("Def.'s Mot. for Summ. J.") at 1. For its part, plaintiff seeks summary judgment as to liability on all nine claims found in its complaint. Pl.'s Cross-Mot. for Summ. J. on Liability ("Pl.'s Mot. for Summ. J.") at 1–2. In addition, plaintiff seeks summary judgment as to liability on a claim for breach of contract, which is found nowhere in its complaint and is raised for the first time in the motion for summary judgment. *Id.* at 13. For the reasons explained below, defendant's motion is granted as to Claims 1 and 2, but denied as to Claim 3. Plaintiff's motion is granted as to Claims 6, 7, and 8, but is denied as to all other claims.

## I. BACKGROUND

On October 30, 2000, the Air Force awarded plaintiff contract number FA6648-01-C0001 ("the contract"). Compl. ¶ 1; Pl.'s Resp. to Def.'s Proposed Findings ¶ 1. As noted above, the contract required plaintiff to repave a parking area for jet aircraft at HARB. Compl. ¶ 1; Pl.'s Resp. to Def.'s Proposed Findings ¶ 1. The parking area in question (the "project site" or "work site") is located near an alert shelter for the Florida Air National Guard (appropriately known by the warlike name of "FANG"). Pl.'s Resp. to Def.'s Proposed Findings ¶ 2. This alert shelter houses fully fueled and armed jets that can be launched on short notice to intercept aircraft posing a threat to the United States. Pl.'s Resp. to Def.'s Proposed Findings ¶ 4. Plaintiff was to repave a three-lane section of the parking area. *See* Pfoh Dep. 82:11, Oct. 7, 2009.

On December 1, 2000, plaintiff received from the contracting officer ("CO") a "notice to proceed," which is the CO's authorization for a contractor to begin work on a project. Pl.'s Resp. to Def.'s Proposed Findings ¶ 7. The contract required plaintiff to begin performance within fourteen days of receiving the notice to proceed. Compl. Ex. 1 at 1. However, also on December 1, 2000, and paradoxically received about the same time as the notice to proceed, the CO issued a second order suspending work until further notice. Def.'s Mot. for Summ. J. Ex. F. The stated reason for the suspension was the delayed completion of another paving project in a different section of the parking area. Pl.'s Resp. to Def.'s Proposed Findings ¶ 8; Burgains Dep. 15:5–25, Nov. 4, 2009. Because FANG needed to ensure the availability of at least one section of the parking area at all times, plaintiff could not begin work until the other paving project was completed. Burgains Dep. 17:22–18:13.

During the period of suspension, the parties had sporadic discussions about when the suspension would be lifted and work could begin. Pl.'s Resp. to Def.'s Proposed Findings ¶ 9. On August 23, 2002, plaintiff's vice president requested that the Air Force provide thirty days notice before requiring plaintiff to begin work. *Id.* ¶ 9. It is uncertain whether the Air Force responded to this request. *Id.* Eventually, in a letter dated July 21, 2004, the CO notified plaintiff that the Air Force intended to lift the suspension on or about September 30, 2004. *See* Def.'s Mot. for Summ. J. Ex. X; *see also* Def.'s Resp. to Pl.'s Proposed Findings of Uncontroverted Fact ("Def.'s Resp. to Pl.'s Proposed Findings") ¶ 5. The Air Force ultimately lifted the suspension on October 18, 2004, with work to begin on October 20, 2004, and be completed by December 19, 2004. Pl.'s Resp. to Def.'s Proposed Findings ¶ 11.

Plaintiff alleges that, on the day the suspension was lifted, it and its subcontractor were delayed from entering HARB due to security clearance problems. Compl. ¶ 8. According to the CO, this delay resulted from plaintiff's failure to follow the correct security clearance procedures.

*See* Burgains Dep. 39:8–23.  According to plaintiff's project manager, however, plaintiff timely submitted the correct security information to the Air Force and any delay was thus the fault of the Air Force.  *See* Pfoh Dep. 136:19–143:5.

Once plaintiff and its subcontractor gained entry to HARB and work was underway, one of the first tasks to be completed was the milling, or removal, of existing asphalt from the parking area.  Pfoh Dep. 31:16–25.  The contract specified that the layer of asphalt to be milled was two to four inches deep.  Def.'s Resp. to Pl.'s Proposed Findings ¶ 10.  Plaintiff alleges that it encountered asphalt in excess of four inches, which required additional milling at increased cost.  Compl. ¶ 9.  So, on November 1, 2004, plaintiff submitted Request for Change Order ("RFCO") Number 5, requesting compensation for "additional direct costs" resulting from the milling of additional asphalt "along the NE [(northeast)] portion of the project."  *Id.* Ex. 2.  According to plaintiff's project manager, the CO was timely notified of the additional asphalt encountered and the CO approved the additional milling.  Pfoh Dep. 40:10–43:22.  The CO, however, denies having been informed of this differing site condition or having authorized any additional milling.  Burgains Dep. 41:3–24.

Also while removing the existing asphalt, plaintiff encountered unforeseen metal and concrete, as well as an electrical duct bank buried within the asphalt.  Def.'s Resp. to Pl.'s Proposed Findings ¶¶ 18–19.  The electrical duct bank, which is essentially a collection of metal tubes housing electrical wiring, was apparently damaged during the milling process, and thus the Air Force required plaintiff to repair it.  Def.'s Resp. to Pl.'s Proposed Findings ¶ 19.

After removing the existing asphalt and concrete, plaintiff prepared to lay new concrete and asphalt.  Pfoh Dep. 44:9–13.  The Air Force then informed plaintiff that additional work would be needed to ensure that water would properly drain from the parking area once it was repaved.  Pfoh Dep. 55:4–58:10.  In particular, the Air Force required plaintiff to provide so-called finish grade elevations in order to ensure that the repaved parking area would have the necessary slope to allow for proper drainage.  *See* Pfoh Dep. 58:20–59:5; Def.'s Resp. to Pl.'s Proposed Findings ¶ 21.

After providing the needed finish grade elevations, plaintiff began pouring the new concrete.  Pfoh Dep. 59:23–60:17.  Concrete for the project was loaded into trucks, or "batched," at an off-base concrete plant, and then delivered to the work site at HARB.  Pfoh Dep. 86:6–16; Easom Dep. 88:24–25, Oct. 6, 2009.  The contract required plaintiff to deliver the concrete for pouring at the work site, in each of the three lanes being repaved, within forty-five minutes of batching (in other words, when it was loaded onto the truck).  Pl.'s Resp. to Def.'s Proposed Findings ¶ 14.  The time period between batching at the plant and pouring at the work site was important because concrete begins to harden immediately after being produced.  *See* Pfoh Dep. 119:8.  If too much time were to pass between preparation of the concrete at the plant and pouring at the work site, the concrete would not set properly when poured and its strength would be affected.  *See* Pfoh Dep. 119:4–120:9.

Although the contract required delivery of the concrete within forty-five minutes, it is uncontroverted that the concrete for the first lane was not poured within forty-five minutes of batching.  *See* Pl.'s Resp. to Def.'s Proposed Findings ¶ 14; Rhodes Dep. 50:1–22, 69:11–13, Oct. 9, 2009.  Plaintiff's subcontractor for concrete, Homestead Paving, was unaware of the forty-

five minute time limit, believing instead that the time limit was ninety minutes. Rhodes Dep. 44:12–45:19. The actual amount of time between batching and pouring of concrete for the first lane varied by truck, but, according to the owner of Homestead Paving, was as long as two hours for one truck. Rhodes Dep. 50:2–10.

The Air Force's project engineer contends that he observed two other contract violations relating to the first lane of concrete—the addition of water to the concrete mixture, and improper vibration of the concrete once it was poured. *See* Willock Dep. 105:9–108:16, 120:1–121:10, Oct. 29, 2009. Vibration is a process designed to ensure that all voids in the concrete are filled and that any air trapped in the concrete is removed. Pfoh Dep. 102:15–19. Adding water to concrete or improperly vibrating concrete can adversely affect the quality of the finished concrete. Easom Dep. 94:1–95:13; Leon Dep. 114:2–17, Oct. 8, 2009. Plaintiff refutes the Air Force's assertions and maintains that no water was added to the concrete and that the concrete was properly vibrated. Pl.'s Proposed Findings of Uncontroverted Fact ¶ 14.

After the first lane of concrete was poured, and prompted by plaintiff's objection to the forty-five minute time limit for delivery of the concrete after batching, the CO performed a test by driving the route from the concrete plant to the work site at HARB in order to determine if it was possible to travel from the concrete plant to HARB within the forty-five minutes required by the contract. Burgains Dep. 130:3–131:17. According to the CO, it took him between twenty and thirty minutes to travel by car from the concrete plant to HARB. *Id.* All the same, plaintiff's project manager contends that it took the concrete trucks an average of forty-three minutes to reach HARB and, upon reaching the entrance to the base, it took additional time for the trucks to pass through security and travel to the project site. *See* Pfoh Dep. 87:1–88:9. According to plaintiff, these facts demonstrate that the requirement to pour concrete within forty-five minutes of batching at the plant was impossible to meet. *See* Pl.'s Mot. for Summ. J. at 22–23.

After learning that the Air Force intended to reject the first lane of concrete, *see* Willock Dep. 101:18–25, 105:12–15, plaintiff requested that the CO withhold his final decision until the concrete underwent the testing required by the contract. *See* Compl. Exs. 1–2. Plaintiff believed that the concrete would pass this testing and should thus be acceptable even though it had not been poured within forty-five minutes of batching. *See* Compl. Ex. 2. Ultimately, the first lane of concrete passed all tests performed. Def.'s Resp. to Pl.'s Proposed Findings ¶ 15; Rhodes Dep. 52:6–56:6; Easom Dep. 81:18–21. Nevertheless, without waiting for the test results, the CO notified plaintiff that the Air Force was rejecting the first lane of concrete due to plaintiff's failure to pour the concrete within specified time limits, plaintiff's addition of water to the concrete mixture, and plaintiff's improper vibration of the concrete. *See* Compl. Ex. 2. The CO required plaintiff to remove the newly poured concrete and to pour the first lane of concrete again. Def.'s Resp. to Pl.'s Proposed Findings ¶ 13. However, before plaintiff poured any additional concrete, the CO agreed to relax the time limit for delivery and pouring of the concrete from forty-five minutes to sixty minutes after batching. *Id.* ¶ 16. Thereafter, plaintiff encountered no problems relating to the time between the batching and pouring of concrete. Pfoh Dep. 171:15–18; Rhodes Dep. 99:6–9.

After replacing the first lane of concrete, plaintiff proceeded to pour concrete for the remaining two lanes. Shortly after the second lane of concrete was poured, a crack developed in one corner. Pfoh Dep. 128:6–21; Rhodes Dep. 71:22–72:2. Under the terms of the contract,

plaintiff was required to repair this crack.  Pfoh Dep. 129:22–25.  However, the required manner of repair differed depending on whether the crack was a "partial-depth" or "full-depth" crack. Pfoh Dep. 133:12–134:3.  A partial-depth crack could be repaired by cutting a small area around the crack and refilling it with new concrete.  *Id.*  Repairing a full-depth crack, however, required removal of an entire section of concrete, at greater expense.  *Id.*; Rhodes Dep. 73:22–74:13.

Perhaps not surprisingly, the Air Force and plaintiff disagreed on whether the crack was partial-depth or full-depth.  According to plaintiff, the crack was a partial-depth crack because it only extended part of the way through the concrete.  Pfoh Dep. 133:12–134:3.  However, the Air Force regarded the crack as full-depth because it considered any crack extending more than halfway through the concrete to be a full-depth crack.  Willock Dep. 199:14–200:9.  In the end, the Air Force required plaintiff to perform the more extensive repair required for a full-depth crack.  Rhodes Dep. 71:17–18; Willock Dep. 199:14–200:9.  Thereafter, on August 31, 2005, plaintiff submitted a Request for Change Order to the CO, requesting additional compensation for repairing the concrete crack.  *See* Compl. Ex. 2.  In a modification dated September 29, 2005, the CO granted only partial compensation for this work.  *See* Def.'s Opp'n to Pl.'s Cross-Mot. for Summ. J. on Liability and Reply in Support of Def.'s Mot. for Partial Summ. J. ("Def.'s Opp'n") Ex. 8; Burgains Dep. 62:11–63:24.

When all work under the contract was ultimately completed on January 11, 2006, the period of performance had lasted 449 days, greatly exceeding the sixty-one days specified in the notice to proceed.  Pl.'s Resp. to Def.'s Proposed Findings ¶¶ 6, 11, 18.  In the CO's judgment, plaintiff was not to blame for the delay in project completion.  Burgains Dep. 178:9–25.  So, the CO granted plaintiff a time extension through January 11, 2006, the end of the actual period of performance.  *See* Def.'s Resp. to Pl.'s Proposed Findings ¶ 22.  Here, the contract provided that the Air Force would be entitled to $338.42 in liquidated damages for each calendar day of delay caused by plaintiff.  *See* Compl. Ex. 1 at 11.  Liquidated damages are a reasonable estimation of actual damages agreed to by the parties in advance and recoverable by one party if the other party fails to fulfill its obligations under the contract.  *See* Restatement (Second) of Contracts § 356 (1981); *see generally* Black's Law Dictionary 447 (9th ed. 2009).  The CO did not assess any liquidated damages against plaintiff for the delay in project completion, as he could have done if he believed that plaintiff was responsible for the delay.  Def.'s Resp. to Pl.'s Proposed Findings ¶ 22.

On September 8, 2006, plaintiff submitted to the CO several claims for additional compensation and requested that the CO issue a final decision either approving or denying the claims, as is required by the CDA.  Def.'s Resp. to Pl.'s Proposed Findings ¶ 26; Compl. Ex. 2; *see* Pub. L. No. 111-350, § 3, 124 Stat. at 3819 (codified at 41 U.S.C. § 7103(f)(2)) (requiring a CO either to issue a decision or to "notify the contractor of the time within which a decision will be issued" within sixty days of receiving a claim).  The CO neither issued a final decision on plaintiff's claims nor notified plaintiff of when he would issue a decision.  *See* Def.'s Resp. to Pl.'s Proposed Findings ¶ 26.  Plaintiff then filed suit in this court on August 28, 2008.  Compl. at 1; *see* Pub. L. No. 111-350, § 3, 124 Stat. at 3820 (codified at 41 U.S.C. § 7104(b)) (authorizing suit if the CO fails to issue a decision within the time periods specified in 41 U.S.C. § 7103).

The parties' cross-motions for summary judgment are now before the court.  As already noted, defendant seeks summary judgment on Claims 1, 2, and 3.  *See* Def.'s Mot. for Summ. J. at

1.  For its part, plaintiff seeks summary judgment as to liability on all nine claims in its complaint, as well as on a breach of contract claim not contained in its complaint.  *See* Pl.'s Mot. for Summ. J. at 1–2; Compl.

## II. JURISDICTION AND STANDARD OF REVIEW

### A. Jurisdiction

It is beyond dispute that the court has jurisdiction over the case at bar under the Tucker Act operating in conjunction with the CDA.  To be sure, the Tucker Act provides jurisdiction over "any claim by or against, or dispute with, a contractor arising under section 7104(b)(1) of title 41," which is the cite to the CDA.  28 U.S.C. § 1491(a)(2), *amended by* Pub. L. No. 111-350, § 5(g)(7), 124 Stat. at 3848; *see supra* note 1.  And the CDA itself provides jurisdiction by allowing a contractor to bring an action in the Court of Federal Claims after submitting a claim to the CO and the CO either issues a final decision denying the claim or fails to do so within the statutorily prescribed time limit.  *See* Pub. L. No. 111-350, § 3, 124 Stat. at 3820 (codified at 41 U.S.C. § 7104) (providing that the contractor must file its action in this court within twelve months of the CO's final decision).

### B. Summary Judgment Standards

In addition to determining jurisdiction, the court faces cross-motions for summary judgment.  *See Int'l Elec. Tech. Corp. v. Hughes Aircraft Co.*, 476 F.3d 1329, 1330 (Fed. Cir. 2007) ("[A] court in the first instance must determine whether or not it has subject matter jurisdiction . . . .");  RCFC 56.  To be sure, summary judgment is not a disfavored shortcut, but rather is an integral part of the court's rules designed to secure a just, speedy, and inexpensive determination of the facts.  *Spirit Leveling Contractors v. United States*, 19 Cl. Ct. 84, 89 (1989) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986)).  It is worth reiterating, however, that summary judgment is appropriate only when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.  RCFC 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986).

A factual dispute is considered "genuine" if it "may reasonably be resolved in favor of either party."  *Anderson*, 477 U.S. at 250.  Indeed, "[o]nly disputes over facts that might affect the outcome of the case under governing law will properly preclude the entry of summary judgment."  *Id.* at 248.  Thus, in order to defeat summary judgment, the nonmoving party must point to "'specific facts showing that there is a genuine issue for trial.'"  *Celotex*, 477 U.S. at 324 (quoting Fed. R. Civ. P. 56(e)).  Furthermore, the test that the court must apply to determine what constitutes a genuine issue of material fact is whether a rational fact-finder could reach only one reasonable conclusion.  *See, e.g., Matsushita Elec. Indus. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  The net result of this requirement is that a court cannot weigh the evidence or make credibility determinations.  *Anderson*, 477 U.S. at 249.  Rather, all reasonable inferences and presumptions must be resolved in favor of the non-moving party.  *Id.* at 255.  Finally, it must be noted that when faced with cross-motions for summary judgment, the court must evaluate each motion on its own merits.  *California v. United States*, 271 F.3d 1377, 1380 (Fed. Cir. 2001).

## III. DISCUSSION

Plaintiff seeks total damages in the amount of $698,939.16, broken down as follows: $429,478.53 for unabsorbed home office overhead during the four-year period of suspension (Claim 1); $117,295.83 for delayed project completion (Claim 2); $30,749.00 for additional asphalt removal (Claim 3); $103,637.50 for replacement of the first lane of concrete (Claim 4); $1,803.63 for the delay in accessing HARB (Claim 5); $7,999.00 for unforeseen material buried in the existing asphalt (Claim 6); $5,175.00 yet to be paid out of $8,000.28 originally sought for repair of the electrical duct bank (Claim 7); $525.00 yet to be paid out of $3,525.00 originally sought for providing finish grade elevations (Claim 8); and $2,257.00 yet to be paid out of $6,257.00 originally sought for repair of the concrete crack (Claim 9). Compl. ¶¶ 7–17. These amounts are taken from the complaint; the court notes that the sum of the individual amounts does not equal the total amount sought.

### A. *Unabsorbed Home Office Overhead (Claim 1)*

The court begins with plaintiff's first claim and notes that two salutary facts are clear from the record. First, it is uncontroverted that the CO issued a notice to proceed on December 1, 2000, then immediately suspended all work under the contract. Def.'s Resp. to Pl.'s Proposed Findings ¶¶ 2–3. Second, it is also uncontroverted that plaintiff did not begin work until nearly four years later, after the Air Force lifted the suspension on October 18, 2004. *Id.* ¶ 9. It is on these facts that plaintiff seeks compensation for delay based on the notion of recovering for damages on what is termed "unabsorbed home office overhead."

Home office overhead is among a contractor's indirect costs, "costs 'that are expended for the benefit of the whole business, [and] by their nature cannot be attributed or charged to any particular contract.'" *Nicon, Inc. v. United States*, 331 F.3d 878, 882 (Fed. Cir. 2003) (quoting *Altmayer v. Johnson*, 79 F.3d 1129, 1132 (Fed. Cir. 1996)). A contractor recovers its indirect costs, such as home office overhead, by allocating a share of these costs to each of its contracts. *See Nicon*, 331 F.3d at 882. The share allocated to each contract is proportional to the amount of direct costs incurred under that contract. *See id.*; Ralph C. Nash & John Cibinic, *Unabsorbed Overhead and the "Eichleay" Formula: Rampant Confusion*, 16 No. 5 Nash & Cibinic Report ¶ 23 (May 2002).

When the government suspends performance under a contract, however, the contractor ceases to incur direct costs under that contract. *See Nicon*, 331 F.3d at 882. If, during the period of suspension, the government requires the contractor to be on standby—*i.e.*, ready to begin work immediately or on short notice—the contractor may be unable to take on replacement work. *See id.* at 883. In that circumstance, the contractor can no longer immediately recover the proportional share of home office overhead originally allocated to the suspended project. *See* Nash & Cibinic, *supra*, ¶ 23; *Nicon*, 331 F.3d at 882. That share of the contractor's home office overhead is said to be "unabsorbed" during the period of suspension. *See Nicon*, 331 F.3d at 882. The Federal Circuit recognizes claims for compensation for unabsorbed home office overhead. *See id.*

The Federal Circuit has established the so-called *Eichleay* formula as the exclusive method for calculating a contractor's unabsorbed home office overhead during a period of government-

caused delay after the start of performance.[2]  *See Nicon*, 331 F.3d at 888; *see also Eichleay Corp.*, ASBCA No. 5183, 60-2 BCA ¶ 2688.  *Eichleay* damages are not available in all instances of government-caused delay, however.  Instead, "the contractor must meet certain strict prerequisites for the application of the formula."  *Nicon*, 331 F.3d at 883.

To establish a prima facie case of entitlement to *Eichleay* damages, the contractor must satisfy three prerequisites.  *Id.*; *P.J. Dick, Inc. v. Principi*, 324 F.3d 1364, 1370 (Fed. Cir. 2003).  First, the contractor must prove that there was a government-caused delay or suspension of uncertain duration.  *Nicon*, 331 F.3d at 883; *P.J. Dick*, 324 F.3d at 1370.  Second, the contractor must prove that the delay extended the original time for performance of the contract, or that the contractor finished on time but nonetheless incurred additional, unabsorbed overhead expenses because it had planned to finish even sooner.  *P.J. Dick*, 324 F.3d at 1370.  Finally, the contractor must prove that the government required it to remain on standby during the period of suspension, waiting to begin work immediately or on short notice.  *Id.* at 1371.  Once the contractor has proven these three elements, the "burden of production shifts to the government to show that it was not impractical for the contractor to take on replacement work and thereby mitigate its damages."  *Id.* at 1370. "If the government meets its burden of production, however, the contractor bears the burden of persuasion that it was impractical for it to obtain sufficient replacement work." *Id.*

The Federal Circuit has stressed that *Eichleay* damages are only available when the government-caused delay occurs after performance has begun, thereby extending the period of performance.[3]  *Nicon*, 331 F.3d at 884–85, 888.  The Federal Circuit has otherwise recognized only one situation in which a contractor may recover unabsorbed overhead during a period of delay that precedes the start of performance.  *See Nicon*, 331 F.3d at 888.  Specifically, when "the

---

[2] The *Eichleay* method for calculating unabsorbed overhead is as follows:  "(1) to find allocable contract overhead, multiply the total overhead cost incurred during the contract period times the ratio of billings from the delayed contract to total billings of the firm during the contract period; (2) to get the daily contract overhead rate, divide allocable contract overhead by days of contract performance; and (3) to get the amount recoverable, multiply the daily contract overhead rate times days of government-caused delay."  *Wickham Contracting Co., Inc. v. Fischer*, 12 F.3d 1574, 1577 n.3 (Fed. Cir. 1994).

[3] The *Eichleay* formula has long been the subject of criticism.  *See, e.g.*, Ralph C. Nash & John Cibinic, *Postscript: Unabsorbed Overhead and the "Eichleay" Formula*, 17 No. 6 Nash & Cibinic Report ¶ 33 (Jun. 2003) ("As best we can tell, the entire standby rule has little or nothing to do with home office overhead. . . .  Yet the Federal Circuit has devised this stringent standby rule to kill *Eichleay* damages and, at the same time, seems still to believe that there is no other means of proving unabsorbed overhead."); Ralph C. Nash & John Cibinic, *Unabsorbed Overhead and the "Eichleay" Formula: Rampant Confusion*, 16 No. 5 Nash & Cibinic Report ¶ 23 (May 2002) ("One of the most confusing issues in the pricing of claims by construction contractors is the proper application of the *Eichleay* formula in computing home office overhead.").  The Federal Circuit has noted that, given the long-standing nature of the *Eichleay* formula, any change to the formula should come from Congress.  *See Capital Elec. Co. v. United States*, 729 F.2d 743, 747 (Fed. Cir. 1984).

government terminates [a] contract for convenience after a period of delay, . . . the contractor may recover unabsorbed overhead costs as part of its termination for convenience settlement."[4]  *Id.* However, the contractor may not use the *Eichleay* method for calculating its unabsorbed overhead in that circumstance, but must offer an alternative method that is "reasonable . . . on the facts of the case."  *Id.*  And regardless of the method of calculation, the contractor must "satisfy the [same] strict prerequisites for recovery of unabsorbed overhead costs."  *Id.*

### 1. Plaintiff Is Not Entitled to *Eichleay* Damages

Here, because plaintiff had not started performance prior to issuance of the suspension order on December 1, 2000, it cannot recover *Eichleay* damages.  Plaintiff contends that issuance of the notice to proceed established the start of performance.  Pl.'s Reply in Support of Pl.'s Cross-Mot. for Summ. J. on Liability ("Pl.'s Reply") at 4.  Therefore, according to plaintiff, performance began on December 1, 2000, and was suspended by defendant that same day.  *See id.* However, equating the issuance of a notice to proceed with the start of performance is at odds with both the language of the contract and the parties' understanding.

The plain language of the contract made clear that the issuance of a notice to proceed and the start of performance were two distinct events.  In particular, the contract provided that plaintiff would "begin performance within 14 calendar days . . . after receiving . . . notice to proceed." Compl. Ex. 1.  Notice to proceed was thus merely the earliest date that performance could begin. This distinction was also reflected in the parties' actions when performance actually began in 2004.  After discussing possible dates with plaintiff, the Air Force issued a second notice to proceed on October 18, 2004, with performance to begin two days later, on October 20, 2004. Pl.'s Resp. to Def.'s Proposed Findings ¶ 11.  The parties thus clearly recognized what the contract established: performance commenced, not when the notice to proceed issued, but when work actually began.

Plaintiff points to no facts, and the court can find none, showing that plaintiff started performance under the contract before its receipt of the suspension order.  Plaintiff does point to the concurring opinion in *Nicon* and urges this court to adopt its view that whether performance has begun is immaterial to the availability of *Eichleay* damages.  Pl.'s Reply at 4 (citing *Nicon*, 331 F.3d at 888 (Newman, J., concurring)).  However, it is the majority opinion in *Nicon*, which held that *Eichleay* damages are only available when performance has begun, that binds this court. *See Nicon*, 331 F.3d at 888.  Because plaintiff had not yet begun performance at the time of the suspension, it is not entitled to recover *Eichleay* damages.

### 2. Plaintiff Cannot Recover Unabsorbed Overhead Using an Alternative Method of Calculation

In the alternative, plaintiff argues that, even if it is not entitled to *Eichleay* damages, it should be permitted to recover unabsorbed overhead using some other, unidentified method of calculation.  Pl.'s Reply at 5 n.1 (citing *Nicon*, 331 F.3d at 884–87).  Plaintiff posits that, under

---

[4] A termination for convenience occurs when the government ends performance of work under a contract because it determines that doing so is in the government's interest.  FAR 2.101(b).

*Nicon*, "even where contract performance has not yet begun, [a] contractor can seek unabsorbed overhead damages for an unreasonable delay in issuing the notice to proceed." *Id.*

Yet, *Nicon*'s holding does not sweep as broadly as plaintiff argues. *See Nicon*, 331 F.3d at 888 (describing its holding as "narrow"). Rather, the holding of *Nicon* is strictly limited to situations in which a contract is ultimately terminated for convenience. *See id.* In any event, the court need not decide whether *Nicon*'s holding can be extended to other situations because, as explained below, plaintiff cannot meet the "strict prerequisites for recovery of unabsorbed overhead costs," *id.*

As stated above, a plaintiff must meet three prerequisites in order to establish a prima facie case of entitlement to compensation for unabsorbed overhead. First, there must be a government-caused delay of uncertain duration. *Id.* at 883. Second, the delay must have extended the period of performance beyond what was originally anticipated. *Id.* Finally, the contractor must have been required to remain on standby during the period of delay. *Id.* It is undisputed that plaintiff meets the first two prerequisites. *See* Def.'s Resp. to Pl.'s Proposed Findings ¶ 4; Def.'s Proposed Findings of Uncontroverted Fact ¶¶ 6, 7, 11. However, as explained more fully below, the court concludes that plaintiff was not required to remain on standby during the period of suspension. Accordingly, plaintiff may not recover its unabsorbed overhead, even assuming that *Nicon* could be extended beyond cases involving a termination for convenience.

In judging whether a contractor was on "standby" during a period of delay, the court first determines "whether the CO [] issued a written order that [1] suspend[ed] all the work on the contract for an uncertain duration and [2] require[d] the contractor to remain ready to resume work immediately or on short notice. In such a case, the contractor need not offer further proof of standby." *P.J. Dick*, 324 F.3d at 1371. Otherwise, the contractor must demonstrate standby through indirect evidence. *Id.*

Plaintiff argues that the CO's suspension order in this case established standby, eliminating the need for further proof. Pl.'s Mot. for Summ. J. at 16–17. To be sure, the suspension order plainly established a suspension of uncertain duration, thus satisfying the first requirement above. *See P.J. Dick*, 324 F.3d at 1371. In particular, the suspension order provided that "a suspension of work is in effect, as of 01 Dec 01, *until further notice*."[5] Def.'s Mot. for Summ. J. Ex. F (emphasis added). However, the suspension order was silent as to whether plaintiff was required to be ready to resume work immediately or on short notice.

Plaintiff argues that the suspension order required it to be on standby precisely because it was silent on the matter and did not explicitly release plaintiff from the obligation to perform under the contract. Pl.'s Reply at 8 ("The appropriate standard is that in absence of language to the contrary, the contractor is required to standby for an uncertain duration."). In support of this argument, plaintiff cites *Oak Environmental Consultants v. United States*, 77 Fed. Cl. 688 (2007). According to plaintiff, the court in *Oak Environmental* "held that the order required the contractor

---

[5] Although the suspension order identified the date of suspension as December 1, 2001, the parties agree that the actual date of suspension was December 1, 2000. *See* Def.'s Resp. to Pl.'s Proposed Findings ¶ 3.

to standby for an uncertain duration because nothing in the letter relieved the contractor of its contractual responsibility." Pl.'s Reply at 7 (citing *Oak Envtl. Consultants*, 77 Fed. Cl. at 699).

Simply put, plaintiff grossly mischaracterizes the court's holding in *Oak Environmental*. In *Oak Environmental*, the court concluded that it was reasonable "for the contractor to be uncertain as to when or if contract performance would resume, and . . . to consider the suspension indefinite." *Oak Envtl. Consultants*, 77 Fed. Cl. at 699. However, the court concluded that fact-finding would be necessary in order to determine whether the contractor was required to remain on standby. *Id.* at 702 (denying the parties' cross-motions for summary judgment). The court explained that, only "if it [were] proven that the government tried to have Oak available for 'quick start-up and early completion,' and the government acted to accomplish this result, [would the government] be found to have placed Oak on standby." *Id.*

Moreover, plaintiff's proposed standard would render superfluous the Federal Circuit's careful explanation of how a contractor can prove standby by indirect evidence. *See P.J. Dick*, 324 F.3d at 1371 (holding that, unless the government issues a written order expressly placing a contractor on standby, the contractor must prove standby by indirect evidence). For, if standby were presumed in the absence of language explicitly relieving the contractor of its obligations, as plaintiff proposes, a contractor would never need to prove standby by indirect evidence. *See id.* To be sure, this view is not the law. Rather, as the Federal Circuit explained when rejecting a similar argument advanced by the plaintiff in *P.J. Dick*, absent a "suspension or other order *expressly* putting the contractor on standby," it is the contractor that bears the burden of proving standby by demonstrating, *inter alia*, that he was required to resume work immediately or on short notice. *Id.* at 1373 (emphasis added); *see* Ralph C. Nash & John Cibinic, *Postscript: Unabsorbed Overhead and the "Eichleay" Formula*, 17 No. 6 Nash & Cibinic Report ¶ 33 (Jun. 2003) (noting the difficulty in establishing "standby" after *P.J. Dick* "because it is unlikely that a Contracting Officer will issue a suspension order containing a requirement that the contractor be ready to immediately resume full-scale work with no remobilization period").

Accordingly, because the CO's suspension order, standing alone, does not establish standby in this case, plaintiff must demonstrate standby through indirect evidence. *See P.J. Dick*, 324 F.3d at 1371. To do so, plaintiff must show that: (1) the period of suspension "was not only substantial but was of an indefinite duration;" (2) plaintiff "was required to be ready to resume work on the contract, at full speed as well as immediately;" and (3) there was "effective suspension of much, if not all, of the work on the contract." *Id.* Plaintiff has failed to make the second showing.

Significantly, being "ready to resume work at full speed as well as immediately" is a strict requirement, one that is separate from the requirement that the delay or suspension be of uncertain duration. *Id.* For instance, if a contractor is given a reasonable amount of time to gather together its equipment and personnel after a suspension is lifted, the contractor is not on standby. *Id.* Nor is a contractor on standby if the government requires "immediate resumption of the work, but only with a reduced work force [that allows] the contractor to gradually increase its work force." *Id.* Rather, in order to be on standby, "the contractor must be required to keep at least some of its workers and necessary equipment at the site, even if idle, ready to resume work on the contract (*i.e.*, doing nothing or working on something elsewhere that allows them to get back to the contract site on short notice)." *Id.*

Plaintiff does not even allege that it had workers or equipment present at the work site during the period of suspension. *See* Pl.'s Reply at 10. Rather, plaintiff merely asserts that "[t]he record evidence demonstrates that Redland was a local contractor that could keep equipment and forces close-by, and did in fact re-commence on short notice." *Id.* Nevertheless, the evidence does not support plaintiff's assertion.

Although plaintiff was a local contractor, there is no evidence that it had equipment or personnel at any location either waiting idly for work to begin at HARB or doing work that could be immediately stopped. When asked to detail what resources plaintiff had available during the period of suspension, plaintiff's vice president could not identify any specific resources, but merely offered that plaintiff would have used either in-house equipment or rental equipment. Easom Dep. 22:5–23:4. Thus, rather than keeping resources idle and ready to commence work at HARB immediately, plaintiff evidently relied, at least in part, on its ability to rent equipment in order to begin work when the suspension was lifted. *See id.* These are signs of a fully employed construction company that would increase its resources to perform additional work, not one that was waiting on standby with its existing resources constantly at the ready.

Also, plaintiff cannot be said to have been ready to perform work immediately because it did not even enter into a contract with one of its primary construction subcontractors, Homestead Paving, until as late as 2004.[6] *See* Rhodes Dep. 16:20–25. Plaintiff essentially dismisses this as irrelevant, arguing that the question is whether plaintiff itself was on standby, not whether its subcontractors were on standby. *See* Pl.'s Opp'n to Def.'s Mot. for Summ. J. at 14 n.6. However, this fact is not so easily dismissed. A contractor cannot be said to have personnel and equipment available to perform "immediately and at full speed" when it makes extensive use of subcontractors and cannot guarantee the availability of those subcontractors. This is particularly true in this case, given that plaintiff relied on subcontractors to perform a majority, if not the entirety, of the repaving work. *See* Easom Dep. 45:10–19. Plaintiff's ability to start work immediately and at full speed thus depended no less critically on the availability of plaintiff's subcontractors than it did on the availability of plaintiff's own personnel and equipment.

Finally, plaintiff's repeated argument that it actually began performance on short notice is unsupported by the facts. *See* Pl.'s Mot. for Summ. J. at 17; Munz Decl. ¶ 9. In support of this argument, plaintiff points to the two-day period between issuance of the second notice to proceed on October 18, 2004, and the start of performance on October 20, 2004. *See* Munz Decl. ¶ 9. Yet, this is misleading. After all, plaintiff knew approximately when work would commence no later than August 18, 2004, when it received notice from the CO of a projected start date of September 30, 2004. *See* Easom Dep. 36:10–38:3; Munz Decl. Ex. B. This notice provided the thirty-day advance notice that plaintiff had consistently requested. *See* Easom Dep. 36:10–38:3. And the court is not persuaded by plaintiff's argument that a thirty-day notice is consistent with being on standby because it "requires immediate mobilization." *See* Pl.'s Mot. for Summ. J. at 17. Quite simply, beginning to "mobilize" is not the same as beginning to work. *See P.J. Dick*, 324 F.3d at 1371. At most, immediate mobilization is an immediate resumption of work with a reduced work force that is gradually increased—a situation that does not amount to standby. *See id.*

---

[6] It is also unclear when plaintiff entered into a contract with APAC, its subcontractor for asphalt paving and milling. *See* Easom Dep. 55:25–56:1.

To be sure, plaintiff's employees insist that plaintiff was on standby. *See* Easom Dep. 28:2–29:1; Leon Dep. 205:5–8. However, such conclusory statements are insufficient to defeat a motion for summary judgment. *See, e.g.*, *Moore U.S.A., Inc. v. Standard Register Co.*, 229 F.3d 1091, 1112 (Fed. Cir. 2000); *see also Madison Servs., Inc. v. United States*, 94 Fed. Cl. 501, 511 (2010) (citing *SEC v. Phan*, 500 F.3d 895, 909–10 (9th Cir. 2007) (holding that self-serving and conclusory affidavits, not based on a declarant's personal observation or knowledge, are not sufficient to overcome summary judgment)).

In sum, plaintiff is not entitled to *Eichleay* damages because those damages are available only for a period of government-caused delay after performance has begun, not in situations such as here where the delay occurred prior to the start of performance. Moreover, plaintiff has failed to satisfy the "strict prerequisites for recovery of unabsorbed overhead costs" because it was not on standby during the period of delay. *See Nicon*, 331 F.3d at 888. This serves as an additional bar to the award of *Eichleay* damages and to the recovery of unabsorbed overhead generally, regardless of the method of calculation. Accordingly, plaintiff's motion for summary judgment on this claim is denied, and defendant's motion for summary judgment on this claim is granted.

## B. Delayed Project Completion (Claim 2)

The court next turns to plaintiff's claim for compensation for delayed project completion. As noted above, performance of the contract began on October 20, 2004, and was to be completed by December 19, 2004, a performance period of sixty-one days. Pl.'s Resp. to Def.'s Proposed Findings ¶ 11. However, plaintiff did not complete work on the project until November 5, 2005, and the work was accepted on January 11, 2006. *Id.* ¶ 18. Thus the period of performance lasted 387 days longer than originally planned.[7] Def.'s Resp. to Pl.'s Proposed Findings ¶ 22. Plaintiff alleges that defendant is responsible for the entire 387-day extension of the period of performance. Pl.'s Mot. for Summ. J. at 21. Therefore, plaintiff seeks to recover its overhead costs for those 387 days. *Id.*

Plaintiff offers two pieces of evidence in support of this claim. First, plaintiff points to the undisputed fact that the CO did not assess liquidated damages against plaintiff. Def.'s Resp. to Pl.'s Proposed Findings ¶ 22. Plaintiff argues that, had it been responsible for any portion of the delay in project completion, the CO would have assessed liquidated damages. Pl.'s Mot. for Summ. J. at 21. Second, plaintiff points to the CO's deposition, in which the CO testified that plaintiff and its subcontractors were not responsible for the delay in project completion.[8] *Id.* (citing Burgains Dep. 178:21–25). From this evidence, plaintiff leaps to the conclusion that the delay must therefore have been traceable to defendant's actions. Pl.'s Reply at 13–14.

---

[7] Based on the dates provided by the parties, the performance period was actually 388 days longer than anticipated. However, because plaintiff has alleged only 387 days of delay, the court uses that number.

[8] The court notes that this statement by the CO is at odds with some of his actions in administering the contract, specifically, his rejection of work (such as the first lane of concrete) as defective. Nevertheless, for the purposes of defendant's summary judgment motion, the court draws all inferences in favor of plaintiff. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

This argument, however, fails as a matter of law and logic.  The argument fails as a matter of logic because there "are three potential causes of delay in performance of a contract:  the contractor's actions, the government's actions, and forces outside the control of both parties." *England v. Sherman R. Smoot Corp.*, 388 F.3d 844, 857 (Fed. Cir. 2004).  Thus, "the mere grant by the government of a contract extension does not indicate that the government is at fault; rather, one of a number of other events external to the government could be responsible."  *Id.* Accordingly, evidence absolving plaintiff of liability for the delay in project completion does not necessarily assign the liability to defendant.

And plaintiff's argument also fails as a matter of law because it seeks to revive a presumption that the Federal Circuit has firmly rejected as contrary to the CDA.  *See id.* at 854, 857.  In *Smoot*, the Federal Circuit rejected the so-called *McMullan* presumption, under which, "when faced with a claim by a contractor for costs incurred as a result of a delay, and the government extended the period of contract performance, the Board [of Contract Appeals] w[ould] invoke a presumption, subject to rebuttal, that the government was at fault for the delay." *Id.* at 851 (citing *Robert McMullan & Son, Inc.*, ASBCA No. 19023, 76-1 B.C.A. ¶ 11,728).  *Smoot* held that this "presumption is contrary to the CDA and no longer good law." *Id.* at 857.  As the Federal Circuit explained, "in court litigation, a contractor is not entitled to the benefit of any presumption arising from the contracting officer's decision."  *Id.* at 854 (quoting *Wilner v. United States*, 24 F.3d 1397, 1401 (Fed. Cir. 1994) (en banc)).  Here, the CO's testimony and his decision not to assess liquidated damages against plaintiff show only that plaintiff was not liable for the delay in project completion.  Absent the repudiated *McMullan* presumption, however, this does not establish defendant's liability for the delay.

In sum, plaintiff has failed to produce any material evidence showing that defendant was responsible for any portion of the 387-day delay in project completion.  *See Wilner*, 24 F.3d at 1401 ("[W]hen the claim being asserted by the contractor is based upon alleged government-caused delay, the contractor has the burden of proving the extent of the delay, that the delay was proximately caused by government action, and that the delay harmed the contractor.").  Instead, plaintiff has only put forth evidence refuting its own liability for the delay; as explained above, this provides no basis for recovery.  Accordingly, plaintiff's motion for summary judgment on this claim is denied, and defendant's motion for summary judgment on this claim is granted.

### C. Milling of Additional Asphalt (Claim 3)

The court next turns to plaintiff's claim for compensation for the milling of additional asphalt, specifically, asphalt in excess of the maximum four-inch depth specified in the contract. Compl. ¶ 9.  Section 52.236-2 of the Federal Acquisition Regulation ("FAR"), which was incorporated by the contract, provides that a "Contractor shall promptly, and before the conditions are disturbed, give a written notice to the Contracting Officer of (1) subsurface or latent physical conditions at the site which differ materially from those indicated in this contract."  FAR 52.236-2(a).  If, upon notice and investigation, the CO concludes that the encountered "conditions do materially so differ" as to "cause an increase or decrease in the Contractor's cost," the CO must make "an equitable adjustment" to the contract and the contract must be "modified in writing accordingly."  FAR 52.236-2(b).  However, "[n]o request by the Contractor for an equitable adjustment to the contract" as a result of the differing site condition "shall be allowed, unless the

Contractor has given the written notice required." FAR 52.236-2(c). Thus, a contractor's failure to notify the CO of the differing site condition bars recovery, at least when the failure results in prejudice to the government. *See id.*; *Ace Constructors, Inc. v. United States*, 70 Fed. Cl. 253, 272 (2006).

The excess asphalt allegedly encountered by plaintiff would appear to qualify as a "subsurface or latent physical conditions at the site which differ[ed] materially from those indicated in this contract," FAR 52.236-2(a). As a threshold matter, however, plaintiff was required to notify the CO in writing of this differing site condition before disturbing it or performing any work not contemplated by the contract. *See id.*

It is uncontroverted that work at HARB began on October 20, 2004, and that asphalt milling was one of the first tasks to be completed. *See, e.g.*, Pfoh Dep. 31:14–25. However, the parties do not identify, and court cannot locate in the record, any evidence of when the actual milling took place, how long it lasted, or when plaintiff discovered the alleged differing site condition. Plaintiff's RFCO No. 5, which sought compensation for additional asphalt milling, is dated November 1, 2004. *See* Compl. Ex. 2. Again, however, the parties do not identify, and the court cannot locate in the record, any indication of whether this was plaintiff's first notice to the CO or, for that matter, whether this notice was given before or after any additional milling was performed. According to plaintiff's project manager, the CO was notified of the excess asphalt and the CO approved the additional milling before work began. *See* Pfoh Dep. 40:7–41:17. The CO, however, testified that he never had the opportunity to investigate the alleged differing site condition and never approved the additional milling. *See* Burgains Dep. 41:3–24.

In short, genuine issues of material fact exist as to the depth of the asphalt actually encountered, whether a differing site condition existed at all, when plaintiff discovered or first notified the CO of this alleged differing site condition, when plaintiff performed any additional milling, and whether the CO approved the work. Accordingly, the parties' cross-motions for summary judgment on this claim must be denied.

### D. Concrete Lane Replacement (Claim 4)

Next, the court considers plaintiff's claim for compensation for replacement of the first lane of concrete on the ground that defendant improperly rejected the concrete that plaintiff initially poured. Compl. ¶ 13. Although there is no dispute that plaintiff initially failed to pour the concrete within forty-five minutes of batching, as was specified in the contract, plaintiff claims that the CO's rejection of this concrete was "arbitrary and unreasonable" because the CO later relaxed the forty-five minute time limit. *See* Pl.'s Mot. for Summ. J. at 22–23. Plaintiff also disputes the assertions that it improperly added water to the concrete mixture or improperly vibrated the concrete after it was poured. Pl.'s Reply at 18; *see* Willock Dep. 105:9–108:16, 120:1–121:10.

Plaintiff's exact theory of recovery on this claim is unclear, and plaintiff cites no law in support of its motion for summary judgment on this claim. *See* Pl.'s Mot. for Summ. J. at 22–23; Pl.'s Reply at 17–18. To be sure, plaintiff repeatedly asserts that meeting the forty-five minute time limit was "impossible." *See, e.g.*, Pl.'s Mot. for Summ. J. at 22. The defense of

impossibility, or what is perhaps more appropriately called impracticability in this case, is certainly available to those contracting with the government. *See Ace Constructors*, 499 F.3d at 1364 (noting that impracticability of performance is "treated as a type of constructive change to the contract"); *Raytheon Co. v. White*, 305 F.3d 1354, 1367 (Fed. Cir. 2002) (same). As a general matter, a contract is commercially impracticable "when, because of unforeseen events, it can be performed only at an excessive and unreasonable cost, or when all means of performance are commercially senseless." *Raytheon*, 305 F.3d at 1367 (internal citations and quotation marks omitted). "Whether performance is factually impossible or commercially impracticable is a question of fact, not of law." *Seaboard Lumber Co. v. United States*, 308 F.3d 1283, 1292 (Fed. Cir. 2002). Commercial impracticability "excuses a party from performing unless the party has assumed the risk of the event" that rendered performance impracticable. *Raytheon*, 305 F.3d at 1367. Impracticability is also "treated as a type of constructive change to the contract; because a commercially impracticable contract imposes substantial unforeseen costs on the contractor, the contractor is entitled to an equitable adjustment." *Id.*; *see also Ace Constructors*, 499 F.3d at 1364.

Here, the CO adjusted the terms of the contract before requiring plaintiff to re-pour the first lane of concrete, allowing for up to sixty minutes or longer between batching and pouring of concrete. *See* Def.'s Resp. to Pl.'s Proposed Findings ¶ 16; Burgains Dep. 132:1–134:10; Willock Dep. 144:19–145:5. Plaintiff argues that this adjustment reveals that it was wrongful for the CO to rely on the delay in pouring as a ground for rejecting the first lane of concrete. *See* Pl.'s Mot. for Summ. J. at 23. Plaintiff chides the CO for "belatedly performing a 'test drive,' which demonstrated the forty-five minute specification was not feasible." Pl.'s Reply at 17. Yet, plaintiff ignores the fact that its own subcontractor was unaware of the forty-five minute limit and was operating under the assumption that a ninety-minute delay between batching and pouring was acceptable. *See* Rhodes Dep. 44:15–46:4. More to the point, after plaintiff objected to the forty-five minute time limit, defendant made an adjustment to this term of the contract, which is generally all that the doctrine of impracticability requires of the government. *See Raytheon*, 305 F.3d at 1367 (stating that impracticability is treated as a type of constructive contract change that entitles the contractor to an equitable adjustment); FAR 43.204(a) (indicating that an equitable adjustment is a change to "contract terms" generally, including changes to price or delivery terms).

Alternatively, perhaps plaintiff means to argue that the CO's adjustment to the contract demonstrates that the forty-five minute time limit was never necessary and that, even with longer delays between batching and pouring, the concrete initially poured was adequate for its intended purpose. So construed, plaintiff's argument could provide relief under the doctrine of economic waste. *See Granite Constr. Co. v. United States*, 962 F.2d 998, 1007 (Fed. Cir. 1992) (holding that the government should not have required a contractor to replace work not meeting contract specifications when the work was adequate for its intended purpose and the cost of replacement was approximately $3.8 million). In general, the government, like any party to a contract, "has the right to insist on performance in strict compliance with the contract specifications and may require a contractor to correct nonconforming work." *Id.* at 1006–07. However, the government may not "direct the replacement of work in situations where the cost of correction is economically wasteful and the work is otherwise adequate for its intended purpose. In such cases, the government is only entitled to a downward adjustment in the contract price." *Id.* at 1007. Supporting applicability of the economic waste doctrine to this case is the fact that the rejected concrete passed all testing required by the contract. *See* Def.'s Resp. to Pl.'s Proposed Findings ¶ 15; Easom Dep. 81:18–21;

Rhodes Dep. 55:7–25.   On the other hand, according to the Air Force's project engineer, the testing conducted does not account for all factors affecting the concrete's adequacy for its intended purpose.  *See* Willock Dep. 125:16–18, 155:3–7.

In the final analysis, the court concludes that further fact-finding is necessary in order to determine whether the rejected concrete was in fact adequate for its intended purpose, and whether meeting the forty-five minute time limit for delivery and pouring of the concrete was impracticable.   Accordingly, plaintiff's motion for summary judgment on this claim must be denied.

### E. Delay in Accessing HARB (Claim 5)

Next, plaintiff claims that it was unreasonably delayed in entering HARB on October 18, 2004, and seeks compensation for the cost of this alleged delay. Compl. ¶ 8.   Defendant responds that access to HARB is controlled, that all contractors must be cleared by the base security office before entering, and that plaintiff was not unreasonably delayed.   Def.'s Opp'n at 20.   Rather, defendant avers, the security process worked as intended.   *Id.*

"Every contract, as an aspect of the duty of good faith and fair dealing, imposes an implied obligation 'that neither party will do anything that will hinder or delay the other party in performance of the contract.'"   *Essex Electro Eng'rs v. Danzig*, 224 F.3d 1283, 1291 (Fed. Cir. 2000) (quoting *Luria Bros. v. United States*, 369 F.2d 701, 708 (Ct. Cl. 1966)).   The government has an "ever-present obligation to carry out its contractual duties within a reasonable time."   *Id.* (quoting *J.D. Hedin Constr. Co. v. United States*, 347 F.2d 235, 253 (Ct. Cl. 1965)).   When the government does delay a contractor's performance, however, liability attaches only when the actions causing the delay are unreasonable.   *CEMS, Inc. v. United States*, 59 Fed. Cl. 168, 195 (2003) (citing *C. Sanchez & Son, Inc. v. United States*, 6 F.3d 1539, 1542 (Fed. Cir. 1993)).

Here, the only evidence that plaintiff cites in support of its motion for summary judgment on this claim is the declaration of its own officer, Charles Munz, stating that defendant "unreasonably delayed security clearance for the personnel of Redland and its subcontractors."   *See* Pl.'s Mot. for Summ. J. at 26; Munz Decl. ¶ 10.   This self-serving and conclusory statement is insufficient to resolve the genuine issues of material fact surrounding this claim.   *Cf. Moore U.S.A., Inc. v. Standard Register Co.*, 229 F.3d 1091, 1112 (Fed. Cir. 2000) (stating that conclusory statements are insufficient to defeat a motion for summary judgment).   Munz asserts that plaintiff was unreasonably delayed by defendant, but provides no basis for his knowledge of the delay and gives no insight into why the delay was unreasonable under the circumstances.   *See* Munz Decl. ¶ 10.   Such bare assertions, standing alone, are insufficient to support a motion for summary judgment.   *Cf. Moore U.S.A.*, 229 F.3d at 1112.   Accordingly, plaintiff's motion for summary judgment on this claim is denied.

### F. Partially Compensated Additional Work (Claims 6, 7, 8, and 9)

For some of the additional work that plaintiff performed, the CO approved additional compensation. Def.'s Resp. to Pl.'s Proposed Findings ¶¶ 18–20.   Plaintiff alleges, however, that it was not fully compensated for this additional work, which included removing unforeseen concrete and metal (Claim 6), repairing the electrical duct bank (Claim 7), providing finish grade

elevations (Claim 8), and repairing the crack in the concrete (Claim 9). Compl. ¶¶ 10–12. Plaintiff asks for summary judgment as to liability on these four claims, arguing that the CO's approval of some compensation for this additional work is sufficient to establish defendant's liability. Pl.'s Mot. for Summ. J. at 24–26.

Plaintiff apparently regards these items of additional work as breaches of contract by defendant, arguing that it "indisputably encountered unforeseen conditions and changed work" and is thus "entitled to summary judgment on its breach of contract claim against the [g]overnment." Pl.'s Mot. for Summ. J. at 13. However, this argument overlooks the distinction in government contract law between claims for relief under contract clauses and claims for breach of contract.

The typical federal government contract contains numerous standard clauses granting remedies to either the contractor or the government. *See, e.g.*, FAR 52.236-2 (Differing Site Conditions); FAR 52.243-4 (Changes). As the Federal Circuit has explained, "contingencies contemplated by various contract clauses are remediable under those clauses of the contract, not as a breach of the contract." *Triax-Pacific v. Stone*, 958 F.2d 351, 354 (Fed. Cir. 1992); *see* John Cibinic, Jr. et al., *Administration of Government Contracts* 1237 (4th ed. 2006) (noting that, given the number of contract clauses generally found in a government contract, "most events leading to a claim are covered by contract clauses providing for the remedy sought"). Even when a contingency is not contemplated by a contract clause, such as when "a contractor performs work beyond the contract requirements without a formal order, either by an informal order or due to the fault of the [g]overnment," the situation is treated as a constructive change to the contact, not as a breach. *Int'l Data Prods. Corp. v. United States*, 492 F.3d 1317, 1325 (Fed. Cir. 2007); *see* FAR 52.243-4(b) ("Any other written or oral order . . . from the Contracting Officer that causes a change shall be treated as a change order under this clause . . . .").

Here, the CO did not issue any formal change orders in advance of plaintiff's performance of the additional work. Therefore, plaintiff's claims for compensation for additional work are properly analyzed as claims for equitable adjustments due to constructive changes to the contract.[9] In order to establish its entitlement to an equitable adjustment, plaintiff must prove three elements: "liability, causation, and resultant injury." *Servidone Constr. Corp. v. United States*, 931 F.2d 860, 861 (Fed. Cir. 1991). In turn, plaintiff can establish liability by proving that there were constructive changes to the contract.[10] To demonstrate a constructive change, plaintiff must show two things: (1) that it performed work beyond the contract requirements; and (2) that the additional work was ordered by the government. *Miller Elevator Co. v. United States*, 30 Fed. Cl. 662, 678 (1994); *see also Tecom, Inc. v. United States*, 66 Fed. Cl. 736, 774 (2005) ("For a

---

[9] Nevertheless, a constructive contract change can be a breach of contract if it is a cardinal change, *i.e.*, a change that requires work materially different from that specified in the contract. *See Int'l Data Prods.*, 492 F.3d at 1325. However, plaintiff has not alleged a cardinal change and indeed could not do so, having already performed the additional work without objection. *See Silberblatt & Lasker, Inc. v. United States*, 101 Ct. Cl. 54, 80 (1944); 1 Ralph C. Nash, Jr. & Steven W. Feldman, Government Contract Changes § 4.9 (3d ed. 2007).

[10] Of course, proving that a constructive change occurred does not necessarily entitle a contractor to additional compensation. *See* FAR 52.243-4(d) (requiring an equitable adjustment when a change results in an increase *or decrease* in the contractor's cost of performance).

contract to be constructively changed, the plaintiff must demonstrate that the [g]overnment expressly or impliedly ordered the contractor to perform work that was outside the contract requirements.").

Here, the uncontroverted facts establish that there were constructive changes to the contract, requiring removal of unforeseen concrete and metal, repair of an electrical duct bank, and provision of finish grade elevations. *See* Burgains Dep. 40:6–18, 50:25–51:8; Easom Dep. 111:25–115:5, 120:8–16; Leon Dep. 49:6–51:9, 171:1–172:11; Pfoh Dep. 78:1–79:11, 143:8–144:4; Willock Dep. 97:8–23. Defendant concedes that it ordered these changes and that they were outside the contract requirements. *See* Def.'s Resp. to Pl.'s Proposed Findings ¶¶ 18, 19, 21. Accordingly, there are no genuine issues of material fact as to defendant's liability for these three constructive changes, and plaintiff is thus entitled to summary judgment as to liability on Claims 6, 7, and 8.

Nonetheless, the court finds that genuine issues of material fact do exist as to whether plaintiff's repair of the concrete crack amounted to a constructive change to the contract. Plaintiff asserts that the crack was partial-depth, requiring only a limited repair under the terms of the contract. *See* Pl.'s Mot. for Summ. J. at 24; Rhodes Dep. 77:20–78:8. The CO instead required plaintiff to make the more extensive repair required for a full-depth crack, which involved removal and replacement of an entire section of concrete. *See* Def.'s Resp. to Pl.'s Proposed Findings ¶ 20; Willock Dep. 200:3–15. Whether this repair was outside the requirements of the contract thus turns on whether the crack was, in fact, full-depth or partial-depth. Although the CO granted plaintiff partial compensation for the repair, this court's "[d]e novo review [under the CDA] precludes reliance upon the presumed correctness of th[at] decision." *Smoot*, 388 F.3d at 854; *accord Wilner* 24 F.3d at 1401–02. Because there is a genuine issue of material fact regarding the depth and type of concrete crack repaired, plaintiff's motion for summary judgment as to liability on Claim 9 must be denied.

### G. Breach of Contract Claim

Finally, plaintiff seeks summary judgment as to liability on a breach of contract claim, asserting that if it prevails on summary judgment with respect to any of its other claims, then it is entitled to summary judgment on a claim for breach of contract. However, this breach of contract claim is not contained in the complaint. Plaintiff could have sought to amend its complaint to add this claim, but did not do so. When a plaintiff raises new claims at this stage of litigation, the defendant is left at a disadvantage because it has not been given an opportunity to prepare for those claims during discovery. *See Lawmaster v. Ward*, 125 F.3d 1241, 1345 n.2 (10th Cir. 1997) (holding that the court will not consider claims first raised in a motion for summary judgment and not contained in the complaint); *Crest A Apartments Ltd. II v. United States*, 52 Fed. Cl. 607, 613 (2002) (same). Because plaintiff only raises this claim in its motion for summary judgment, the court will not consider it, and plaintiff's motion for summary judgment on this claim must be denied. Moreover, even if this claim had been properly pled, plaintiff would still not be entitled to summary judgment because, as explained above, plaintiff has only prevailed on claims requesting equitable adjustments for constructive changes to the contract.

## IV. CONCLUSION

For the foregoing reasons, defendant's motion for summary judgment is GRANTED IN PART and DENIED IN PART, and plaintiff's motion for summary judgment is GRANTED IN PART and DENIED IN PART.  Specifically:

(1) defendant's MOTION for summary judgment is GRANTED as to CLAIM 1 (unabsorbed home office overhead) and CLAIM 2 (delayed project completion) and DENIED as to CLAIM 3 (additional asphalt milling); and

(2) plaintiff's MOTION for summary judgment as to liability is GRANTED as to CLAIMS 6, 7, and 8 (equitable adjustment for removal of unforeseen concrete and metal, repair of an electrical duct bank, and provision of finish grade elevations) and DENIED as to ALL OTHER CLAIMS.

The parties SHALL file, no later than May 6, 2011, a JOINT STATUS REPORT suggesting a procedural course for resolving the remaining issues.

**IT IS SO ORDERED.**

s/ *Lawrence J. Block*

Lawrence J. Block
Judge